UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

VAUGH SCHOTT, NIGERIA SCOTT, PRINCE   Index No. 14-cv-4441(KMK)
SCOTT, ANDRE HARRIS, BRENDA SCOTT,
KRAIG UTLEY, COREY MARROW, A.S.,
A MINOR CHILD, K.M., A MINOR CHILD,    Plaintiff's Rule 56.1
AND JULIAN RENE,           Statement

<i>Plaintiffs,</i>

against --

THE CITY OF MOUNT VERNON, a municipal
Entity, MT. VERNON POLICE OFFICER ALLEN,
MT. VERNON POLICE OFFICER CAMILO
ANTONINI, MT. VERNON POLICE OFFICER
TIMOTHY BRILEY, MT. VERNON POLICE
OFFICER DET. BRENT GAMBLE, MT. VERNON
POLICE OFFICER SGT. STEVEN SEXTON,
CITY OF MOUNT VERNON POLICE
DEPARTMENT, AND POLICE OFFICERS JOHN
DOES 1-10,

<i>Defendants.</i>
-------------------------------------------------------------------x

   Pursuant to Rule 56.1 of the Local Rules of this Court, the plaintiffs submit that

the following facts are undisputed:[1]

# I.  Background and Parties

---

[1]  Where a numerical paragraph states that a defendant "testified" to a fact, the paragraph should be understood to mean that the plaintiffs regard it as undisputed that the defendant in question testified as set forth. The fact stated by the defendant in such testimony is not thereby accepted by the plaintiffs as true or factual. Such defendant may not, however, take a position on the same issue contrary to his or her own testimony. For example, the statement herein that "Defendant Briley testified that the occupants of the apartment were 'cursing' at the police, 'using foul language' at them, and 'calling [them] names,'" means that – regardless of whether such "cursing" actually occurred -- Defendant Briley cannot take the position that he believed that the police were permitted to enter and remain in the apartment. (Briley Tr. 19:17-25).

1

1.     The plaintiffs are a law-abiding family, including minor [at the time of filing of the Complaint on June 19, 2014] children and their grandmother.  (Compl. ¶ 1; admitted in Answer ¶ 1).

2.     On March 20, 2013, members of the Mount Vernon Police department, including the defendants named in the June 19, 2014 Complaint, unlawfully invaded the plaintiff's apartment.  (Compl. ¶ 1; admitted in Answer ¶ 1).

3.     The officers held the plaintiffs prisoner for approximately five hours. (Compl. ¶ 1; admitted in Answer ¶ 1).

4.     During this time, none of the plaintiffs were free to leave.  (Compl. ¶ 1; admitted in Answer ¶ 1).

5.     The plaintiffs were under unlawful arrest.  (Compl. ¶ 1; admitted in Answer ¶ 1).

6.     The officers damaged and destroyed fixtures and furnishings.  (Compl. ¶ 1; admitted in Answer ¶ 1).

7.     No lawful reason for this action was ever given.  (Compl. ¶ 1; admitted in Answer ¶ 1).

8.     The plaintiffs in this case are

    a.     Vaughn Scott
    b.     Prince Scott
    c.     Nigeria Scott
    d.     Brenda Scott
    e.     Andre Harris
    f.     Corey Marrow
    g.     A.M.
    h.     K.M.  (Compl. ¶¶ 9-16).

9.     Corey Marrow is Vaughn Scott's son.  (Vaughn Tr. 33:13-20).

10.     Nigeria Scott is Vaughn Scott's daughter. (Nigeria Tr. 25:8-14).

11.     Prince Scott is Vaughn Scott's son. (KM Tr. 9:12-23).

12.     Brenda Scott is Vaughn Scott's mother. (Vaughn Tr. 14:19 – 17:3).

13.     Andre Harris is Vaughn Scott's brother. (Vaughn Tr. 14:19 – 17:3).

14.     A.S. is Vaughn Scott's daughter. (Vaughn Tr. 14:19 – 17:3).

15.     K.M. is Vaughn Scott's son. (KM Tr. 9:12-23).

16.     The relationship of Kraig Utley to the Scott family is like family. Vaughn Scott regards him like a godson. (Vaughn Aff. ¶ 43; Utley Tr. 7:19-25).

17.     The relationship of Julian Rene to the Scott family is like family. Vaughn Scott regards him like a godson. (Vaughn Aff. ¶ 43; K.M. Tr. 9:12-23).

18.     The City of Mount Vernon is a municipal corporation having its principal place of business at 1 Roosevelt Square, Mount Vernon, N.Y. (Compl. ¶ 6; admitted in Answer ¶ 1).

19.     The City or Mount Vernon Police Department is a division of the city government of the City of Mount Vernon, having its principal place of business at 2 Roosevelt Square, Mount Vernon. N.Y. (Compl. ¶ 7; admitted in Answer ¶ 1).

20.     At the time the Complaint was filed, A.S. and K.M. were minor children. (Compl. ¶¶ 17-18; admitted in Answer ¶ 1).

21.     Mount Vernon Police Officer Allen ("Defendant Allen") is an officer and employee of the Mount Vernon Police Department, having his/her principal place of business at 2 Roosevelt Square, Mount Vernon, N.Y. (Compl. ¶ 19; admitted in Answer ¶ 1).

