1  far as how fast you --
2      If it's something that's active, and if it's
3  something that requires immediate attention, then
4  you will have a detective activated for that
5  particular incident.  Then there's times that
6  there's not.
7      Q    Was there a detective activated for this
8  incident?
9      A    Yes, there was.
10     Q    Do you know who it was?
11     A    Detective Castellano.
12          (Pause)
13 BY MR. THOMPSON:
14     Q    Was Detective Castellano ever at 328
15 South Second Avenue while you were there that day?
16     A    Yes.
17     Q    At what point in time did he arrive?
18     A    I don't know.  It was dark outside.
19          (Pause)
20 BY MR. THOMPSON:
21     Q    So you made a call to the detective
22 supervisor, whoever that was, asking for approval to
23 apply for a search warrant;
24     Is that correct?
25     A    I called the detective supervisor to

1   consult him if I had enough for a search warrant.
2       Q    Okay.
3       What was judgment as to whether or not you had
4   enough for a search warrant?
5       A    That -- to notify the Duty DA.
6       Q    So he didn't express an opinion?
7       Or he thought you did, and therefore, you
8   should call the DA, or something else?
9       A    Well, he --
10      He felt that it was a possibility.  That's why
11  he wanted confirmation from a Duty DA.
12      Q    What did they do at that point?
13      A    The detective notified the Duty DA.
14      Q    So you didn't do that yourself?
15      A    The case detective usually --
16      Q    Okay.
17      A    -- deals one-on-one with that.
18      Q    And that was Detective Castellano?
19      A    Yes.
20      Q    Was he already at the apartment when you
21  made that call, or something else?
22      A    I don't know.  I don't know.  At that
23  point, it was a waiting game.
24      Q    How long were you at the apartment?
25      A    A long time.

1    (Pause)

2    THE WITNESS: Maybe two -- two hours,

3    maybe. Two, three hours.

4    BY MR. THOMPSON:

5        Q    During the period of time that you were

6    there, were the occupants of the apartment free to

7    leave?

8        A    No.

9        Q    You mentioned that Prince Scott had been

10   aggressive, in your terms, when you when you were

11   first entering the apartment.

12       Did any of the occupants of the apartment

13   exhibit aggression towards you at any other time?

14       A    Anyone else in the apartment?

15       Q    Yes.

16       A    Yeah. They were all getting loud as far

17   as -- you know, "Get out. Get out of here."

18       Q    Okay, so you're talking about verbal

19   conduct?

20       A    Yeah, verbal conduct.

21       Q    Did they interfere with your

22   investigation in any way?

23       A    Initially, as far as trying to coerce the

24   grandmother not to allow us into the apartment to

25   check the welfare of a possible victim -- he was

1  video --
2  (Thereupon, an informal discussion
3  was held off the record.)
4  THE WITNESS: I'm sorry. I remember
5  making some actions in the video.
6  Once he decided to record me and his
7  buddies started standing behind, all of
8  them, I let him know that I felt -- I felt
9  that he was putting me in fear or danger
10  of injury.
11  So hopefully he got that on his phone
12  recording, too.
13  BY MR. THOMPSON:
14  Q   Okay, so he put you in fear of danger and
15  injury by filming you?
16  A   No, by the acts of aggression and his
17  buddies standing behind me with somebody possibly in
18  possession of a firearm in the house.
19  Q   Okay, so just to be clear, what were --
20  Other than standing behind Corey Marrow, what
21  were the other individuals doing that put you in
22  fear?
23  (Pause)
24  THE WITNESS: What else were they
25  doing?

1  A     Yeah, I don't know.
2  Q     Do you --
3        With regard to the order thereof, do you
4  remember who else arrived?
5  A     Officer Briley, Officer Antonini, Officer
6  Garcia.
7              (Pause)
8              THE WITNESS:  That was at the
9         apartment inside?  I can't think of anyone
10        else at this time.
11             (Pause)
12 BY MR. THOMPSON:
13 Q     Did you have --
14             MR. THOMPSON:  Withdrawn.
15 BY MR. THOMPSON:
16 Q     You mentioned interactions with the woman
17 that opened the door, with Prince Scott, with Corey
18 Marrow, and with Julian Rene.
19       Did you have any conversation with any other
20 individuals that were present in the apartment?
21 A     Only when I asked them to --
22       When I made it inside the apartment, I asked
23 them to come out from the back room, because they
24 actually were hiding, which also piqued my
25 interest --

Q   Okay. When --

A   -- when I made numerous -- when I spoke to those involved, asking if there was anyone else in the apartment.

They said no, and as we checked, there was additional people in the back that just wanted to stay quiet.

Q   Okay, so you searched the apartment?

A   For the victims, yeah. Any victims.

Q   Okay.

Who were the individuals in the back that wanted to stay quiet?

A   Demetrius Royal King, Kraig Utley.

There was another guy. I don't remember his name. He was dark-skinned, chubby.

Q   Okay.

By staying in the back and remaining quiet, did they violate any law?

A   No.

Q   Other than the interactions that you've mentioned so far, did you have any other conversations with the individuals that were in the apartment?

