UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------- X

VAUGHN SCOTT, NIGERIA SCOTT,
PRINCE SCOTT, ANDREE HARRIS,
BRENDA SCOTT, KRAIG UTLEY, COREY MARROW,
AS A MINOR CHILD, K.M., A MINOR CHILD,
AND JULIAN RENE,

          Plaintiffs,

         -against-
                      14-CV-4441(SHS)
CITY OF MOUNT VERNON, ET AL.,

         Defendants.

------------------- X

HELD AT:    Office of Corporation Counsel
            1 Roosevelt Square
            Mount Vernon, New York 10550
            December 2, 2015
            2:38 p.m.


        Examination before Trial of the Plaintiff, JULIAN RENE, pursuant to Court Order, held at the above time and place before a Notary Public of the State of New York.


J & L REPORTING SERVICE
of Westchester, Inc.
50 Main Street, Suite 1000
White Plains, New York 10606
(914) 682-1888
Lisa Dobbo, Reporter

A P P E A R A N C E S:

    STECKLOW COHEN & THOMPSON, PLLC
    Attorneys for the Plaintiffs
    Office & Post Office Address
    217 Centre Street, 6th Floor
    New York, New York 10013
    BY:  DAVID ALLEN THOMPSON, ESQUIRE


    THE OFFICE OF CORPORATION COUNSEL
    Attorneys for the Defendants
    Office & Post Office Address
    1 Roosevelt Square
    Mount Vernon, New York 10550
    BY:  WELTON K. WISHAM, ESQUIRE
       Of Counsel

```
 1                    J. RENE                    5
 2    break, just say you need a break but if I
 3    have a question that I'm asking you I'd
 4    appreciate if you answer the question first
 5    and then you can take a break.  If you need
 6    to speak with your attorney, same thing,
 7    just let me ask the question, you finish
 8    your answer to my question and then you can
 9    speak with your attorney.
10           Is there anything that would prohibit
11    you from giving truthful testimony today?
12           A.    No.
13           Q.    You haven't been on any
14    alcohol, medication, drugs or anything of
15    that nature?
16           A.    No.
17           Q.    I hope I don't keep you long
18    and I thank you for coming in on a timely
19    basis.
20           A.    No problem.
21           Q.    I understand you were shot on
22    March 20th, 2013; is that correct?
23                 THE WITNESS:  On March 20th,
24           '13?
25                 MR. WISHAM:  Yes.
```

```
1                    J. RENE                    6
2              THE WITNESS:  That was the date
3         of the incident?
4              MR. WISHAM:  Yes.
5         A.   Actually, I was grazed, not
6    actually shot.
7         Q.   What is the difference between
8    being shot and grazed?
9         A.   Grazed is when the incident
10   happened basically like the bullet hit the
11   floor and ricochets up, so I guess the
12   impact of hitting the floor and bounces up I
13   guess it just like tapped me like but it was
14   like a little flush like nothing went in
15   because I didn't go to the hospital.
16        Q.   You recall the day that you
17   were grazed with the bullet then; correct?
18        A.   Correct.
19        Q.   March 20th, 2013; correct?
20        A.   Yes.
21        Q.   Where did the shooting take
22   place?
23        A.   Where did the shooting take
24   place?  I want to say on 240 -- I believe
25   that's the projects.  I'm not too sure.
```

It's basically in between 9th and 7th.

    Q.    Would that be S. 9th Avenue?

    A.    Yeah, basically.

    Q.    Near 3rd Street?

    A.    Yeah.

    Q.    Shots were fired; correct?

    A.    Correct.

    Q.    Do you recall how many shots were fired?

    A.    I can't put a number but I know multiple.

    Q.    Multiple shots?

    A.    Yes.

    Q.    Did anyone get shot directly?

    A.    No.

    Q.    Did anybody else get grazed by the bullet?

    A.    No.

    Q.    What were you doing in this area at the time the shots were being fired?

    A.    What was I doing? Me and Kraig was going to the store -- came from the store. After we left the store we was walking down towards 9th going up towards

```
                            J. RENE                          8
```

3rd Street and that's when we heard shots, whatever, and then I just turned around and start running back up towards 9th.

    Q.    Is that area you talked about that you described earlier, is that near the projects?

    A.    Yeah.

    Q.    Would that be Ebony Gardens?

    A.    Yeah.

    Q.    You were with Kraig Utley?

    A.    Yes.

    Q.    What about Corey, were you with Corey Marrow?

    A.    I didn't meet up with Corey until actually the spur of the moment we seen the van driving down 9th and we flagged him down, got in the van and left and went to his house on 2nd.

    Q.    You indicated that you and Kraig Utley had gone into some store?

    A.    Yeah.

    Q.    What type of store?

    A.    Convenient store, little corner store right there.

J. RENE                                    10

he was wearing.

Q. What about Corey Marrow, do you recall what he was wearing on March 20th, 2013 during the time these shots were fired?

