UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X

VAUGHN SCOTT, NIGERIA SCOTT,
PRINCE SCOTT, ANDREE HARRIS,
BRENDA SCOTT, KRAIG UTLEY,
COREY MARROW, AS A MINOR CHILD,
K.M., A MINOR CHILD, AND JULIAN RENE,

Plaintiffs,

-against-

14-CV-4441(SHS)

CITY OF MOUNT VERNON, ET AL.,

Defendants.

- - - - - - - - - - - - - - - - - - - - X

HELD AT: Westchester County Department of Corrections
10 Woods Road
Valhalla, New York 105
December 17, 2015
11:05 a.m.

Examination before Trial of the Plaintiff, PRINCE SCOTT, pursuant to Court Order, held at the above time and place before a Notary Public of the State of New York.

J & L REPORTING SERVICE
of Westchester, Inc.
50 Main Street, Suite 1000
White Plains, New York 10606
(914) 682-1888
Lisa Dobbo, Reporter

A P P E A R A N C E S:

    STECKLOW COHEN & THOMPSON, PLLC
    Attorneys for the Plaintiffs
    Office & Post Office Address
    217 Centre Street, 6th Floor
    New York, New York 10013
    BY:  DAVID ALLEN THOMPSON, ESQUIRE

    THE OFFICE OF CORPORATION COUNSEL
    Attorneys for the Defendants
    Office & Post Office Address
    1 Roosevelt Square
    Mount Vernon, New York 10550
    BY:  WELTON K. WISHAM, ESQUIRE
        Of Counsel

Q. So, there was only two police officers that you saw entering your apartment?

A. No, there was a line of police officers in my hallway coming up the stairs. The stairs are right there. They were lined up on the stairs and approximately eight to ten officers and Sexton was in the front. He was pushing my grandmother. As she was trying to hold the door, she was like "Are you touching me?" "I'm a police officer." She didn't know who he was. He was in plain clothes and I told her that he's a police officer.

Q. Who was that officer?

A. Sexton.

Q. Officer Sexton, he was in plain clothes?

A. Yes.

Q. You knew Officer Sexton and Officer Antonini?

A. Yes.

Q. You knew them before they entered your apartment on March 20th, 2013?

A. Yes.

Q. How did you first come to know who they were before March 20th, 2013?

A. You know, I just see them around.

Q. Did they ever arrest you before March 20th, 2013?

A. Yes, Officer Sexton arrest me my first time of being arrested.

Q. When was that?

A. Maybe approximately 2005; 2005 on 15th Avenue.

Q. On 15th Avenue?

A. Yes.

Q. What was the basis for that arrest?

A. Basis for that arrest, you know, he arrested me for -- I was charged allegedly for assaulting -- a domestic violence case, allegedly assaulting a female.

Q. Who's the female?

A. My first child's mother.

Q. Her name?

    Q.    He arrested you more than once?

    A.    He might have.

    Q.    Is it fair to say that he knew who you were because of these past encounters?

    A.    Yes, it's fair to say.

    Q.    What about Officer Antonini, you indicated, I believe, that you knew him when he entered your apartment?

    A.    Yes.

    Q.    How did you know of Officer Antonini prior to March 20th, 2013?

    A.    I mean he's a very aggressive guy and he's someone I know to abuse their authority, you know, so he's someone that stands out to me.

    Q.    Did he ever arrest you?

    A.    Yes.

    Q.    When?

    A.    On several occasions. He always like -- he tells me to go in the house and if I don't go in the house he arrests me and charges me with things that, you know, anything. He will tell me to go

Q. You were convicted of a crime prior to March 20th, 2013?

A. Yes.

Q. Can you tell me what crimes you were convicted of?

A. I was convicted of attempted assault, I'm not sure the degree and possession of controlled substance.

Q. What type of controlled substance would that have been?

A. Ecstasy.

Q. That was what year, that conviction was what year?

A. I believe they were both in 2007. They were together in 2007, I believe.

Q. You served time for those convictions?

A. Yes.

Q. Where?

A. Right here, Westchester County Correctional Facility.

Q. How long did you serve?

A. One year.

A. No, two blocks away.

Q. Who were you playing basketball with?

A. I was actually by myself but there were other people outside.

Q. Did you recognize the other people?

A. Just from playing basketball.

Q. How long were you -- about what time of day was it that you were playing basketball?

A. About 3:00 in the afternoon until the time when my brother came and picked me up.

Q. Your brother is?

A. Corey.

Q. Corey Marrow?

A. Yes.

Q. Corey was driving?

A. Yes.

Q. What kind of car was he driving?

A. He was driving a white minivan.

Q. Was he the owner of that white

minivan?

    A.    I'm not sure. I believe it might been registered to my sister or something.

    Q.    Your sister's name is what?

    A.    Nigeria Scott.

    Q.    Corey Marrow was driving the car and he gave you a ride to your home?

    A.    Yes.

    Q.    What was the address of your home on March 20th, 2013?

    A.    328 S. 2nd Avenue.

    Q.    Now, did anything occur either during the time you were playing basketball on 3-20-2013 or sometime thereafter?

    MR. THOMPSON: Objection to the form. Could you be a little more specific?

