UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - X

VAUGHN SCOTT, NIGERIA SCOTT,
PRINCE SCOTT, ANDREE HARRIS,
BRENDA SCOTT, KRAIG UTLEY, COREY MARROW,
AS A MINOR CHILD, K.M., A MINOR CHILD,
AND JULIAN RENE,

               Plaintiffs,

          -against-
                   14-CV-4441(SHS)
CITY OF MOUNT VERNON, ET AL.,

              Defendants.

- - - - - - - - - - - - - - - - - - - X

HELD AT:      Office of Corporation Counsel
                1 Roosevelt Square
                Mount Vernon, New York 10550
                December 1, 2015
                10:48 a.m.


           Examination before Trial of the

Plaintiff, VAUGHN SCOTT, pursuant to Court

Order, held at the above time and place

before a Notary Public of the State of New

York.




         J & L REPORTING SERVICE
           of Westchester, Inc.
      50 Main Street, Suite 1000
    White Plains, New York 10606
          (914) 682-1888
        Lisa Dobbo, Reporter

A P P E A R A N C E S:


STECKLOW COHEN & THOMPSON, PLLC
Attorneys for the Plaintiffs
Office & Post Office Address
217 Centre Street, 6th Floor
New York, New York 10013
BY:  DAVID ALLEN THOMPSON, ESQUIRE


THE OFFICE OF CORPORATION COUNSEL
Attorneys for the Defendants
Office & Post Office Address
1 Roosevelt Square
Mount Vernon, New York 10550
BY:  WELTON K. WISHAM, ESQUIRE
      Of Counsel


A L S O   P R E S E N T:

          Victoria Badu

A.    Yes.

Q.    Do you have any questions

regarding the deposition before we proceed?

A.    No.

Q.    You filed a civil rights

lawsuit?

A.    Yes.

Q.    Can you tell me why?

A.    Because on that date the police

entered my house without permission and they

held me hostage for five hours; two of them

hours was outside.

Q.    Do you recall what time of day

that was; evening, night?

A.    Approximately 5:30, 6:00.

Q.    So, police officers held you

hostage?

A.    Yes.

Q.    Could you explain what you mean

by that they held you hostage?

A.    They pushed their way into my

home, they took me outside after I told them

do not enter my home.  They said they had a

search warrant.  They took me outside, made

me stand on the porch.  They would not allow

me to go back into my home, they would not

allow me to get a jacket and they would not

allow me to leave my residence even to walk

off my porch.  They would not allow me to.

Q.    Were you injured as a result of

that police action?

A.    Yes.

Q.    How were you injured?

A.    Mentally and I have a physical

illness where I'm not supposed to be in the

cold.  I was made to stand outside, I was

not allowed to get a jacket, was not allowed

to go back into my home for two hours and I

had to stand outside in a T-shirt and a pair

of pajama pants so it made me pain.  I had

pain.  I was in excruciating pain throughout

my body that I have to take morphine for

this pain.

Q.    I'm sorry, you're taking pain

for what?

A.    Morphine because of the pain in

my body that I have.  I have arthritis and

by them making me stand outside it made the

1
2  pain worse.

3          Q.    When did you first start taking

4  the morphine?

5          A.    After I had back surgery.

6          Q.    When was that?

7          A.    That was in 2010.

8          Q.    You started taking morphine

9  before March 20th of 2013; correct?

10          A.    Yes.

11          Q.    Did the police tell you why

12  they were at your apartment?

13          A.    No.

14          Q.    During the course of three

15  hours of the five hours that you said they

16  were present, they never once told you why

17  they were there?

18          A.    No.

19          Q.    Did you ask them why they were

20  there?

21          A.    Yes.

22          Q.    Did they respond?

23          A.    No.

24          Q.    Well, what did they say when

25  you asked them why they were there?

1

2          A.    All they said was -- I believe

3    they said they were investigating something.

4    They never said what.  They would not give

5    me no answers.  They just asked me to be

6    quiet and sit down.

7          Q.    They did inform you that they

8    were there as a result of a police

9    investigation; is that fair to say?

10         A.    They said that but they did not

11   tell me specifically why they were there,

12   yes.

13         Q.    It had occurred approximately

14   what time?

15              MR. THOMPSON:  Objection.

16         Asked and answered.

17              MR. WISHAM:  I can't recall

18         what she said.

19              MR. THOMPSON:  That's fine.

20              MR. WISHAM:  You can answer.

21         A.    Approximately about 5:30, 6:00.

22         Q.    Are you currently employed?

23         A.    No.

24         Q.    When is the last date of your

25   employment?

A.    2010, I believe.

Q.    Can you tell me the name of the employer?

A.    Last employment was at the post office in Harrison.  I don't know the name of the employee but it's the United States Post Office.

