UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - X

VAUGHN SCOTT, NIGERIA SCOTT,
PRINCE SCOTT, ANDREE HARRIS,
BRENDA SCOTT, KRAIG UTLEY, COREY MARROW,
AS A MINOR CHILD, K.M., A MINOR CHILD,
AND JULIAN RENE,

                Plaintiffs,

              -against-

                              14-CV-4441(SHS)
CITY OF MOUNT VERNON, ET AL.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - X

HELD AT:    Office of Corporation Counsel
            1 Roosevelt Square
            Mount Vernon, New York 10550
            December 2, 2015
            11:05 a.m.

        Examination before Trial of the Plaintiff, KRAIG UTLEY, pursuant to Court Order, held at the above time and place before a Notary Public of the State of New York.

            J & L REPORTING SERVICE
              of Westchester, Inc.
        50 Main Street, Suite 1000
        White Plains, New York 10606
              (914) 682-1888
            Lisa Dobbo, Reporter

A P P E A R A N C E S:

      STECKLOW COHEN & THOMPSON, PLLC
      Attorneys for the Plaintiffs
      Office & Post Office Address
      217 Centre Street, 6th Floor
      New York, New York 10013
      BY:  DAVID ALLEN THOMPSON, ESQUIRE


      THE OFFICE OF CORPORATION COUNSEL
      Attorneys for the Defendants
      Office & Post Office Address
      1 Roosevelt Square
      Mount Vernon, New York 10550
      BY:  WELTON K. WISHAM, ESQUIRE
          Of Counsel

Q. Do you know her?

A. No.

Q. Where did you see her before 2013?

A. She's an officer of the law. She rides around the neighborhood.

Q. Mount Vernon must be a pretty small city then.

A. Yes.

Q. How long were the police officers in your apartment on March 20th, 2013?

A. About three and-a-half hours.

Q. What were they doing?

A. They was trying to search the house and then one of the officers, they was telling us that there was an incident trying to say we was involved in an accident or we had something to do with the incident and they had everybody in the living room and had us sitting there for three and-a-half hours. Within them three and-a-half hours one of the officers, Officer Antonini threw handcuffs on me and he was saying that I was

2    getting out of control.

3        Q.    Officer Antonini handcuffed
4    you, you said?

5        A.    Yes.

6        Q.    What were you doing before he
7    put the handcuffs on?

8        A.    I was arguing.

9        Q.    What were you saying to him?

10       A.    "This ain't right. You don't
11   have a warrant to be in here," stuff like
12   that.

13       Q.    Were you cursing Antonini,
14   Officer Antonini?

15       A.    I probably cursed a few words
16   out.

17       Q.    Do you recall what you said?

18       A.    "Get the fuck out of here, this
19   ain't fucking right, you're fucking
20   harassing us."

21       Q.    What did Antonini say to you,
22   if anything, after you cursed him?

23       A.    He got in my face, he
24   threatened he'll choke me out and I told him
25   he's not going to do nothing. That's when

A. I wasn't trying to challenge him. I was just making it clear that he wasn't going to do nothing to me.

Q. Was that a threat?

A. It wasn't a threat. He threatened me.

Q. Did any other officers assist in handcuffing you?

A. I think about two others.

Q. Were you resisting -- did he tell you to turn around and put your hands behind your back?

A. No, he actually came in front of me and said "Put your hands behind your back." I said, "No, I'm not putting my hands behind my back because you have no reason to put handcuffs on me. I'm not arrested." He replied with "I'm putting the cuffs on you for my safety and your safety."

Q. He indicated that -- Officer Antonini indicated that he was putting the cuffs on you for your safety and his safety?

A. Yeah.

Q. Did you say anything to him

```
1                     K. UTLEY                      21
2              Q.   Did the officers hit anybody
3      during that period of time?
4              A.   Not that I know of.
5              Q.   Let's focus on Julian Rene.
6         How long have you known Julian Rene?
7              A.   I know him since I was ten.
8              Q.   He was in the apartment as you
9      indicated; correct?
10             A.   Right.
11             Q.   What was he doing?
12             A.   They was searching Julian and
13     they was observing that he had got grazed
14     because he indicated that he got shot and
15     they wanted to know where he got shot at and
16     so he showed them where he got shot at.
17             Q.   So, Julian Rene showed the
18     officers where he got shot?
19             A.   Yes.
20             Q.   How did he show the officers
21     where he got shot?
22             A.   They was saying that we had
23     something to do with the shooting and Julian
24     Rene said "Look, I'm the one that got shot.
25     I'm the victim."
```

