14 CV 04441 (K.M.K,)
_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____
VAUGHN SCOTT, NIGERIA SCOTT, PRINCE SCOTT,
ANDREE HARRIS, BRENDA SCOTT, KRAIG  UTLEY,
COREY MARROW, A.S. A MINOR CHILD,
K.M. A MINOR CHILD, AND JULIAN RENE,

                          Plaintiffs,


       -against-


CITY OF MOUNT VERNON,A MUNICIPAL ENTITY,
MT. VERNON POLICE OFFICER ALLEN,
MT. VERNON POLICE OFFICER CAMILO ANTONINI,
MT. VERNON POLICE OFFICER TIMOTHY BRILEY,
MT VERNON POLICE OFFICER DET. BRENT GAMBLE,
MT. VERNON POLICE OFFICER SGT. STEVEN SEXTON,
CITY OF MT. VERNON POLICE DEPARTMENT, AND
POLICE OFFICERS JOHN DOES 1-10.

                          Defendants,
_____X


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT**
_____


                    By      /s/_____
                                    Welton K. Wisham, Esq. (WW8674)
                                    43 West 43rd Street, Suite 95
                                    New York, New York 10036-7424
                                    Attorney for the Defendants
                                        (212) 709-8183

## TABLE OF CONTENTS        PG

<u>TABLE OF AUTHORITES</u> …………………………………………………………4, 5, 6, 7

<u>PRELIMINARY STATEMENT</u>…………………………………………………..    8

<u>STATEMENT OF FACTS</u>…………………………………………………………    13

<u>LEGAL ARGUMENT</u>………………………………………………………………    13

<u>STANDARD FOR SUMMARY JUDGMENT</u>……………………………………….    13

 POINT I

THE SEARCH AND SEIZURE INSIDE PLAINTIFFS' RESIDENCE WITHOUT A WARRANT
WAS CONSTITUTIONALLY PERMISSIBLE DUE TO THE EXIGENT CIRCUMSTANCES
WHICH EXISTED AT THE TIME OF ENTRY. ………………………………………… .    14

a)  THE DOCTRINE OF "HOT PURSUIT"…………………………………………    23

b)  EMERGENCY AND PREVENTION OF HARM………………………………….    23

c)  THE PREVENTION OF THE IMMINENT DESTRUCTION OF EVIDENCE
   AUTHORIZED THE OFFICERS TO ENTER PLAINTIFFS' RESIDENCE
   WITHOUT  A WARRANT. …………………………………………………..  24

d)  THE SEARCH FOR WEAPONS IN THE ABSENCE OF PROBABLE CAUSE TO ARREST
   WAS CIRCUMSCRIBED BY THE EXIGENCIES OF THE CIRCUMSTANCES AND FOR
   THE PROTECTION OF THE  OFFICERS…………………………………………  25

<u>POINT II</u>

DEFENDANTS DID NOT ENGAGE IN EXCESSIVE USE OF FORCE AGAINST THE
PLAINTIFFS
  …………………………………………………………………………  29

<u>POINT III</u>

PLAINTIFFS' SECOND CLAIM FOR RELIEF FOR FALSE ARREST UNDER 42.U. S. C
SECTION 1983 MUST BE DISMISSED BECAUSE NONE OF THE PLAINTIFFS WERE
ARRESTED AND BECAUSE THE PLAINTIFFS TEMPORARY DETENTION WAS
BASED ON PROBABLE CAUSE……………………………………………………..    32

<u>POINT IV</u>

PLAINTIFFS' THIRD CLAIM FOR RELIEF FOR FAILURE TO INTERVENE UNDER
42 U.S.C. 1983, MUST BE DISMISSED BECAUSE PLAINTIFF'S FOURTH
AMENDMENT RIGHTS WERE NOT VIOLATED.
  ………………………………………………………………………………..  33

**POINT V**

**PLAINTIFF FOURTH CLAIM FOR RELIEF FOR FALSE IMPRISONMENT AND FALSE ARREST UNDER NEW YORK STATE LAW MUST BE DISMISSED BECAUSE THE CLAIM IS TIME BARRED. …………………………………………………………… 35**

**POINT VI**

**PLAINTIFFS' FIFTH CLAIM FOR RELIEF FOR ASSAULT AND BATTERY UNDER 42.U.S.C. SECTION 1983, AND UNDER NEW YORK STATE LAW MUST BE DISMISSED, BECAUSE THE ACTION IS TIME BARRED UNDER NEW YORK STATE LAW AND BECAUSE OF THE LACK OF OFFENSIVE CONTACT. …………………………………………………………………………………………… 41**

**POINT VII**

**THE PLAINTIFF'S  SIXTH AND SEVENTH CLAIM FOR RELIEF FOR NEGLIGENCE UNDER 42 U.S.C. SECTION 1983, MUST BE DISMISSED BECAUSE THERE IS NO EVIDENCE OF THE MUNICIPALITY'S FAILURE TO TRAIN , SUPERVISE ,OR RETAIN DEFENDANTS. ……………………………………………………………….. 42**

**POINT VIII**

**PLAINTIFFS' EIGHTH CLAIM FOR RELIEF FOR RESPONDEAT SUPERIOR UNDER NEW  YORK STATE LAW FAILS BECAUSE THERE WAS NO TORTIOUS ACT COMMITTED BYTHE DEFENDANT OFFICERS. …………………………………………………………………………………….. 44**

**POINT IX**

**MONELL:**

**PLAINTIFF'S NINTH CLAIM FOR RELIEF CITING MONELL UNDER 42.US.C. SECTION 1983, MUST BE DISMISSED BECAUSE THE PLAINTIFFS HAVE FAILED TO PRODUCE ANY EVIDENCE IN THE RECORD SHOWING ANY DEFICIENCIES IN THE CITY OF MOUNT VERNON'S HIRING, TRAINING,SUPERVISION, OR DISCIPLINE OF ITS POLICE OFFICERS………........................................................  45**

**POINT X**

**THE CITY OF MOUNT VERNON POLICE DEPARTMENT IS A NON SUABLE ENTITY AND THERFORE PLAINTIFFS CLAIMS AGAINST THE DEFENDANT MOUNT VERNON POLICE DEPARTMENT MUST BE DISMISSED………………  50**

**POINT XI**

**SINCE THE POLICE OFFICERS ACTED OBJECTIVELY REASONABLE IN ENTERING PLAINTIFF'S RESIDENCE,THE DEFEDNATS ARE ENTITLED TO QUALIFIED  IMMUNITY............................................................................................ 50**

**CONCLUSION ……………………………………………………………… 52**

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                 <u>**Pages**</u>

Anderson v. Branen,
  17 F. 3d 552, 557 (2nd Cir. 1994) ……………………………………………………  34

Anderson v. Creighton,
  483 U.S. 635, 107 S. Ct. 3034 (1987)………………………………………………  50,51

Anderson v. Liberty Lobby Inc.,
  477 U.S. 242, 248, 106 S. Ct. 2505 (1986)…………………………………………  14

Antonious v. Muhammad, 250 A.D. 559,(2nd Dept. 1998)……………………………  43

Bernard v. United States,
  25 F. 3d 98, 102 (2nd Cir. 1994)…………………………………………………...  33

Brigham City v. Stuart,
  547 U.S. 398, 403 (2006)……………………………………………………………  15, 24

Broughton v. State,
  37 N.Y.S. 2d 451, 457, 335 N.E. 2d 310, 373 N.Y.S. 2d 87 (1975)…………………  36

Camara v. Municipal Court,
  387 U.S. 523 (   ) ……………………………………………………………………..  27

Canton v. Harris,
  489 U.S. 378, 109 S. Ct. 1197, (1989)……………………………………………  42, 47

Carrol v. United States
,
  267 U.S. 132 (    )……………………………………………………………………  28

Celotex v. Catrett,
  477, U.S. 317, 323-324, 106 S.Ct. 2548 (1986)……………………………………  13

Chambers v. Maroney,
  399 U.S. 42 (1970) …………………………………………………………………  15

Clay v. Conlee,
  815 F. 2d 1164, 1170 (8th Cir. 1987) ……………………………………………  44

Colon v. Coughlin,
  58 F. 3d 856, 873 (2nd Cir. 1995)…………………………………………………..  43

Croh v. Ramirez ,
  540 U.S. 555, 559 (2004)……………………………………………………………  15

Cruz v. Church,
  05-CV-1067, 2008 WL 4891165 (N.D.N.Y. ) ……………………………………  14

Dwares v. City of New York,
    985 F. 2d 94, 101 (2nd Cir. 1993)………………………………………………………………… 48

Elkins v. United States,
    364 U.S. 206 (1960)………………………………………………………………………… 15

Fincher v. County of Westchester,
    44 Misc. 3d 383, 979 F. Supp. 989,998 (S.D.N.Y. 1997)……………………………………… 35

Florida v. Royer,
    460 U.S. 491(1983)…………………………………………………………………………… 27

Georgia v. Randolph,
    547 U.S. 103 (2006)………………………………………………………………………… 15

Graham v. Connor,
    490 U.S. 386, 396 (1980)…………………………………………………………………… 31

Guntlow v. Barbera,
    76 A.D. 3d. 760, 907 N.Y.S. 2d 86 (3rd Dept. 2010)…………………………………………… 41

Harlow v. Fitzgerald,
    457 U.S. 800,818 102 S. Ct. 2727 (1982)……………………………………………………... 50, 51

Hernandez v. City of New York,
    100 A.D. 3d 433, 953 N.Y.S. 2d 199 (1st Dept. 2012)……………………………………… 35

Iqbal v. Hasty,
    490 F. 3d 143, 152 (2nd Cir. 2007) ……………………………………………………… 43

Jeffreys v. City of New York,
    426 F.3d 549, 554 (2nd Cir. 2005)………………………………………………………… 32

Kentucky v. King.
    563 U.S. 452 (2011)………………………………………………………………………… 25

Kerzer v. Kingly Mfg.,
    156 F.3d 396, 400 (2nd Cir. 1998)………………………………………………………… 14

Khanukayev v. City of New York,
    No 09 Civ. 61751 (2012) U.S Dist. Lexis 113779 WL 3538729 (S.D.N.Y. 2012)    48

Koeiman v. City of New York,
    36 A.D. 3d 451, 453 (1st Dept. 2007) ……………………………………………………... 31

Malley v. Briggs,
    475 U.S. 335, 341 106 S. Ct. 1092 (1986)…………………………………………………... 50, 52

Matsushita Elec. Indus Co. v. Zenith Radio Corp.,
    475 U.S. 574, 587 (1986)…………………………………………………………………… 14

TABLE OF AUTHORITIES                                                      Pg

Medina v. City of New York,
    102 A.D. 3d 101, 108 (1st Dept. 2012)……………………………………………………   43

Mincey v. Arizona,
    437 U.S. 394 (1978)……………………………………………….. …………………..   15

Minnesota v. Olsen,
    495 U.S. 91 (1990)…………………………………………………………………… 24

Mitchell v. Forsyth,
    472 U.S. 511,526 (1985) …………………………………………………… ..   51

Monell v. New York City Dept. of Social Servs,
    436 U.S. 658, 694, 98 S. Ct. 2018 (1978)………………………………………… 42, 47

Oklahoma City v. Tuttle,
    471 U.S. 808-824 (1985)…………………………………………………………….. 48

Orraca v. City of New York,
    897 F. Supp. 148897 F. Supp. 148, 151-152 (S.D.N.Y. 1995)…………………………… 50

Pendleton v. City of New York,
    44 A.D. 3d 733, 736 (2nd Dept. 2007)…………………………………………………   47

Pearson v. Callahan,
    129 S. Ct. 808, 816 (2009)………………………………………………………...   51

Petrychenko v. Solvey,
    99 A.D. 3d 777, 780 952 N.Y.S. 2d 575 (2nd Dept. 2012)………………………………..   35

Posr. v. Killackey,
    01 Civ. 2320 (LTS) (GWG) 2003 U.S. Dist. Lexis 12755, at 7-8(S.D.N.Y. July 25,2003)……….. 14

Rivera v. City of New York,
    40 A.D. 3d 334, 341 (1st Dept. 2007)…………………………………………………   31

Rizzo v. Goode,
    423 U.S. 362, 371 (1976)……………………………………………………………   44

Roaden v. Kentucky,
    413 U.S. 496 (1973) 93 S. Ct. 2796 2802……………………………………………….   16

Saucier v. Katz,
    533 U.S. 194, 205 (2001)……………………………………………………………   52

Seshadri v. Kasraian,
    130 F. 3d 798, 802 (7th Cir. 1997)……………………………………………………… 32