22.     Mount Vernon Police Officer Camilo Antoinini ("Defendant Antonini") is an officer and employee of the Mount Vernon Police Department, having his/her principal place of business at 2 Roosevelt Square, Mount Vernon, N.Y. (Compl. ¶ 20; admitted in Answer ¶ 1).

23.     Mount Vernon Police Officer Timothy Briley ("Defendant Briley") is an officer and employee of the Mount Vernon Police Department, having his/her principal place of business at 2 Roosevelt Square, Mount Vernon, N.Y. (Compl. ¶ 21; admitted in Answer ¶ 1).

24.     Mount Vernon Police Officer Brent Gamble ("Defendant Gamble") is an officer and employee of the Mount Vernon Police Department, having his/her principal place of business at 2 Roosevelt Square, Mount Vernon, N.Y. (Compl. ¶ 22; admitted in Answer ¶ 1).

25.     Mount Vernon Police Officer Steven Sexton ("Defendant Sexton") is an officer and employee of the Mount Vernon Police Department, having his/her principal place of business at 2 Roosevelt Square, Mount Vernon, N.Y. (Compl. ¶ 23; admitted in Answer ¶ 1).

26.     Mount Vernon Police Officer John Does 1·10 are officers and employees of the Mount Vernon Police Department, having his/her principal place of business at 2 Roosevelt Square, Mount Vernon, N.Y. (Compl. ¶ 24; admitted in Answer ¶ 1).

27.     The following people lived in the Scott family apartment at 328 South Second Avenue on the date of the incident:

        i.      Vaughn Scott
        j.      Prince Scott
        k.      Nigeria Scott

l.      Brenda Scott

m.      Andre Harris

n.      Corey Marrow

o.      A.S.

p.      K.M.

q.      Martha Ogunjana, Julian Rene's mother.  (Vaughn Aff. ¶¶ 33-42).

r.      Julian Rene was

28.     Vaughn Scott, Prince Scott, Nigeria Scott, Corey Marrow, K.M. and A.S. were on the lease.  (Vaughn Aff. ¶ 58).

29.     Kraig Utley and Julian Rene did not live at 328 South Second Avenue, however.  (Vaughn Aff. ¶ 45).

## II. The Scott Family Apartment

30.     The Scott family apartment was inside 328 South Second Avenue. (Vaughn Aff. ¶ 2).

31.     328 South Second avenue was a three story detached house.  (Vaughn Aff. ¶ 3).

32.     It was a three family home.  (Vaughn Tr. 12:15-17; Vaughn Aff. ¶ 4).  .

33.     On the right side on the house was a driveway.  (Vaughn Aff. ¶ 6).

34.     On the left side of the house was another driveway.  (Vaughn Aff. ¶ 7).

35.     The entrance to the house was on a porch.  (Vaughn Aff. ¶ 7).

36.     The porch had a roof and was partially enclosed by the front wall of the house, which rose approximately two feet above the floor of the porch.  (Vaughn Aff. ¶ 8).

37.     This front wall stood approximately six feet back from the inner line of the sidewalk.  (Vaughn Aff. ¶ 9).

38.     The portion of the property between the front wall of the house and the sidewalk was raised about one and a half feet above the sidewalk level.  (Vaughn Aff. ¶ 10).

39.     The edge of this raised area which was closest to the sidewalk was bordered by a brick wall which was also approximately one and a half feet high. (Vaughn Aff. ¶ 11).

40.     Three steps led from the sidewalk to the surface of this raised area. (Vaughn Aff. ¶ 12).

41.     Approximately eight steps led from the surface of the raised area in front of the house up to the porch. (Vaughn Aff. ¶ 13).

42.     The door on the porch had a doorknob, a latch, and a lock.  There was a doorbell for each apartment.  (Vaughn Aff. ¶ 14).

43.     Inside the door was a foyer.  (Vaughn Aff. ¶ 15).

44.     In the foyer were two doors leading to the first floor apartment.  (Vaughn Aff. ¶ 16).

45.     From the foyer, stairs led up to a landing in front of the Scott family's apartment.  (Vaughn Aff. ¶ 17).

46.     At the landing, there was a door leading to the Scott family apartment. (Vaughn Aff. ¶ 18).

47.     At the landing, was another door leading to the stairs to the third floor apartment.  (Vaughn Aff. ¶ 19).

48.     At the landing, was a door leading to a room belonging another family that lived in the third floor apartment.  (Vaughn Aff. ¶ 20).

49.     The Scott family apartment door had a doorknob, a latch, and a lock. (Vaughn Aff. ¶ 21).

50.     Inside the door was a small foyer.  (Vaughn Aff. ¶ 22).

51.     From the foyer was a doorway leading into the living area.  (Vaughn Aff. ¶ 23).

52.     The living area included a living room on the left, as one faced into the apartment from the door.  (Vaughn Aff. ¶ 24).

53.     The living area included a kitchen on the right, as one faced into the apartment from the door.  (Vaughn Aff. ¶ 25).

54.     The kitchen and the living area were separated by a built-in counter, which was approximately waist-high.  (Vaughn Aff. ¶ 26).