(Pause)

THE WITNESS: Just after having them

```
 1                come out of the back rooms, I just
 2                mentioned that "You guys hear me calling,
 3                and you are not saying anything."
 4                     I just made that statement and told
 5                them to come out.
 6   BY MR. THOMPSON:
 7        Q    Did they respond?
 8        A    Not verbally, but yeah, they complied and
 9   came out from the back room.
10        Q    Okay.
11             Are other than what you've testified to so far,
12   did you have any other interaction with the people
13   inside the apartment?
14        A    When you say any "verbal
15   conversations" --
16        Q    Could be verbal.  Could be physical.
17        A    No verbal or physical conversations,
18   really, after that.
19        Q    So after that, you were simply waiting
20   for a search warrant to be issued?
21        A    Yeah.
22             I had everybody come into the living room with
23   my officers, and we had to wait to get confirmation
24   from the DA for a search warrant.
25        Q    Okay.  During that time, the occupants
```

were required to wait in the living room?

A Yes, for all our safety. Considering what we were looking for, yes.

Q Okay. Now, you mentioned that officers Briley, Antonini, and Garcia arrived at the apartment at some point.

Other than those officers, can you recall any other officers who were in the apartment?

A Uniformed patrol started showing up. I don't remember which uniformed patrol.

Detective Gamble eventually showed up. However, he was not in the apartment.

(Thereupon, an informal discussion was held off the record.)

BY MR. THOMPSON:

Q Other than the officers that you've mentioned, can you recall any other officers that were in the apartment?

A No, I cannot remember.

Q I guess this is as good a time as any.

(Pause)

MR. THOMPSON: Okay.

I am going to show the witness a document that has previously been marked as Plaintiffs' Exhibit 1.

BY MR. THOMPSON:

    Q    Did there come a point in time when you learned whether a search warrant was going to be issued?

    A    Yes.

    Q    And what was the result? Was a search warrant issued or not?

    A    No. The DA said that there was not enough probable cause for the search warrant.

    Q    What did you do at that point?

    A    I told my officers to leave, and we completed a report. Most of us complete reports.

    Q    Was anyone arrested at the scene?

    A    No.

        (Pause)

BY MR. THOMPSON:

    Q    Were you the officer in charge inside the apartment at all times?

    A    I was the highest ranking officer, yes.

    Q    You mentioned that at a certain point in time, Detective Castellano arrived at the scene?

    A    Yes.

    Q    And that he was the detective detailed to the investigation; is that correct?

    A    The assault, yes. The initial incident,

```
 1   yes.
 2       Q     What, if anything, did Detective
 3   Castellano do when he arrived at the location?
 4       A     I briefed him on the circumstances.
 5   That's when he attempted to obtain a search
 6   warrant.
 7       Q     Did he have any conversation with any of
 8   the occupants in the apartment?
 9       A     I don't know.  I don't remember.
10             (Pause)
11   BY MR. THOMPSON:
12       Q     Other than --
13             MR. THOMPSON:  Withdrawn.
14   BY MR. THOMPSON:
15       Q     Did you or any of the other officers
16   present break any doors?
17       A     No.  Excuse me.  No.
18             (Pause)
19   BY MR. THOMPSON:
20       Q     Other than what you've testified to so
21   far, did any of the police officers inside the
22   apartment have any other interaction with the
23   civilians that were there?
24       A     I'm sorry.  Could you repeat that one
25   more time, please?
```

1  Q    If you can recall?

2              MR. THOMPSON:  Objection.

3  BY MR. WISHAM:

4  Q    What were her exact words when you asked

5  her if you could enter the apartment?

6  A    I don't remember the exact words.

7  Q    Did you --

8  Did you touch any of the plaintiffs physically

9  on March 20th, 2013?

10 A    No, I didn't touch anyone.

11 Q    Did you --

12 Do you recall if any of the other six or more

13 officers that were inside of the residence touched

14 any of the plaintiffs?

15 A    No.

16             (Pause)

17             THE WITNESS:  Julian -- Julian Rene

18         had his injury, and we --

19             When he showed us his wound, there

20         was no -- there's no -- there's no -- no

21         touching, to my knowledge.

22 BY MR. THOMPSON:

23 Q    Because when you say Julian Rene "showed"

24 you his wound, how did he show you his wound?

25 A    By exposing -- exposing his pants

```
 1    (indicating).
 2         Q     And how did he expose his pants?
 3         A     Unbutton.
 4         Q     Did he unbutton his pants voluntarily?
 5         A     Yes.
 6         Q     Did you ask him to unbutton his pants?
 7         A     No.  He showed us --
 8         Q     Did he take --
 9         A     -- to --
10         Q     Sorry.  Continue.
11         A     We didn't have to ask.
12    He made mention that he was shot, and he showed
13    us the injury.
14         Q     Did he close his pants back up at some
15    point?
16         A     Yes.
17         Q     How long were --
18    Did Julian Rene have his pants pulled down to
19    show you his injuries?
20         A     A couple seconds.
21         Q     And you saw the injuries?
22         A     Yes.
23         Q     What did the injuries look like?  What
24    were the injuries?
25         A     It was a burn, a red burn; a minor, open
```

1  wound, minor -- minor broken skin.
2      Q    Did Julian Rene ever receive any medical
3  treatment as a result of those wounds that you saw?
4      A    Ambulance was called.
5      Q    Who called the ambulance, if you can
6  recall?
7      A    I don't remember.
8      Q    Did the ambulance come?
9      A    Yes.
10     Q    Did you see the ambulance?
11     A    Yes.
12     Q    Did Mr. Rene go to the hospital as a
13 result of his wounds?
14     A    No.
15     Q    Do you know why not?
16     A    Because he refused -- he refused medical
17 treatment.
18          (Thereupon, an informal discussion
19      was held off the record.)
20 BY MR. WISHAM:
21     Q    Did any Mount Vernon police officer
22 connected with the investigation on March 20th of
23 2013 ever search the white minivan that was in the
24 driveway?
25     A    The interior, no.