A. No.

Q. Do you recall anybody wearing a red hoody?

A. When I looked back, only thing I saw was someone running, basically running across from like the projects to Ebony Gardens building in like one of them side doors. I didn't really get a chance to see his face. I seen him running in. Besides everybody else that was around in that area everybody was getting down and all that. The first person when I seen was basically standing up like running trying to get away from the scene. That's what it looked like to me.

Q. Was this person a male that was running with the red hoody?

A. I'm pretty sure it was a guy.

Q. Did you get a good glance of him?

A. I just seen his whole body posture.

Q. But he had a red hoody?

A. Yeah.

Q. What time was that, do you know?

A. I would say no earlier, no later than probably like 3:00, 3:30, 4:00.

Q. P.M.?

A. P.M., yeah.

Q. You and Kraig Utley were running and you got into Corey Marrow's van?

A. Yes.

Q. Corey Marrow was driving a white van?

A. Right.

Q. Was that his van?

A. Yes.

Q. Where did you go, where did the three of you go once you and Kraig Utley got into Corey Marrow's van, where did you go?

A. We seen him, we flagged him down on 9th and 3rd Street. He kept going straight down 9th going towards 4th Street

and then once he made the left on 9th and
4th he went up 4th Street because his house
is right there on 2nd Avenue and 4th Street.

    Q.    When you say his house, is that
328 S. 2nd Avenue?

    A.    Yes.

    Q.    So, you're at 328 S. 2nd Avenue
after the shooting; correct?

    A.    Yes.

    Q.    Was there any damage done to
that vehicle that you're aware of?

    A.    Not that I would know of.  I
mean nothing was damaged as far as when we
-- on our way there, when we got there I
can't speak what happened to the van.  Once
we got in the house, I don't know.

    Q.    Did you ever take a look at the
van that day?

    A.    No, because after everything
was overwhelmed, we were in the house for
like six, seven, eight hours, I was just
like shaky like, you know, like I got grazed
and I got shot actually before in 2012 so
I'm like, I was like shaken up a little bit

2    like.

3    Q.    You were shot before in 2012?

4    A.    Yes.

5    Q.    When in 2012, what month we

6    talking?

7    A.    August.

8    Q.    August 2012?

9    A.    Yeah.

10    Q.    Where did this shooting take

11    place?

12    A.    It was -- I was walking from my

13    Godmother's. It was her birthday. As a

14    matter of fact, this happened July 29th, the

15    day of her birthday. July 29th was the

16    night we left, we went to my friend's home

17    and shots was fired and three people got

18    shot.

19    Q.    Who got shot?

20    A.    Me and two other friends.

21    Q.    Do you know their names?

22    A.    No, I don't know nobody like

23    that, like I think one of them was Caisson,

24    other guy named Jim. I don't know their

25    last names.

Q. Caisson you said?

A. Yeah.

Q. August 2012 you weren't grazed with a bullet, you actually got shot?

A. Yeah.

Q. Where did you get shot, what part of your body?

A. I want to say behind my right knee. It hit basically my cap and went through my leg went in and out.

Q. How many bullets?

A. Just one.

Q. Did you receive medical treatment?

A. Yeah.

Q. What hospital did you receive medical treatment?

A. Sound Shore New Rochelle.

Q. That's here in Mount Vernon?

A. New Rochelle.

Q. And the shooting took place in Mount Vernon?

A. Yes.

Q. Did they arrest the people who

2       A.      Because for one they just
3   assumed something, they didn't go through
4   the right procedures of everything.  They
5   tried to come to the house.  They didn't
6   care about nobody's story.  They past
7   through the threshold.  I never seen nothing
8   like that before and, you know, like I felt
9   like me filing would put a stop to certain
10  things.  At the end of the day no matter
11  what it is it's all how you do it.  In my
12  book that's how I feel so I wasn't feeling
13  the whole situation.  Like I said, I was
14  like stunned up about the whole situation.
15  There was a lot going on so I just was like
16  we all decided to stand for everything and
17  that's what we did, we all decided to just
18  file.
19      Q.      How many officers arrived at
20  328 S. 2nd Avenue?
21      A.      I want to say about -- there
22  was a lot.  They had the whole house
23  flooded.  I want to say pretty much about 15
24  or more.
25      Q.      Did you know any officers, did

2    you recognize any of the officers that
3    entered your apartment?
4           A.    Most of them.
5           Q.    You knew Officer Allen, the
6    female officer?
7           A.    Yeah, I knew her.
8           Q.    How did you know her?
9           A.    We used to go to school
10   together.
11          Q.    What school was that?
12          A.    Mount Vernon High School.
13          Q.    Other than going to school with
14   Officer Allen, had you ever had any
15   subsequent contact with her prior to
16   3-20-2013?
17          A.    No.
18          Q.    What about Antonini, Officer
19   Antonini?
20          THE WITNESS:  You're asking me
21   after that situation or before?
22          MR. WISHAM:  We're going to
23   talk about before and after.  Let's
24   talk about before.
25          A.    No, we really had no run-ins

J. RENE                                    24

out of trouble you get an ACD. It was a
violation, so everything you probably
wouldn't see in the system because it's a
violation. I mean everything is documented
but you can see, though, you would be like
wow. Like the last year of whenever it
happened in March 2013 from now it's a trap
record.