    THE WITNESS: I can answer.

    A.    During the time I was playing basketball I'm not sure what happened because I was playing basketball. From the time he picked me up and brought me home nothing significant happened, nothing at

Q. How many people were in the minivan?

A. Approximately four, five.

Q. All males?

A. Yes.

Q. There were males in Corey Marrow's white minivan before he had picked you up from the basketball court?

A. Yes. Actually, I called him to come pick me up. I seen him drive by and I waived him down.

Q. You waived him down.

Nothing unusual occurred while you were playing basketball?

MR. THOMPSON: Objection.

MR. WISHAM: You can answer.

A. I mean like I told you, I wouldn't know because I was playing basketball.

Q. How far is the basketball court that you were playing on on March 20th, 2013, how far is that to 328 S. 2nd Avenue where you live, approximately how long was the drive?

A. They stayed in the front. They had to stay outside. The police yellow taped.

Q. Were you injured?

THE WITNESS: Was I injured in which way?

Q. I don't know, were you injured in any way as a result of the accident with the police officers on 3-20-13?

THE WITNESS: What do you mean by injured? I would like you to clarify injured.

MR. WISHAM: Well, I can't clarify.

A. You mean if you talking about like was I embarrassed, was I embarrassed, it held more of a like mental, you know, like degrading, like embarrassing, you know, traumatized. I'm never going to forget that. There's a difference. I wouldn't say physically injured but like -- I mean he did bend my wrist to grab the phone but it wasn't more so a physical injury. I didn't hold any scars or anything but it was

A.      He asked why we were being treated like suspects when we're the victims.

Q.      Did the police officers respond to Julian Renee?

A.      They told him, you know, shut up. There's a gun in the house, they're going to find it.

Q.      What did Julian Renee say after that?

A.      I don't know exactly what he said but he just, you know, started -- he just started, you know, complaining, basically complaining like, you know, like why is this going on, whatever he was asking them, why we all being targeted, things of that nature.

Q.      Did any of the police officers physically touch Julian Renee?

A.      They physically touched every one of us when they sat us on my couch.

Q.      Is that all the physical contact that you observed that the police officers touched Julian Renee is having him

degrading.

Q. The van that you were in, this white minivan, did it have any -- can you describe how the back rear windshield looked, if you can recall, on 3-20-2013?

A. I don't recall how it looked on that date.

Q. We're going to refer to an exhibit, Plaintiff's Exhibit Number 12 again Bates Number 000173.

MR. WISHAM: Counselor, is that what you have?

MR. THOMPSON: That's what I have.

Q. If you could just take a few moments and scan this particular document.

Have you had an opportunity to scan that document?

A. Yes.

Q. At the top it says Aegis Public Safety System; do you see where it says that?

THE WITNESS: On the first page?

this, this one right here, you know.

Q. Just for my clarification, what do you mean adjoined with this?

A. They were marked down and a memo was written and things of that nature. I brung up the issues but I don't believe anything else was filed besides this.

Q. So, those prior arrests and searches by Officer Antonini, would that be part of the basis for you filing this lawsuit?

MR. THOMPSON: Objection.

THE WITNESS: I don't understand. What do you mean by that?

Q. Well, you indicated that you had some run-ins with Officers Antonini and Sexton before March 20th, 2013; correct?

A. I had -- I did indicate that I had run-ins with both of them on several occasions, yes.

Q. And you never filed a civil rights lawsuit before March 20th, 2013; correct?

fidgeting around and I recorded him when it came time that the focus was on him.

Q. What did your recordings show?

A. I'm not for certain because there was a time when the battery died and I was more so just recording so they don't over step their boundaries more than they had already.

Q. Where is that recording?

A. I'm not too certain. I believe most of it is on a flash drive or whatever you call it, you know -- I don't know. I gave it to my brother. It actually wasn't my phone. I don't have a phone.

Q. Was Julian Renee injured on 3-20-13, to your knowledge?

A. To my knowledge, yes.

Q. How was he injured?

A. I'm not so certain. I just remember him saying something about he was injured on his buttocks.

Q. He said that to you?

A. No, actually the police were, you know, we were looking for explanation as

morning, did you see Julian Renee do anything else before the police officers left your apartment?

THE WITNESS: As far as lift his pants up or something like that?

MR. WISHAM: Yeah, did he lift his pants up?

A. He pulled his pants down and lifted his shirt up and showed them that he had injuries.

Q. So, Julian Renee pulled his pants down?

A. Yes.

Q. You saw the injury?

A. Yes.

Q. Did Julian Renee receive any medical treatment as a result of his injuries, to your knowledge?

A. Not to my knowledge. I don't know.

MR. WISHAM: Just give me a couple minutes, please.

MR. THOMPSON: We got another piece of mail with our old address