Q.    How long were you employed at the post office?

A.    Approximately four, five months.

Q.    Why did you leave?

A.    Because of a back injury.

Q.    Where did you sustain that back injury?

A.    In -- I don't know how I sustained it.

Q.    Before you were employed at the post office for the period of four to five months, were you employed somewhere prior to that?

A.    Yes, I also worked at the school, Mount Vernon School District.

Q.    How long were you employed at

1

2      the Mount Vernon School District?

3              A.    For two years.

4              Q.    What was your position there,

5      by the way?

6              A.    I was a lunch monitor.

7              Q.    A lunch monitor?

8              A.    Yes.

9              Q.    Let's go back to 3-20-2013 at

10     about 5:30 or 6:00.

11             Is that a house, is that an

12     apartment?

13             A.    It's an apartment in a private

14     house.

15             Q.    Is it a two-family,

16     three-family?

17             A.    It was a three-family home.

18             Q.    Where did you live at the time?

19             A.    On the second floor.

20             Q.    Second floor?

21             A.    Yes.

22             Q.    Do you own or do you rent that

23     apartment?

24             A.    Rent.

25             Q.    How long had you been renting

entered.

      Q.    Was she present at any time during the course of this event of 3-20-13?

      A.    Yes.

      Q.    At what point was she present?

      A.    When the officer had me call her and she was on her way home with my granddaughter and had me call her to ask her may they enter her vehicle which was parked in the driveway.

      Q.    Can you describe that vehicle that was parked in the driveway?

      A.    Yes.  It was a minivan, a white minivan, seven passenger.

      Q.    Was the windshield shattered, the back windshield, if you can recall?

      A.    I believe so.  I'm not sure.

      Q.    Arabia Scott, was she present?

      A.    Yes.

      Q.    How old is Arabia Scott, by the way?

      A.    Now Arabia is 17.

      Q.    Is she related to you?

      A.    Yes.

1

2    now?

3              A.    19.

4              Q.    If you don't mind me asking,

5    Ms. Scott, what was everybody doing in this

6    apartment on this particular date?

7              A.    They were playing games, video

8    games, I was getting ready to cook dinner,

9    me and my mother and we was watching TV just

10   getting ready preparing dinner.

11             Q.    You indicated that the police

12   officers told you they were there for an

13   investigation; correct?

14             A.    Yes, after approximately about

15   an hour.

16             Q.    You were standing outdoors?

17             A.    I was in my house until they

18   took me outside.

19             Q.    How did they take you outside?

20             A.    They dragged me and took me out

21   of the house and took me down the steps

22   after they busted into the door.

23             Q.    Did you recognize any of those

24   police officers that were present at that

25   time?

behind in front of everybody.

Q.    So, police officers started to
search Julian Rene?

A.    Yes.

Q.    How did they search him?

A.    By taking down their clothes --
his clothes.

Q.    Well, did they ask him to take
his clothes down?

A.    No.

Q.    But they took his clothes down?

A.    They told him to take his
clothes down.  They didn't ask him and they
pulled his pants down and that's how we
knew.

Q.    Did the police officer ask
anybody else at that residence to take their
clothes down?

A.    Yes, they searched everybody.

Q.    Did they search you?

A.    No.

Q.    Did they search Prince Scott?

A.    They searched everybody else
but me and my mother.

1

2          Q.    You indicated that the police

3    officer pulled down Julian Rene's clothes --

4    pants?

5          A.    Yeah, when they searched him

6    they searched him and pulled down his pants

7    and that's when they noticed that he had, I

8    guess a mark, a hole in his -- I don't know,

9    I can't recall, he had a slit in his

10   underwear and that's when they pulled them

11   down.

12         Q.    Did Julian Rene tell you how

13   that mark got on his body?

14         A.    No.

15         Q.    That mark was where on his

16   body?

17         A.    On his cheek, on his butt.

18         Q.    On his butt?

19         A.    Yes.

20         Q.    Did he tell you he had been

21   shot?

22         A.    No.

23         Q.    During the three or five hour

24   encounter that the police officers were

25   present in your home at 328 S. 2nd Avenue,

you that he had been shot at another

location before 5:30 or 6:00 on March 20th,

2013?

     A.    No.

     Q.    The van was owned by Nigeria

Scott; correct?

     A.    Correct.

     Q.    Had she allowed Corey Marrow or

Julian Rene to drive the vehicle on March

20th, 2013, to your knowledge?

     A.    I don't know.

     Q.    How long have you known Corey

Marrow?

     A.    His whole life.  I'm his

mother.

     Q.    He's not related to you, is he?

     A.    That's my son.

     Q.    Corey?

     A.    That's my son, my child.

     Q.    Do you recall if Corey Marrow

has ever been arrested?