2    Q.    Julian Rene was shot on
3    3-20-2013?
4    A.    Yes.
5    Q.    Julian Rene told the police
6    officers "I'll show you where I got shot?"
7    A.    Yes.
8    Q.    And Julian Rene told the police
9    officers "I'm the victim?"
10   A.    Yes.
11   Q.    How did Julian Rene show the
12   police officers that he had gotten shot?
13         THE WITNESS:  What do you mean
14   shot?
15   Q.    Julian said "I got shot and
16   I'll show you where I got shot," something
17   to that effect?
18   A.    Yes.
19   Q.    How did he then show the police
20   officers where he had been shot?
21   A.    He got up and showed his butt
22   cheek.
23   Q.    Julian Rene was sitting down?
24   A.    He was sitting town.
25   Q.    Then he got up?

```
1                        K. UTLEY                    23
2            A.   He got up.
3            Q.   Then he pulled his pants down
4       and showed the police officers?
5            A.   Yes.
6            Q.   He had gotten shot on the butt
7       cheek?
8            A.   Yes.
9            Q.   Was any blood in that
10      apartment?
11           A.   I don't know.
12           Q.   Julian Rene indicated "I'm the
13      victim," correct?
14           A.   Yes.
15           Q.   Julian Rene told the police
16      officer he was the victim; correct?
17           A.   Yes.
18           Q.   Did Julian Rene tell anybody in
19      the apartment on 3-20-2013 before the
20      officers entered the apartment, did Julian
21      Rene tell anybody that he had been shot?
22           A.   I don't know.  I wasn't around
23      if he told them.  I found out when he showed
24      the officer that he got shot.
25           Q.   That's the first time you
```

became aware that Mr. Rene had been shot?

A. Yes.

Q. What about Corey Marrow, had he been shot?

A. Not to my knowledge.

Q. Did Julian Rene tell you or anyone during that time on 3-20-13 how he had gotten shot?

THE WITNESS: Did he tell anybody?

MR. WISHAM: Yes.

A. I mean I wasn't around. He probably did tell somebody how but I wasn't around when he told somebody how.

Q. Do you know where he got shot?

THE WITNESS: Where at he got shot?

MR. WISHAM: Yes, approximately where.

A. It had to have been by the projects.

Q. The projects is what area, that's in Mount Vernon?

A. Yes.

```
1                     K. UTLEY                    25
2           Q.    Do you know what street that
3    would have been on?
4           A.    3rd Street.
5           Q.    Who was Julian Rene with when
6    he got shot?
7           A.    Me.
8           Q.    He was with you?
9           A.    Yes.
10          Q.    Was he with anybody else?
11          A.    No, he was just with me when he
12   got shot.
13          Q.    So, you saw him get shot?
14          A.    I did not see him get shot
15   because when the shots was being fired me
16   and Julian Rene ran into cover.
17          Q.    You ran into where?
18          A.    Ran into cover.  I was on the
19   floor behind a car and when I yelled I
20   noticed that Julian Rene was behind the car.
21          Q.    Behind what car?
22          A.    I don't know exactly what type
23   of car it was.  It was a car.
24          Q.    Do you know who was doing the
25   shooting?
```

```
                    K. UTLEY                      27
```

 1
 2      Q.   You and Julian Rene hopped into
 3 the white minivan?
 4      A.   Yes.
 5      Q.   Who was driving the white
 6 minivan?
 7      A.   I believe it was Corey Marrow.
 8      Q.   Corey Marrow, yourself and
 9 Julian Rene were at the scene where the
10 shots had occurred; correct?
11      A.   No, Corey Marrow was not at the
12 scene.  We met Corey Marrow on 9th and 3rd.
13      Q.   9th and 3rd; correct?
14      A.   Yes.
15      Q.   How did you and Julian Rene
16 meet Corey Marrow on 9th and 3rd?
17      A.   Mr. Marrow just happened to be
18 coming down 9th.  We seen the car and we
19 stopped him.
20      Q.   Were shots still being fired at
21 the time?
22      A.   Yes.
23      Q.   Do you recall how many shots
24 were fired?
25      A.   Around six or seven.

```
 1                    K. UTLEY                    28
 2         Q.    So, you and Julian Rene hopped
 3   into Corey Marrow who was driving the white
 4   van; correct?
 5               MR. THOMPSON:  Objection to
 6         form.
 7         Q.    You, Julian Rene, right, got
 8   into Corey Marrow's car that he had been
 9   driving which was a white minivan; correct?
10         A.    Yes.
11         Q.    What was said between yourself,
12   Julian Rene and Corey Marrow during this
13   time that you were in the van?
14         A.    "Somebody was just shooting."
15         Q.    Who said that?
16         A.    I did.
17         Q.    Was there a response?
18         A.    It was "Who was shooting?"  "I
19   don't know."
20         Q.    Did Julian Rene say anything
21   during this time?
22         A.    I don't believe so.  I can't
23   recall.
24         Q.    Do you recall whether or not
25   the white van had a windshield, rear
```

windshield that was broken?

A. I don't recall.

Q. Corey Marrow drove to 328 S. 2nd Avenue; correct?

A. Yes.

Q. Did Mr. Rene receive any medical treatment?

A. Not at my aunty's house.

Q. Where did he receive it?

A. I don't know if he received any medical attention at all but I know at the time me being with him on that day he did not receive medical attention when I was with him.