Talavera v. Arbit,
    18 A.D. 3d 738, 795 N.Y.S. 2d 708 (2nd Dept. 2005)    ……………………………….. 45

Terry v. Ohio,
    392 U.S. 1 (1968)………………………………………………… 15, 25, 27, 28, 32,

Town of Orangetown v. Magee,
    88 N.Y.S. 2d 41, 49( 1996)    …………… …………………………………………… 47

Trigo Hnos Inc. v. Premium Wholesale Groceries Inc.,
    424 F. Supp. 1125, 1129 (S.D.N.Y. 1976)……………….………………………………….. 32

United States v. Santana,
    427 U.S. 38 (1976)………………………………………………………………   15, 23

Warden v. Hayden,
    387 U.S. 294 (1967)………………………………………………………… 15, 22, 23, 28

Wahhab v. City of New York,
    386 F. Supp. 2d 277, 285 (S.D.N.Y. 2005) ……………………………………..         49

Weyant v. Okst,
    101 F. 3d 845, 852 (2nd Cir. 1996) ……………………………………..    32, 50

Wilner v. Village of Roslyn,
    952 N.Y.S. 2d 71 (2nd Dept. 2012)………………………………………………………   47

## STATUTES

**U.S. Const. IV………………………………………………...11, 15, 22, 25, 26, 28, 32,33**

**42 U.S.C. Section 1983   ……………………………………… 7, 34, 42, 43, 46,47**

**N.Y. Gen. Mun. Law Section 50 (e )…………………………………………,        13**

**C.P.L.R. (215)(3)…………………………………………………………… 35,42**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X_

VAUGHN SCOTT, NIGERIA SCOTT, PRINCE SCOTT,                    **DEFENDANTS'**
ANDREE HARRIS, BRENDA SCOTT, KRAIG  UTLEY,                  **MEMORANDUM OF LAW**
COREY MARROW, A.S. A MINOR CHILD,                                  **IN SUPPORT OF THEIR**
K.M. A MINOR CHILD, AND JULIAN RENE,                                **MOTION FOR SUMMARY**
**JUDGMENT**

                                        Plaintiffs,                                    14 CV 04441 (K.M.K,)

              -against-                                                         ORAL ARGUMENT
                                                                                   **REQUESTED**

CITY OF MOUNT VERNON,A MUNICIPAL ENTITY,
MT. VERNON POLICE OFFICER ALLEN,
MT. VERNON POLICE OFFICER CAMILO ANTONINI,
MT. VERNON POLICE OFFICER TIMOTHY BRILEY,
MT VERNON POLICE OFFICER DET. BRENT GAMBLE,
MT. VERNON POLICE OFFICER SGT. STEVEN SEXTON,
CITY OF MT. VERNON POLICE DEPARTMENT, AND
POLICE OFFICERS JOHN DOES 1-10.

                                        Defendants,
_____X

     Defendants City of Mount Vernon, Mount Vernon Police Department, Officer Allen,

Officer Camilo Antonini, Detective Brent Gamble, Officer Sgt. Steven Sexton, and Officer

Timothy Briley, by their attorney Welton K. Wisham, as outside counsel for the Corporation

Counsel of the City of Mount Vernon, submit the within memorandum of law in support of their

motion for summary judgment pursuant to Fed. R. Civ. P. 56.

## PRELIMINARY STATEMENT

     On the evening of March 20, 2013 at approximately  18:17 hours,  (6:17 pm) a  frantic

caller dialed 911, in the City of Mount Vernon , New York, informing the Mount Vernon Police

Department that several shots had been fired in the vicinity of 215 South Ninth Ave, City of

Mount Vernon.   The caller informed the police that a white Mini Van with a shattered rear

windshield containing three male blacks had been spotted in the area where the shots had been

fired traveling down South Ninth Street.  The call was logged, and recorded, by the Mount

Vernon Police Department Live Aegis Public Safety System Incident Report.

A second caller also made a called to 911 to report the fact that he heard shots fired and witnessed a light skin male with a red hoodie run towards ebony gardens, opposite 70 West 3rd street. The shooting incident was recorded as Incident No 2013-00009571.

The Mount Vernon Police Department immediately dispatched several police units to the scene where the shots had been fired. Officers Michael Gregorio, and Officer Johanna Santos, responded to the area of South 9th. Street on a radio report of shots fired, and that a male black had been seen running through Ebony Gardens ,and that multiple suspects had been seen getting into a white van, with a shatter rear windshield at South 9th Ave. Both officers Gregorio, and Santos, set up a perimeter at the vicinity of South 8th Ave. Three (3) 9mm shell casings were recovered at the crime scene by detective Notarfrancesco from the roadway located at West 3rd street between South 7th. Ave & South 9th. Ave opposite 70 West 3rd street. The shell casings recovered were subsequently logged in as evidence. The police department immediately dispatched several police officers to the scene.

Officers Gregorio, and Santos, responded to the report of shots fired and proceeded to canvass the area for a white van with a shattered rear windshield. While canvassing the vicinity, officer Gregorio observed a white van with a shattered rear windshield parked in the driveway of 328 South 2nd Ave. The vehicle fit the description of the van observed fleeing the scene where moments before several shots had been fired on South 9th Street, only minutes away from 328 South 2nd Ave. The Mount Vernon police department sent out a radio transmission alerting several officers that the white minivan which fled the scene of the shooting had been located at 328 South 2nd Ave. Officer Gregorio reported that upon arriving at 328 South 2nd Ave, he felt the hood of the van noting that the engine which was still warm.

Officer Gregorio observed the vans' licensed plate number as NY-GEN 5700, parked in the driveway of 328 South 2nd Ave. Detective Ibanez arrived at 328 South 2nd Ave, along with an eyewitness who saw the minivan driving away from the shooting. The eyewitness immediately identified the minivan parked in the driveway of 328 South 2nd Ave, as the van he observed

leaving the area of 215 South 9th Ave. at the time of the shooting.  Officer Gregorio ran a check on the license plate number and was informed that the owner of the vehicle was Nigeria Scott, a resident of 328 South 2nd Ave.

Police units established a perimeter in front of 328 South 2nd Ave.  Officer Gregorio, and Santos, were met at the scene of 328 South 2[nd.] Ave, by Sgt. Steven Sexton, who was also made aware of the fact that a shooting had occurred and that individuals had fled in a white van which was now found in the driveway of 328 South 2nd Ave.

Sargent Sexton, and officer Gregorio, proceeded to the 2nd floor where they knocked on the door and were met by Brenda Scott, and Vaughn Scott. The officers informed Brenda Scott that the officers were there to investigate the shooting which involved her daughter's white minivan. The officers requested permission to enter the residence due to the nature of their investigation and their belief that some of the occupants might have been involved in the shooting, or injured. Brenda Scott granted the officers request and gave consent for the officers to enter.

Upon entering the residence,   Officer Gregorio observed approximately six black males inside the apartment.  Two males approached the doorway . Officer Gregorio instantly recognized Prince Scott, and Corey Marrow, both of whom began shouting obscenities at the officers. Officer Gregorio observed both males to be "**sweating profusely, and breathing rapidly"**.

Sargent Sexton also immediately recognized Corey Marrow, Kraig Utley, Prince Scott, and Demetrius Royal, inside the apartment as individuals whom Sgt. Sexton had numerous prior interactions with, and who knew the individuals, Marrow, Utley, Scott and Royal, as members of a local gang crew called " **The Gunners" .** The Gunners, according to Sgt. Sexton, were responsible for a lot of violence within the City of Mount Vernon.  In fact Sargent Sexton recalled that Prince Scott had been involved in a prior shooting incident which took place the prior summer on Adams Street and Fulton Ave.

Officer Gregorio identified other occupants of the apartment as being Kraig Utley, James Howell, Turone Basin, Kevin Marrow, Arabia Scott, Andre Harris, Demetrius King Royal, Julien Renee, and Corey Marrow.

Once inside the apartment the officer conducted a limited search for weapons, and possible victims.  The search was also conducted for the safety of the officers.   One of the occupants, Julien Renee, admitted that he had in fact been shot in the buttocks, and voluntarily pulled down his pants to show the officers his wounds.  Mr. Renee informed the officers that he had been shot in front of 70 West 3rd Street towards 7th Ave where he had heard five (5) gunshots.

Julien Renee informed the officers that had jumped into his friends van and drove to 328 South 7th Ave.  Corey Marrow was the driver of the white minivan that had fled the scene of the earlier shooting.   Sexton saw several occupants hiding in a back room, and were subsequently ordered to come out of the back room ,and to gather in the  living room where the occupants could be readily observed for the safety of the officers.  No physical altercation occurred and no arrests were made.  The officers remained inside the occupant's residence for approximately two to three hours.

Defendants' motion for summary judgment should be granted for several reasons.  First, exigent circumstances existed prior to the defendant's entry inside the occupants residence which authorized entry within the parameters of  the reasonableness recognized under the Fourth Amendment to the Constitution of the United States.   The entry without a warrant, was justified based on the exigent circumstances which existed at the time of entry and the consent that was given by Brenda Scott.

Second, the Defendants had probable cause to detain the occupants of the residence. The officers reasonably believed  that a crime had been committed and that the occupant's lives may have been in danger . The officers also believed that suspects of the shooting were inside who posed an imminent threat to the occupants.

Third, the Defendants were faced with "now, or never" circumstances which prevented them from obtaining a search warrant prior to their entry inside the residence. Based on the exigent circumstances, the officers conducted a limited search of the residence, and temporarily detain the occupants.

Fourth, Plaintiffs' claims of false arrest, and false imprisonment, cannot stand, because the defendants had probable cause for the detainment and under New York Law both actions are time barred.

Fifth, Plaintiff Julien Rene's claim that the officers forced him to pull his pants down to show where he had been shot should be dismissed. Julien Rene voluntarily pulled down his pants to show the defendant officers that he was the victim of a crime and that he had been shot in the buttocks. Thus, this claim must be dismissed.

Sixth, Plaintiffs' claim that the defendants had established records of unlawful or negligent performance of their duties including incidents of harassment of civilians, false arrest and excessive force must be dismissed because Plaintiffs have failed to point to any evidence within the record whereby a reasonable jury could favorably find for the Plaintiffs on this issue.

Seventh, Plaintiff's claims against the Defendants for assault and battery, under New York Law, must be dismissed because the Plaintiff's claims are time barred because. Plaintiffs failed to timely commence their lawsuit within one year and ninety days.

The instant action commenced on March 20, 2013. According to this Court's civil docket sheet, Plaintiff's Summons and Complaint was filed on June 19, 2014. According to N.Y. Gen Municipal Law Section 50-e and 50-I, requires that a plaintiff asserting a state tort law claim against a municipal entity, or its employees acting within the scope of their employment, the action must be commenced within one year, and ninety days from the date of accrual. Thus, this claim is time barred.

12

Eighth, Plaintiffs claims against the Defendants for conduct alleging negligence under New York State Law must also be dismissed in accordance with Gen Mum L. Sections 50-e and 50-i as untimely for the reasons set forth above.

Ninth, Plaintiffs claims against the Defendants alleging "Respondent Superior under New York State Law must also be dismissed in accordance with  Gen. Mun. Law Section 50(e), and 50 (i) because the Plaintiff commenced this action in excess of the one year, and ninety day statute of limitations. Moreover, the record is void of tortious conduct committed by the Defendants.

Tenth, Plaintiff's claims against Defendants for " Negligence " under U.S.C. Section 1983 must also be dismissed because the claim is not cognizable under 42 U.S. Section 1983.

Eleventh, Defendants are entitled to Qualified Immunity which shields the Defendants from any liability stemming from the March 20, 2013, incident because their actions were objectively reasonable under the circumstance and  no rational trier of fact could possibly find in favor of the Plaintiffs.

## STATEMENT OF FACTS

The Court is respectfully directed to Defendants' Statement Of Facts under Fed. R. Civ. Pro. Local Rule 56.1

## LEGAL ARGUMENT

## STANDARD FOR DISMISSAL UNDER SUMMARY JUDGMENT

Summary judgment is warranted when viewing the evidence in a light most favorable to the non- moving party, the Court determines that there exists no genuine issues of material fact in dispute.   Under Fed. R. Civ. P. 56, summary judgment is warranted if the pleading , depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56.    In determining whether a genuine issue of material facts exists, the Court must resolve all ambiguities, and draw all reasonable inferences against the moving party.  **Celotex v. Catrett**, 477 U.S. 317, 323-24 106 S. Ct. 2548 (1986).