55.     The built-in counter was attached to the wall farthest from the entrance to the apartment (the "back wall").  (Vaughn Aff. ¶ 27).

56.     The built-in counter was not attached to the wall in which the entrance to the apartment was located (the "front wall").  A space of approximately three feet existed between the end of the counter and the front wall, allowing passage from the living room into the kitchen.  (Vaughn Aff. ¶ 28).

57.     Along the right-hand wall of the living area (the "right hand wall"), as one faced into the apartment from the door, were the kitchen's sink, stove and refrigerator. (Vaughn Aff. ¶ 29).

58.     Where the right hand wall met the front wall, there was a door leading into a hallway.  (Vaughn Aff. ¶ 30).

59.     On the left-hand side of that hallway was a door to the bathroom. (Vaughn Aff. ¶ 31).

60.     Further down the hallway were two bedrooms.  (Vaughn Aff. ¶ 32).

61.     One bedroom was shared by K.M. and A.S.  (Vaughn Aff. ¶ 33).

62.     One bedroom was used by Nigeria Scott.  (Vaughn Aff. ¶ 34).

63.     In between the entrance to the apartment and the hallway leading to the bathroom was a door leading to Prince Scott's bedroom.  (Vaughn Aff. ¶ 35).

64.     Along the back wall in the living room portion of the living area was a couch.  (Vaughn Aff. ¶ 36).

65.     Where the left hand wall of the living area, as one faced into the apartment from the door (the "left hand wall"), met the front wall, there was a door.  (Vaughn Aff. ¶ 37).

66.     This door led directly into another bedroom.  (Vaughn Aff. ¶ 39).

67.     This bedroom was used by Corey Marrow.  (Vaughn Aff. ¶ 40).

68.     Along the left hand wall of the living area was another couch.  (Vaughn Aff. ¶ 38).

## III.    The Shooting Near 70 West Third Street

69.     An unknown individual or individuals fired several shots in the vicinity of 70 West Third Street, near South Seventh Avenue.  (Pl. Ex. 2, pp. 1-2 ("Suspects: Unknown");[2] Pl. Ex. 14 00:00 – 01:00; Utley Tr. 25:2-20).

---

[2]     Where plaintiffs cite a document produced by the defendants and created by the City of Mount Vernon or its employees, the plaintiffs do not concede that such document accurately states any fact except those presented herein as undisputed.  Nor do plaintiffs waive future objections to the authenticity, admissibility, or relevance of such document.

70.     Kraig Utley and Julian Rene were together on West Third Street when this happened.  (Utley Tr. 25:2-12; Rene Tr. 7:20 – 8:4).

71.     Julian Rene was grazed by a bullet in the right buttocks. (Pl. Ex. 2, p. 14).

72.     Fleeing the scene, Kraig Utley and Julian Rene happened to see Corey Marrow in his sister Nigeria Scott's white minivan.  (Utley Tr. 26:6 – 27:7).

73.     They got in, and Corey Marrow took them to 328 South Second Avenue. (Utley Tr. 29:4-6).

74.     The first call to the police relating to the incident was at 18:17 (6:17 PM). (Pl. Ex. 4, p. 1).

75.     As the dispatcher correctly reported over the air, witnesses were "conflicting" as to who might have been involved.  (Pl. Ex. 14, 10:15 – 10:35).

76.     Callers, officers and dispatch reports variously identified a "light skinned male black with a red hoodie [who] ran into … the building opposite 70 West Third Street," one of the Ebony Gardens apartment buildings, "six males" who entered a white minivan" with a broken window on Ninth Avenue, three males entering a similar vehicle, and two men with "black shirts, black jeans" who ran away from Ninth Avenue towards Seventh Avenue.  In addition, callers were "giving … different locations" of where the shots were fired.  (Pl. Ex. 14, 01:00 – 13:20).

77.     None of these individuals reported seeing a gun or shots actually being fired.  (Pl. Ex. 14, 01:00 – 13:20; Pl. Ex. 3; Pl. Ex. 7; Pl. Ex. 8).

78.     None of these individuals reported seeing anyone injured.  (Pl. Ex. 14, 01:00 – 13:20; Pl. Ex. 3; Pl. Ex. 7; Pl. Ex. 8).

79.     At no point in time prior to entry by the police into the plaintiffs'
apartment did any officer find evidence that someone had been injured.  (Pl. Ex. 14 00:00
– 23:14; Pl. Ex. 3; Pl. Ex. 7, Pl. Ex. 8).

80.     At no point in time did the police discover evidence that any person other
than Julian Rene had been injured.  (Pl. Ex. 3; Pl. Ex. 7, Pl. Ex. 8).

81.     Officers Michael Gregorio and Johanna Santos were together when they
responded to the call.  (Pl. Ex. 7, p. 1).

82.     They first "set up a perimeter" at South 8th Avenue, to participate in
canvas for "a male black wearing a red sweatshirt."  (Pl. Ex. 7, p. 1).

83.     That individual was not found.  (Pl. Ex. 7, p. 1).

84.     Officers Michael Gregorio and Johanna Santos then "went on a canvas for
the white van."  (Pl. Ex. 7, p. 1).

## IV.     Police Arrival at The House Next Door to the Plaintiffs'

85.     Michael Gregorio and Johanna Santos arrived at 324 South Second
Avenue 20 minutes after the first call, at 18:37:48 ("At Scene 2").  (Pl. Ex. 4, p. 1).