    Q.    Let's go back to March 2013 when these officers entered your apartment.

    Did you see them enter the apartment?

    THE WITNESS: Did I see them enter the apartment?

    MR. WISHAM: Yes.

    A.    I didn't see them but we looked out the window, somebody looked out the window and we seen a whole bunch of cop cars there and they came, I guess they knocked but I was in Prince's room, a couple of us were in Prince's room playing a game or whatever. I believe his grandma answered the door, if I'm not mistaken.

    Q.    Brenda Scott?

    A.    Brenda Scott, yeah, and I heard

   A.   A beer bottle.

   Q.   How did it get there?

   A.   I can't explain that to you.  I don't know when that was there or when this picture was taken.

   Q.   And the last page?

   A.   Outside of the white Chevrolet van.

   Q.   Back or front?

   A.   Front.

   Q.   Does it show the license plate number?

   A.   Yes.

   Q.   And that's the van you were in?

   A.   Yes.

       MR. WISHAM:  Defendants E.

       (Whereupon, Defendant's Exhibit E, Evidence - 4 pages, was marked for Identification.)

   Q.   I'll show Defendant's Exhibit E to counsel first and I'd like if you could take a look at it, Mr. Rene.

       (Handed)

       MR. WISHAM:  I don't believe

there are any Bates numbers
associated with this, counsel.
    Q.    Do you recognize this exhibit
in front of you?
    A.    Yes.
    Q.    Let's start with Page 1.
It says "Evidence"?
    A.    Right.
    Q.    Mount Vernon Police Department?
    A.    Yes.
    Q.    It's got a date?
    A.    Yes.
    Q.    What is the date?
    A.    3-20-13.
    Q.    It says victim.
    A.    Julian Rene.
    Q.    Were you the victim on
3-20-2013?
    A.    Yes.
    Q.    Let's go to the second page.
Can you identify the second page?
    A.    Yes, that's me.
    Q.    That's a photograph of you?
    A.    Yes.

```
 1                      J. RENE                    35
 2              MR. THOMPSON:  Objection.
 3         Q.   The officers didn't use any
 4    physical force to pull your pants down;
 5    correct?
 6         A.   No.
 7         Q.   Now, what are we looking at?
 8              MR. THOMPSON:  Where?
 9         Q.   When you pulled your pants
10    down, what else do you see?
11         A.   I see my flesh wound right
12    there.
13         Q.   Is that the red spot?
14         A.   Yes.
15         Q.   That's a flesh wound?
16         A.   Yeah.
17         Q.   Or is that a tattoo?
18         A.   Oh, no, that's a flesh wound.
19    I was bleeding.
20         Q.   You were bleeding?
21         A.   Yes.
22         Q.   You indicated earlier during
23    this testimony that the bullet that was shot
24    didn't penetrate you, it hit the ground;
25    correct?
```

    Q.    What about Kevin Marrow, did they ask him to pull his pants down?

    A.    Not that I recall.

    Q.    Prince Scott?

    A.    Not that I recall.

    Q.    Anybody else in the apartment?

    A.    Not that I recall.

    Q.    Do you know why they asked you to pull your pants down?

    A.    I don't know.

    Q.    There were like nine different people in this apartment; correct?

    A.    Right.

    Q.    Corey Marrow, Kevin Marrow, Prince Scott, Nigeria Scott, Arabia Scott, Julian Rene, Kraig Utley, Demetrius Roy King, James Howell, Terrane Batson, Brenda Scott, Andree Harris and Vaughn Scott; correct, but you're the only person they asked to pull their pants down?

    A.    They searched everybody. The reason why they told me to when they were searching me I was actually sore so I guess they seen like blood so that made them say

2   take off your pants.
3           Q.   So the police officers saw
4   blood?
5           A.   Yeah, like yeah.
6           Q.   What else did you see the
7   police officers do during this period of
8   time?
9           A.   They was just like trying to
10  search the house, things like that.  They
11  just tried to keep us all in the living room
12  why they searched around for whatever they
13  supposedly was looking for.
14          Q.   Did they cause any damage to
15  the property during the time they were
16  there?
17          A.   I mean the only thing they
18  caused as far as like I guess when they bum
19  rushed the door.
20          Q.   What do you mean bum rushed?
21          A.   Like forced their way in.
22          Q.   They damaged the door by coming
23  in?
24          A.   Yes.
25          Q.   You saw that?

A. Yes.

Q. What type of damage?

A. Like the door was off the hinges, couldn't close properly.

Q. Anything else?

A. Not that I could remember at this time.

Q. Were you injured as a result of the police officers action on 3-20-2013?

A. I'm not going to say physically, no, but mentally yes.

Q. How were you injured mentally?

A. I mean I didn't -- I was just so fed up with the situation and just felt like my rights got violated that I just was stunned over the whole thing, you know, I didn't even want to go to the hospital to even get -- like I just kind of like stayed in my own corner like sheltering myself basically.

Q. Are you sheltering yourself now?

MR. THOMPSON: Objection to form.