     A.    Yes.

     Q.    How many occasions, to your

knowledge?

2013?

A.    No.

Q.    You recall that the police held you hostage for about three to five hours; correct?

A.    Correct.

Q.    You were outside at one particular point and then you re-entered your apartment 328 S. 2nd Avenue?

A.    Yes.

Q.    At first you indicated that -- I believe you indicated the police would not allow you to enter 328 S. 2nd Avenue; is that true?

A.    Yes.

Q.    At what point did they allow you to re-enter your apartment at 328 S. 2nd Avenue?

A.    At approximately 8:00 p.m., two hours after they came in.

Q.    So --

A.    Once they came in and I told them they was not allowed to come in, asked them to leave, they took me outside and they

held me on the porch for two and a half --

for two hours.  Then they took me back

upstairs, they allowed me to go back

upstairs and they held me in my living room

for the remainder of the three hours.

       Q.    When you went back upstairs and

you were in the living room, the other eight

individuals that we mentioned, they were

also present?

       A.    Yes.

       Q.    Can you recall what Corey

Marrow was doing during this time?

       A.    Yes.

       Q.    What was he doing?

       A.    Sitting on the couch with his

video -- his phone recording.

       Q.    So, he recorded this incident?

       A.    Yes.

       Q.    Do you recall what -- was Corey

Marrow speaking to the police officers while

you were present inside your apartment at

328?

       A.    I believe -- I can't recall.  I

don't remember when was speaking to him or

it was me, my mother and I'm not sure who
else answered the door.  It might have been
Corey but I'm not sure.

     Q.    Do you recall how many police
officers were present at the time that you
responded to their knock at the door?

     A.    I seen five of them.

     Q.    Do you recall Brenda Scott
saying anything to the police officers as a
result of her responding to their knock on
your door?

     A.    No.

     Q.    Did Brenda Scott say anything
to the police officers, if you can recall?

     MR. THOMPSON:  Objection.

     A.    I don't know.  I don't recall.

     Q.    Do you recall whether Nigeria
Scott consented to the police officers to
search her white minivan on March 20th,
2013?

     A.    Yes.

     Q.    Did any of the occupants
sustain any physical injuries as a result of
the police encounter on March 20th, 2013?

A.     Taking my child from the Bronx because I didn't know who the people were that had kidnapped him at the time.

MR. WISHAM:  I just have a couple more questions and we can end this.  Thank you for bearing with me.

Q.     Are there any type of activities that you were able to do before March 20th, 2013 that you're not able to do today as a result of the police encounter on March 20th, 2013?

A.     Yes.

Q.     Could you describe those activities that you're not able to perform?

A.     I'm not able to perform -- I'm not able to read.  I cannot see; I can't cook, I need assistance in doing everything including bathing myself; I can't walk out the door myself.  If I want to decide to go get something, I cannot do it no longer without assistance.

Q.     Well, you indicated during this testimony that Mount Vernon police officers did not physically injure you; correct?

A.     No, they did not physically
other than making me -- they did not
physically injure me but they mentally
injured me.

Q.     But how are you saying that the
Mount Vernon police officers are responsible
for your impaired vision as a result of the
March 20th, 2013 encounter?

A.     Because before March 20th, 2013
I was able to see.  I went to the doctors as
I was told because I had arthritis and
different things.  I had to get all types of
tests done on me including CAT scans and
everything because I had back surgery and I
had fusions put in my neck before this and
due to -- after this incident, I sustained
14 aneurisms, seven brain surgeries,
constantly see a psychiatrist, cannot sleep,
have seizures, a stroke and can't help
myself more less help my children right now.
I can't even watch my grandchild for my
daughter to go to work, so yes, they have
kept me from being able to live a normal,
independent life.

1

2          Q.     When did you first have

3     seizures?

4          A.     I had seizures when -- the

5     first seizure was when I went into the

6     operating room and they decided they was

7     going to clip the aneurism in the first

8     surgery and I was on life support.

9          Q.     When was that?

10          A.     I had a seizure, stroke and --

11     that was the year of 2013, November 2013.  I

12     had four surgeries in between November 2013

13     and December 2nd, 2013.

14          Q.     You're stating that the police

15     officers --

16          A.     Before this I had no aneurisms.

17          Q.     No aneurisms before March 20th,

18     2013?

19          A.     Exactly.

20          Q.     You're saying the police

21     officers caused your aneurisms?

22          A.     Yes.

23          Q.     How did you reach that

24     conclusion that the Mount Vernon police

25     officers as a result of not physically

harming you caused seizures, caused the

stroke, caused your brain surgery?