Q. When he got into the white minivan, he didn't say "Oh, I'm hurt. Drive me to the hospital?"

A. No.

Q. The police eventually left your apartment after what, three and-a-half hours you said?

A. Three and-a-half hours.

Q. Did they arrest you?

A. No.

```
                         K. UTLEY                    30
```

Q. Did they arrest anybody in that apartment?

A. No.

MR. WISHAM: I'd like to have a document marked for identification.

(Whereupon, Defendant's Exhibit C, Adult Profile Sheet, was marked for Identification.)

MR. THOMPSON: Kraig, you got your eyes about five inches from the record. Do you have trouble reading?

THE WITNESS: Yes.

MR. THOMPSON: Do you have glasses or something that you can use to make it easier for you to read?

THE WITNESS: No, I lost my glasses.

MR. THOMPSON: I guess the record should also reflect Mr. Utley is looking at what's been marked as Defendant's Exhibit C.

Q. You've been given a copy of what's been marked as Defendant's Exhibit C; correct?

K. UTLEY                          31

        A.    Yes.

        Q.    At the top it says Aegis Public Safety System; correct?

        A.    Yes.

        Q.    Mount Vernon Police Department?

        A.    Yes.

        Q.    Adult Profile Sheet?

        A.    Yes.

        Q.    It's got your name underneath, Utley, Kraig?

        A.    Yes.

        Q.    It says height 5'4", is that approximately correct?

        A.    Yes.

        Q.    Approximately 135 pounds in weight?

        A.    Yes.

        Q.    Brown eyes?

        A.    Yes.

        Q.    Black hair?

        A.    Yes.

        Q.    Date of birth 11-25-1988?

        A.    Yes.

        Q.    Below it says previous address.

A. Yes.

Q. Is that information correct, that you had a previous address at 347 S. 4th Avenue?

A. Yes.

Q. And 247 S. 4th Avenue?

A. No.

Q. You never lived there?

A. No.

Q. What about 210 S. 3rd Avenue?

A. Yes, but not on this date.

Q. And the date that says that you lived at the previous address 210 S. 3rd Avenue, that was 6-27-2006?

A. 6-27-2006 I lived at 210 S. 3rd Avenue.

Q. What date did you live there?

A. I moved from 210 S. 3rd Avenue in 2001.

Q. But you did live there?

A. Yes.

Q. I just want to -- before I ask you -- go into this report, let me ask you this: Have you ever been arrested before?

```
                    K. UTLEY                      33
```

A. Yes.

Q. Do you recall approximately how many times?

A. Between five and ten.

Q. Five and ten times?

A. Yes.

Q. Do you recall the first time you were arrested?

A. The first time, yes.

Q. What were you arrested for?

A. Marijuana.

Q. Do you recall the disposition of that case?

THE WITNESS: Disposition?

MR. WISHAM: Yes.

Q. Was it dismissed, did you plead guilty, was there a trial?

A. The first time I was arrested was I was 16 and I got arrested in school.

Q. And --

A. That was for attempted robbery.

Q. Okay.

A. I ended up pleading guilty and received three years probation.

```
                        K. UTLEY                    40
Law 205.30, resisting arrest.
        Were you ever arrested for resisting
arrest?
        A.   I was arrested for.
        Q.   Have you ever been arrested for
resisting arrest?
        A.   Yes.
        Q.   When?
        THE WITNESS:  Like by myself
resisting arrest or arrested for
another charge and they put resisting
arrest on?
        MR. WISHAM:  Why don't you just
tell me if you ever resisted arrest
and the circumstances whether or not
it was for a different charge or any
charge.
        MR. THOMPSON:  I'm going to
direct him not to discuss the
circumstances of arrests other than
what we're here for today.
        Q.   You indicated you've been
arrested for resisting arrest; correct?
        A.   Yes.
```

the city?

MR. WISHAM: Yes.

A. This will be my first suing incident.

Q. You weren't physically injured; correct?

A. No.

Q. Did you sustain any injuries on March 20th, 2013?

MR. THOMPSON: Objection. Asked and answered.

MR. WISHAM: I asked about physical injuries. I said injuries, counselor.

Q. Did you sustain any injuries on March 20th, 2013?

THE WITNESS: Clarify injuries.

Q. Were you harmed in any way on March 20th, 2013?

THE WITNESS: Bodily harmed, physically harmed, mentally harmed?

Q. Were you harmed in any way, were you harmed in any manner?

A. I wasn't physically harmed but

K. UTLEY 49

emotionally I was harmed.

     Q.   How were you emotionally harmed?

     A.   Because I had to sit in a house in prison for three and-a-half hours for nothing.

     Q.   As a result of your emotional harm, did you see any medical personnel?

     A.   No.

     Q.   No counselors?

     A.   No.

     Q.   As a result of your emotional harm, are you limited in any activities today that you could perform on March 20th, 2013?

     THE WITNESS: Clarify your question.

     Q.   You said you have emotional injuries; correct?

     A.   Yes.

     Q.   Do you still have the emotional injuries today?

     A.   Yes.

     Q.   How?