Once a motion for summary judgment is made and supported, the non-moving party must come forward with specific facts showing there is a genuine issue for trial.  See **Matsushita Elec. Indus Co. v. Zenith Radio Corp,** 475 U.S. 574, 587(1986)(citation omitted).

 A dispute of fact is material " if it might affect the outcome of the suit under the governing law" **Anderson v. Liberty Lobby, Inc.** 477 U.S. 242, 248 106 S. Ct. 2505, (1986)  "Factual disputes which are irrelevant, or unnecessary will not  be counted".  **Id.** at 248.  In determining whether a factual dispute is genuine, " a dispute of fact is genuine if the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." **Id**.  Conclusionary allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." **Kerzer v. Kingly Mfg.,** 156 F. 3d. 396, 400 (2nd Cir. 1998)

 If the non-moving party's evidence "is merely colorable, or is not significantly probative," or if it consists only of "conjecture, or surmise," summary judgment may be entered against that party.   **Posr v. Killackey,** 01 Civ. 2320(LTS)(GWG),2003 U.S. Dist. Lexis 12755, at 7-8 (S.D.N.Y. July 25, 2003)

 It is well established that issues of credibility are almost never to be resolved by a court on a motion for summary judgment." **Cruz v. Church,** 05-CV-1067, 2008 WL 4891165(N.D.N.Y.) For the reasons set forth herein, Defendants are  respectfully requesting this Court to grant the Defendants request for summary judgment and dismiss the Plaintiff's complaint in its entirety .

## POINT  I

**THE SEARCH AND SEIZURE INSIDE PLAINTIFFS' RESIDENCE WITHOUT A WARRANT WAS CONSTITUTIONALLY  PERMISSIBLE DUE TO THE EXIGENT CIRCUMSTANCES WHICH EXISTED AT THE TIME OF ENTRY.**

 The Fourth Amendment to the Unites States Constitution generally requires the police to have a warrant to enter a suspect's home to search, or to seize evidence of a crime.  The Fourth Amendment states in relevant part that " the right of the people to be secure in their person, houses, papers and effects, against **unreasonable search and seizures**, shall not be violated…" Const. Amend. IV. (emphasis added).

14

The right however, is not absolute and is subject to several exceptions. "For what the Constitution forbids is not all searches, and seizures, but **unreasonable searches. and seizures".** **Terry v. Ohio ,** 392 U.S. 1, (1968 )(quoting **Elkins v. United States,** 364 U.S. 206 (1960) (emphasis added).   Although searches, and seizures inside a home without a warrant are presumptively unreasonable, this presumption may be overcome if the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.   **Mincey v. Arizona** , 437 U.S. 394 (1978). See also **Brigham City v. Stuart**, 547 U.S. 398, 403(2006)(quoting **Croh v. Ramirez,** 540 U.S. 551, 559 (2004).

The Supreme Court of the United States has created several exceptions to the above rule, and as such, allows police officers to enter a person's home or residence without a warrant based on the finding of situations that demand immediate action.  The **Court** has carved out several notable exceptions to the requirement of law enforcement's entry into a home without a warrant based on the exigency of the situation or "Exigent Circumstances", **Id**. Hot pursuit,  Emergency, Threat to Public Safety, Prevention of Imminent Harm, Prevention of Imminent Destruction of Evidence, Prevention of Escape, and the Protection of residents from Imminent Physical Danger, have all been recognized, and classified, as exigent circumstances which were found to be reasonable circumstances for which law enforcement need not have a search warrant to enter a person's residence.   Thus, these exceptions have been upheld as constitutionally permissible. **Warden v. Hayden, 387** U.S. 294,(1967),   **United States v. Santana,** 427, U.S. 38(1976), **Mincey v. Arizona,** 437,U.S. 385, (1978), **Georgia v. Randolph,** 547, U.S. 103 (2006).

Exigent circumstances, in relations to justification for warrantless searches  generally exist when law enforcement officials will be unable, or unlikely, to effectuate an arrest, search, or seizure for which probable cause exists ,unless they act swiftly, and without seeking prior **judicial** authorization.   **Chambers v. Maroney,** 399, U.S. 42, (1970), 90 S. Ct 1975.(emphasis added).

Where there are exigent circumstances in which police action must literally be" **now or never"** to preserve evidence of the crime, it is reasonable to permit action, without prior evaluation ". **Roaden v. Kentucky** , 413, U.S. 496,(1973). 505, 93 S. Ct. 2796, 2802.  The Defendant police officers confronted such now or never circumstances on the evening of March 20, 2013, when frantic phone calls were received by the Mount Vernon Police Department confirming the fact that several gun shots had been fired, and that a white minivan with a shattered windshield drove away from the scene with three black males inside. (emphasis added)

On the evening of March 20, 2013, the Defendant officers were faced with such circumstances that required immediate action, now, or never, circumstances as set forth In **Roaden. Id.**   The officers entered the residence occupied by the Plaintiffs without a warrant based on the exigencies which existed prior to their entry into Plaintiff's  2nd floor apartment located at 328 South 2nd Ave, Mount Vernon, New York .(hereinafter referred to as the residence, or premises ), without a warrant to search, or to arrest.

The Mount Vernon Police Department had received a telephone call from a complainant who indicated that she had heard two shots fired, and had seen a white van with three males, one wearing a red cap, and two others dressed in black going down South 9th Ave in a white van. See City of Mount Vernon's Live Aeigs Public Safety System Incident Report March 23, 2013. (Annexed to the Wisham Decl. as **Exhibit " B".)**

Soon thereafter,  at approximately 18:26, (6:26 pm) the Mount Vernon Police Department received a second call from a male caller who informed the police that he had seen a light skin male, with a red hoodie run towards Ebony Gardens opposite 70 West 3rd street.  See City of Mount Vernon's Live Aeigs Public Safety System Incident Report **Id.**

Moments after the radio transmission, Sgt. Sexton, and several other police units were notified that a vehicle matching the description via the radio transmission had been located by the police parked in the driveway of 328 South 2nd Ave.   Sargent Sexton was one of the first police officers to arrive at the scene of 328 South 2nd Ave., for the purpose of conducting a criminal

investigation of a serious crime, namely an assault with a handgun based on the report that gunshots were heard and that a minivan had driven off with three male blacks.   See Sexton Deposition (annexed to Wisham Decl. as **Exhibit No. "1"**, at 11:12-15, 21-25, 12:1-3, 13:2-4.

Sexton was also notified by police officer Gregorio, that the vehicle located at 328 South 2nd Ave., might have been the vehicle involved in the shooting.   See **Exhibit No. "1",** Sexton's Dep. annexed to Wisham Decl.   Sexton  was made aware of the fact that three(3) male blacks had been seen running from the original scene of the shooting which was only minutes away from the Plaintiffs residence.  Sexton's Dep. Annexed to Wisham Decl.as **Exhibit No. "1",** at 12:13-15. The black males were seen running from the scene, and getting into a white minivan with a shattered rear windshield.

Sexton was also aware via a radio transmission that shell casings had been found, and recovered  at the location of the shooting  near 9th Ave. and Third Street.   See Sexton Dep. Annexed to Wisham Decl. as **Exhibit No. "1'.** at 13:18-22.   Sexton was also made aware prior to his arrival at 328 South 2nd Ave. that the white van pursued in the shooting, had its rear windshield shattered.  Sexton spotted the van with its rear windshield shattered parked in the driveway of 328 South 2nd Ave.  The vehicles' engine was still warm.   See Sexton Dep. Annexed to Wisham Decl. as **Exhibit No."1'**, at 15:17-25, 16:1-2, 17:6-14.,19: 5-7.

Within minutes of the radio transmission, officer Camilo Antonini, arrived at the premises in response to the radio transmission he received that shots had been fired and that the police were seeking suspects in a white van .  **Exhibit No."3',**  Dep. of Camilo Antonini, annexed to Wisham Decl., at 19:19-21, 26:20-25, 27:1-7.

Police officer Allison Allen was also dispatched to 328 South 2nd Ave to take part in the police investigation..  See Dep. of Allison Allen attached to Wisham Decl. as **Exhibit No."2",** at 10:6-13, 11: 10-22.     In addition, police officer Timothy Briley responded to the radio transmission calling for the dispatch of additional units to the scene at 328 South 2nd Ave.  Officer Briley was also made aware that gunshots had been fired in the vicinity of Fifth Ave., and Third

Street, and that an injured individual had been shot and placed inside a vehicle matching the vehicle found at 328 South 2nd Av.  See Briley Dep., annexed to Wisham Decl. as **Exhibit No.'5"**, at 9: 10-16, 9:18-24, 10: 23-25, 11: 1-2,11:11-25.

Defendant Officer John Gamble was not present at the plaintiff's residence, nor was he part of the criminal investigation of a shooting incident on March 20, 2013.  See Dep. of John Gamble, annexed to Wisham Decl., as **Exhibit No. "4",** at 10: 20-25, 11:2-20, 12: 5-25, 13:2-24, 15:10-13, 18:23, 16: 2-10.

All of the officers who were present at 328 South 2nd Ave. were dispatched there to conduct an investigation of a prior shooting and that a car had sped off from the scene of the shooting which was later found parked in the driveway of 328 South 2nd Ave.  See Dep. of Officer Allison Allen attached to Wisham Decl. as **Exhibit No."2',** at 20:12-24.   See also Decl. of officer Timothy Briley, annexed to Wisham Decl. as **Exhibit No. "5"**, at 9:10-16.l

Officer Sexton knocked on the door and was met by an adult female believe to be Brenda Scott.  Sexton informed her that the police were there to investigate a shooting which had occurred and that the van found in her driveway fit the description of the van that was involved in the shooting.  Sexton also testified that the woman who opened the door did in fact tell him that the person who owned the white vehicle parked in the driveway, lived there at 328 South 2nd Ave, and was her daughter.  **Exhibit No. "1",** at 17: 17-19, 21:7-25.   The white minivan was located approximately ten to fifteen minutes  after the initial shots were fired.  See Sexton Dep, **Exhibit No.'1"**, at 15: 17-20.

When the officers spotted the white van in the driveway of 328 South 2nd Ave. ,they now had reasonable belief that the individuals involved in the shooting, were inside the apartment  who were believed to be armed, and dangerous, and posed an immediate threat to the lives of the occupants.   The exigency of the situation was clear, and present, and warranted an immediate response from the Defendant officers.  Fearing that lives were in danger, and knowing the suspects in a shooting were seen running into a white van now parked in the driveway of 328

South 2nd Ave, the officers entered plaintiffs' residence.   This threat of imminent harm was known to all the officers who entered the residence.   Officers Chery, Gregorio, and Detective Hutchins confirmed the events which unfolded and lead police officers to go inside the apartment in search of armed suspects.   Chery, Gregorio and Hutchins filed police reports describing the events of March 20, 2013.

Officer Chery's report stated that he was dispatched to 215 9th Ave., based on information that **" multiple reports of shots being fired in the area.**"   See **Exhibit "H".**   Chery's New York State Incident Report, annexed to Wisham Decl.   Officer Chery further stated in his report that he spoke to an uncooperative female witness at the scene who informed officer Chery that she had seen some guys leaving the scene in a white minivan after shots had been fired.

Officer Chery's report states that he blocked off south bound traffic on S. 9th Ave, and W. 2nd street to preserve the crime scene.     Chery disclosed the fact that Detective Notarfrancesco responded to the scene and recovered three shell casings on the roadway opposite 70 W. 3rd Street.   At approximately 18:30 hours,  P.O. Gregorio observed a vehicle fitting the  description of the white minivan in front of 328 South 2nd Ave, where a **shot victim was found, Julien Rene.** See **Exhibit " H " ,** Chery's New York State Incident Report, attached to Wisham Decl.

This information was conveyed to officer Steven Sexton through the police radio transmission. Sexton arrived at 328 South 2nd floor, and proceeded to knock on the door of the residence in furtherance of his investigation of an assault in the 2nd degree which had in fact been committed.

Gregorio's report states that he and officer Santos responded to the area of South 9th Ave, and 3rd street on reports of shots fired.   Officer Gregorio received a radio transmission that multiple suspects were seen getting into a white van with a shattered rear windshield at South 9th Ave, and 3rd street.    The white van was seen traveling southbound on South 9th Ave,  from 3rd street. Gregorio then proceeded to canvass the area for a white van with a shattered rear windshield.. Gregorio found the white van with the shattered rear windshield parked in the driveway of 328 South 2nd Ave, with plastic wrap covering the rear windshield.  According to Gregorio,  the

vehicle's engine was still warm.  See **Exhibit ""I"**, Gregorio's Supplemental Report.  The van was registered to Nigerian Scott. **Id.**

The police immediately set a perimeter outside of 328 South 2nd Ave.  Sargent Sexton arrived at the premises within minutes of the shooting.   Gregorio, and, Sexton then proceeded to go to the 2nd floor whereby they knocked on the door and was met by Brenda Scott who informed the officers that the van was registered to her daughter Nigeria Scott.  See **Exhibit "I",** Gregorio's Report.