86.     Officer Gregorio called the dispatcher to check the license plate of a white
minivan.  (Ex. 14 13:38 – 14:08; Sexton Tr. 80:3 – 81:3).

87.     Officer Gregorio reported that the minivan was "parked in the driveway of
… 324 South Second Avenue."  (Ex. 14 13:38 – 14:08; Sexton Tr. 80:3 – 81:3).

88.     The plaintiffs, it should be remembered, were in **328** South Second
Avenue, not **324** South Second Avenue.

89.     Officer Gregorio reported that the minivan was "unoccupied."  (Ex. 14
13:38 – 14:08; Sexton Tr. 80:3 – 81:3).

90.     The police did not witness the white minivan arrive at the location where it was parked on South Second Avenue.  (Ex. 14 13:38 – 14:08; Pl. Ex. 7).

91.     The police did not see anyone get out of the minivan.  (Ex. 14 13:38 – 14:08; Pl. Ex. 7).

92.     The police did not possess any information to indicate where the driver and any occupants of the van might have gone.  (Ex. 14 00:01 – 14:08).

93.     The dispatcher reported that the registration was valid, and the car belonged to Nigeria Scott.  The dispatcher reported that the address for Nigeria Scott was a PO box.  (Ex. 14 14:33 – 14:41).

94.     About two minutes later, Officer Gregorio confirmed to the dispatcher that the minivan was parked at "324 South Second Avenue."  (Ex. 14 16:09 – 16:11; Sexton Tr. 80:3 – 81:3).

95.     Officers Gregorio and Santos waited approximately five minutes for Sergeant Steven Sexton to arrive.  (Sexton Tr. 16:11 – 17:01; Pl. Ex. 4, p. 2 ("At Scene 2 18:43:07")).

96.     When Defendant Sexton arrived, he took command at the scene.  (Sexton Tr. 20:24 – 21:1).

97.     Defendant Sexton remained in command at the scene throughout the incident.  (Sexton Tr. 52:17-19).

98.     When Defendant Sexton arrived, no police officers had yet entered the plaintiff's address at 328 South Second Avenue.  (Sexton Tr. 16:21 – 17:1).

99.     At this time, the police did not know the name of any victim or perpetrator of the shooting.  (Briley Tr. 16:23 – 17:2).

100.     Between the time police first arrived in the vicinity of 328 South Second Avenue, and the time they first entered, the police did not observe any person enter 328 South Second Avenue.  (Sexton 15:17 – 17:23).

101.     At this time, the police did not know any facts suggesting that any person who had been inside the van was present inside 328 South Second Avenue.  (Ex. 14 00:00 – 16:11).

102.     At the time, the police did not know which apartment within 328 South Second Avenue might contain any person associated with the white minivan.  (Sexton Tr. 17:17 – 18:11).

103.     Nevertheless, the police entered 328 South Second Avenue.

104.     The police entry into 328 South Second Avenue occurred at Defendant Sexton's command.  (Sexton Tr. 20:24 – 21:1).

## V. The Police Entry Into 328 South Second Avenue

105.     The front door of 328 South Second Avenue was closed when the police arrived.  (Vaughn Aff. ¶ 46).

106.     The police opened the door without permission from any of the plaintiffs. (Vaughn Aff. ¶ 47).

107.     No-one else in the building gave the police permission to enter.  (Vaughn Aff. ¶ 48).

108.     Visitors to 328 South Second Avenue normally requested permission to enter the front door before doing so.  (Vaughn Aff. ¶ 49).

109.     Visitors typically requested permission to enter by ringing the doorbell or calling on the phone.  (Vaughn Aff. ¶ 50).

110.    The common areas of 328 South Second Avenue were not generally open to the public.  (Vaughn Aff. ¶ 51).

111.    Residents or occupants of 328 South Second Avenue possessed keys to the front door.  (Vaughn Aff. ¶ 52).

112.    The police knocked on every door inside 328 South Second Avenue. (Sexton Tr. 17:17-23).

113.    Defendant Sexton knocked at the door of the plaintiffs' apartment on the second floor.  (Sexton Tr. 19:23 – 20:7; 21:2-9; Brenda Tr. 9:6-18; Corey Tr. 14:6-11; K.M. Tr. 11:8 – 15:25).

114.    The following people were in the apartment when the police arrived:

      a.     Vaughn Scott

      b.     Prince Scott

      c.     Andre Harris

      d.     Brenda Scott

      e.     Kraig Utley

      f.     Corey Marrow

      g.     A.S.

      h.     A.S.

      i.     Julian Rene

      j.     Demetrius King

      k.     James Batson

      l.     Martha Rene  (Vaughn Tr. 14:19 – 17:3; Corey Tr. 7:11 – 8:13).

115.    Brenda Scott answered the door.  (Sexton Tr. 21:7 – 23:8; Brenda Tr. 9:6-18; Corey Tr. 9:8 – 11:23; K.M. Tr. 11:8 – 15:25).