        A.     The stress and constant

harassment and the nightmares of being in

the pain that my body went into that I could

not get my blood pressure down from being in

the cold I had to go through epidural shots

and I could not get the pain to go down so

it made my blood pressure go down from

sitting in that cold and my doctor always

told me because of the back surgery I should

not be in the cold.  I'm supposed to stay

warm.  At a certain temperature of my body

my bones hurt and after that it made my

blood pressure elevated and the constantly

being of going outside every time you go

outside and seeing Antonini having a way

about himself as arrogant and threatening me

numerous times of telling me he's going to

lock me up.  "You're going to lock me up?

There's going to be a cause for you locking

me up."  "I'm going to make up a charge."

Every time I got in the car and rode with my

son somewhere, in the car with Corey, we was

1

2       doctor for arthritis?

3               A.    Since 2010, 2011.

4               Q.    Any other physical ailments

5       before March 20th, 2013?

6               A.    Not -- no, not where I couldn't

7       -- other than cancer.

8               Q.    I believe you testified today

9       that police officers caused your vision

10      impairment; is that correct?  I believe that

11      you testified today that the Mount Vernon

12      police officers as a result of their

13      encounter with you on March 20th, 2013

14      caused your vision impairment; is that

15      correct?

16              A.    Yes.

17              Q.    You saw an eye doctor as a

18      result of --

19              A.    Yes.

20              Q.    When did you first see this eye

21      doctor?

22              A.    The first time I seen him was

23      when I had 20/20 vision but the last time I

24      seen him was after 2014 I had to see him

25      when I came home from rehab and hospital and

1

2          Q.     Now, nowhere in Paragraph 48

3     where it mentions Vaughn Scott, you as a

4     plaintiff, nowhere in that paragraph does it

5     mention anything regarding the officers'

6     conduct on March 20th, 2013 caused you to

7     have brain surgery; is that true?

8                MR. THOMPSON:  Objection.

9                MR. WISHAM:  You can answer.

10         A.     No, it's not true.

11         Q.     In this Complaint, Paragraph 48

12    it refers to you having brain surgery as a

13    result of the police officers' conduct?

14               MR. THOMPSON:  Objection.  This

15          is argumentative.

16               MR. WISHAM:  You can answer.

17               MR. THOMPSON:  I'm going to

18          direct her not to answer and I'll say

19          why on the record because I know

20          counsel is aware of the broad

21          mechanical information included in

22          the legal term personal injuries so I

23          believe that counsel knows that this

24          is an improper line of questioning

25          for a lay person.

a stroke was, was that in November 2013?

       A.    Yes.

       Q.    But there's no mention of you
having a stroke in 2013 that was caused by
the Mount Vernon police officers March 20th,
2013 actions; correct?

           MR. THOMPSON:  Objection.  You
           mean there's no mention in the
           Complaint?

           MR. WISHAM:  Yes.

           MR. THOMPSON:  I'll just go on
           the record that I believe given the
           fact that we all know the Notice
           doesn't require numeration of
           damages.  Given the fact Ms. Scott
           has a visual impairment for her to
           read the Complaint, it will make it
           difficult for her to understand the
           significance in the Complaint as she
           reads them.  The Complaint speaks for
           itself.  I'm going to direct her not
           to answer questions concerning what
           the Complaint says, what it doesn't
           say and, you know, I will be happy if

the judge believes it is important

for these questions to be answered

I'll be happy to come back with Ms.

Scott and answer the questions but I

believe they're improper questions.

MR. WISHAM:  So noted,

counselor.  Just to be clear that her

testimony today was that the Mount

Vernon police officers as a result of

their entry into Ms. Scott's home on

March 20th, 2013 caused the

plaintiff, Vaughn Scott, to have

brain surgery, seizures, stroke,

aneurisms which are injuries related

to the police officers' actions and

you're directing your client to fail

to discuss that; correct?

MR. THOMPSON:  No, my direction

not to answer is very limited.  I'm

directing her not to answer questions

concerning what is or is not written

in the Complaint.  As far as -- I'm

not directing her not to answer

questions about causation or the

relationship between this incident,

the subject of this lawsuit and how

that lead to her injuries.  The

extent of her injuries and all that

stuff you can ask about.

MR. WISHAM:  Okay.

Q.    Ms. Scott, did a medical doctor

who provided you care indicate to you in

writing that because of police officers'

conduct by entering your home and failing to

allow you to move about caused you to

sustain seizures, stroke, aneurisms and high

blood pressure, did any medical doctor tell

you that?

A.    No medical doctor, no.

Q.    Well, Ms. Scott, if no medical

doctor told you that your brain surgery, the

seizures that you had, stroke that you

sustained and aneurisms that you sustained

were due to the police officers' March 20th,

2013 conduct, how are you testifying today

that the police officers caused you to have

brain surgery, seizures, stroke and

aneurisms sometime after the March 20th,