Gregorio observed approximately six (6) males inside the apartment.  He was approached by two males that were known to Officer Gregorio as Prince Scott, and Corey Marrow.  Gregorio saw both Prince Scott, and Corey Marrow **" sweating profusely and breathing rapidly.'**'. **Exhibit "I".**

Gregorio informed Brenda Scott that the police were investigating a shooting which had occurred fifteen minutes earlier involving her granddaughter's white van.   Officer Gregorio asked Brenda Scott if the officers could enter the apartment.  Brenda Scott replied **" Okay".**  See **Exhibit " I",** Gregorio's Supplemental Police Report. (emphasis added)

Once inside the residence, Julien Rene informed the officers that he was the one who had gotten shot, and he then proceeded to pull his pants down to show the officers a small grazed bullet wound on his right buttocks, indicating he had in fact been shot. **Exhibit "I".**  See also **Exhibit "E",** photographs of Julien Rene buttocks which were grazed by a bullet logged in as evidence by the Mount Vernon Police Department.   Julien Rene was treated on the scene.

Julien Rene told officer Gregorio that he had been walking in front of 70 East 3rd street towards 7th Ave, when he heard five gunshots.  Rene then ran towards South 9th Ave and saw his friend Cj (Corey Marrow) driving a white van.  Julien Rene then jumped in the van and drove with Corey Marrow to 328South 2nd Ave.   **See Exhibit "I",**   Gregorio's New York State Supplemental Report prepared on March 20, 2013, in regards to his investigation of **"shots fired"** (emphasis added).

Detective Hutchins also filed a police report regarding the March 20, 2013, incident which was assigned incident number 13-9571.  Hutchins report confirmed that the police were investigating the report of shots fired and there was a victim of the shooting. The crime as noted as an  Assault in the First Degree.  See **Exhibit "G",** annexed to Wisham Decl.,  Incident report by Detective Hutchins  Police Department Detective Division.

Detective Hutchins stated in his report that Julien was shot while walking eastbound on W. 3rd. St. in front of 70 w. 3rd. Street.  The original crime scene occurred on W.3rd  St, between S. 7th Ave & 9th Ave opposite 70 W. 3rd street.  Hutchins' report further described the victim, Julien Rene and his injuries as a small gunshot, graze wound to the right buttocks.  Rene was treated at the scene and release.  **Exhibit "G".**   Detective Hutchins listed the physical evidence recovered at the original scene of the shooting:  three (3) 9mm silver colored spent shell casings recovered from a roadway by Det. Notarfrancesco.  **See Hutchins Report Exhibit "G".**

An eyewitness to the shooting was brought to 328 South 2nd Ave. to identify the white minivan parked in the driveway **as the van he observed leaving the scene of 215 South 9th Ave at the time of the shooting.   Exhibit "G".  (**emphasis added). The identification was made prior to the officer's entry inside the residence.

The witness identified the van in the driveway as the van he observed leaving the scene. Detective Hutchins spoke with Nigeria Scott over the phone who gave permission to Hutchins to search the white vehicle parked in her driveway.  Nigeria Scott signed a voluntary waiver to search her minivan. **Exhibit   "C",** Voluntary Waive Consent to Search signed by Nigeria Scott.

Officer Gason also filed a report regarding his investigation of an Assault in the 2nd Degree. See  **Exhibit "J"**,  Officer Gason's New York State Supplemental Report prepared March 20, 2013, annexed to Wisham Decl.    Gason's report stated that he was dispatched to South 9th Avenue and West 3rd Street on a report that shots had been fired in this area. Gason's report noted

the fact that several shell casings had been recovered, and   turned   over to detective Notarfrancesco **Id.**    Based on the exigency of the  circumstances described, and set forth herein, the officer entered the plaintiff's residence in furtherance of their criminal investigation.   The entry was reasonable, and lawful.

 The officer's  temporary detention of the plaintiffs was based on the exigencies which existed and the officers' reasonable belief that crime was afoot, and that  the occupant's lives may have been in danger.   The officers need to act quickly under the circumstances was reasonable and based on what a reasonably prudent police officer would have done under similar circumstances.

 The Fourth Amendment does not require police officers to delay in the course of their investigation if to do so would gravely endanger their lives, or the lives of others.  **Warden v. Hayden,** 387 U.S. 294, (1967). The Defendant police officers did not delay their investigation. Speed was essential, and only by a thorough search of the premises for persons, and weapons could have reasonably ensured that the officers had gained control of any weapons which could have been used against the officers as well as against the occupants, and or to affect an escape. This rule was upheld in **Warden. Id** .

 Without a warrant to search or arrest but with substantial reason to believe that suspects of a recent shooting were inside the premises , the officers entered the apartment and began to undertake a limited protective search of the living room area for a weapon that was involved in the prior shooting.  The search was made based on the officer's reasonable  belief that suspects were inside the premises, and that victims may have also been inside the apartment, who required emergency treatment.   The threat to the occupants was imminent.   The pursuit of the white minivan and the pursuit of possible suspects seen entering the van which sped away from the scene of the shooting and drove to 328 South 2nd Street, formed the basis of hot pursuit which authorized the police to enter the home of the residents without a warrant.

a) **The doctrine of " Hot Pursuit"**

The recognition of a warrantless entry into a person's home based on the doctrine of "Hot Pursuit\e" has been  constitutionally upheld when police with probable cause to believe that an armed robber had entered a house a few minutes before to make a warrantless entry to arrest the robber and to search for weapons. **Warden v. Hayden** , 387, U.S. 294.

Hot pursuit means some sort of a chase ,but it need not be an extended  "hue and cry in an about the public streets".   **United States v. Santana,** 427 U.S. 38 (1976).  The warrantless search into Santana house without a warrant was upheld. **Id.**   In the case at bar, the police officer had probable cause to believe that persons armed with a deadly weapon had left the scene of a shooting in a moving vehicle and that the suspects were in a white minivan which fled the scene of the shooting  and retreated to 328 South 2nd Ave inside a 2nd floor apartment.  The officers were in hot pursuit of the suspects, and entered the plaintiff's home without a warrant based on the fact that they found the vehicle fitting the description of being involved in a serious crime, parked in the driveway with its engine still warm.  These facts are indicative of a "hot pursuit for which the officer had a legal right to enter the residence in search of weapons and victims.

The holding in **Warden** ,was based on the exigencies which existed and did not include the term "hot pursuit". Nevertheless the doctrine should apply in this instant matter.  Court have also recognize an emergency exception to the requirement of the necessity of possessing a warrant prior to entry of a person's home  as constitutionally permissible to prevent harm to the residents.

b)  **Emergency and Prevention of Harm"**

On March 20, 2013, the Defendant police officers were faced with an emergency situation which required the officers to make a judgment, warranting the entry into the plaintiff's residence without a warrant.   Notwithstanding the assertion that officers Sexton, and Gregorio had consent to enter the residence, the entry was warranted based on the emergency exception to the Fourth Amendment.

The "Emergency " exception to the warrant requirement allows police officers to enter, and search a residence in circumstances which  prevent the offices from obtaining a search warrant  or consent.  The gravity of the crime, and the likelihood that the suspect is armed, and dangerous must be factors in assessing the urgency of the situation.    **Minnesota v. Olsen**, 495 U.S. 91, 110 S. Ct. 1684 (1990).

Based on the undisputed facts set forth herein and in Defendants Statement pursuant to F.R. Civ. P. 56, it is clear that an emergency situation existed and that the officers responded accordingly.  There was an actual shooting involving three black males.  The male blacks were seen running into a white van with a shattered rear window shatter.  The van sped away from the scene and was found parked in the plaintiff's driveway.  The victim of the shooting, Julien Rene, was inside with blood on his pants.  Julien Rene admitted that he had gotten near 9th and 3rd street.  Corey Marrow and Kraig Utley were with Julien Rene when they drove away from the scene of the shooting and drove to 328 South 2nd Ave.  With full knowledge of these facts, the Defendant officers possessed probable cause to believe that there was a clear and present danger to the occupants of the apartment which constituted an emergency requiring the officers to intervene and act quickly to prevent harm to the occupants. Courts have also widely recognized law enforcement's need to enter a residence without a warrant based on the prevention of the destruction of evidence.

### c) The prevention of imminent destruction of evidence authorized the officers to enter plaintiff's residence without a warrant.

The exception to the warrant requirement under the Forth Amended based on law enforcement's needs to prevent the imminent destruction of evidence has long been upheld by the Courts as sufficient justification for a warrantless entry, and search.    **Brigham City v. Stuart**, 547 U.S. 398, (2006).  See also **Minnesota v. Olson,** 495 U.S. 91, 100  (1990).

The vast majority of cases in which evidence is destroy are those cases involving drugs based on the recognition that drugs are easily disposed by flushing down a toilet.  **Kentucky v. King**,

563 U. S. 452  (2011).  Nevertheless, the warrantless entry, and search in the instant case was reasonable and within the exceptions to warrant requirement of the Fourth Amendment in order to allow officers to dispense with the warrant requirement and search the premises of the occupants for a weapon the officers reasonably believe existed and the threat of destruction.

  The exigency of the situation was such that there was no time for delay. Therefore, because of the facts and circumstances cited herein, and the undisputed fact that the Mount Vernon Police department did not create the exigency by engaging in conduct that violated the Fourth Amendment, the defendant's warrantless entry to prevent the destruction of a weapon reasonably believe to have existed within the premises, was reasonable, and constitutionally permissible.

d)  **THE SEARCH FOR WEAPONS IN THE ABSENCE OF PROBABLE CAUSE TO ARREST WAS CIRCUMSCRIBED BY THE EXIGENCIES OF THE CIRCUMSTANCES AND FOR THE PROTECTION OF THE OFFICERS.**

  It has been well recognized that where a responsibly prudent officer is warranted in the circumstance of a case to believe that his safety or that of others is endanger, he may make a reasonable search for weapons of the person, or persons believed by him to be armed, and dangerous regardless of whether or not he has probable cause to arrest that individual for a crime or the absolute certainty that the individual is armed.  **Terry v. Ohio**, 392 U.S. 7 (1968)

  Whenever a police officer restrain a person's  freedom to walk away , a seizure has occurred and the Fourth  Amendment to the constitution governs the reasonableness of the seizure.  **Terry v. Ohio**, Id.  The Defendant officers seized the individual occupants within the confines of their home on March 20, 2013.  However, the seizure was reasonable and necessary under the circumstance and well within the scope of the Fourth Amendment requirements.

  Upon entering the occupant's residence, officer Sexton, Gregorio and Officer Antonini, immediately recognized several of the occupants as persons whom the officers had arrested in the past for serious criminal activity.  Antonini recognized Prince Scott, Corey Marrow, Julien Rene, Kraig Utley, and Demetrius Royal King upon entering the plaintiff's residence because Antonini had  arrested  the  individuals  in  the  past  for  possession  of  drugs,  gang  affiliation  and  for

involvement in shootings which had occurred in the city of Mount Vernon.  See Deposition of Camilo Antonini annexed as **Exhibit No. 3 at 23:3-12.**

Officer Sexton gave similar testimony that upon entering the residence, he recognized Corey Marrow ,because Sexton had  numerous interactions with him and that the whole crew is actually one of the local gangs who are responsible for a lot of the violence in the community. See Sexton Deposition annexed as **Exhibit No. 1 at 29:4-9**

Prince Scott admitted under oath that he knew both officers Antonini, and  Sexton when they entered his apartment because the officers had arrested Prince Scott on several occasions prior to the March 20, 2013, incident.  See Deposition of Prince Scott annexed as **Exhibit No.  10,** at 8:7-24, 9:2, 12:8-25.   Prince Scott further testified that he had several run ins with both officers Sexton and Antonini.  **See Exhibit No 10,** 42: 17-22.

Prince Scott has an enormous criminal history with the Mount Vernon Police Department. See **Exhibit "L",** Aeigs Public Safety System Adult Profile Sheet" Prince Scott. This reports enumerates several arrests made by the Mount Vernon Police Department of Plaintiff Prince Scott.   Scott was arrested by Officer Antonini on July 27, 2008, and charged with Criminal Contempt per P.L. Section 215.50. **Id**, at pg. "5".   Antonini also arrested Prince Scott on July 11, 2011, and charged with Scott resisting arrest per P.L. Section 205.30. Antonini again arrested Prince Scott on May 12, 2012, and charged Scott with unlawful possession of Marijuana. **Id.** at 3.