116.    Defendant Sexton did not know Brenda Scott.  (Sexton Tr. 21:7 – 23:8).

117.    Defendant Sexton testified that he told this woman that he was looking for the "registered owner" of the white minivan.  (Sexton Tr. 21:21- 22:13).

118.    Defendant Sexton did not know whether the registered owner of the white minivan had been inside the vehicle when it was reportedly seen.  (Sexton Tr. 22:24 – 23:2).

119.    Defendant Sexton told Brenda Scott that he and the officers wanted to come in.  (Brenda Tr. 9:12-18; Sexton Tr. 25:2-4).

120.    Defendant Sexton testified that he wanted to find out if there was anyone wounded in the apartment.  (Sexton Tr. 24:11-16).

121.    Defendant Sexton testified falsely that Brenda Scott told him the police could come in.  (Sexton Tr. 24:22 – 25:4).

122.    In fact, Brenda Scott told Defendant Sexton he had to wait, while Brenda asked her daughter Vaughn Scott if it was OK for the police to enter.  (Brenda Tr. 9:12-18; Vaughn Tr. 7:6 – 8:6).

123.    Vaughn Scott told the police not to enter.  (Vaughn Tr. 7:6 – 8:6)

124.    Brenda Scott told Defendant Sexton, "Please don't come in."  (Brenda Tr. 9:12-18; K.M. Tr. 11:8 – 15:25).

125.    Brenda Scott also asked Defendant Sexton if he had a warrant.  (Brenda Tr. 9:19-22).

126.    The police did not have a warrant.  (Sexton Tr. 82:8-12).

127.    Defendant Sexton told Brenda Scott that they didn't need a warrant. (Brenda Tr. 9:19-25).

128.    Defendant Sexton admitted that Prince Scott, who was known to him as a member of the family, told the police to leave.  (Sexton Tr. 25:8-24).

129.    Prince Scott told Defendant Sexton and the police, "Get out of here." (Sexton Tr. 25:22-24).

130.    Prince Scott told Defendant Sexton and the police "to get off his property."  (Sexton Tr. 27:2-15).

131.    At the time, Sexton understood Prince Scott to be a resident of the apartment.  (Sexton Tr. 27:2-15).

132.    Prince Scott was, in fact, a resident of the apartment.  (Vaughn Aff. ¶¶ 35, 58).

133.    Defendant Briley knew that the occupants of the apartment were "irate about us being in their home."  (Briley Tr. 19:15-21).

134.    Defendant Briley testified that the occupants of the apartment were "cursing" at the police, "using foul language" at them, and "calling [them] names." (Briley Tr. 19:17-25).

135.    Defendant Briley knew that the occupants did not give the police permission to be in the apartment.  (Briley Tr. 20:7-13).

136.    Defendant Briley testified that he heard the occupants of the apartment "screaming … 'Why are they here?,'" referring to himself and the other police officers inside the apartment.  (Briley Tr. 23:9-12).

137. Defendant Briley understood that the occupants "were upset that [the police] were in the apartment." (Briley Tr. 23:14 – 24:3).

138. Occupants of the apartment expressed their upset to Defendant Sexton.

139. who told the occupants that the police were "trying to conduct some type of investigation." (Briley Tr. 23:14 – 24:3).

140. Defendant Briley testified that Vaughn Scott, Prince Scott's mother (and Brenda Scott's daughter, was "initially in the beginning very belligerent, hostile" to Defendant Sexton. (Briley Tr. 76:6-10).

141. All the occupants of the apartment told Defendant Sexton and the other police officers to leave. (Sexton Tr. 41:9-17).

142. Indeed, Defendant Sexton testified that "all" the occupants of the apartment were "getting loud as far as – you know, 'Get out. Get out of here." (Sexton Tr. 41:9-17).

143. Defendant Sexton testified that the occupants of the apartment "were telling us how horrible we are, and this constant dialogue is going on about how just awful the police department is." (Sexton Tr. 54:2-21).

144. Brenda Scott told Defendant Sexton that her daughter Vaughn Scott didn't want the police to enter the apartment. (Brenda Tr. 10:2-5; Vaughn Tr. 7:6 – 8:6).

145. Brenda Scott told Defendant Sexton that he needed a warrant to enter. (Brenda Tr. 10:2-11).

146. The defendant police officers knew that the occupants of the apartment did not want them inside the apartment, and did not give permission for the police to enter. (Briley Tr. 1:15 -19:21, 19:17-25, 20:7-13, 23:9-12, 23:14 – 24:3, 76:6-10; Sexton Tr.

25:22-24, 27:2-15, 41:9-17, 54:2-21; Brenda Tr. 9:12-18, 10:2-11, Vaughn Tr. 7:6 – 8:6; A.S. Tr. 12:8-16; K.M. Tr. 11:8 – 15:25).

147.    The defendant police officers knew that the occupants of the apartment did not want them inside the apartment, and did not give permission for the police to remain in the apartment once they entered.  (Briley Tr. 1:15 -19:21, 19:17-25, 20:7-13, 23:9-12, 23:14 – 24:3, 76:6-10; Sexton Tr. 25:22-24, 27:2-15, 41:9-17, 54:2-21; Brenda Tr. 9:12-18, 10:2-11, Vaughn Tr. 7:6 – 8:6; A.S. Tr. 12:8-16; K.M. Tr. 11:8 – 15:25).