Officer Sexton arrested Prince Scott on November 21, 2005, and charged Scott with assault in the 3rd degree in accordance with P.L. Section 120. Id.   Prince Scott was also arrested by police officer Chery on April 4, 2012, and charged him with criminal contempt, P.L. 215.50. **Id.**

All of the occupants were made to come out from other rooms and gather in one room, the living room.    The intrusion was necessary to prevent the possible escape of suspects as well as the prevention of the destruction of a weapon, and for the protection of the officers, as well as for the protection of the occupants.  The occupants were temporarily detained for a period of two or three hours.  Sexton indicated that the occupants were detained in order for the officers to secure

a search warrant from the district attorney office because Sexton wanted to conduct an extensive search of the residence for a possible firearm based on the information that he had at the time he enter the residence. The district attorneys however, decline the issuance of a warrant. See Deposition of Steven Sexton annexed as **Exhibit No.'1"**, at 36:21-25, Dep. 52: 2-12.

   Corey Marrow, and Kraig Utley have also been arrested on numerous occasions by officers Gregorio, Sexton, and Antonini. Corey Marrow's Adult Profile Sheet contains 8 pages of information relating to his numerous arrests. On January 1, 2013, police office Gregorio arrested Corey Marrow on a charged of criminal possession of Marijuana. P.L. Section 221.10   See **Exhibit "M".**

   Kraig Utley's adult profile sheet denotes similar arrests by Antonini, and officer Addison. On March 4, 2012, officers Antonini arrested Utley and charged him with criminal possession of a control substance, P.L. Section 221.15   See **Exhibit " O".** Officer Addison arrested Utley on May 10, 2007, and charged him with robbery in the second degree.

   In determining the reasonableness of a seizure the Court should first focus on the government's interest which justified the intrusion upon the constitutionally protected interests of the occupants. " There is no ready test for determining reasonableness other than by balancing the need to search or seize against the invasion for which the search or seizure entails". **Terry v, Ohio,** 392 U. S. 1 (1968), **Camera v. Municipal Court**, 387 U.S. 523 ( ). The predicate permitting seizures on suspicion short of probable cause is the law enforcement's interest warranting a limited intrusion on the personal security of the person. **Florida v. Royer,** 460, U. S. 491 (1983).

   In determining whether the officers' actions were justified at its inception, and whether the officers' actions were reasonably related in scope to the circumstances which justified the interference of the individual's liberty, a balancing of the interest is required. When the nature and extent of the detention are minimally intrusive of the individuals fourth amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause." **Terry v. Ohio**, 392 U.S. 1 (1968).

In making the assessment of reasonableness, it is important that the facts be judged against an **objective standard:** ,would the facts available to the officer at the moment of the seizure or the search, warrant a man of reasonable caution in the belief that the action taken was appropriate. **Carrol v. United States,** 267 U.S. 132. (emphasis added).   Upon entering the plaintiff's residence, the defendant police officers were discharging their investigative function when they decided to enter, and detained the occupants for a limited period of time.   In fact, it would have been poor police work for the officers not to have immediately entered the occupant's apartment to continue their investigation based on the exigencies of the circumstances which existed.   The officers were under a continuing duty to investigate the shooting which had taken place only minutes before the officers entered the plaintiff's residence.   The officers had a duty to protect themselves once they entered the residence especially in light of the fact that the officers knew Corey Marrow, Kraig Utley, Prince Scott and other occupants.   It would have been unreasonable for the defendant officers, not to have acted upon the information possessed at the time they entered plaintiff's residence.   "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the office or to others, it would appear to be clearly unreasonable to deny the office the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm". **Terry v. Ohio,** 392 U.S. 1 (1968)**.**   A search for weapons in the absence of probable cause to arrest must be strictly circumscribed by the exigencies which justify its initiation. **Warden v. Hayden**, 387 U.S. 294 (1967).  Therefore,  in balancing the interest of the Mount Vernon police officers in their criminal investigation of shots fired, and for the protection of life and the imminent threat of harm to the occupants, it is clear that the  Defendants had authority to conduct a reasonable search for weapons for the protection of the police officers. The search was also justified based on the officers knowledge that Corey Marrow, Prince Scott and Kraig Utley, and Julien Rene had been engaged in gang related activities, including violent crimes ,who could have been  armed and dangerous.   The officers did not have to be absolutely

certain that the individuals were armed.  The issue is whether a reasonably prudent police officer in possession of the information which was known to the defendants would have reason to believe that the safety of the officers and occupants were in such danger to have justified the search, and detention of the occupants. The defendants are entitled to summary judgment because a reasonable prudent officer would have believed that the occupants lives were in danger and that a limited search of the occupant's residence was absolutely reasonable and necessary. Therefore Plaintiff's first claim must be dismissed.

### POINT II

### C)   DEFENDANTS DID NOT ENGAGE IN EXCESSIVE USE OF FORCE AGAINST THE PLAINTIFFS.

Summary judgment is warranted on plaintiff's claim for excessive force because the record is completely void of any evidence for which a rational juror could find for the plaintiffs that any of the named defendants had in fact engaged in the unreasonable use of physical force.  For the reasons stated herein, the defendants respectfully request this Court to grant the defendant's motion to dismiss relating to the  use of excessive use of force.  Each of the plaintiffs have clearly stated under oath that they were not physically injured by the defendants.

A. Vaughn Scott

Vaughn Scott testified that she was not physically injured by the police on March 20, 2103. See **Exhibit No. "11",** at 42: 23-25, 43: 2-7, 60:23-25, 61:2-5.  Vaughn also gave testimony the police caused her to have "14 aneurisms, seven brain surgeries, constantly see a  psychiatrist , cannot sleep , have seizures , a stroke, and cant' help myself more less help my children right now.  I can't even  watch my grandchild for my daughter to go to work, so yes they have kept me from being able to live a normal independent life.'  **Exhibit " "11",** 61:6-25. Vaughn Scott claims the Mount Vernon Police officers caused her to have seizures.  Id., **Exhibit No. "11"**,at 62:2-22.  These assertion are utterly absurd and without merit.  Vaughn Scott's testimony regarding her injuries are remarkable and implausible.  No rational juror could find that the

defendant committed any physical acts against Ms. Scott to have caused 14,aneurisms, seven brain surgeries or a stroke.   Plaintiff Vaughn Scott failed to submit any evidence to establish a causal connection between her temporary detention ,and her medical condition. Plaintiff originally stated she was not physically injured because the defendants did not injure her.   As a matter of law summary judgment should be granted.

B. Nigeria Scott

 The record is void of any evidence that the police officers physically injured Nigeria Scott. In fact Ms. Scott testified that she was not hurt. **Exhibit No."9",** at 20: 13-25,21: 2-17.

C. Andree Harris

 Andree Harris testified that he "was pushed aside and I was told to empty the contents of my pocket and remove my ID." No other injuries.  See **Exhibit No. "12"**,at 20: 20-25, 21: 2-5.

D.  Brenda Scott   Brenda Scott testified that she was not physically injured by the police during the March 2013, incident nor did she observe any other occupant physically injured by the police. See **Exhibit No. "13",** at 21:12-14, 28: 15-18.


E. Kraig Utley

 Kraig Utley testified that he was not physically harmed on March 20, 2013.  See **Exhibit No. "15"**, at 48:9-25, 49:2

F. Corey Marrow

 Corey Marrow failed to testify as to any physical injuries he sustained by the defendant police officers on March 20, 2013.  Corey Marrow was not handcuffed or physically harmed by the Defendants.  See **Exhibit No. "14"** at, 31: 10-15, See also **Exhibit "F"** ,at 36:5-11

G. Kevin Marrow

 Kevin Marrow testified that he was not injured by the Defendants on March 20, 2013.  See **Exhibit No. "7",** at 22:2-7

H. Julien Rene

Julien Rene testified that he was not physically injured by the police on March 20, 2013. See **Exhibit No. "6"**, at 40: 9-12

I. <u>Prince Scott</u>

Prince Scott stated that he was not physically injured. **Exhibit No "10'**, at 32:5-24, None of the plaintiffs  were placed in handcuffs.  Prince Scott was made to " Sit down and don't move"  Id at 31: 5-8

J. <u>Arabia Scott</u>

Arabia Scott stated during her deposition that she was not physically injured in any manner by the Defendant police officers.  See Dep. Arabia Scott. **Exhibit No. 8,** at 18:4-21.

It is well established that not every push or shove violates the Fourth Amendment. **Graham v. Connor**, 490 U.S. 386, 396 (1989).   Whether the force used is excessive must be analyzed under the Fourth Amendment and its standard of objective reasonableness.  **Rivera v. City of New, York** 40 A.D. 3d 334, 341 (1st Dept. 2007).  "The reasonableness of the force used must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight". **Id.** at 341. The determination of excessive force requires consideration of all the facts… the severity of the crime at issue , and whether the  suspect posed an immediate threat to the safety of the officers.  **Koeiman v. City of New York,** 36 A.D. Ed 451, 453 (1st Dept. 2007)

To the extent the plaintiffs' claim is stated in an action for excessive force, see Compl, Paragraph 59(d), the claim must be denied upon summary judgment because there are no material facts in dispute with regard to the unlawful use of force for which a rational jury could find for the Plaintiffs.  The Plaintiffs individual testimony rebuts such a cause of action grounded in the unlawful use of force.

While the Court must view the facts in the light most favorable to the non-moving party, a plaintiff is obligated to " offer some hard evidence that his version of the events in not wholly **fanciful' , Jeffreys v. City of N.Y.**, 426 F. 3d 549 , 554(2nd Cir. 2005).  Testimony should be

rejected without a trial if in the circumstance no reasonable person would believe it. **Seshadri v. Kasraian,** 130 F.3d 798, 802 (7th Cir. 1997)

Although Vaughn Scott testified that she was not physically injured, she later changed her testimony claiming that the police actions which she experienced on March 20, 2013, caused her aneurisms, arthritis, and seizures.  This testimony is the type of testimony that should be rejected because no reasonable, or rational person would believe it.   Summary judgment is warranted where a plaintiff's evidence is " too incredible to be believed by reasonable minds" such that no reasonable juror could not possibly accept his account of the facts".    **Trigo Hnos, Inc v. Premium Wholesale Groceries, Inc.** 424 F. Supp, 1125, 1129 (S.D.N.Y 1976).

Defendants respectfully request this Court to dismiss any claims by the plaintiff grounded in the use of excessive force for the reasons set forth above.

### POINT III

**PLAINTIFFS' SECOND CLAIM FOR RELIEF FOR FALSE ARREST UNDER 42.U. S. C SECTION 1983 MUST BE DISMISSED BECAUSE NONE OF THE PLAINTIFFS WERE ARRESTED AND BECAUSE THE PLAINTIFFS TEMPORARY DETENTION WAS BASED ON PROBABLE CAUSE.**

Plaintiff's  second claim for relief based on false arrest should be dismissed because none of the Plaintiffs were arrested on March 20, 2013 during the course of this incident.   The Supreme Court defined an arrest as being .."the  initial stages of a criminal prosecution .  It is intended to vindicate society's interest in having its laws obeyed and it is inevitably accompanied by future interference with individual's freedom of movement, whether or not trial or conviction follows. **Terry v. Ohio**, 392 U. S. 1 (1968).   None of Plaintiff's were arrested  or taken into custody to answer for criminal activity on March 20, 2013, which would have initiated the initial stages of an arrest as delineated in **Terry**. Id.  Plaintiff's confinement was based on probable cause which is defeats plaintiffs claim for false arrest.

The Fourth Amendment guarantees that an individual shall not be arrest without probable cause.  See **Weyant v. Okst,** 101 F.3d 845, 852 (2nd Cir. 1996) " Probable cause to arrest exists

when the police officers have knowledge or reasonably trustworthy information of facts and circumstance that are sufficient to warrant  a person of reasonable caution in the belief that the person to be arrested has committed, or is coming a crime. " **Id** at 852.  Probable cause to arrest serves as justification , and is a complete defense to an action for false arrest. **Bernard v. United States** , 25 F.3d 98, 102 (2nd Cir. 1994)

The facts contained in the underlying case mandate the dismissal of plaintiff's claim for false arrest because the plaintiffs were not in fact arrested, and the officers had probable cause for the detainment of the occupants.  Defendants actions were based entirely on probable cause to believe that exigent circumstances existed which authorized the officers to reasonably detain the Plaintiff's while defendants continued their investigation of the facts that shoots had been fired at a prior location and that the vehicle was found at in the plaintiff's driveway minutes after the shooting, with the van's engine still warm .