148.    The defendant police officers knew that the occupants of the apartment wanted them to leave.  (Briley Tr. 1:15 -19:21, 19:17-25, 20:7-13, 23:9-12, 23:14 – 24:3, 76:6-10; Sexton Tr. 25:22-24, 27:2-15, 41:9-17, 54:2-21; Brenda Tr. 9:12-18, 10:2-11, Vaughn Tr. 7:6 – 8:6; A.S. Tr. 12:8-16; K.M. Tr. 11:8 – 15:25).

149.    Defendant Sexton pushed the door open and entered.  (Brenda Tr. 10:17 – 11:20; Corey Tr. 9:8 – 11:23; A.S. Tr. 12:8-16; K.M. Tr. 11:8 – 15:25).

150.    Defendant Sexton, in pushing the door open to enter, struck Brenda Scott's foot with the door.  (Brenda Tr. 12:8-12).

151.    Defendant Antonini entered shortly after Defendant Sexton.  (Prince Tr. 24:21 – 28:18; Utley Tr. 11:18 – 13:15).

152.    Prince Scott called the Mount Vernon Police Station to tell them that plainclothes officers were forcing their way into the apartment.  (Prince Tr. 25:18 – 27:10).

153.    Uniformed officers responded to that call.  (Prince Tr. 25:18 – 27:10).

154.    After speaking with Defendants Sexton and Antonini, these uniformed officers did nothing to stop the unlawful occupation of the apartment.  (Prince Tr. 25:18 – 27:10).

155.    Once the police entered the apartment, all occupants of the apartment were seized.  (Briley Tr. 47:3-10; Corey Tr. 5:25 – 7:7; Vaughn Tr. 7:6 – 8:6; A.S. Tr. 12:20 – 13:6).

156.    The occupants of the apartment were not free to leave.  (Briley Tr. 47:3-10; Sexton Tr. 41:5-8; Brenda Tr. 15:11-16; Vaughn Tr. 7:6 – 8:6; A.S. Tr. 12:20 – 13:6).

157.    Once inside the apartment, the police searched the house.  (Brenda Tr. 13:21 – 14:6; Corey Tr. 5:25 – 7:7, 13:10-22; Prince Tr. 29:11-21; Utley Tr. 19:3-22; K.M. Tr. 11:8 – 15:25).

158.    The police looked in the entire apartment, including the bathroom, bedrooms, and closets.  (Brenda Tr. 13:21 – 14:6; Corey Tr. 5:25 – 7:7, 13:10-22; 14:15 – 15:5; A.S. Tr. 14:24 – 15:8; Utley Tr. 19:3-22; Prince Tr. 29:15-21; K.M. Tr. 11:8 – 15:25).

159.    The police broke the bathroom door.  (A.S. Tr. 14:24 – 15:8).

160.    The police took everything out of the medicine cabinet and put it in the sink.  (A.S. Tr. 14:24 – 15:8).

161.    The police searched Corey Marrow.  (Corey Tr. 15:6 – 17:23).

162.    The police searched Prince Scott, Julian Rene, and Kraig Utley.  (Corey Tr. 15:6 – 17:23; K.M. Tr. 11:8 – 15:25).

163.    Defendant Sexton testified that the police "searched the apartment." (Sexton Tr. 47:8-9).

164.    The police searched the back bedroom.  (Sexton Tr. 46:19 – 47:9; Corey Tr. 5:25 – 7:7, 13:10-22).

165.    Defendant Sexton testified that the police were searching for "any victims."  (Sexton Tr. 46:19 – 47:9).

166.    In their search, the police found no weapons or contraband.  (Corey Tr. 17:24 – 18:2; Pl. Ex. 3; Pl. Ex. 7; Pl. Ex. 8)

167.    Defendant Sexton had no specific information suggesting that victims of the shooting were to be found inside the apartment.  (Sexton Tr. 46:19 – 47:9).

168.    Defendant Sexton made all occupants of the apartment come into the living room and wait there.  The occupants were not free to leave the living room or move around the apartment.  (Sexton Tr. 46:21 – 49:3; Corey Tr. 5:25 – 7:7; Vaughn Tr. 7:6 – 8:6; K.M. Tr. 11:8 – 15:25).

169.    The occupants were required to ask permission to use the bathroom, and were accompanied by an officer when doing so.  (Corey Tr. 18:3-14; Vaughn Tr. 28:16-20).

170.    Brenda Scott was forbidden to finish cooking dinner.  (A.S. Tr. 9:3-16, 14:16-23).

171.    The police officers turned off the TV.  (A.S. Tr. 13:2-6).

172.    The police told the occupants of the apartment that if they talked they would be arrested.  (A.S. Tr. 13:2-6, 14:16-23).

173.    The police remained inside the apartment for several hours.  (Brenda Tr. 20:22 – 21:7; Pl. Ex. 4 p. 1 "Clear 3/20/2013 23:57:35"; Corey Tr. 5:25 – 7:7; K.M. Tr. 11:8 – 15:25).

174.    It was not until "2033HRS", or 8:30 PM, that police inside the apartment discovered that Julian Rene had been shot.  (Pl. Ex. 4, p. 4).