Police officers are often faced with making split second decisions, especially in those cases where a reported shooting occurred, and that information was made known to the officers that the suspects were known to the defendant officers as individuals previously engaged in criminal activity.  The defendant officers' actions on March 20, 2013 were reasonable and for that reason the Plaintiff's claim for false arrest should be dismissed.   The Defendant officers are entitled to qualified immunity  because they held a reasonable belief that their actions were objectively reasonable.

## POINT IV

### PLAINTIFFS' THIRD CLAIM FOR RELIEF FOR FAILURE TO INTERVENE UNDER 42 U.S.C. 1983, MUST BE DISMISSED BECAUSE PLAINTIFF'S FOURTH AMENDMENT RIGHTS WERE NOT VIOLATED.

Plaintiff's third claim for relief for the failure of the individual Defendants to intervene should be dismissed because the actions by the Defendants did not violate the Plaintiff's Fourth Amendment right to be free from unreasonable search and seizure.

In order to find liability under 42 U.S.C. Section 1983 for the failure to Interne, Plaintiff must show and prove that the Defendants participated in a, unconstitutional violation, and that the officers failure to intervene to stop the alleged constitutional violations took place in their presence, and that the officers had a reasonable opportunity to intervene to prevent or remedy obvious constitutional violations by other officers.

" It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens form infringement by other law enforcement officers in their presence". **Anderson v. Branen,** 17 F. 3d 552, 557 (2nd Cir. 1994).

To establish liability plaintiffs must show 1) the alleged violation took place in the officer's presence, 2) the officer had a realistic opportunity to intercede and prevent the harm, 3) a reasonable person in the officer's position would know that the plaintiffs' rights were being violated, and 4) the officer did not take reasonable steps to intervene. **Id**. at 557

In the case at bar the defendants maintain that plaintiff's constitutional right of privacy was not violated, and that the search, and seizure which occurred was permissible based on the exigent circumstances which existed at the moment the defendants were compelled to enter plaintiff's residence.   The Defendants took necessary measures to protect themselves against individuals that they knew were involved in criminal activity.   The officers gathered all the occupants into one room to reduce the risk that a weapon could have been inside the apartment which could have been used against the officers.   In addition, the officers were given consent by Nigeria Scott to enter the apartment to further investigate the recent shooting.

Moreover, the exceptional circumstances present on March 20, 2016, gave defendants the right to enter plaintiff's' apartment, and to conduct a limited search for weapons and to impose a temporary restraint on the plaintiffs movements.

Therefore, the plaintiff's claim for failure to intervene should be dismissed.

**POINT V**

**PLAINTIFF FOURTH CLAIM FOR RELIEF FOR FALSE IMPRISONMENT AND FALSE ARREST UNDER NEW YORK STATE LAW MUST BE DISMISSED BECAUSE THE CLAIM IS TIME BARRED.**

a)   Plaintiffs Fourth Claim for relief based on false imprisonment, and false arrest, should be dismissed as a matter of law because such claims have a one year statute of limitations under N.Y. C.P.L.R. Section 215(3).   According to New York Civil Practice and Rules Section 215 actions to be commenced within one year  (3) include those actions for assault, battery, and false imprisonment.

The  Plaintiff's instant action was commenced by the filing of a summons, and complaint, dated June 19, 2014.  The Plaintiffs' claim alleging false arrest, and false imprisonment accrued on March 20, 2013. The time period to file claims grounded in false arrest, and false imprisonment under New York State Law, expired on March 19, 2014, one year after the alleged incident.   Therefore the Plaintiffs claims against the individually named Defendants for false arrest, and false imprisonment are time barred under New York State Law, and therefore must be dismissed.

b.   The temporary confinement of the plaintiffs was based on probable cause and therefore the claim for false arrest and imprisonment should be dismissed.

Under New York Law, the tort of false arrest, and false imprisonment, are synonymous. **Fincher v. County of Westchester,** 44 Misc. 3d. 383, 979 F. Supp. 989, 998 (SDNY,1997).

To establish claims based on false arrest, and false imprisonment, the plaintiff must show that: 1) the defendant intended to confine him, (2), the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.   See **Petrychenko v. Solvey,**  99 A.D. 3d. 777, 780, 952  N.Y.S .2d 575 (2nd Dept. 2012).  **Hernandez v. City of New York,** 100 A.D. 3d. 433, 953 N.Y.S. 2d. 199 (1st Dept. 2012)

When confronted with such a claim and concomitant proof, the defendant can nevertheless prevail if he proves legal justification for the arrest and imprisonment which may be established

by showing that the arrest was based on probable cause.  **Broughton v. State**, 37 N.Y. 2d. 451, 457,335 N.E.2d. 310,  373 N.Y.S. 2d. 87 (1975).

The Defendant officers hereby move for summary judgment as a matter of law based on the facts established in the record which justified the temporary detention of the plaintiffs. The officers restraint of the plaintiff's movement was based on probable cause, and the exigent circumstance which existed at the time the officers entered the residence at 328 South 2nd Ave. on the evening of March 20, 2013.

On the evening of March 20, 2013, the Defendant officers were informed that shots had been fired near the vicinity of 9th Ave.,  and Third Street, near Levister Towers, Mount Vernon, New York.  See **Sexton Dep. Exhibit No. "1"**, at 13:6-22 , 14:1-14, 15:17-25,16:1-2.

Sexton initiated his investigation of a criminal assault with a weapon which led him to 328 South 2nd Ave.,  upon information that a white minivan with a shatter rear window had been seen at the location of the shooting at 9$^{th,}$ and 3rd street, and was found parked in the driveway of 328 South 2nd Ave.  **See Exhibit No. "1",** at 11:12-15,  21-25, 12: 1-3, 13:2-4, 12:13-15.  Sexton had also received information prior to his arrival at 328 South 2nd Ave, that shell casings had been discovered at the location of the shooting, and that there was evidence of a crime scene where shots had been fired.   See  **Exhibit No."1'**, at 15:17-25, 16:1-2.  **See also Exhibit "D",** photographs of white van owned by Nigeria Scott bearing license plate number NY GEN 570. See also **Exhibit "P",** Evidence Form of Mt. Vernon property clerk's invoice of three 9mm shell casings recovered at 2155 9th Ave.

Officer  Sexton was also informed that the vehicle parked in the driveway of 38 South 2nd Ave, was "**still warm"  Exhibit No."1",** at 17:6-14.  Sexton knocked on the door and was met by a woman who informed him that the vehicle parked in the driveway belong to her daughter who lived there.  **Exhibit No."1",** at 17:17-19, 21:7-25.  Nigeria Scott gave her consent allowing the Mount Vernon Police Department to search her vehicle.  See **Exhibit "C",** consent to Search form signed by Nigeria Scott on March 20, 2013.  The exigency of the circumstances which

36

existed prior to the officers' entry inside the residence of 328 South 2nd Ave, as also recognized by Police officer Chery.

Officer Chery filed his  police report stating that he was dispatched to 215 9th Ave., based on information that **" multiple reports of shots being fired in the area.**"  See  **Exhibit "H".** Chery's New York State Incident Report, annexed to Wisham Decl.   Officer Chery further stated in his report that he spoke to an uncooperative female witness who informed officer Chery that she had seen some guys leaving the scene in the above listed vehicle, a white minivan, after shots were fired.  Officer Chery then stated in his report that he block off south bound traffic on S. 9th Ave, and W. 2nd  street to preserve the crime scene.

Chery stated that Detective Notarfrancesco responded to the scene, and recovered three shell casings on the roadway opposite 70 W. 3rd.  At approximately 18:30 hours,  P.O. Gregorio observed a vehicle fitting the  description of the white minivan in front of 328 South 2nd Ave, where a **shot victim was found, Julien Rene.**  See **Exhibit " H" ,** Chery's New York State Incident Report, attached to Wisham Decl.

This information was conveyed to officer Steven Sexton within minutes through the police radio transmission.  Sexton arrived at 328 South 2nd floor and proceeded to knock on the door of the residence in furtherance of his investigation of an assault in  the 2nd Degree which had in fact been committed.  Sexton was also concern that possible suspects were indeed at the residence occupied by the Plaintiffs.   The criminal investigation was also being conducted by officers Gregorio and Santos.

Officer Gregorio ,and officer Santos ,both responded to the area of South 9th Ave, and 3rd street on reports of shots fired.   Officer Gregorio received a radio transmission that multiple suspects were seen getting into a white van with a shattered rear windshield ,at South 9th Ave and 3rd street.    The white van was seen traveling southbound on South 9th Ave,  from 3rd street. Gregorio then proceeded to canvass the area for a white van with a shattered rear windshield.. Gregorio found a white van with the shattered rear windshield parked in the driveway of 328

South 2nd Ave  with plastic wrap covering the rear windshield.  According to Gregorio,  the vehicle's engine was still warm.  See Exhibit ""I", Gregorio's Supplemental Report.  The van was registered to Nigerian Scott.

The Mount Vernon police department immediately set a perimeter outside of 328 South 2nd Ave.  when Sargent  Sexton arrived at the scene.  Gregorio and Sexton then proceed to go to the 2nd floor, knocked on the door and was met by Brenda Scott who informed the officers that the van was registered to her daughter Nigeria Scott.  See **Exhibit "I",** Gregorio's Report.

Gregorio observed approximately six (6) males inside the apartment.  He was approached by two make that were know, to Officer Gregorio as Prince Scott, and Corey Marrow.  Gregorio reported that he saw both Prince Scott, and Corey Marrow **" sweating profusely and breathing rapidly."**'.   Gregorio informed Brenda Scott that the police were investigating a shooting which had occurred 15 minutes earlier involving her granddaughter's  white van.  Officer Gregorio then stated in his report  that he asked Brenda Scott if the officers could enter the apartment and Brenda Scott replied " Okay".   See **Exhibit " I",** Gregorio's Supplemental Police Report. (emphasis added)

Julien Rene informed the officers that he was the one who had gotten shot, and he then proceeded to pull his pants down to show the officers a small grazed bullet wound on the right buttocks, indicating he had in fact been shot.  See **Exhibit "E",** Photographs of Julien Rene buttocks which were grazed by a bullet logged in as evidence by the Mount Vernon Police Department.

 According to Gregorio an ambulance was called, and Julien Rene was treated on the scene. Julien Rene told officer Gregorio that he had been walking in front of 70 East 3rd street towards 7th Ave, when he heard five gunshots.  Rene then ran towards South 9th Ave and saw his friend Cj (Corey Marrow) driving a white van.  Julien Rene then jumped in the van and drove with Corey Marrow to 328South 2nd Ave.   **See Exhibit "I",**  Gregorio's New York State Supplemental

Report prepared on March 20, 2013 in regards to his investigation of **"shots fired" , Id.**
**(emphasis added)**

Moreover, a similar police report regarding the shooting was filed by detective Hutchins regarding Incident No. 13-9571 , Assault in the First Degree.  See **Exhibit "G",** annexed to Wisham Decl.,  Incident report by detective Hutchins  Police Department Detective Division.

Detective Hutchins stated in his report that Julien was shot while walking eastbound on W. 3rd. St. in front of 70 w. 3rd. street.  The original crime scene occurred on W.3[rd]  St, between S. 7th Ave & 9th Ave opposite 70 W. 3rd street.  Hutchins' report further described the victim, Julien Rene's injuries as a small gunshot, graze wound to the right buttocks.  Rene was treated at the scene and release.  **Exhibit "G".**   Detective Hutchins listed the physical evidence recovered at the original scene of the shooting:  three (3) 9mm silver colored spent shell casing recovered from roadway by Det. Notarfrancesco.  **See Hutchins Report Exhibit "G".**

A witness to the shooting was brought to 328 South 2nd Ave. to identify the white minivan as the van he observed leaving the scene of 215 South 9th Ave at the time of the shooting.

The witness identified the van in the driveway as the van he observed leaving the scene. Detective Hutchins spoke with Nigeria Scott over the phone who gave permission to Hutchins to search the white vehicle parked in her driveway.  Nigeria Scott signed a voluntary waiver to search her minivan. Officer Gason filed a similar account of the criminal investigation of the Assault.

Officer Gason filed his report regarding his investigation of an Assault in the 2nd Degree.  See **Exhibit "J"**,  Officer Gason's New York State Supplemental Report prepared March 20, 2013, annexed to Wisham Decl.