175.    At that point in time, the police had been at the location almost 2 hours. (Pl. Ex. 4 p. 2 ("Arrive at Scene 2 … 18:37:48 … Santos, Johanna … Scene Loc. 324 S. 2nd Av."), p. 4 ("Found a shot victim at 328 S. 2nd Av @2033HRS"); Corey Tr. 27:2-7).

176.    Defendant Sexton testified that Julian Rene had been "grazed" by a bullet. (Sexton Tr. 34:20 – 35:7).

177.    It was at this time that Defendant Sexton learned that anyone on the apartment – specifically, Julian Rene – had been in the area of the reported shooting. (Sexton Tr. 34:20 – 35:17).

178.    Julian Rene told Defendant Sexton that someone unknown to him had "opened fire" and a bullet grazed him.  (Sexton Tr. 34:20 – 35:17).

179.    Julian Rene did not want police assistance medical treatment.  (Sexton Tr. 34:20 – 35:19; 85:12-17).

180.    Defendant Sexton testified that he did not look at the injury.  (Sexton Tr. 34:20 – 35:7).

181.    The police remained inside the apartment waiting to see if they could obtain a warrant to search the apartment.  (Sexton Tr. 35:20-24, 48:22 – 49:3; Utley Tr. 20:7-13).

182.    Defendant Sexton wanted to search for a firearm.  (Sexton Tr. 35:25 – 36:16).

183.    Defendant Sexton's reason for believing that a firearm might be present in the apartment was that "the group of individuals … [were] known for weapons possession … or violent acts."  (Sexton Tr. 36:7-16).

184.    These individuals' alleged reputation was defendant Sexton's only basis to believe that a firearm might be present in the apartment.  (Sexton Tr. 36:7-16).

185.    However, Defendant Sexton did not know whether any of the individuals present in the apartment had ever been either arrested for or convicted of a shooting offense.  (Sexton Tr. 32:2-10).

186.    Defendant Sexton did not know what the charges were for which any person present in the apartment had ever previously been arrested.  (Sexton Tr. 32:8-10).

187.    Eventually, Defendant Sexton was told that the District Attorney would not obtain a search warrant because there was no probable cause to search.  (Sexton Tr. 52:2-9).

188.    The last police officers left the apartment at about 10:30.  (Vaughn Aff. ¶ 61).

189.    Police remained on the porch and on the plaintiffs' property until approximately 11:57 PM.  (Pl. Ex. 4 p. 1 ("Clear 3/20/2013 23:57:35"); Vaughn Tr. 7:6 – 8:6; Vaughn Aff. ¶ 62).

190.    When the officers finally left, it was at Defendant Sexton's orders. (Sexton Tr. 56:15-21).

191.    Two days later, police arrested Corey Marrow for "obstructing governmental administration, on the basis of the fact that Corey told the police to leave him home when they unlawfully entered.  (Corey Tr. 39:21-40:3).

192.    The charge was later dismissed when Corey Marrow pled guilty to an another pending offense from a different date and incident.  (Corey Tr. 39:21-40:3).

## VI.    Additional Facts Relating to Particular Plaintiffs

### A.    Additional Facts Relating to Nigeria Scott

193.    Nigeria Scott signed a form consenting to search the white minivan.  (Def. Ex. H).

194.    Nigeria Scott signed this form at 22:00 hours, or 10:00 PM.  (Def. Ex. H).

195.    At that point in time, the police had been occupying the apartment for approximately three hours, and were refusing to leave.  (Sexton Tr. 35:20-24, 46:21 – 49:3; Briley Tr. 23:14 – 24:3; *supra passim*).

196.    Nigeria Scott signed the consent form under duress, believing that unless she did so the police would remain at the apartment indefinitely.  (Nigeria Tr. 28:7 – 29:5).

197.    Nigeria Scott signed the consent form under duress, believing that unless she did so the police would confiscate the vehicle.  (Nigeria Tr. 28:7 – 29:5).

198.    Police told Nigeria Scott that if she did not sign the consent, the vehicle would be confiscated. (Nigeria Tr. 28:7 – 29:5).

199.    Although Nigeria Scott signed a form consenting to search the white minivan, according to Defendant Sexton, none of the officers actually searched the interior of the minivan.  (Sexton Tr. 85:21-25).

200.    Nigeria Scott resided at 328 South Second Avenue.  (Nigeria Tr. 10:16 – 11:5; Def. Ex. H).

201.    Nigeria Scott was not at home when the police officers arrived.  (Nigeria Tr. 16:3 – 21:11; 24:20 – 25: 23).

202.    When Nigeria arrived, she was prevented from entering her apartment by the police.  (Nigeria Tr. 16:3 – 21:11; 24:20 – 25: 23).

203.    She was made to stand for a period of time on the porch of 328 South Second Avenue.  (Nigeria Tr. 16:3 – 21:11; 24:20 – 25: 23).

204.    Police then told her to get off the porch and leave her own property. (Nigeria Tr. 16:3 – 21:11; 24:20 – 25: 23).

205.    Nigeria Scott did so.  (Nigeria Tr. 16:3 – 21:11; 24:20 – 25: 23).

206.    Nigeria Scott waited on the sidewalk for hours while the police occupied her apartment.  (Nigeria Tr. 16:3 – 21:11; 24:20 – 25: 23).