Base on the exigent circumstance which existed at the time of the investigation, the entry into the residence by the Defendant officers was reasonable and lawful.  The officer's  detention of the Plaintiffs was privileged based on the exigencies which existed and the officers' reasonable belief that crime was afoot, and that  person's  lives may have been in danger.

The officers need to have acted quickly under the circumstances was reasonable and based on what a reasonably prudent police officer would have done under the circumstances.

The Court should note that Plaintiffs Corey Marrow and Prince Scott were lawfully arrest on March 25, 2013, and bother were charged with one count of the Offense of Obstruction of Governmental Administration in the 2nd Degree in accordance with Penal Law Section 195.05 See **Exhibit "Q",** annexed to Wisham Decl." Superseding  Misdemeanor Information " The People of the State of New York against Prince Scott, 328 South 2nd Ave., Mount Vernon, New York, and Corey Marrow, 328 South 2nd Ave., Mount Vernon, New York, stemming from their unlawful interference with the Mount Vernon Police Department on March 20, 2013.

Corey Marrow and Prince Scott were charged with aiding and abetting and acting in concert with each other, did physically interfere with members of the Mount Vernon Police Department performing an official function.  The Deponent for this information was Officer Gregorio who further stated that he, and other members of the mount Vernon Police Department while attempting to interview a witness with respect to a recent shooting within the vicinity and while performing this official function of interviewing a witness, the defendant Prince Scott and Corey Marrow, each shouted obscenities at Officer Gregorio.  They were advised to stop their actions and leave the area. They refused to do so. Scott told officer Gregorio " fuck you guys. Don't talk to my fucking grandmother".  Marrow said " get the fuck out of here".  **Exhibit "Q"**.

Both Corey Marrow, and Prince Scott, pled guilty to this offense which occurred March 20, 2013.  See **Exhibit "R",** Certificate of Disposition State of New York, Mount Vernon City Court Criminal Division.    Prince Scott pled guilty to the reduced charge of disorderly conduct P.L. 240.20.

Corey Marrow was charged under Docket No. 13:1172.  Marrow pled guilty and in full satisfaction of P.L. 195.5.  See **Exhibit "R"** annexed to the Wisham Decl.

Based on the substantial evidence submitted herein, Plaintiffs claim for false arrest and imprisonment under New York Law and Under 42 U.S.C Section 1983 must be dismissed.

Summary judgment therefor is warranted and should be granted and the claim for false arrest and false imprisonment should be dismissed.

## POINT VI

**PLAINTIFFS' FIFTH CLAIM FOR RELIEF FOR ASSAULT AND BATTERY UNDER 42.U.S.C. SECTION 1983, AND UNDER NEW YORK STATE LAW MUST BE DISMISSED, BECAUSE THE ACTION IS TIME BARRED UNDER NEW YORK STATE LAW AND BECAUSE OF THE LACK OF OFFENSIVE CONTACT.**

Plaintiff Julien Rene brought this cause of action against the individual Defendants for Assault and Battery under New York State Law, and under 42 U.S.C. Section 1983.  Rene claims that unnamed defendants officers unlawfully force him to remove his clothing, and, or forcibly removed his clothing in the presence of his family, including a female adult, and one female child.  See Compl. **Exhibit "A",** paragraphs 81-84.

A battery is defined as the unlawful touching without consent, cause, or justification, and without the consent of the plaintiff, unlawful engagement in physical contact with the plaintiff.   In order for Defendants to succeed on a motion for summary judgment for assault and battery, Defendants must demonstrate that the officers did not intentionally place Plaintiff in apprehension of imminent harmful or offensive contact, and did not intentionally engage in offensive bodily contact without the consent of the Plaintiff.  **Guntlow v. Barbera,** 76 A.D. 3d. 760, 907 N.Y.S.2d 86 (3rd Dept. 2010).

This claim for relief for battery must be dismissed upon summary judgment because the Plaintiff himself testified during his deposition that the officers did not use any physical force when he, Julien Rene, pulled down his pants to show the officers that he had been shot in the buttocks ,on March 20, 2013.  See Deposition of Julien Rene annexed in the Wisham Decl. as **Exhibit No."6 ,at 35: 3-6.**  Therefore the Defendants

41

respectfully request that the accusation against the Defendants be dismissed as it relates to the Plaintiff's Fifth claim for Battery.

Moreover, the statute of limitations for battery which is an intentional tort under New York's C.P.L.R.215.(3), is one year from the date of the accrual.  The action related to battery accrued on March 20, 2013.  Plaintiff's action was filed on June 19, 2014, well beyond the time period for sustaining a claim under New York for battery.

## POINT VII

### THE PLAINTIFF'S  SIXTH AND SEVENTH CLAIM FOR RELIEF FOR NEGLIGENCE UNDER 42 U.S.C. SECTION 1983 MUST BE DISMISSED BECAUSE THERE IS NO EVIDENCE OF THE MUNICIPALITY'S FAILURE TO TRAIN , SUPERVISE OR RETAIN DEFENDANTS.

Plaintiff's sixth and seventh claim for relief for negligence under New York State law and under 42 U.S.C. 1983 must be dismissed because the evidence established by the underlying record fails to present any triable issues of fact which a reasonable jury could conclude that either officer Sexton or Officer Gamble failed in their duty to supervise the subordinate officers that entered plaintiffs apartment and placed a temporary restriction on their movements.

First, it is well settled that a municipality cannot be held vicariously liable on a section 1983 claim for an alleged injury inflicted by its employees or agents.  **Monell v. New York City Dept. of Social Servs**. 436 U.S. 658, 694,(1978),  98 S. Ct. 2018.  Moreover, a municipality cannot be held liable based solely on the doctrine of respondent superior.  **Canton v. Harris**, 489 U.S. 378 (1989).  The plaintiffs have failed to produce any evidence supporting their contention that the action is alleged to have been committed was in fact committed under a municipal policy statement, or ordinance.  Thus, this claim against officers Sexton, and Gamble must  dismissed as a matter of law.

In addition,  the record established the fact that officer John Gamble was never present in the plaintiff's residence during the time the defendant  officers entered the occupant's home on March 20, 2013.  See Deposition of Officer John Gamble annexed to Wisham Decl. as **Exhibit No. "4",** at 10:20-25, 11:2-20, 12:10-25, 13: 2-19, 15:4-23, 16: 2-11.  Thus, no claim for liability exists against officer Gamble and all claims against him must be dismissed.

Second, the State of New York, in cases alleging police misconduct, does not recognized a cause of action for general negligence.  **Medina v. City of New York,** 102 A.D. 3d 101, 108 (1st Dept. 2012).   A plaintiff seeking damages for an injury resulting from a wrongful arrest and detention, may not recover under broad general principles of negligence but must proceed by way of the traditional remedies of false arrest, and imprisonment.  **Antonious v. Muhammad,** 250 A.D. 559,(2nd Dept. 1998).   Thus plaintiff seventh claim for relief must be dismissed.

b) supervisory liability

A supervisor may not be held liable under section 1983 because his subordinate committed a constitutional tort.  To hold a supervisor liable, the plaintiff must show that the supervisor 1) directly participated in the underlying constitutional violation: 2) failed to remedy the violation upon learning of it: 3) established a custom, or policy fostering the violation, or allowed such custom or policy to continue after learning of the violation,4) was grossly negligent in the supervision of the subordinates who committed the violation ,or 5) acted with deliberate indifference to the rights of plaintiffs by failing to act on allegations of the subordinates misconduct.  **Colon v. Coughlin,** 58 F.3d 856, 873 (2nd Cir. 1995).  **Iqbal v. Hasty,** 490 F3d 143, 152 (2nd Cir. 2007).

Plaintiffs' have failed to meet their burden of proof and therefore the defendants respectfully request this Court to dismissed plaintiffs' claims against officers  Sexton and Gamble based on supervisory liability because the defendants' acts were not in violation of plaintiff's constitutional rights.  When supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity for his own culpable action ,or inaction in the training, supervision or control

of his subordinates.  **Clay v. Conlee ,** 815 F. 2d 1164, 1170 (8th Cir. 1987)  Moreover, the

misconduct of the subordinate must be " affirmatively linked to the action, or inaction of the

supervisor. **Rizzo v. Goode**, 423 U.s 362, 371 (1976)

   Plaintiffs cannot show that Sgt. Sexton was deliberately indifferent to their constitutional

rights.  In order to demonstrate deliberate indifference a plaintiff must show 1) a grave risk of

harm, 2) the defendant's actual or constructive knowledge of that risk, 3) his failure to take easily

available measures to address the risk.  Sexton's acts were constitutionally permissible based on

the need to act quickly and the exigencies which existed during the time plaintiffs were

temporarily detained.

### POINT VIII

### PLAINTIFFS' EIGHTH CLAIM FOR RELIEF FOR RESPONDEAT SUPERIOR UNDER NEW  YORK STATE LAW FAILS BECAUSE THERE WAS NO TORTIOUS ACT COMMITTED BYTHE DEFENDANT OFFICERS.

   Plaintiffs contend in their eight claim  for relief that the municipal defendants hired, and

supervised, the individual defendants, and that the individual defendants committed wrongs while

acting within the scope of their employment, as employees of the City of Mt. Vernon, and the

Mount Vernon Police Department.  Plaintiffs further contends that Sargent Sexton, and defendant

officer Gamble, out ranked the other individual defendants who committed some of the unlawful

acts and that Sexton, and Gamble ,had supervisory authority over those officers and are therefore

liable under the doctrine of respondent superior.  This argument is flawed and should be

dismissed for several reasons.

   First as set forth supra, officer Gamble was not involved in detaining the plaintiffs on March

20, 2013. Gamble was never present in the Plaintiffs' residence and thus any claims against him

should be dismissed.

   Second, in order to find liability under the doctrine of respondent superior in the State of New

York, plaintiffs must prove the existence of evidence that the defendant committed a tortious act

while acting within the scope of their employment. **Talavera v. Arbit** 18, A.D. 3d 738 795 N.Y.S.2d 708 (2nd Dept. 2005 ).

Here in the instant action, there is no dispute that the individual officers were employees of the City of Mount Vernon.  It is further uncontested that the officers were acting within the scope of their authority during their entry into the plaintiffs' residence on the evening of March 20, 2013. However, as previously set forth throughout this motion, the Defendant police offices were acting with reasonable justification in their entry into plaintiff's residence which resulted in plaintiff's temporary restraint of movement for the protection of the defendant officers.

The officers did not engage in tortious conduct for which liability attaches. Based on the facts stated in Wisham Decl., the defendant officers acted reasonably in their criminal investigation and the emergency which they reasonably believed existed. Therefore, this claim must fail and be dismissed.

## POINT IX

**THE PLAINTIFF'S NINTH CLAIM FOR RELIEF CITING MONELL UNDER 42.US.C. SECTION 1983, MUST BE DISMISSED BECAUSE THE PLAINTIFFS HAVE FAILED TO PRODUCE ANY EVIDENCE IN THE RECORD SHOWING ANY DEFICIENCIES IN THE CITY OF MOUNT VERNON'S HIRING, TRAINING,SUPERVISION, OR DISCIPLINE OF ITS POLICE OFFICERS.**

Plaintiffs filed a complaint against the defendants alleging municipal liable under 42 U.S.C. Section 1983. The Complaint states in part that the municipal defendants engaged in a policy and practice of encouraging police harassment of the disadvantage and minority member of the community in the false name of public order.  See Complaint annexed to Wisham Decl. as **Exhibit "A",** at 12: 101-105, 13: 106-115, 14: 107-115.

The Complaint also alleges that the City of Mount Vernon Police Department, including officer Antonini, routinely harassed the plaintiffs with unlawful stop and frisks, verbal harassment false arrest and threats.  The Complaint further alleges that the " Former Commission Carl Bell is on the record stating in 2012, that an officer waived a handgun in civilians' face and another cop took a civilian's cell phone." **Id.,** at 13: 106.

Plaintiffs continue their unsupported diatribe by stating in their complaint that the Municipal Defendants have a police of tolerating rampant racism with the Mount Vernon Police Department such as that exposed in the case of Sergeant Michael Marcucilli, and that the City of Mount Vernon has failed to implement a proper Civilian Complaint Review Board that had been the Mt. Vernon City Charter since 1992.  Moreover, the Complaint alleges that the Mayor of Mount Vernon, the City Council, and the Ethics Board, has failed to implement or revise said legislation. **Id.** at 13:106-110.