**B.  Additional Facts Relating to Vaughn Scott**

207.    Vaughn Scott resided at 328 South Second Avenue.  (Vaughn Tr. 7:6 – 8:6; 12:9-24; 13:8-10)

208.    After entering, the police compelled Vaughn Scott to leave her apartment and stand on the porch.  (Vaughn Tr. 7:6 – 8:6; 17:16-22).

209.    The made her stand on the porch for approximately two hours.  (Vaughn Tr. ¶ 54).

210.    Vaughn Scott was told she could not leave the porch.  (Vaughn Tr. ¶ 55).

211.    Vaughn Scott asked to be allowed to re-enter her home, but the police refused.  (A.S. Tr. 15:17 – 16:2).

212.    Two officers guarded Vaughn Scott to prevent her from leaving the porch or entering the building.  One of these officers was Defendant Gamble.  (Vaughn Tr. ¶ 56).

213.    The police told Vaughn Scott that if they found anything in the apartment, she would go to jail, because her name was on the apartment lease.  (Vaughn Tr. ¶ 58).

214.    After approximately two hours, the police took Vaughn Scott back inside the apartment and made her sit on the couch.  (Vaughn Tr. ¶ 59).

215.    Vaughn Scott remained under police control in this way for another two to three hours.  (Vaughn Tr. ¶ 59).

### C.  Additional Facts Relating to Brenda Scott

216.    Brenda Scott was cooking dinner when the police arrived, and the police would not allow her to finish doing so.  (A.S. Tr. 9:3-16, 14:16-23).

### D.  Additional Facts Relating to Corey Marrow

217.    Corey Marrow told occupants of the apartment to calm down to avoid getting arrested by the police.  (A.S. Tr. 17:15 – 18:3).

218.    Defendant Antonini bent Corey Marrow's hand back and confiscated his cell phone, to prevent Mr. Marrow from filming the police.  (Corey Tr. 30:12-20).

219.    Police searched Corey Marrow.  (Corey Tr. 15:6 – 18:2; Vaughn Tr. 29:15-18).

220.    As a result of police activity at 328 South Second Avenue, neighbors gathered outside and around 328 South Second Avenue to watch, and news media arrived to report on the incident.  (Corey Tr. 31:16 – 32:6).

### E.  Additional Facts Relating to Julian Rene

221.    Julian Rene was walking with Kraig Utley away from a grocery store whe

222.    The police searched Julian Rene.  (Corey Tr. 15:6 – 18:2).

223.    Police ordered Julian Rene to pull his pants down to show his injury. (Rene Tr. 27:15 – 29:3; Vaughn Tr. 26:3-16; A.S. 13:10 – 14:12; K.M. Tr. 11:8 – 17:8).

224.    He did so because he didn't believe he had a choice.  (Rene Tr. 27:15 – 29:3).

### F. Additional Facts Relating to Prince Scott

225.     The police searched Prince Scott.  (Corey Tr. 15:6 – 18:2; Vaughn Tr. 26:23 – 27:5).

### G. Additional Facts Relating to Kraig Utley

226.     The police searched Kraig Utley.  (Corey Tr. 15:6 – 18:2; Vaughn Tr. 29:4-8).

227.     Kraig Utley told Defendant Antonini that he had no right to be inside the apartment without a warrant.  (Utley Tr. 14:15 – 18:7).

228.     Kraig Utley told Defendant Antonini to get out of the apartment.  (Utley Tr. 14:15 – 18:7).

229.     In response, Defendant Antonini threatened to "choke [Kraig] out." (Utley Tr. 14:15 – 18:7).

230.     Kraig Utley responded, in sum and substance, that Defendant Antonini was not going to do that.  (Utley Tr. 14:15 – 18:7).

231.     The City of Mount Vernon takes the position that Defendant Antonini had the lawful authority to choke Kraig Utley out.  (Utley Tr. 16:11 – 17:4).

232.     Defendant Antonini handcuffed Kraig Utley.  (Utley Tr. 14:15 – 18:7).

233.     Defendant Antonini and the other defendant officers left Kraig Utley in handcuffs for approximately three hours and fifteen minutes.  (Utley Tr. 14:15 – 18:7).

### H. Additional Facts Relating to Andre Harris

234.     The police searched Andre Harris.  (Corey Tr. 15:6 – 18:2).

### I. Additional Facts Relating to A.S.

235.     A.S. is a female, and was approximately 15 years old at the time of the incident.  (A.S. Tr. 17:10-14).

236.     A.S. was held by the police in the living room of the apartment for approximately five hours.  (A.S. Tr. 9:3-16).

237.     During that time, the police did not allow her to talk or watch TV.  (A.S. Tr. 9:3-16).

**J. Additional Facts Relating to K.M.**

238.     K.M is a male, and was approximately 16 years old at the time of the incident.  (K.M. Tr. 11:8 – 15:25).

DATED:        New York, N.Y.

April 8, 2016

_____//s//_____
David A. Thompson, Esq. [dt3991]
Stecklow & Thompson
217 Centre Street, 6th floor
New York, N.Y. 10013
Phone: (212) 566-8000
Fax:    (212) 202-4952