Plaintiff also contends that the City of Mount Vernon  failed to comply with national standards according to the National Association of Civilian Oversight of Law Enforcement, and that the federal  authorities are investigating or have investigated the Mount Vernon Police Department as a whole, for systematic  police brutality, and criminal civil rights violations.  **Id,** at 13: 111-112.

According to the Plaintiffs, that " in order to file a formal complaint against the Mount Vernon Police Department, a complainant  is required to go the police station and provide photo I.D to a police officer in order to receive a complaint form, and that the purpose, and effect, of this unlawful requirement is to intimidate complainants, and prevent complaints from being filed. **Id.** at 13:113-114.

Plaintiffs conclude their unsupported allegations against City of Mount Vernon by stating within their Complaint, unfounded allegations that the Municipal Defendants do not want a record of unlawful actions by the officers in their employ, and that the Municipal Defendants want unlawful police tactics to continue, and they do continue.  See Complaint annexed as Wisham Decl. **Exhibit "A".**

These allegations set forth in Exhibit "A", at 12:101-105, 13:106-115,14:116-117, are absurd and without merit, evidence, or support in the record, and as a result, plaintiff's ninth claim seeking relief under Monell must be dismissed as a matter of law.

There is absolutely no basis for a recognized Monell claims against the City of Mount Vernon for municipal liability nor have Plaintiffs proffer any evidence in support of their claims,

therefore the Plaintiffs' Ninth claims against the City of Mount Vernon must be dismissed in its entirety.

The law establishing Municipal Liability is well settled. First, in order to subject a Municipality for liability under 42 U.S.C. Section 1983, the Plaintiffs must first plead, and prove (1) an official policy, or custom that (2) causes the plaintiff to be subjected to a denial of a constitutional right. See **Canton v. Harris**, 489 U.S. 378,(1989). **Monell v. New York City Depart. Of Social Servs,** 436 U.S. 658 (1978).  See also **Wilner v. Village of Roslyn,** 952 NYS2d 71, (2nd Dept. 2012)  Moreover, "for a cause of action to lie against a municipality, the action that is alleged to be unconstitutional must implement or execute a policy statement, ordinance. regulation ,or decision officially adopted, and promulgated by that body's officers, or have occurred pursuant to a practice so permanent, and well settled as to constitute a custom or usage with the force of law. **Pendleton v. City of New York**, 44 A.D. 3D 733, 736 (2nd Dept. 2007)

In addition, the Plaintiffs must establish an **affirmative link between the municipal policy and the injuries sustained** by him or her.  **Monell v. Department of Social Services of City of New York**, 436 U.S. 658, 692 (1978). (emphasis added)  Accordingly. plaintiffs must demonstrate that his injury arose from the acts of the officer in the courses of executing a municipal police or custom.  **Town of Orangetown v. Magee,** 88 N.Y. 22d41,49 (1996)

Plaintiffs' claims against the City of Mount Vernon  fails, and must be dismissed because the complaint  failed to allege and prove that the City of Mount Vernon had established a pattern or practice , custom or policy that was in effect on or before March 20, 2013, within the city of Mount Vernon, or the Mount Vernon Police Department, the Mount Vernon City Council which authorized plaintiffs to be routinely harassed , or subjected to  false arrests, excessive use of force of themselves or any other known civilians.

Moreover, plaintiffs' claims under a Monell theory must fail because the plaintiffs complaint fails to allege with any specificity that the City of Mount Vernon violated plaintiffs constitutional

rights in permitting such a pattern or practice for which the City was deliberately indifferent to the depravation of the constitutional rights of its citizens including those of the Plaintiffs.

Plaintiffs have failed to established by the evidence that the City of Mount Vernon or the Mount Vernon City Council, Board of Ethics instituted a municipal policy, practice or custom that was **"the moving force" be**hind the alleged violation of the Plaintiffs' constitutional rights as required under Monell.  (emphasis added)  See,  **Dwares v. City of New York ,**985, F2d 94,101(2nd Cir. 1993)   Moreover, the Plaintiffs have failed to proffer any evidence in the record that the Municipal Defendant, City of Mount Vernon failed to comply with the national standards according to the National Association of Civilian Oversight of Law.  The underlying record is completely void of any suggestive evidence for which a reasonable juror could find in favor of the plaintiffs claim of Municipal Liability.

Similarly Plaintiffs have failed to exhibit any form of evidence showing the City of Mount Vernon engaged in a pattern, practice, custom or design which lead to the deprivation of the Plaintiff's constitutional rights related to any Federal Investigation for police brutality and criminal civil rights violations that would in any manner  sustain a policy, practice, custom that was the moving force behind the Plaintiffs alleged violations of their constitutional rights as required under Monell.

This Court has held that a single incident alleged in a complaint especially if it involved only actors below the policy –making level, does not suffice to show a municipal policy.  See **Oklahoma City v. Tuttle**, 471 U.S. 808-24 (1985)

Mere "boilerplate" assertions that a municipality has such a custom or police which resulted in a deprivation of the plaintiff's civil rights is insufficient to state a Monell claim and accordingly must be dismissed.  See **Khanukayev v. City of New York** , No. 09 Civ. 6175, 2012 U. S. Dist. LEXIS 113779 WL 3538729(S.D.N.Y. 2012)

It is generally recognized the there are four situations in which a municipality maybe held liable under Section 1983,  which include "1)  an officially promulgated policy endorsed or

ordered by the municipality; 2) a custom or practice that is so widespread that the municipality had either actual or constructive knowledge of it; 3) actions taken or decisions made by the municipal employee who as a matter of law is responsible for establishing municipal policies with respect to the area in which the action is taken or 4) whether the failure of the municipality to train its employees rises to the level of deliberate indifference to the constitutional rights of other." **Wahhab v. City of New York,** 386 F. Supp. 2d 277, 285 (SDNY 2005).

Plaintiffs have failed to meet their burden of proof in regards to their Ninth claims against the City of Mount Vernon, and thus defendants hereby request this claim to be dismissed in its entirety.

There is no tangible evidence established in the record for which the plaintiff may avail. There is no evidence of a widespread practice by the Mount Vernon police department or policy of allowing the members of its police force to engage in" unlawful or negligent performance of their duties including incidents of harassment of civilians, false arrest and or excessive force" as set forth in the Complaint paragraphs 101-105. See **Exhibit "A"**. Compl.

The record is void of any evidence that the Mount Vernon Police Department had a custom, practice or policy with regards to police harassment of the disadvantage, and minority members of the community in the false name of public order. Furthermore, the record failed to show that the Mount Vernon Police Department such as Defendant Officer Antonini engaged in a widespread practice or policy of routinely harassing the Plaintiffs, and other members of the minority community.

Nor is there any form of proof offered by the Plaintiffs which raises a triable issue of fact for which the Plaintiff would be successful on the allegations of municipal liability for allowing Antonini to routinely harass plaintiff with unlawful stop and frisk, verbal harassment, or false arrests as alleged by the plaintiffs. Therefore, Defendants respectfully request this honorable Court dismiss Plaintiffs' Ninth claims under Monell in accordance with this motion.

## POINT X

### THE CITY OF MOUNT VERNON POLICE DEPARTMENT IS A NON SUABLE ENTITY AND THERFORE PLAINTIFFS CLAIMS AGAINST THE DEFENDANT MOUNT VERNON POLICE DEPARTMENT MUST BE DISMISSED.

The Plaintiffs claims against the City of Mount Vernon Police Department should be dismissed because it is well settled that the Mount Vernon Police Department is an agency of the City of Mount Vernon and as an agency of the municipality is a non- suable entity under 42. U.S.C. Section 1983. See **Orraca v City of New York,** 897 F. Supp. 148, 151-152 (S.D.N.Y. 1995).

## POINT XI

### SINCE THE POLICE OFFICERS ACTED OBJECTIVELY REASONABLE IN ENTERING PLAINTIFF'S RESIDENCE,THE DEFEDNATS ARE ENTITLED TO QUALIFIED IMMUNITY.

The doctrine of qualified immunity  is a well-recognized judicial doctrine that entitles  police officers to be shielded from liability for damages unless the officer's conduct violates clearly established constitutional right of which a reasonable person would have known.  **Weyant  v. Okst,** 101 F.3d 845, 857 (2nd Cir. 1996). See also, **Harlow v. Fitzgerald,** 457 U.S. 800,at 818, 102 S. Ct. 2727(1982), or unless it was objectively unreasonable for the officer to have believed that their conduct did not violates those rights.  **Anderson v. Creighton,** 483 U.S. 635, 107  S. Ct.  3034 (1987).

The legal requirement of a clearly established right means that the inquiry into whether qualified immunity is available to officers differs from the inquiry into whether the Fourth Amendment may have been violated.  Actions that violate the Fourth Amendment do not necessarily deprive police officers of the defense of qualified immunity.  **Anderson v. Creighton,** 483 U.S. 635, 107 S. Ct.  3034 (1987).  See also **Malley v. Briggs,** 475 U.S. 335, 341 106 S.  Ct. 1092 (1986) (noting that qualified immunity " provides ample protection to all but the plainly Incompetent or those who knowingly violate the law." Harlow 457 U.S. at 818, 102 S. Ct

at 2738 In order to defeat defendants defense of qualified immunity, the right alleged to have been violated must be clearly established at a level of specificity such that " a reasonable official would understand that what he is doing violates that right." **Anderson v. Creighton,** 483 U.S. 635, 640, 107 S. Ct.

Although the Defendants believe that they should prevail of the merits of the Plaintiffs claims, alternatively, the Defendants contend that they are protected under the doctrine of qualified immunity which shields the Defendants from any liability because the Defendant's acted objectively reasonable when they entered the Plaintiff's residence without a warrant based on the fact that a shooting had occurred and that the occupants of the Plaintiff's residence were involved.

 The subsequent  limited search conducted by the officer to prevent the occupants from securing a weapon the Defendants reasonably believed existed inside the residence did not violate the Plaintiffs' constitutional rights.  Furthermore, the Defendants acted reasonable when they took protective measure to secure an area within the premised by ordering all residence to gather into the occupants living room in order that none of the occupants would have the means to retrieve a weapon to be used against the Defendants officers.

   Qualified immunity is " an immunity from suit rather than the mere defense to liability and is effectively lost if the case is erroneously permitted to go to trial."   **Mitchell v. Forsyth,** 472  U.S. 511,526 (1985).

   Governmental officials, such as the Defendant officers, performing discretionary functions" generally as shielded from liability for civil damage insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." **Harlow v. Fitzgerald,**  457 U.S. 800, 818 (1982).

   In determining the existence of qualified immunity, the Courts have undertaken a two-step inquiry, in either order, into whether a right was clearly established, and whether a plaintiff's constitutional rights have been violated.  See **Pearson v. Callahan,** 129 S. Ct. 808, 816 (2009).

Whenever reasonably competent officials could disagree as to whether the conduct at issue would violate clearly established right, the defendant is entitled to qualified immunity. See **Malley v. Briggs**, 475 U.S. 335, 341 (1986).   Law enforcement officials are given the constitutional benefit of the doubt, and are protected unless they are" **plainly incompetent or knowingly** violate the law".  **Saucier v. Katz,** 533 U.S. 194, 205 (2001)(emphasis added)

The radio transmission received by each defendant police officers notifying them that not one, but several shots had been fired and that an eyewitness identified a white minivan with its rear windshield shatter at the scene of the shooting, and that three black males were seen running and entering the van was the triggering event that cause the officers to respond to the emergency which lead the officers to the occupants residence at 328 South 2nd Ave.  Based on the fact the officers knew several of the occupants ho have engaged in past criminal activity such as violent crimes, i.e. the possession of  weapons, and gang activity.  These facts coupled with the officers reasonable concern for the safety of the residents  provided the officers the constitutional authority to enter the Plaintiff's  residence with or with consent and with a warrant to search.

The exigency of the circumstances contained herein was  the moving force for the officers to act now, or never, in the interest of laws enforcement and of saving individual lives. There was insufficient time for the officers to ignore the circumstances and to have sought a search warrant before entering the residence

Therefore, the Defendants are entitled to summary judgment on all of claims brought against them for the reasons set forth throughout this motion.

## **CONCLUSION**

Based on the foregoing, the Defendants respectfully request this honorable Court to grant the Defendants' motion in its entirety, and dismiss this action together with such other and further relief as the Court deems just and proper.

Dated: New York, New York
      April 6, 2016

By /s/_____

Welton K. Wisham, Esq. (ww8674)
The Law Office of Welton K. Wisham
43 West 43rd Street, Suite 95
New York, New York, 10036-7424
Attorney for the Defendants
(212) 709-8183