UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
VAUGH SCHOTT, NIGERIA SCOTT, PRINCE            Index No. 14-cv-4441
SCOTT, ANDRE HARRIS, BRENDA SCOTT,
KRAIG UTLEY, COREY MARROW, A.S.,
A MINOR CHILD, K.M., A MINOR CHILD,         Responsive 56.1 Statement
AND JULIAN RENE,
                   *Plaintiffs,*

        against --

THE CITY OF MOUNT VERNON, a municipal
Entity, MT. VERNON POLICE OFFICER ALLEN,
MT. VERNON POLICE OFFICER CAMILO
ANTONINI, MT. VERNON POLICE OFFICER
TIMOTHY BRILEY, MT. VERNON POLICE
OFFICER DET. BRENT GAMBLE, MT. VERNON
POLICE OFFICER SGT. STEVEN SEXTON,
CITY OF MOUNT VERNON POLICE
DEPARTMENT, AND POLICE OFFICERS JOHN
DOES 1-10,
                   *Defendants.*
-----------------------------------------------------------------------x


      The plaintiffs, by David A. Thompson, Esq., of Stecklow & Thompson, submit

this response to the defendants' 56.1 statement.

# I.      General Objections

      1.      Pursuant to this Court's individual rules, in responding to a Rule 56.1
statement, "Opposing parties must reproduce each entry in the moving party's Rule 56.1
Statement, and set out the opposing party's response directly beneath it."  The
defendants' statements have been reproduced here without correction of typographical or
formatting errors.  The defendants' use of bold or underlined font has **not** been
reproduced, however, although references to "emphasis added" have been retained.

      2.      "Each statement by the movant or opponent pursuant to Rule 56.1(a) and
(b), including each statement controverting any statement of material fact, must be
followed by citation to evidence which would be admissible, set forth as required by Fed.
R. Civ. P. 56(c)."  *See* Local Rule 56.1(d).  The plaintiffs object to each of the statements
not supported by admissible evidence, and move that such statements be stricken.

      3.      With respect to issues of justification for entry, the plaintiffs object to each
and every fact herein which does not relate to facts known or alleged to be known by the
defendant officers at the time of their entry into the plaintiffs' home.  Only facts actually

known by the officers at that time are relevant to whether there was probable cause for entry. *See Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. N.Y. 2006)). *Accord Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. N.Y. 2002); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996). Facts unknown to the officers are irrelevant and therefore immaterial. The plaintiffs move to strike all such statements.

      4.      The plaintiffs object to each statement herein that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition. Such as statement is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

      5.      The fact that a plaintiff made a statement in this litigation is generally not a fact material to liability in this case. The principal legal question is whether the defendants' entry into the home without a warrant, to seize the occupants, was justified. Entry or seizure can only be justified based on facts the officers knew at the time they entered and committed the seizure. Probable cause must be determined based on the knowledge of the arresting officer at the time of the arrest, and therefore a plaintiff's subsequent admissions in his deposition cannot provide a basis for probable cause. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, * 11-12 (E.D.N.Y. Feb. 27, 2015); *Spruill v. Levy*, No. 04 Civ.7316 (KMW)(JCF), 2008 U.S. Dist. LEXIS 30311, 2008 WL 1744787, at *1 (S.D.N.Y. Apr. 11, 2008) (noting that "police may not rely on information gained post-hoc to show that probable cause existed at the time of arrest"). *See, generally, Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013). The fact that such a subsequent testimonial statement was made – even if it would have provided probable cause if contemporaneously known -- is therefore not a material fact. The plaintiffs are not required to respond to statements of immaterial fact. Therefore, the plaintiffs move that each such statement be stricken.

      6.      The defendants' Rule 56.1 statement is laden with such "**statements about statements**." The frequency of their use suggests that the defendants are attempting to subvert the proper use of a 56.1 statement. For example, statement 138 below is: "Vaughn Scott further testified that the police asked her to be quiet and sit down. [citing Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. 11, at 10:2-6]." If this were framed as a statement about what happened, it would read: "The police asked her to be quiet and sit down." Such a direct statement by the defendants would be an admission by them that the police dominated and controlled Vaughn at that point in time – that they seized her. Casting it as a statement about a statement, the defendants appear to seek to bind Vaughn to a testimonial position while avoiding taking any position on the underlying facts about what happened. This is inherently improper, especially because the defendants have framed dozens of statements in this fashion. For each such improper statement, the defendants should be deemed to have taken the position that the plaintiff's statement referenced by them is true in its substance, to the extent not inconsistent with the plaintiffs' particular objections, and not merely to have taken the position that the plaintiff's statement was made. The plaintiffs so move the Court.

7. The plaintiffs object to each characterization of a statement by a plaintiff as an "admission," because of its unfounded implication that such plaintiff's statement tends to show their culpability or untruthfulness. The plaintiffs move that each such characterization be stricken.

8. The plaintiffs object to each characterization of a statement by a plaintiff as a change in the plaintiff's testimony, because of its unfounded implication that a conflict in testimony exists, or that any conflict in testimony which may exist is not the result of the objectionable and confusing form to the questions placed to the witness. The plaintiffs move that each such characterization be stricken.

9. The plaintiffs object to each facts stated herein that is not based on evidence whose admissibility is established by the defendants in their submission, as is their burden. The plaintiffs move that each such statement be stricken.

10.

## II. Responses to Statements

1. On March 23, 2013, at approximately 18:17 (6:17 pm), The Mount Vernon Police Department received a telephone call from a complainant who indicated that she had heard two shots fired, and had seen a white van with three males, one with a red cap, and two others dressed in black going down South 9th Ave. in the white van. See City of Mount Vernon's Live Aegis Public Safety System Incident Report March 23, 2013, annexed to the Declaration of Welton K. Wisham (the Wisham Decl.) as Exhibit "B".) [sic].

> Response 1 - 1:    Disputed as unsupported.

> Response 1 - 2:    The plaintiffs do not dispute that the first call to the police relating to the incident terminated at or before 18:17 (i.e., 6:17 PM).

> Response 1 - 3:    On the first page near the top of this document is a list of five events: (1) Call, (2) Dispatch, (3) Arrive 1, (4) Arrive 2, and (5) Clear.  Next to each event is a stated date (3/20/13 for all five), and a stated time.  The first event in the list is "Call."  The time stated is 18:17:14 (6:17 PM and 14 seconds).  The second event is "Dispatch."  The time stated is 18:17:14 (6:17 PM and 14 seconds).

> Response 1 - 4:    However, there is no evidence – even within the document cited – that the first call contained the allegations stated in this statement of purported fact.  Beginning at the bottom of the document's third page are eight lines of text that appear to reflect or

refer to statements made by civilians and police. These eight lines are the only place on the document that could be source for the defendants' allegation of what the substance of the complaint which was called in at 18:17 was. These eight lines appear to bear time stamps. None of the time stamps correspond to the "Call" time of 18:17:14. The first of these eight line refers to a "Mr. James" who is referred to as a compl[ainant]. This line is time stamped 18:26:32, about 9 minutes and 18 seconds after when this document states the first call concluded or was registered. Each of the rest of these eight lines is assigned a time stamp of 19:13:33 or later – almost an hour after the first call concluded or was registered at 18:17:14. The eight lines refer to four sources of information: (1) Mr. James; (2) an unnamed "she"; (3) "another complaint," also unnamed; and (4) a police officer in or at the plaintiffs' home at 20:33 hours. Based on these eight lines it is impossible to determine what statements, if any, can be attributed to the first call ending at 18:17:14.

Response 1 - 5:   The first call in the Audio Exhibit is a call from an anonymous female. (Ex. U to 4/8/16 Thompson Decl. 00:00 – 00:56). The caller begins by stating that she is located at "215 Livingston Towers" in a parking lot. (*Id.* 00:00 – 00:06).[1] The caller's end of the call is mostly inaudible. (*Id.* 00:00 – 00:56). However, this caller clearly stated that she heard four shots, not two. (*Id.* 00:16 – 00:21). The complainant appears to be saying that she saw "guys running" who "just ran past in the parking lot I don't know where they went." (*Id.* 00:31 – 00:56). The recording provided by the defendants, therefore, does not support the defendants' contention that the first caller stated that "she had heard two shots fired, and had seen a white van with three males, one with a red cap, and two others

---

[1]      The caller appears to state later on that she is located between 215 South Second Avenue and 70 West 3rd Street. (*Id.* 00:24 – 00:31).

4

dressed in black going down South 9th Ave. in the white van," as alleged by the defendants in this alleged undisputed fact.

Response 1 - 6:   Beginning at 8:43 in the Audio Exhibit is a call from a different anonymous female.  This female stated, in sum and substance, that she heard two shots fired, and had seen a three males in black, one with a red cap, enter a white van on South 9th Ave.  (Ex. U to 4/8/16 Thompson Decl. 08:43– 09:45).  This caller expressly stated that she "did not know what they did."  (*Id.* 09:13-09:15).  This is not the first call in the recording, and it cannot be established on the evidence of the Audio Exhibit that it was the first call received or that it was made "at approximately 18:17."

Response 1 - 7:   The plaintiff objects, noting that the events of this case did not occur on March 23, 2013.  The events of this case took place on March 20, 2013.  (See Compl. ¶ 1 (Ex. A to 4/8/16 Thompson Decl.), admitted in Answer ¶ 1 (Ex. B to 4/8/16 Thompson Decl.)).

2.      At approximately 18:26, (6:26pm) the Mount Vernon Police Department received a second phone call from a male caller who informed the police that he had seen a light skin male, with a red hoodie, run towards Ebony Gardens opposite 70 West 3rd street. See City of Mount Vernon's Live  Aegis Public Safety System Incident Report, (annexed to the Wisham Decl. as Exhibit "B"). [sic].

Response 2 - 1:   Disputed as unsupported by admissible evidence.  Please see objections to this exhibit set forth in II.B above.

Response 2 - 2:   As discussed above, beginning at the bottom of the document's third page are eight lines of text that appear to reflect or refer to statements made by civilians and police.  The first of these eight line reads: "Compl –Mr. James – 308-2819   18:26:32."  This line is consistent with the allegation that a male caller called at 18:26.  However, the lines of reflecting that a complainant referred to a "light skin male," with a "red hoodie" are time-stamped 09:15:02 (i.e., 9:15

PM and 2 seconds) and later, and appear to refer to the call of "another complain[ant]."

Response 2 - 3:   Beginning at 00:59 in the Audio Exhibit is a recording of a call from a male caller who stated that he had seen a light skin male, with a red hoodie, run **into** (not "towards") Ebony Gardens opposite 70 West 3rd street.  This is the second call on the Audio Exhibit as provided by the defendants.  However, there is no indication on the recording of the time at which the call was made.

Response 2 - 4:   Beginning at 07:22 in the Audio Exhibit is the following exchange, which appears to the recording of the call by Mr. James.  The Aegis Public Safety System Incident Report contains a reference to "Mr. James" time stamped 18:26:32 at the bottom of page three. The Mr. James on the Audio Exhibit at 7:22 could be the Mr. James referred to in Public Safety System Incident Report and time stamped at 18:26:32.  In the Audio Exhibit, Mr James refers to a" black male" with a red "shirt" or "sweatshirt" and "black jeans." He does not reference "light skin" or a "hoodie."  In the Audio Exhibit, Mr. James states that two other black males in black clothing ran "through the projects" "back towards seventh avenue going towards 4th street playground.":

| | |
|---|---|
| Dispatcher: | Mount Vernon Police 27. |
| Caller: | Hey 27 this is Mr. James how are you doing? |
| Dispatcher: | Good Who's this? |
| Caller: | Mr. James. |
| Dispatcher: | OK, How are you? |
| Caller: | All right that shooting that just occurred is one black male with a red shirt and black jeans he ran to the right towards Ebony gardens.  It was the two it was the two that were shooting they got on two Black shirts, black jeans, they ran to the left in the projects they ran going back towards seventh avenue going towards 4th street playground. |
| Dispatcher: | They ran towards where? |
| Caller: | 4th Street playgrounds, through the projects. |
| Dispatcher: | The two male blacks they had black shirts on |
| Caller: | Yeah |

| Dispatcher: | And just your phone number Mr. James? |
| Caller: | This is my desk number I give you my phone number 914-308-2819. |
| Dispatcher: | All right so two male blacks black shirts they ran towards the.. |
| Caller: | They ran through the projects going towards fourth street playground |
| Dispatcher: | Towards the fourth street playground. |
| Caller: | Correct. |
| Dispatcher: | And they're the ones you saw with the gun? |
| Caller: | No they was one was running |
| Dispatcher: | Right |
| Caller: | He was running from them that's the red sweatshirt. |
| Dispatcher: | The guy with the red sweatshirt had the gun. |
| Caller: | No he was running from them. |
| Dispatcher: | All right the man with the red shirt was running from them. |
| Caller: | Right … And he ran into Ebony Gardens. |
| Dispatcher: | He ran into Ebony Gardens.  And the other two ran to the fourth street playground. |
| Caller: | Right they ran through the projects. |
| Dispatcher: | Thanks Mr. James. |

Response 2 - 5:   The plaintiffs do not dispute that there was more than one call to the police or the 911 switchboard regarding the incident.

Response 2 - 6:   The plaintiffs do not dispute that different calls provided different and information as to the number, description, activities and location of people seen by callers.

Response 2 - 7:   The plaintiffs do not dispute that there was a time interval between the first and second calls from civilians regarding the incident.

3.      Several police units were dispatched to the area where the shots were reportedly fired at 215 South 9th street, Mount Vernon, New York. The incident was logged in by the Mount Vernon Police Department, and assigned Incident # 2013-00009571.  See City of Mount Vernon Live Aegis Public Safety System Incident Report, annexed to Wisham Declaration as Exhibit" B".  [sic]

Response 3 - 1:   Disputed as unsupported by admissible evidence.

Response 3 - 2:   From the document itself it cannot be determined whether: (a) the shots were fired at 215 South 9th Avenue;[2] or (b) the person(s) reporting the shots was at 215 South 9th Avenue; or (c) something else entirely.

Response 3 - 3:   The statement "The incident was logged in by the Mount Vernon Police Department, and assigned Incident # 2013-00009571" is not material.

Response 3 - 4:   It is undisputed that police units were dispatched to 215 South 9th Avenue.

4.     Plaintiff Corey Marrow was the driver of the white van. See Cory Marrow's Dep. (annexed to Wisham Decl. as Exhibit No." 14", at 19:7-10. ("I was driving past; I didn't know it was a shooting".) [sic].

Response 4 - 1:   This is not a material fact, because the defendants did not know, and could not know, who had driven the vehicle when they decided to enter the plaintiffs' apartment without a warrant.

5.     Corey Marrow was the driver of the white van near the location of the shooting. See Cory Marrow Deposition annexed hereto as Exhibit No. "14", at 19:7-10, 22:8-12.

Response 5 - 1:   This is not a material fact, because the defendants did not know, and could not know, who had driven the vehicle when they decided to enter the plaintiffs' apartment without a warrant.

Response 5 - 2:   Disputed as not supported by the testimony.  Corey testified that he did not know exactly where the shooting occurred. (Corey Tr., Ex. O to the 4/8/16 Thompson Decl., 19:16 – 20:3) ("I don't know where the shooting occurred.").

6.     Corey Marrow testified that Julian Rene admitted to him that he heard shots in the vicinity of 7th Ave and 3rd Street. See Cory Marrow's Dep. (annexed to Wisham Decl. as Exhibit No. "14", at 23:12 [sic].

---

[2]     Upon information and belief, there is no such address as 215 South 9th **street** in Mount Vernon, N.Y.

Response 6 - 1:   This is not a material fact, because the defendants did not know, and could not know, what Julian "admitted" to Corey when they decided to enter the plaintiffs' apartment without a warrant.

Response 6 - 2:   This is not a material fact, because the defendants did not know, and could not know, what Julian heard when they decided to enter the plaintiffs' apartment without a warrant.

Response 6 - 3:   A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.* At the time the defendant officers were determining whether probable cause existed, the nature of Corey's future testimony in this civil case was not known to them.

7.      Julian Rene was shot by a bullet fired near the vicinity of 7th Ave and 3rd street. See Corey Marrow Deposition annexed to Wisham Decl. as Exhibit No."14", at, 21:25, 22:2-13, 23:3-11.

Response 7 - 1:   Undisputed.

Response 7 - 2:   However, Corey Marrow, whose testimony is cited by the defendants, stated that did not know where the shooting occurred.  (Corey Tr., Ex. O to the 4/8/16 Thompson Decl., 19:16 – 20:3) ("I don't know where the shooting occurred … I wasn't there.").

8.      Julian Rene was the black male running into the white van driven by Corey Marrow, Exhibit "No. 14" ,at 23:3-11, 23:23-25, 24:2-12 [sic].

Response 8 - 1:   It is undisputed that Julian is black and male, ran to Corey's vehicle, and got in.  It is unclear what this statement means when it states that Julian was "the" black male.  No witness statement

9

cited directly or indirectly by the defendants refers to a single black male getting into the vehicle.

Response 8 - 2:   This is not a material fact.  The cited testimony does not establish that any defendant officer knew that Julian Rene left the area of the shooting in Corey's car until after the defendants entered the plaintiffs' home.

9.     Corey Marrow admitted that he had driven his sister's white 2001 Chevy to the Fourth Street Park and that the van's rear windshield was covered with plastic. See Corey Marrow 50-H Transcript (annexed to the Wisham Decl. as Exhibit ""F", at 9: 20-22, 12: 21-25, 13:2-7, 13:8-16, 19-24. [sic].

Response 9 - 1:   A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

Response 9 - 2:   Undisputed.

10.     Plaintiff Corey Marrow also admitted that he drove to the park with Plaintiff Kraig Utley.  Exhibit" F", at 14:22-25.

Response 10 - 1:        This is not a material fact, because the defendants did not know, and could not know, whether Corey Marrow drove to the park with Kraig Utley heard when they decided to enter the plaintiffs' apartment without a warrant.

Response 10 - 2:        In the testimony cited, Corey is referring to going to the park at approximately 3:30 PM, or two and a half or three hours before the shooting.

Response 10 - 3:        Furthermore, the defendants have provided no evidence that the defendant police knew this alleged fact when determining if probable cause existed to enter the plaintiffs' home. Therefore the fact is immaterial to probable cause.

11. Corey Marrow also stated that Demetrius (King) was inside the car with Corey at the time the shots were fired. See Corey Marrow 50-H transcripts (annexed to Wisham Decl. as Exhibit "F". 17:11¬18, 18:2 [sic].

          Response 11 - 1:      This is not a material fact, because the defendants did not know, and could not know, whether Demetrius (King) had been inside the car with Corey, when the defendants decided to enter the plaintiffs' apartment without a warrant.

          Response 11 - 2:      The defendants have provided no evidence that, if known to the police, this fact would have been relevant to probable cause.

          Response 11 - 3:      A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

12. . Corey Marrow admitted that he parked his sister's white van in his driveway. Exhibit "F", at 25:19-25.

          Response 12 - 1:      It is undisputed that, at the time he located the vehicle, Officer Gregorio believed that the driveway it was parked in belonged to **324** South Second Avenue. (Ex U to 4/8/16 Thompson Decl., 13:38 – 14:08, 16:08 – 16:10; Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 80:3 – 81:3). Probable cause is based on facts known to the officers at the time probable cause is determined. *See Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. N.Y. 2006)). *Accord Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. N.Y. 2002); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996).

          Response 12 - 2:      The defendants have offered the Aegis Public Safety System Incident Report (Ex. B to the Wisham

Declaration) as establishing the location and time of the dispatch of officers. This report shows that Sgt. Sexton was dispatched to **324** South Second Avenue, not 328 South Second Avenue. (Ex. B to the Wisham Declaration, p. 2 ("At Scene 2 … 18:43:07 …. Sexton, Steven … Sec. Loc.: 324 S 2nd Av")).

Response 12 - 3: Officer Gregorio told Sexton the information concerning the location of the vehicle by radio transmission. (Sexton Tr., Ex. J to the 4/8/16 Thompson Decl. 12:18 – 13:4). In the recording of Officer Gregorio's radio transmission, he states that the vehicle is located at **324** South Second Avenue, not 328. (Ex U to 4/8/16 Thompson Decl., 13:38 – 14:08; 16:08 – 16:10; Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 80:3 – 81:3). Consistently with this recording, the Aegis Public Safety System Incident Report (Ex. B to the Wisham Declaration, p. 3) reflects Officer Johanna Santos arriving at "Scene 2" approximately five minutes before Sexton, and the location is identified as "**324** S 2nd Av" Officer Santos shared a car with Officer Gregorio. (Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 16:8-15). Where the Aegis Public Safety System Incident Report reflects Officer Santos arriving at "**324** S 2nd Av.," it means that Officer Gregorio was at the same location.

Response 12 - 4: A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

13. Sargent Steven Sexton was one of several police officers who responded to the call of shots fired and who was called to conduct a criminal investigation of an assault with a handgun . Sexton was dispatched to 328 South 2nd Ave. on March 20, 2013 ,as a result of a radio transmission he received which had indicated to him that a vehicle possibly involved in a shooting was located at this address. See Sexton

Deposition (annexed to Wisham Decl. as Exhibit No. "1",at 11:12-15, 21-25, 12:1-3, 13:2-4. [sic].

Response 13 - 1:          Disputed.

Response 13 - 2:          The defendants have offered the Aegis Public Safety System Incident Report (Ex. B to the Wisham Declaration) as establishing the location and time of the dispatch of officers.  This report shows that Sgt. Sexton was dispatched to **324** South Second Avenue, not 328 South Second Avenue.  (Ex. B to the Wisham Declaration, p. 2 ("At Scene 2 … 18:43:07 …. Sexton, Steven … Sec. Loc.: 324 S 2nd Av")).

Response 13 - 3:          Officer Gregorio told Sexton the information concerning the location of the vehicle by radio transmission.  (Sexton Tr., Ex. J to the 4/8/16 Thompson Decl. 12:18 – 13:4).  In the recording of Officer Gregorio's radio transmission, he states that the vehicle is located at **324** South Second Avenue, not 328.  (Ex U to 4/8/16 Thompson Decl., 13:38 – 14:08; 16:08 – 16:10; Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 80:3 – 81:3).  Consistently with this recording, the Aegis Public Safety System Incident Report (Ex. B to the Wisham Declaration, p. 3) reflects Officer Johanna Santos arriving at "Scene 2" approximately five minutes before Sexton, and the location is identified as "**324** S 2nd Av"  Officer Santos shared a car with Officer Gregorio.  (Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 16:8-15).  Where the Aegis Public Safety System Incident Report reflects Officer Santos arriving at "**324** S 2nd Av.," it means that Officer Gregorio was at the same location.

14.     Officer Gregorio had informed Sargent Sexton that the vehicle possibly involved in the shooting had been located at 328 South 2nd Ave. See Sexton Deposition annexed hereto as Exhibit No."1', at 12:13-15.

Response 14 - 1:          Disputed.

Response 14 - 2:        Officer Gregorio did not inform Sergeant Sexton that the vehicle was at 328 South 2nd Avenue.  Rather, he informed Sexton the vehicle was at **324** South 2nd Avenue.

Response 14 - 3:        According to the cited testimony, Officer Gregorio told Sexton the information concerning the location of the vehicle by radio transmission.  (Sexton Tr., Ex. J to the 4/8/16 Thompson Decl. 12:1 – 13:4).  Sexton testified that Gregorio's transmission was recorded.  (*Id.* 12:7-9).  In the recording of Officer Gregorio's radio transmission, he states that the vehicle is located at **324** South Second Avenue, not 328.  (Ex U to 4/8/16 Thompson Decl., 13:38 – 14:08, 16:08 – 16:10; Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 80:3 – 81:3).  Consistently with this recording, the Aegis Public Safety System Incident Report (Ex. B to the Wisham Declaration, p. 3) reflects Officer Johanna Santos arriving at "Scene 2" approximately five minutes before Sexton, and the location is identified as "**324** S 2nd Av."  Officer Santos shared a car with Officer Gregorio.  (Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 16:8-15).  Where the Aegis Public Safety System Incident Report reflects Officer Santos arriving at "**324** S 2nd Av," it means that Officer Gregorio was at the same location.  Officer Gregorio reported that the minivan was "parked in the driveway of … 324 South Second Avenue." (Ex U to 4/8/16 Thompson Decl., 13:38 – 14:08, 16:08 – 16:10; Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 80:3 – 81:3).

Response 14 - 4:        It is undisputed that at that point in time, in the officers' knowledge there was only a "possibility" that the van was "involved" in the shooting.

15.     Prior to arriving at 328 South 2nd Ave., Sargent Sexton had received information via radio transmission that suspects from the shooting had entered a white van and had driven off. See Sexton Dep. annexed to Wisham Decl. as Exhibit "No."1", at 13:6-17.

Response 15 - 1:        Disputed.

Response 15 - 2:     Sergeant Sexton was dispatched to **324** South Second Avenue, not 328.  The defendants have offered the Aegis Public Safety System Incident Report (Ex. B to the Wisham Declaration) as establishing the location and time of the dispatch of officers.  This report shows that Sgt. Sexton was dispatched to **324** South Second Avenue, not 328 South Second Avenue.  (Ex. B to the Wisham Declaration, p. 2 ("At Scene 2 … 18:43:07 …. Sexton, Steven … Sec. Loc.: 324 S 2nd Av")).

Response 15 - 3:     Sexton knew that individuals witnessed in the vicinity of the shooting "entered a white van and had driven off." Sexton was not aware of any additional facts suggesting that these individuals were responsible for the shooting, rather than involved as bystanders or victims.

Response 15 - 4:     Sergeant Sexton's cited testimony did not communicate any specifics as to what conduct of the individuals entering the van made them "suspects."  (Sexton Tr. 13:6 – 15:13).

Response 15 - 5:     Prior to Officer Gregorio's call that the van was located at 324 South Second Avenue, and thus before Sexton's arrival at 324 South Second Avenue, dispatch communicated via radio the fact that there were conflicting witness statements concerning who might have been responsible for the shooting. Dispatch broadcast:

> I now have conflicting from parties that are calling here. One witness states it was two male blacks with black shirts that fled towards the fourth street playground.  Another witness said it was two shots, one wearing red cap, two parties wearing black shirts, and they all got in that minivan.   (Ex. U to 4/8/16 Thompson Decl., 10:15 – 10:35).

Response 15 - 6:     Prior to Officer Gregorio's call that the van was located at 324 South Second Avenue, and thus before Sexton's arrival at 324 South Second Avenue, dispatch communicated via

radio that there were conflicting witness statements concerning where the incident occurred. Dispatch broadcast: "Apparently right in the area of 70 West [inaudible], People that were calling in were giving us different locations" for the incident. (Ex. U to 4/8/16 Thompson Decl., 13:15 – 13:21).

Response 15 - 7:     Prior to Officer Gregorio's call that the van was located at 324 South Second Avenue, and thus before Sexton's arrival at 324 South Second Avenue, no radio communication referred to a victim of the shooting. (Ex. U to 4/8/16 Thompson Decl., 00:00 – 13:21).

Response 15 - 8:     Thus, the information communicated by radio, taken as a whole, provided ambiguous and conflicting information concerning the location of the alleged crime, the nature of the crime, and the existence of any victim of the crime. (Ex. U to 4/8/16 Thompson Decl., 00:00 – 13:21).

16.     Sexton was made aware of the fact that shots had been fired in the vicinity of 9th Ave., and Third Street near Levister Towers. See Sexton Deposition annexed hereto as Exhibit No."1", at 13:18-22.

Response 16 - 1:     Undisputed that Sexton testified to this effect.

Response 16 - 2:     Prior to Officer Gregorio's call that the van was located at 324 South Second Avenue, and thus before Sexton's arrival at 324 South Second Avenue, dispatch communicated via radio that the incident was "Apparently right in the area of 70 West [inaudible], People that were calling in were giving us different locations" for the incident. (Ex. U to 4/8/16 Thompson Decl., 13:15 – 13:21).

17.     Sexton was aware of earlier reports by local residents who had called the Mount Vernon Police Department stating that "shots had been fired". See Sexton Dep. annexed to Wisham Decl. as Exhibit No."1" at, 14:1-14.

Response 17 - 1:     Disputed.

Response 17 - 2:        Undisputed that Sexton was aware that there has been reports of shots fired.

Response 17 - 3:        The statement is disputed in part as unsupported by the cited testimony, insofar as it might be interpreted to mean that Sexton had knowledge of the content of specific reports made by particular individuals.  The cited testimony does not support that conclusion..  Sexton referred to "area residents" when defining the meaning of the dispatcher's term "shots fired call."  Sexton testified that a shots fired call meant that people had called in.  He did not testify that he was aware of any particular "area residents" who had called in reports, or what information any such reports may have contained.

18.     Sgt. Sexton was in possession of information prior to his arrival at 328 South 2nd Ave, of the fact that shell casings had been recovered at the location of the shooting and that there was evidence of a crime scene where shots had been fired.  See Exhibit No."1", at 15:17-25, 16:1-2.

Response 18 - 1:        Disputed as unsupported by the cited testimony.  The cited testimony simply states that Sexton received a call that a vehicle had been located approximately 10 to 15 minutes after the first report of shots fired, and that when he received the call he went to the location.

Response 18 - 2:        A police report refers to shell casings as having been "recovered" at 19:02, 19:03 and 19:25 by a Det. Notarfrancesco.   (Ex. E to 4/8/16 Thompson Decl., p. 1).  Sexton has arrived at 324 South Second Avenue prior to the earliest of these times.

Response 18 - 3:        Sergeant Sexton was dispatched to **324** South Second Avenue, not 328.  The defendants have offered the Aegis Public Safety System Incident Report (Ex. B to the Wisham Declaration) as establishing the location and time of the dispatch of officers.  This report shows that Sgt. Sexton was dispatched to **324**

South Second Avenue, not 328 South Second Avenue.  (Ex. B to the

Wisham Declaration, p. 2 ("At Scene 2 … 18:43:07 …. Sexton,

Steven … Sec. Loc.: 324 S 2nd Av")).

19.	Officer Gregorio had informed Sgt. Sexton that the vehicle Sexton was responding to was the same vehicle that had been reported at the location of the earlier shooting, and that the windshield was missing, and that the vehicle was still warm. See Sexton Deposition transcript annexed to Wisham Decl. as Exhibit No."1", at 17:6-14.

> Response 19 - 1:	Disputed as unsupported by the cited
>
> evidence.  This statement alleges that all the facts referenced about
>
> the vehicle were communicated by Officer Gregorio to Sgt. Sexton.
>
> However, the cited testimony simply states that "Officer Gregorio let
>
> me know that the vehicle was still warm, as if it had just arrived
>
> there."  In the cited testimony, Defendant Sexton did not testify that
>
> Officer Gregorio told him that it was "the same vehicle that had been
>
> reported at the location of the earlier shooting," or "that the
>
> windshield was missing."

20.	Upon arriving at 328 South 2nd Ave, Sgt. Sexton knocked on the door and was met by a woman who informed Sexton that the van in the driveway was owned by her daughter who lived there at 328 South 2nd Ave.  See Sexton Deposition annexed hereto as Exhibit "No. "1", at 17:17-19, 21:7-25.

> Response 20 - 1:	Disputed.
>
> Response 20 - 2:	Sexton stated that he wanted to come in, and
>
> refused to say why.  (K.M. Tr., Ex. N to 4/8/16 Thompson Dec., 12:2-
>
> 9; A.S. Tr., Ex. T to 4/8/16 Thompson Decl., 10:17 – 12:25).
>
> Response 20 - 3:	Sergeant Sexton was dispatched to **<u>324</u>**
>
> South Second Avenue, not 328.  The defendants have offered the
>
> Aegis Public Safety System Incident Report (Ex. B to the Wisham
>
> Declaration) as establishing the location and time of the dispatch of
>
> officers.  This report shows that Sgt. Sexton was dispatched to **<u>324</u>**
>
> South Second Avenue, not 328 South Second Avenue.  (Ex. B to the
>
> Wisham Declaration, p. 2 ("At Scene 2 … 18:43:07 …. Sexton,
>
> Steven … Sec. Loc.: 324 S 2nd Av")).

Response 20 - 4:        When Sergeant Sexton turned his attention to 328 South Second Avenue, he did several other things before knocking on the plaintiffs' door.

Response 20 - 5:        First, Sexton could not knock on the plaintiffs' door without entering the curtilage of 328 South Second Avenue.  (Vaughn Aff., Ex. D to the 4/8/16 Thompson Decl., ¶¶ 8-12).

Response 20 - 6:        Second, Sexton had to have gone onto the partially-enclosed porch. (Vaughn Aff., Ex. D to the 4/8/16 Thompson Decl., ¶¶ 7-8, 13).

Response 20 - 7:        Third, Sexton had to have entered the front door of 328 South Second, which was normally locked.  (Vaughn Aff., Ex. D to the 4/8/16 Thompson Decl., ¶¶ 14, 46-52).

Response 20 - 8:        Fourth, Sexton "knocked on every door" inside 328 South Second Avenue before knocking on the plaintiffs' door.  (Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 17:17-23).

Response 20 - 9:        Sexton  "knocked on every door" inside 328 South Second Avenue  because the building contained three apartments and Sexton did not know which apartment (if any) belonged to the registered owner of the white minivan.  (Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 17:17-23).

Response 20 - 10:        Only after all of these steps did Sexton knock on the door of the plaintiffs' apartment.

Response 20 - 11:        Brenda Scott was the woman who answered the door.  (K.M. Tr., Ex. N to 4/8/16 Thompson Dec., 12:2-9; A.S. Tr., Ex. T to 4/8/16 Thompson Decl., 10:17 – 12:25).


Response 20 - 12:        Sexton and the police officers asked to come in.  Brenda refused, told them they would have to wait, and asked if

they had a warrant.  Sexton stated that he wanted to come in, and refused to say why.  (K.M. Tr., Ex. N to 4/8/16 Thompson Dec., 12:2-9; A.S. Tr., Ex. T to 4/8/16 Thompson Decl., 10:17 – 12:25).

Response 20 - 13:          Sgt. Sexton did not learn that Nigeria Scott lived at 328 South Second Avenue until he entered the plaintiffs' home.  The dispatcher reported that the registration was valid, and the vehicle belonged to Nigeria Scott. The dispatcher reported that the address for Nigeria Scott was a PO box. (Ex. 14 14:33 – 14:41). Specifically, the dispatcher said: "Valid 2001 Chevy Venture Color White to a Nigeria Scott from the City.  It's a P.O. Box."

21.     The van which had earlier been spotted at the location of the shooting was found parked in the driveway at 328 South 2nd Ave. See Sexton Deposition annexed hereto as Exhibit No."1", at 19:5-7.

Response 21 - 1:          Disputed.  According to the cited testimony, Officer Gregorio told Sexton the information concerning the location of the vehicle by radio transmission.  (Sexton Tr., Ex. J to the 4/8/16 Thompson Decl. 12:1 – 13:4).  Sexton testified that Gregorio's transmission was recorded.  (*Id.* 12:7-9).  In the recording of Officer Gregorio's radio transmission, he states that the vehicle is located at **324** South Second Avenue, not 328.  (Ex U to 4/8/16 Thompson Decl., 13:38 – 14:08, 16:08 – 16:10; Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 80:3 – 81:3).  Consistently with this recording, the Aegis Public Safety System Incident Report (Ex. B to the Wisham Declaration, p. 3) reflects Officer Johanna Santos arriving at "Scene 2" approximately five minutes before Sexton, and the location is identified as "**324** S 2nd Av"  Officer Santos shared a car with Officer Gregorio.  (Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 16:8-15). Where the Aegis Public Safety System Incident Report reflects Officer Santos arriving at "**324** S 2nd Av.," it means that Officer Gregorio was at the same location.  Officer Gregorio reported that the minivan was "parked in the driveway of … 324 South Second

Avenue." (Ex U to 4/8/16 Thompson Decl., 13:38 – 14:08, 16:08 – 16:10; Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 80:3 – 81:3).

Response 21 - 2:    On either side of 328 South Second Avenue was a driveway.  One of the two driveways was on the property 328 South Second Avenue.  The other was on the property 324 South Second Avenue.  (Vaughn Aff., Ex. D to the 4/8/16 Thompson Decl., ¶¶ 5-6; Ex. 4 to 6/7/16 Thompson Decl.).

22.    When Sexton arrived at 328 South 2nd. Ave. he informed the women who opened the door for him, that Sexton wanted to know if anyone in the apartment had been wounded because of the information Sexton had received from a called that shots had been fired, and that the vehicle at the scene of the shooting was found parked at 328 South 2nd Ave.  Exhibit No. "1",at 24:3-16. [sic].

Response 22 - 1:    Disputed.

Response 22 - 2:    Sergeant Sexton was dispatched to **324** South Second Avenue, not 328.  The defendants have offered the Aegis Public Safety System Incident Report (Ex. B to the Wisham Declaration) as establishing the location and time of the dispatch of officers.  This report shows that Sgt. Sexton was dispatched to **324** South Second Avenue, not 328 South Second Avenue.  (Ex. B to the Wisham Declaration, p. 2 ("At Scene 2 … 18:43:07 …. Sexton, Steven … Sec. Loc.: 324 S 2nd Av")).

Response 22 - 3:    When Sergeant Sexton turned his attention to 328 South Second Avenue, he did several other things before knocking on the plaintiffs' door.

Response 22 - 4:    First, Sexton could not knock on the plaintiffs' door without entering the curtilage of 328 South Second Avenue.  (Vaughn Aff., Ex. D to the 4/8/16 Thompson Decl., ¶¶ 8-12).

Response 22 - 5:    Second, Sexton had to have gone onto the partially-enclosed porch.  (Vaughn Aff., Ex. D to the 4/8/16 Thompson Decl., ¶¶ 7-8, 13).

Response 22 - 6:          Third, Sexton had to have entered the front door of 328 South Second, which was normally locked.  (Vaughn Aff., Ex. D to the 4/8/16 Thompson Decl., ¶¶ 14, 46-52).

Response 22 - 7:          Fourth, Sexton "knocked on every door" inside 328 South Second Avenue before knocking on the plaintiffs' door.  (Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 17:17-23).

Response 22 - 8:          Sexton "knocked on every door" inside 328 South Second Avenue  because the building contained three apartments and Sexton did not know which apartment (if any) belonged to the registered owner of the white minivan.  (Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 17:17-23).

Response 22 - 9:          Only after all of these steps did Sexton knock on the door of the plaintiffs' apartment.

Response 22 - 10:          Brenda Scott was the woman who answered the door.  (Brenda Tr., Ex. M to 4/8/16 Thompson Decl., . 9:6 – 13:20; Corey Tr., Ex. O to 4/8/16 Thompson Decl., 5:17-24).

Response 22 - 11:          Sexton and the police officers asked to come in.  Brenda refused, told them they would have to wait, and asked if they had a warrant.  (Brenda Tr., Ex. M to 4/8/16 Thompson Decl., . 9:6 – 13:20; Corey Tr., Ex. O to 4/8/16 Thompson Decl., 5:17-24).

Response 22 - 12:          Undisputed that, as this testimony reflects, when Sexton approached the plaintiffs' apartment, he had no knowledge of what role, if any, the occupants of the apartment played in the shooting incident: victim, shooter, bystander, or none of the foregoing.

Response 22 - 13:          Disputed.  The testimony of Brenda Scott, the person who opened the door, was quite different.  She testified that, in sum and substance, as follows. (Brenda Tr., Ex. M to 4/8/16 Thompson Decl., . 9:6 – 13:20).  She answered the door to a knock,

and police were at the door, and told her that they wanted to come in.
Brenda replied: "[Y]ou have to wait … please don't come in."
Brenda then told them that if they wanted to come in, they would
need a warrant.  The police responded, "[W]e don't need a warrant."
The leading officer "became belligerent," and Brenda repeated that
they would a warrant to enter.  The police stated that there had been a
shooting.  They did not ask if anyone had been wounded.  Brenda told
the officers that the "kids" "weren't involved that [she] knew of."
The police then pushed their way in.  (Brenda Tr., Ex. M to 4/8/16
Thompson Decl., . 9:6 – 13:20; Corey Tr., Ex. O to 4/8/16 Thompson
Decl., 5:17-24).

23.    Sexton testified that he was looking for possible victims of the shooting,
and " an additional crime scene.   See Sexton Deposition transcript annexed hereto as
Exhibit No. "1", at 24:18-21.  [sic].

Response 23 - 1:          Undisputed that Sexton testified as stated.

Response 23 - 2:          Undisputed that, as this testimony reflects,
when Sexton approached the plaintiffs' apartment, he had no
knowledge of what role, if any, the occupants of the apartment played
in the shooting incident: victim, shooter, bystander, or none of the
foregoing.

24.    The woman who opened the door at 328 South 2nd Ave. was cooperative
with Officer Sexton when she initially opened the door, and gave Sexton consent to enter
her apartment. See Sexton Deposition annexed hereto as Exhibit No."1", at 24:22-25,
25:1-4.

Response 24 - 1:          Disputed.  The testimony of Brenda Scott,
the person who opened the door, was quite different.  (See Brenda
Tr., Ex. M to 4/8/16 Thompson Decl., . 9:6 – 13:20).

Response 24 - 2:          Brenda answered the door to a knock, and
police were at the door, and told her that they wanted to come in.
Brenda replied: "[Y]ou have to wait … please don't come in."
Brenda then told them that if they wanted to come in, they would
need a warrant.  The police responded, "[W]e don't need a warrant."

The leading officer "became belligerent," and Brenda repeated that they would a warrant to enter. The police stated that there had been a shooting. They did not ask if anyone had been wounded. Brenda told the officers that the "kids" "weren't involved that [she] knew of." The police then pushed their way in. (Brenda Tr., Ex. M to 4/8/16 Thompson Decl., . 9:6 – 13:20; Corey Tr., Ex. O to 4/8/16 Thompson Decl., 5:17-24).

Response 24 - 3:        Brenda Scott did not tell any officer it was OK for them to come into the apartment. (Brenda Tr., Ex. M to 4/8/16 Thompson Decl., . 10:12-16; Briley Tr., Ex. K to 4/8/16 Thompson Decl., 76:6-10).

25.        Prince Scott appeared at the door and began yelling and threatening Sgt. Sexton, and began to interfere with Sexton's criminal investigation: See Sexton Deposition annexed hereto as Exhibit No "1", at 25:10-25, 26:1-14.

Response 25 - 1:        Disputed as unsupported.

Response 25 - 2:        Prince's conduct that Sexton alleged was improper was entirely conduct that Prince could lawfully do within his own home: tell a police officer who entered without a warrant or probable cause to leave – even loudly; tell his family members not to let the police in; get out a camera phone to start recording the police; and get "passionate and animated." (Sexton Tr., Ex. J to 4/816 Thompson Decl., 25:8 - 27:15). At the time of this conduct, Sexton understood Prince Scott to be a resident of the apartment. (Sexton Tr., Ex. J to 4/816 Thompson Decl., 27:2-15).

Response 25 - 3:        In his testimony, Sexton did not explain how Prince's action interfered with Sexton's investigation in a manner that exceeded the right of a civilian to exercise dominion over their own home. Sexton stated in conclusory terms that Prince was "threatening" or "aggressive," but he could not identify any conduct allegedly described by the conclusory adjectives. Indeed, Sexton

admitted that all Prince's conduct was lawful. (Sexton Tr., Ex. J to 4/816 Thompson Decl., 28:2 – 28:8).

Response 25 - 4:     Prince Scott, who was known to Sexton as a member of the family, told the police to leave. (Sexton Tr., Ex. J to 4/816 Thompson Decl., 25:8-24).

Response 25 - 5:     Prince Scott told Defendant Sexton and the police, "Get out of here." (Sexton Tr., Ex. J to 4/816 Thompson Decl., 25:22-24).

Response 25 - 6:     Prince Scott told Defendant Sexton and the police "to get off his property." (Sexton Tr., Ex. J to 4/816 Thompson Decl., 27:2-15).

26.     Sexton immediately recognized Corey Marrow who was present at 328 South 2nd Ave. Sexton testified that he had had "numerous interactions with (Corey Marrow) and that the whole crew is actually one of the local gangs who are responsible for a lot of the violence in the community". See Sextons' deposition transcript annexed to Wisham Decl. as Exhibit No. "1", at, 29:4-9.

Response 26 - 1:     Undisputed that Sexton recognized Corey Marrow.

Response 26 - 2:     Sexton's alleged knowledge of Corey's gang involvement is irrelevant to the question of probable cause to enter the apartment, because Sexton allegedly did not believe or know that Corey lived at 328 South Second Avenue. (Sexton Tr. 28:17 – 29:1). Sexton therefore had no basis to believe that Corey could be found there until after he entered.

Response 26 - 3:     Undisputed that "Sexton testified that he had had 'numerous interactions with (Corey Marrow) and that the whole crew is actually one of the local gangs who are responsible for a lot of the violence in the community.'" The fact that Sexton testified as stated is not a material fact. Sexton provided no evidence that there is an objective basis to this testimony. None of the defendants have provided an objective evidentiary basis for this allegation.

Response 26 - 4:    When asked, out of all the individual accused of gang membership, he could knew of only one conviction. As to Prince, Sexton expressly stated "I have no facts." (Sexton Tr., Ex. J to 4/816 Thompson Decl., 32:2-34).

Response 26 - 5:    Sexton's testimony provides no objective basis to for reasonable person to see find probable cause based on Corey's presence in the apartment occupied by his mother.

Response 26 - 6:    In his testimony, when Sexton uses the word "gang," he does not mean a criminal enterprise. He means: "A group of people working together for a negative impact on society." He explained that his use of the word "covers criminal and noncriminal" activities. (Sexton Tr., Ex. J to 4/816 Thompson Decl., 31:18-25). As so defined, the term "gang" – depending on one's worldview -- could refer to disfavored political parties, people who don't recycle, or even the Mount Vernon Police Department. Therefore, Sexton's testimony that Corey is a member of a "gang" is of no evidentiary value whatsoever.

27.    Sexton further testified that he also knew Julian Rene, Demetrius Royal and that the "apartment was actually loaded up with the actual gang, the crew, the Gunners is the name of the gang." See Sexton's deposition annexed as Exhibit "1",at 29:24-25, 30:1-8, 31:3-7.(emphasis added). [sic].

Response 27 - 1:    Undisputed that Sexton "testified" as stated.

Response 27 - 2:    Sexton provided no objective evidentiary basis upon which another person could reach the conclusion that the individuals named are part of a gang.

Response 27 - 3:    When asked, out of all the individual accused of gang membership, he could knew of only one conviction. As to Prince, Sexton expressly stated "I have no facts." (Sexton Tr., Ex. J to 4/816 Thompson Decl., 32:2-34).

Response 27 - 4:    None of the defendants have provided an objective evidentiary basis for this allegation.

Response 27 - 5:    In his testimony, when Sexton uses the word "gang," he does not mean a criminal enterprise. He means: "A group of people working together for a negative impact on society." He explained that his use of the word "covers criminal and noncriminal" activities. (Sexton Tr., Ex. J to 4/816 Thompson Decl., 31:18-25). As so defined, the term "gang" – depending on one's worldview -- could refer to disfavored political parties, people who don't recycle, or even the Mount Vernon Police Department. Therefore, Sexton's testimony that these  is a member of a "gang" is of no evidentiary value whatsoever.

Response 27 - 6:    Even if each of these individuals was a member of true criminal enterprise, because there is no evidence that prior to his entry into 328 South Second Avenue Sexton knew any of these individual were in the second floor apartment there, or knew that any of them had been in the vicinity of the shooting, these individuals' alleged criminal histories could provide no basis for entry in the plaintiffs' apartment without a warrant.

28.    Sgt. Sexton's knowledge that Kraig Utley, Corey Marrow, and Demetrius Royal were members of a gang known as the "Gunners" was obtained through "Intel of the Westchester County Police". Exhibit " No "1", at 31:8-17.

Response 28 - 1:    Disputed.

Response 28 - 2:    Sexton provided no objective evidentiary basis upon which another person could reach the conclusion that the individuals named are part of a gang.

Response 28 - 3:    None of the defendants have provided an objective evidentiary basis for this allegation.

Response 28 - 4:    Referencing "Intel of the Westchester County Police" simply turns "because I say so" into "because they say so," adding an extra layer of hearsay to an evidence-free allegation.

Response 28 - 5:    When asked, out of all the individual accused of gang membership, he could knew of only one conviction. As to Prince, Sexton expressly stated "I have no facts." (Sexton Tr., Ex. J to 4/816 Thompson Decl., 32:2-34).

Response 28 - 6:    In his testimony, when Sexton uses the word "gang," he does not mean a criminal enterprise. He means: "A group of people working together for a negative impact on society." He explained that his use of the word "covers criminal and noncriminal" activities. (Sexton Tr., Ex. J to 4/816 Thompson Decl., 31:18-25). As so defined, the term "gang" – depending on one's worldview -- could refer to disfavored political parties, people who don't recycle, or even the Mount Vernon Police Department. Therefore, Sexton's testimony that these is a member of a "gang" is of no evidentiary value whatsoever.

29.    Prince Scott, Corey Marrow, Kraig Utley, and Demetrius Royal, had been arrested prior to March 20, 2013, and Sexton was aware of this this fact. Exhibit No. "1", at32:6-12. [sic].

Response 29 - 1:    Not a material fact.

Response 29 - 2:    Sexton's knowledge that the individuals "had been arrested" provides no objective evidentiary basis upon which another person could reach the conclusion that cause existed to enter the plaintiffs' apartment without a warrant.

Response 29 - 3:    Even if each of these individuals was a member of true criminal enterprise, because there is no evidence that prior to his entry into 328 South Second Avenue Sexton knew any of these individual were in the second floor apartment there, or knew

that any of them had been in the vicinity of the shooting, these individuals' alleged criminal histories could provide no basis for entry in the plaintiffs' apartment without a warrant. (Sexton Tr., Ex. J to 4/816 Thompson Decl., 34:11 – 36:16).

Response 29 - 4:        After the police learned that Julian was a victim of the shooting who neither needed nor wanted help, the police had no reason to believe that a firearm might be present other than the occupants' supposed criminal history. (Sexton Tr., Ex. J to 4/816 Thompson Decl., 36:7-16).

30.    Sargent Sexton entered the premises at 328 South 2nd Street (the premises) based on his reasonable belief that someone within the premises had been shot based on information which he had received by the Mount Vernon Police Department via radio transmission. Exhibit No. "1", at 34:12-19.

Response 30 - 1:        This is not a material fact. The statement presents a legal conclusion that the belief referenced would be objectively reasonable.

Response 30 - 2:        Disputed as unsupported by the referenced evidence. The four lines of testimony referenced in support of this statement contain Sexton's statement that his purpose in walking into the apartment was to make sure that there were no injured parties there.

Response 30 - 3:        Whether Sexton had a subjective belief is not material to the question of whether the entry was lawful. Furthermore Sexton's allegation the he acted on a subjective "belief" that an injured person was there is belied by his own conduct which was inconsistent with such a motivation. After determining that the only injured party present was not seriously hurt, refused medical care, and did not wish to cooperate with an investigation, Sexton and the officers "wanted to stay at the apartment and get approval from the District Attorney for a search warrant." (Sexton Tr., Ex. J to 4/816 Thompson Decl., 34:11 – 35: 24). The search warrant has no

stated or conceivable connection to the alleged purpose of finding and protecting an injured victim.

Response 30 - 4:     The testimony cited provides no objective basis for a belief that someone on the premises had been shot.

Response 30 - 5:     Sexton was called to the location on the basis of Officer Gregorio's radio transmission that the white van was parked at 324 South Second Avenue.  driveway it was parked in belonged to 324 South Second Avenue.  (Ex U to 4/8/16 Thompson Decl., 13:38 – 14:08, 16:08 – 16:10; Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 80:3 – 81:3; Ex. B to the Wisham Declaration, p. 2 ("At Scene 2 … 18:43:07 …. Sexton, Steven … Sec. Loc.: 324 S 2nd Av")).

Response 30 - 6:     Sexton did not arrive at 324 South Second Avenue until approximately 20 minutes after the first call regarding the incident.  (City of Mount Vernon's Live  Aegis Public Safety System Incident Report, (annexed to the Wisham Decl. as Exhibit "B"), pp. 1-2) (Compare p. 1: "Call … 18:17:14," with p. 2: "Arrive Scene 2 … 18:43:07 .. Sexton, Steven, Sec. Loc. 324 S. 2nd  Ave.").

Response 30 - 7:     Wherever the van was parked, Sexton had no reason to believe that, 20 minutes later, the people witnessed getting into the white van (now empty), remained nearby.  They could have been at 324 South Second, 328 South Second, some other address on the block, or somewhere else entirely.

Response 30 - 8:     Running the license plate did not lead to an address.  The dispatcher reported that the address for the registered owner, Nigeria Scott, was a PO box. (Ex. 14 14:33 – 14:41).  Specifically, the dispatcher said: "Valid 2001 Chevy Venture Color White to a Nigeria Scott from the City.  It's a P.O. Box."  The defendants apparently dispute that the dispatcher's voice says "PO Box."  No matter: The dispatcher indisputably does **_not_** say "328

South Second Avenue." Sexton lacked knowledge of what address or apartment was linked to the white van: Sexton "knocked on every door" inside 328 South Second Avenue before knocking on the plaintiffs' door. (Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 17:17-23). (He probably also knocked on the doors in 324 South Second Avenue as well, and didn't testify to that.)

Response 30 - 9:        Thus, even if Sexton had an iron-clad guarantee that a shooter or seriously injured victim had gotten in the white van at the scene of the shooting, 20 minutes later there was no objective basis to determine where such person was to be found.

Response 30 - 10:        Finally, the defendants insistence that the facts supported a belief that a victim was in the van, and **also** a belief that a criminal was in the van, really means there was no basis to believe either a victim or criminal was in the van.

31.    When Sexton entered the premises he learned in fact that Julian Rene had been shot or grazed in the buttocks by a bullet. See Exhibit No. "1", at 34: 23-25, 35:1-4. Sexton also knew that some of the individuals in the premises were known for "weapons possession or violent acts" Exhibit No. "1", at 36:7-12.  [sic].

Response 31 - 1:        Disputed.

Response 31 - 2:        Undisputed that the police did not learn of any injury to anyone inside the apartment until after they entered.

Response 31 - 3:        After learning that Julian was a shooting victim, Sexton and the other police stayed because they "wanted to stay at the apartment and get approval from the District Attorney for a search warrant." (Sexton Tr., Ex. J. to 4/8/16 Thompson Decl., 35:20-24).

Response 31 - 4:        Sexton provided no objective evidentiary basis upon which another person could reach the conclusion that the individuals named are part of a gang.

Response 31 - 5: None of the defendants have provided an objective evidentiary basis for this allegation.

Response 31 - 6: Sexton provided no objective evidentiary basis upon which another person could reach the conclusion that the individuals present had been previously involved in violent acts or weapons possession.

Response 31 - 7: Referencing through "Intel of the Westchester County Police" simply turns "because I say so" into "because they say so," adding an extra layer of hearsay to an evidence-free allegation.

Response 31 - 8: When asked, out of all the individual accused of gang membership, he could knew of only one conviction. As to Prince, Sexton expressly stated "I have no facts." (Sexton Tr., Ex. J to 4/816 Thompson Decl., 32:2-34).

Response 31 - 9: In his testimony, when Sexton uses the word "gang," he does not mean a criminal enterprise. He means: "A group of people working together for a negative impact on society." He explained that his use of the word "covers criminal and noncriminal" activities. (Sexton Tr., Ex. J to 4/816 Thompson Decl., 31:18-25). As so defined, the term "gang" – depending on one's worldview -- could refer to disfavored political parties, people who don't recycle, or even the Mount Vernon Police Department. Therefore, Sexton's testimony that these is a member of a "gang" is of no evidentiary value whatsoever.

Response 31 - 10: Even if Sexton had such knowledge of these individuals' reputation or criminal history, criminal history alone is never sufficient to provide probable cause for a search. it would **not** be sufficient for probable cause to believe that anyone in the apartment actually had a weapon.

Response 31 - 11:     Other that the alleged fact that some of the individuals in the premises were supposedly known for "weapons possession or violent acts," Sexton had no other basis to believe that anyone in the apartment possessed a weapon.  (Sexton Tr., Ex. J. to 4/8/16 Thompson Decl., 36:7-16):

> Q:     What was your basis for thinking that the firearm would be present in the apartment?
>
> A:     Because the group of individuals I was dealing with are known for weapons possession … or violent acts.
>
> Q:     Other than that, did you have any other reason to think there was a gun there?
>
> A:     No.

32.     Julian Rene admitted to Sexton that he had been in the area of the shooting. See Sexton Deposition annexed hereto as Exhibit No. "1", at 35:1-14.

Response 32 - 1:     Undisputed that Julian told the police, including Sexton, that he was at the scene of the shooting in the role of the victim.  (Sexton Tr., Ex. J. to 4/8/16 Thompson Decl., 34:15 35;7).  There was no evidence that Julian shot himself in the buttock. There was no evidence that the incident involved an exchange of gunfire between two culpable parties.  There was no evidence that anyone in the apartment with Julian when Sexton arrived had been responsible for shooting Julian.  Knowing that Julian had been shot took away any residual possibility that the apartment contained the shooter.

Response 32 - 2:     At that point, other that the alleged fact that some of the individuals in the premises were known for "weapons possession or violent acts," Sexton had no other basis to believe that anyone in the apartment possessed a weapon.  (Sexton Tr., Ex. J. to 4/8/16 Thompson Decl., 36:7-16):

> Q:     What was your basis for thinking that the firearm would be present in the apartment?
>
> A:     Because the group of individuals I was dealing with are known for weapons possession … or violent acts.

> Q:      Other than that, did you have any other reason to think there was a gun there?
>
> A:      No.

Response 32 - 3:        Julian's admission did not, of course justify Sexton's entry into the apartment, because Sexton entered without that knowledge.


33.      Based on Sexton prior knowledge that some of the occupants were previously involved in violent acts, and weapons possession, Sexton conducted a limited search for weapons. Exhibit No."1", at 35:25, 36: 1-12.

Response 33 - 1:        Disputed.

Response 33 - 2:        Sexton provided no objective evidentiary basis upon which another person could reach the conclusion that the individuals present had been previously involved in violent acts or weapons possession.

Response 33 - 3:        None of the defendants have provided an objective evidentiary basis for this allegation.

Response 33 - 4:        When asked, out of all the individual accused of gang membership, he could knew of only one conviction. As to Prince, Sexton expressly stated "I have no facts."  (Sexton Tr., Ex. J to 4/816 Thompson Decl., 32:2-34).

Response 33 - 5:        In his testimony, when Sexton uses the word "gang," he does not mean a criminal enterprise.  He means: "A group of people working together for a negative impact on society."  He explained that his use of the word "covers criminal and noncriminal" activities.  (Sexton Tr., Ex. J to 4/816 Thompson Decl., 31:18-25). As so defined, the term "gang" – depending on one's worldview -- could refer to disfavored political parties, people who don't recycle, or even the Mount Vernon Police Department.  Therefore, Sexton's testimony that these  is a member of a "gang" is of no evidentiary value whatsoever.

Response 33 - 6:     Even if Sexton had relevant knowledge of these individuals' reputation or criminal history, criminal history alone is never sufficient to provide probable cause for a search. it would **not** be sufficient for probable cause to believe that anyone in the apartment actually had a weapon. Lacking a reason to be in the apartment, officer safety could not justify the search. Safety could be achieved by leaving.

Response 33 - 7:     Other that the alleged fact that some of the individuals in the premises were supposedly known for "weapons possession or violent acts," Sexton had no other basis to believe that anyone in the apartment possessed a weapon. (Sexton Tr., Ex. J. to 4/8/16 Thompson Decl., 36:7-16):

> Q:     What was your basis for thinking that the firearm would be present in the apartment?
>
> A:     Because the group of individuals I was dealing with are known for weapons possession … or violent acts.
>
> Q:     Other than that, did you have any other reason to think there was a gun there?
>
> A:     No.

Response 33 - 8:     Sexton did not conduct a limited search. A "search of the premises for weapons" is not a limited search in any legally relevant sense.

Response 33 - 9:     The search was not limited in any way rationally linked to the officers' safety while in the apartment. For example, the officers broke the bathroom door, and emptied the contents of the medicine cabinet into the sink. (Arabia Tr., Ex. T to 4/8/16 Thompson Decl., 14:25 – 15:6). They left everything piled in the sink. *Id.*

Response 33 - 10:     The officers searched the entire house, 'the bathroom, bedrooms, everything," including the closets. (Brenda Tr,. Ex. M to 4/8/16 Thompson Decl., 13:21 – 14:11).

Response 33 - 11:      The police "searched the apartment."

(Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 47:8-9).

34.     Detective Castellano was also present at the premises according to Sexton. Exhibit No."1", at 39:7-16.

Response 34 - 1:      Undisputed that Castellano was at the apartment.  Sexton stated that he was there after dark.  Upon information and belief, sunset on May 20, 2013 was at 8:11 PM.[3]

35.     Sexton sought approval for an application of a search warrant. Exhibit "1", at 39: 21-25, 40:1.

Response 35 - 1:      Undisputed.

Response 35 - 2:      Other that the alleged fact that some of the individuals in the premises were supposedly known for "weapons possession or violent acts," Sexton had no other basis to believe that anyone in the apartment possessed a weapon.  (Sexton Tr., Ex. J. to 4/8/16 Thompson Decl., 36:7-16):

Q:      What was your basis for thinking that the firearm would be present in the apartment?

A:      Because the group of individuals I was dealing with are known for weapons possession … or violent acts.

Q:      Other than that, did you have any other reason to think there was a gun there?

A:      No.

36.     Sexton testified that a detective supervisor also believed that a search warrant could have been approved based on the evidence known to Sexton, and the Mount Vernon Police Department. See Sexton Deposition annexed hereto as Exhibit No. "1",at 40:3-11.

Response 36 - 1:      The subjective belief testified to is immaterial to whether the objective standard applicable to their conduct was met.  This is not a material statement of fact.

---

[3]      https://www.google.com/webhp?sourceid=chrome-instant&ion=1&espv=2&ie=UTF-8#safe=off&q=may+20%2C+2013+sunset+new+york

Response 36 - 2:    The fact that Sexton "testified" as stated is not a material statement of fact.

37.    The officers remained inside the premises for approximately 3-4 hours. See Sexton Deposition annexed to Wisham Decl. hereto as Exhibit No. "1", at 40:24-25, 41:1-3.

Response 37 - 1:    Undisputed that they remained inside the apartment approximately 4 hours.

38.    Sargent Sexton also gave testimony that he believed that there could have been a weapon in the house. See Sexton Deposition annexed to Wisham Decl. as **Exhibit No. "1"**, at 43:14-18.

Response 38 - 1:    Sgt. Sexton's testimony did not state any basis for his belief in the existence of a weapon in the house. His subjective belief is irrelevant to the existence of probable cause.

Response 38 - 2:    A statement that Sgt. Sexton testified to something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

39.    Upon Sexton's entry into the premises, Sexton found individuals hiding in a back room. Sexton ordered those individuals to come out and gather into the living room. Sexton then proceeded to conduct a limited search of the premises for weapons, and for any victims. See Sexton Deposition annexed to Wisham Decl. as Exhibit No. "1", at 46:22-25, 48:22-25, 47:8-9.

Response 39 - 1:    Disputed.

Response 39 - 2:    The individuals were in their home, not hiding.

Response 39 - 3:    A "search of the premises for weapons" is not a limited search in any legally relevant sense.

Response 39 - 4:    The search was not limited in any way rationally linked to the officers' safety while in the apartment. For example, the officers broke the bathroom door, and emptied the

contents of the medicine cabinet into the sink.  Arabia Tr., Ex. T to
4/8/16 Thompson Decl., 14:25 – 15:6).  They left everything piled in
the sink. *Id.*

Response 39 - 5:          The officers searched the entire house, 'the
bathroom, bedrooms, everything," including the closets.  (Brenda Tr,.
Ex. M to 4/8/16 Thompson Decl., 13:21 – 14:11).

40.     The individual occupants of the premises were ordered into the living
room for the safety and protection of the police officers. See Sexton's Deposition
annexed hereto as Exhibit No. "1", at 48:25, 49:1-3.

Response 40 - 1:          Disputed.

Response 40 - 2:          The safety and protection of the officers did
not justify keeping the entire family in the living room for four hours.

Response 40 - 3:          Sexton forced the entire family into "a
waiting game" that took "a long time."  (Sexton Tr., Ex. J, 4/8/16
Thompson Decl., 40:20 – 41:8).  During that time, the family were
not free to leave.  (*Id.*).

41.     Detective Gamble was not present inside of the occupant's apartment. See
Sexton Deposition annexed as Exhibit No. "1", at 49:7-12.

Response 41 - 1:          Undisputed that Detective Gamble was not
inside the apartment.

Response 41 - 2:          Detective Gamble was present at the scene.
(Sexton Tr., Ex. J to 4/8/16 Thompson Decl. 49:4-12).

Response 41 - 3:          Detective Gamble participated in the seizure
of Vaughn Scott.  (Vaughn Aff., Ex. D to 4/8/16 Thompson Decl., ¶
56).

42.     None of the occupants at 328 South 2n Ave. were arrested on March 20,
2013. Exhibit No. "1", at 52:13-14.  [sic].

Response 42 - 1:          Undisputed that none of the occupants were
arrested in the sense of making an arrest for the purpose of taking a
suspect of a crime into custody.

Response 42 - 2:     Each of the occupants of the home were seized in a Fourth Amendment sense.  They were held captive in the home for approximately four hours.  During that time they were not free to leave.  (Briley Tr., Ex. K to 4/8/16 Thompson Decl., 47:3- 10; Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 41:5-8; Brenda Tr., Ex. M to 4/8/16 Thompson Decl., 15:11-16; Vaughn Tr. 7:6 – 8:6, Ex. 1 to 6/6/16 Thompson Decl.; A.S. Tr., Ex. Tto 4/8/16 Thompson Decl., 12:20 – 13:6).

Response 42 - 3:     During their captivity, the plaintiffs were not permitted to engage in any activity without police permission.  (A.S. Tr., Ex. T to 4/8/16 Thompson Decl.,  14:16-23; Julian Rene Tr., Ex. R to 4/8/16 Thompson Decl., 26:15-25).

Response 42 - 4:     For example, the grandmother, Brenda Scott, asked if she could finish cooking dinner and was told she could not.  (A.S. Tr., Ex. T to 4/8/16 Thompson Decl.,  14:16-23).

Response 42 - 5:     Occupants were not allowed to get water or food while the police were there.  (Julian Rene Tr., Ex. R to 4/8/16 Thompson Decl., 26:15-25).

43.     No doors were broken by any of the officers present during the search of the premises. See Sexton Deposition annexed as Exhibit No. ”1”, at 53:15-17.

Response 43 - 1:     Disputed.  The officers broke the bathroom door.  (Arabia Tr., Ex. T to 4/8/16 Thompson Decl., 14:25 – 15:6).

44.     The occupants of the premises were never physically touched by any Mount Vernon Police Officers.  See Sexton Deposition annexed as Exhibit No. ”1”, 83:8-15.

Response 44 - 1:     Disputed.

Response 44 - 2:     For example, Officer Sexton pushed the door of the apartment in against Brenda Scott's foot.  (Brenda Tr., Ex. M to 4/8/16 Thompson Decl., 5:17-24; Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 12:18-25).

Response 44 - 3:        As another example, Defendant Antonini placed Kraig Utley in handcuffs.  (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 14:15 – 16:10).  Two other officers assisted Antonini.  (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 17:8 - 10).

Response 44 - 4:        Defendant Antonini bent Corey Marrow's hand back and confiscated his cell phone, to prevent Mr. Marrow from filming the police. (Corey Tr., Ex. O to 4/8/16 Thompson Decl., 30:12-20).

Response 44 - 5:        Defendant Antonini threatened to "choke out" Kraig Utley.  (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 15:21 – 16:4).

45.     Julian Rene voluntarily pulled his pants down to show the officers his injuries from being gazed by a bullet on 9th street and Third Ave. Sexton Deposition Exhibit No. "1",at 83:17-23, 84:1-25 .

Response 45 - 1:        Disputed.

Response 45 - 2:        Julian testified that police asked to pull his pants down, and he did not believe that he had any choice but to comply: "I mean I felt like I had no choice; 15 cops there.  You got to comply what they say."  (Julian Tr., Ex. R to 4/8/16 Thompson Decl., 27:15 – 28:16).

46.     Officer Camilo Antonini admitted during his deposition testimony that he was part the responding Mount Vernon Police Officers who arrived at the scene at 328 South 2nd Ave., on March 20, 2013, to investigate a reported shooting that had occurred earlier at 7 and 3 street. See Dep. Camilo Antonini annexed to the Wisham Decl. as Exhibit No."3", at 19:19-21, 26:20-25, 27:1-7.

Response 46 - 1:        Undisputed that Antonini testified as stated.

47.     Officer Antonin entered the occupants' living room where he met other officers who were also part of the investigation. Exhibit No."3", at 22:3-5. [sic].

Response 47 - 1:        Undisputed that Defendant Antonini entered the plaintiffs' living room.

Response 47 - 2:        To the extent that this statement implies, without expressly stating, that Antonini was a latecomer, disputed.

Antonini was one of the first officers at the apartment. Prince tr., Ex.
Q to 4/8/16 Thompson Decl., 23:10 - 25:13).

48.     Antonini testified that upon entering the premises he immediately
recognized Demetrius Royal King, James Haugh, Corey Marrow, Julian Rene, Kraig
Utley, and Prince Scott, as individuals with whom officer Antonini had arrested in the
past for "**possession of drugs, gang affiliation, and parties being investigated for
shootings, narcotics those type of crimes in the city**". See Deposition of Camilo
Antonini annexed to Wisham Decl. as **Exhibit No."3,**" at 23:3-12.(emphasis added)

> Response 48 - 1:     Undisputed that Antonini testified, in sum
> and substance, as stated.

> Response 48 - 2:     This is not a material fact. These
> individuals' alleged criminal history or reputation is unsupported in
> the record except by the self-serving, after-the-fact testimony of the
> defendants. Even if substantiated in some way, these individuals'
> reputation or history was not a factor in the decision to enter the
> apartment without a warrant, because none of the officers knew that
> any of these individual were – or were likely to be – inside the
> apartment until they entered 328 South Second Avenue.

> Response 48 - 3:     This is not a material fact. These
> individuals' alleged criminal history or reputation, even if
> substantiated and known prior to entry into 328 South Second Avenue
> by the police, would not have provided a lawful basis to enter without
> a warrant.

49.     There was no physical contact made between the police officers present
within the said premises towards the occupants. See Deposition of Camilo Antonini
annexed hereto as Exhibit No." 3", at 26:5-9.

> Response 49 - 1:     Disputed.

> Response 49 - 2:     For example, Officer Sexton pushed the
> door of the apartment in against Brenda Scott's foot. (Brenda Tr., Ex.
> M to 4/8/16 Thompson Decl., 5:17-24; Kraig Tr., Ex. S to 4/8/16
> Thompson Decl., 12:18-25).

Response 49 - 3:      As another example, Defendant Antonini placed Kraig Utley in handcuffs.  (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 14:15 – 16:10).  Two other officers assisted Antonini.  (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 17:8 - 10).

Response 49 - 4:      Defendant Antonini bent Corey Marrow's hand back and confiscated his cell phone, to prevent Mr. Marrow from filming the police. (Corey Tr., Ex. O to 4/8/16 Thompson Decl., 30:12-20).

Response 49 - 5:      Defendant Antonini threated to "choke out" Kraig Utley.  (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 15:21 – 16:4).

50.     Officer Antonini knew some of the occupants in the premises as being members of a gang known as "the Gunners". See Deposition of Camilo Antonini annexed hereto as Exhibit No. "3", at 28:13-25.

Response 50 - 1:      Undisputed that Antonini testified, in sum and substance, as stated.

Response 50 - 2:      This is not a material fact.  These individuals' alleged criminal history or reputation is unsupported in the record except by the self-serving, after-the-fact testimony of the defendants.  Even if substantiated in some way, these individuals' reputation or history was not a factor in the decision to enter the apartment without a warrant, because none of the officers knew that any of these individual were – or were likely to be – inside the apartment until they entered 328 South Second Avenue.

Response 50 - 3:      Defendant Antonini's testimony quoted in Statement 51 below demonstrates that Antonini's testimony concerning Prince Scott, and the "Gunners," is hearsay, consisting of Antonini's repetition of unsworn communications from third parties.  His testimony does into fall into a hearsay exception, and is therefore not admissible.  *See* FRE 802.

Response 50 - 4:        This is not a material fact.  These individuals' alleged criminal history or reputation, even if substantiated and known prior to entry into 328 South Second Avenue by the police, would not have provided a lawful basis to enter without a warrant.

51.     Plaintiff Prince Scott was known by officer Cameo Antonini from information officer Antonini obtained through the Mount Vernon Police Department 's Narcotics unit, and from the Westchester County Intel Center. See Deposition of Camilo Antonini annexed hereto as Exhibit No. "3", at 28:13 (They provide us with up to date information of all gang activities throughout the whole county of Westchester, including the city of Mt. Vernon. The six parties that I mentioned to you are all part of a gang named the Gunners. The Third Street Gunners, Okay. Which have all been involved in shootings throughout out the city"). See Deposition of Camilo Antonini annexed hereto as Exhibit No. "3", at 26:1, 29:1-4.  [sic].

Response 51 - 1:        Undisputed that Antonini testified, in sum and substance, as stated.

Response 51 - 2:        This is not a material fact.  These individuals' alleged criminal history or reputation is unsupported in the record except by the self-serving, after-the-fact testimony of the defendants.  Even if substantiated in some way, these individuals' reputation or history was not a factor in the decision to enter the apartment without a warrant, because none of the officers knew that any of these individual were – or were likely to be – inside the apartment until they entered 328 South Second Avenue.

Response 51 - 3:        Defendant Antonini's testimony demonstrates that Antonini's testimony concerning Prince Scott, and the "Gunners," is hearsay, consisting of Antonini's repetition of unsworn communications from third parties.  His testimony does into fall into a hearsay exception, and is therefore not admissible.  *See* FRE 802.

Response 51 - 4:        This is not a material fact.  These individuals' alleged criminal history or reputation, even if substantiated and known prior to entry into 328 South Second Avenue

by the police, would not have provided a lawful basis to enter without a warrant.

52.     Officer Antonini believed that exigent circumstances existed at the time he entered the premises at 328 South 2nd Ave., based on the fact that other officers were present within the premises. See Deposition of Camilo Antonini annexed hereto as Exhibit No."3", at 38:21-25, 39:1.

Response 52 - 1:     This is not a material fact.  Whether Antonini subjectively believed that exigent circumstances existed is not relevant to whether such circumstances actually did exist.

Response 52 - 2:     This is not a material fact because it is ambiguous and unintelligible.  "Exigent circumstances" is not a substance.  It is a concept that is unintelligible unless it is related to an action, as well as to consequences of inaction.  There can be exigent circumstance to justify actions like entering a premises, or conducting a search, or – in present times – torture and extra-judicial killing.  What circumstances are "exigent" depends on the action potentially to be taken.  This statement refers to exigent circumstances, but exigent circumstances to do what?  The term is meaningless without that missing factor.

Response 52 - 3:     Det. Antonini believed that the phrase "exigent circumstances" means "investigating a crime – an ongoing crime."  (Antonini Tr., Ex. L to 4/8/16 Thompson Decl., 36:23 – 37:4).   Det. Antonini was unable to explain how long after a shooting occurs the situation would be an "ongoing crime."  (*Id.* 37:4 – 39:14).

Response 52 - 4:     While he was at the apartment, Det. Antonini did not know what the exigent circumstances were.  (Antonini Tr., Ex. L to 4/8/16 Thompson Decl., 39:5-8).

Response 52 - 5:     To the extent that this statement implies, without expressly stating, that Antonini was a latecomer, disputed.  Antonini was one of the first officers at the apartment.  (Prince Tr., Ex. Q to 4/8/16 Thompson Decl., 23:10 - 25:13).

53. Officer John Gamble was named as a defendant to the instant action yet he testified that he was not connected in any way to the investigation involving the shooting which occurred on March 20, 2013, at 7Ave. Gamble also testified that he was never present at the premises located at 328 South 2Ave, nor was he involved in the detention of the Plaintiffs. See Deposition of Officer John Gamble annexed to the Wisham Decl. as Exhibit No."4", at 10:20-25,11:2-20, 12:5-25,13:2-24,15:10-13, 18:23, 16:2-10.

Response 53 - 1:    Disputed.

Response 53 - 2:    Undisputed that John Gamble was named as a defendant.

Response 53 - 3:    Undisputed that Gamble testified that he was never present at the premises located at 328 South 2nd Ave. However, his testimony on this point is not true. Detective Gamble was present at the scene. (Sexton Tr., Ex. J to 4/8/16 Thompson Decl. 49:4-12).

Response 53 - 4:    Detective Gamble participated in the seizure of Vaughn Scott. (Vaughn Aff., Ex. D to 4/8/16 Thompson Decl., ¶ 56).

Response 53 - 5:    Undisputed that Gamble testified that he was not connected in any way to the investigation involving the shooting which occurred on March 20, 2013. However he is a defendant because he participated in a seizure, not because he participated in an investigation. Gambles' testimony, even if true, is not material to his liability.

54. Officer Allison Allen also responded to a radio transmission from the Mount Vernon Police Department which called for her assistance at 328 South 2nd Ave. Officer Allen arrived at the premises at approximately 6:00pm. See Deposition of Officer Allison Allen annexed to Wisham Decl. as Exhibit No. "2 ", 10:6-13, 11:10-22.

Response 54 - 1:    Disputed.

Response 54 - 2:    A the time he located the vehicle, Officer Gregorio believed that the driveway it was parked in belonged to **324** South Second Avenue. (Ex U to 4/8/16 Thompson Decl., 13:38 – 14:08, 16:08 – 16:10; Sexton Tr., Ex. J to 4/8/16 Thompson Decl.,

80:3 – 81:3).  Probable cause is based on facts known to the officers at the time probable cause is determined.  *See Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. N.Y. 2006)). *Accord Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. N.Y. 2002); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996).

Response 54 - 3:       The defendants have offered the Aegis Public Safety System Incident Report (Ex. B to the Wisham Declaration) as establishing the location and time of the dispatch of officers.  This report shows that Sgt. Sexton was dispatched to **324** South Second Avenue, not 328 South Second Avenue.  (Ex. B to the Wisham Declaration, p. 2 ("At Scene 2 … 18:43:07 …. Sexton, Steven … Sec. Loc.: 324 S 2nd Av")).

Response 54 - 4:       Officer Gregorio told Sexton the information concerning the location of the vehicle by radio transmission.  (Sexton Tr., Ex. J to the 4/8/16 Thompson Decl. 12:18 – 13:4).  In the recording of Officer Gregorio's radio transmission, he states that the vehicle is located at **324** South Second Avenue, not 328.  (Ex U to 4/8/16 Thompson Decl., 13:38 – 14:08; 16:08 – 16:10; Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 80:3 – 81:3). Consistently with this recording, the Aegis Public Safety System Incident Report (Ex. B to the Wisham Declaration, p. 3) reflects Officer Johanna Santos arriving at "Scene 2" approximately five minutes before Sexton, and the location is identified as "**324** S 2nd Av"  Officer Santos shared a car with Officer Gregorio.  (Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 16:8-15).  Where the Aegis Public Safety System Incident Report reflects Officer Santos arriving at "**324** S 2nd Av.," it means that Officer Gregorio was at the same location.

Response 54 - 5:       A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in

a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

55.     When Officer Allen arrived she was met by several police officers who were standing both outside and inside of the Plaintiff's apartment. See Deposition of Officer Allen annexed to Wisham Decl. as Exhibit"2", at 11:23-25, 12:1.

Response 55 - 1:     Undisputed.

56.     Allen was dispatched to the premises after she received a radio transmission that shots had been fired, and that a white minivan with a "busted out window was parked in the driveway of 328". See Deposition of Allison Allen annexed hereto as Exhibit No."2", at 12:3-12.

Response 56 - 1:     Disputed that Allen hear a radio transmission that contained the quoted sentence. Radio transmissions that have been produced stated that the van was at 324 South Second Avenue.

Response 56 - 2:     Officer Gregorio told Sexton the information concerning the location of the vehicle by radio transmission. (Sexton Tr., Ex. J to the 4/8/16 Thompson Decl. 12:18 – 13:4). In the recording of Officer Gregorio's radio transmission, he states that the vehicle is located at **324** South Second Avenue, not 328. (Ex U to 4/8/16 Thompson Decl., 13:38 – 14:08; 16:08 – 16:10; Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 80:3 – 81:3). Consistently with this recording, the Aegis Public Safety System Incident Report (Ex. B to the Wisham Declaration, p. 3) reflects Officer Johanna Santos arriving at "Scene 2" approximately five minutes before Sexton, and the location is identified as "**324** S 2nd Av" Officer Santos shared a car with Officer Gregorio. (Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 16:8-15). Where the Aegis Public Safety System Incident Report reflects Officer Santos arriving at "**324** S 2nd Av.," it means that Officer Gregorio was at the same location.

57.     Prince Scott, and Corey Marrow, were cursing Officer Allen, and the other officers during the officer's investigation conducted inside the premises of 328 South 2nd Ave. See Deposition of Officer Allison Allen annexed to Wisham Decl. as Exhibit "2", at, 15:21-25, 16:3-7, 23-25.

>    Response 57 - 1:          Undisputed that Prince and Corey cursed at the police officers.

>    Response 57 - 2:          Allen claims she was present for only ten minutes.  (*Id.* 33:1-8).

58.     Neither Officer Allen, nor any of the other officers present at the scene of 328 South 2nd Ave., had physical contact with any of the occupants during the course of the officer's investigation of a prior shooting which led to the premises in search of any victims of the shooting that may have been shot and required medical attention. Allen was "just standing inside of the living room of the apartment protecting the other officers. See Deposition of Allison Allen annexed as Exhibit"2", at 19:1-17.

>    Response 58 - 1:          Undisputed that Officer Allen did not have physical contact with any of the occupants.

>    Response 58 - 2:          The characterization of the investigation is not supported by the cited testimony.

>    Response 58 - 3:          Disputed as contradicted by other evidence. Officer Sexton pushed the door of the apartment in against Brenda Scott's foot.  (Brenda Tr., Ex. M to 4/8/16 Thompson Decl., 5:17-24; Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 12:18-25).

>    Response 58 - 4:          As another example, Defendant Antonini placed Kraig Utley in handcuffs.  (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 14:15 – 16:10).  Two other officers assisted Antonini.  (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 17:8 - 10).

>    Response 58 - 5:          Defendant Antonini bent Corey Marrow's hand back and confiscated his cell phone, to prevent Mr. Marrow from filming the police. (Corey Tr., Ex. O to 4/8/16 Thompson Decl., 30:12-20).

Response 58 - 6:        Defendant Antonini threatened to "choke out" Kraig Utley.  (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 15:21 – 16:4).

59.    5.    Allison Allen witnessed Julian Rene voluntarily pull down his pants for about a few seconds to show the officers exactly where he had been shot. None of the police officers on the scene of 328 South 2nd Ave., engaged in any form of force which caused Julian Rene to pull down his pants in front of his family. See Deposition of Officer Allen annexed to Wisham Decl. as Exhibit No."2", at 31:8-1031:11¬17.

Response 59 - 1:        Disputed.

Response 59 - 2:        Disputed that Officer Allen witnessed the events as stated.  Allen testified that she "wasn't looking" when this occurred.  (Allen Tr., 31:18-21, Wisham Decl. as Exhibit No."2").

Response 59 - 3:        Undisputed that no physical force was used to force Julian to pull down his pants.  Police asked to Julian to pull his pants down, and he did not believe that he had any choice but to comply: "I mean I felt like I had no choice; 15 cops there.  You got to comply what they say."  (Julian Tr., Ex. R to 4/8/16 Thompson Decl., 27:15 – 28:16).

60.    When Officer Allen arrived in inside the residence of 328 South 2nd Ave., she maintains that the other officers inside the premises were just standing in the living room. The officers were not harassing nor were they engaged in any physical use of force against the occupants. No physical contact occurred between the police and the occupants.  See Deposition of Officer Allison Allen annexed to Wisham Decl. as Exhibit No. "2", at 21:3-6.

Response 60 - 1:        Disputed as not supported by the testimony cited.  In the cited testimony, Allen states only that while she was in the apartment she did not see physical contact occurred between the police and the occupants.  (See Deposition of Officer Allison Allen annexed to Wisham Decl. as Exhibit No. "2", at 21:3-6).

Response 60 - 2:        Allen claims she was present for only ten minutes.  (*Id.* 33:1-8).

61.    All  the officers who responded to the scene at 328 South 2nd Ave, were there as a direct result of the official radio communications which commenced their

investigation of a prior shooting, and that a car had sped off from the scene of the shooting and was found parked in the plaintiff's driveway located at 328 South 2nd Ave. See Deposition of Allison Allen annexed as Exhibit No"2", at 20:12-24.

> Response 61 - 1:    Disputed as unsupported by the testimony cited.  Allen's testimony makes no mention of "radio communications," whether received by other officers or by herself.  Allen's testimony makes no statement  that officers were at the apartment "as a result" of anything in particular, including but not limited to "radio communications"  Of the other officers present she stated, in the cited testimony: "I don't know what they were doing, what they had in the works.  I was just there for backup."

> Response 61 - 2:    Allen's cited testimony concerning the investigation was not based on personal knowledge, and was hearsay, because in she expressly disclaims knowledge: "I want to say they were doing an investigation, because the car that was speeding off from the shooting scene was in their driveway, but far as the investigation goes, I don't know exactly the details of what they were doing."

62.    Officer Timothy Briley also received a radio transmission from the Mount Vernon Police Department alerting Briley to the fact that an individual had been shot in the vicinity of Fifth Ave and Third Street on March 20, 2013. See Exhibit No."5 ", Deposition of Timothy Briley, annexed to Wisham Decl. at 9:10-16.

> Response 62 - 1:    Disputed.

> Response 62 - 2:    Officer Briley testified that to this effect.  However,  the radio transmissions produced by the defendants in the Audio Exhibit contain no reference to an individual being shot.  (Ex. U to 4/8/16 Thompson Decl., 00:00 – End).  To the extent that the defendants have withheld this radio transmission, they should be precluded from offering evidence concerning the message or what knowledge Briley claims to have derived from it.  On the record during Briley's deposition, Plaintiff called for the production of the

radio calls referenced by Briley, and the defendants agreed to produce them. (Briley Tr., Ex. K to 4/8/16 Thompson Decl., 71:17 – 73:3).

Response 62 - 3:       None of the witness statements produced in any form, whether in the Audio Exhibit or reproduced in police documents reflect that any witness at the scene reported that a person was shot or injured. (Audio Exhibit, Ex. U to 4/8/16 Thompson Decl.; Hutchins Report, Ex. G to Wisham Decl., p. 3; Officer Chery Report, Ex. H to Wisham Decl.; Gregorio Report, Ex I to Wisham Decl.; Gason Report, Ex. J to Wisham Decl.).

Response 62 - 4:       The report of Det. Hutchins states, to the contrary, that during the investigation at the plaintiffs' apartment the police "learned" that there was a shooting victim. (Ex. G to Wisham Decl., p. 3).

Response 62 - 5:       None of the statements by police, dispathers, or other law enforcement recorded in documents or radio transmissions offered into evidence by the defendants reflect that the police believed anyone had been shot until after the police interviewed Julian Rene after entering the plaintiffs' apartment. (Audio Exhibit, Ex. U to 4/8/16 Thompson Decl.; Hutchins Report, Ex. G to Wisham Decl., p. 3; Officer Chery Report, Ex. H to Wisham Decl.; Gregorio Report, Ex I to Wisham Decl.; Gason Report, Ex. J to Wisham Decl.).

Response 62 - 6:       Regardless of whether an injured person was known to have been in the vehicle, before he entered the plaintiffs home Briley did not have "any information [] that anyone had been shot that was inside the residence [of the plaintiffs]". (Briley Tr., Ex. K to 4/8/16 Thompson Decl., 82:8-22).

63.     Officer Briley was also informed via a radio transmission that "the injured party was placed inside the vehicle". See Briley Deposition annexed to Wisham Decl. as Exhibit No "5", at 9:18-24.

Response 63 - 1:          Disputed.

Response 63 - 2:          Officer Briley testified that to this effect. On the record during Briley's deposition, Plaintiff called for the production of the radio calls referenced by Briley, and the defendants agreed to produce them.  (Briley Tr., Ex. K to 4/8/16 Thompson Decl., 71:17 – 73:3).  However,  the radio transmissions produced by the defendants in the Audio Exhibit contain no reference to an injured person being placed inside a vehicle.  (Ex. U to 4/8/16 Thompson Decl., 00:00 – End).  To the extent that the defendants have withheld this radio transmission, they should be precluded from offering evidence concerning the message or what knowledge Briley claims to have derived from it.

Response 63 - 3:          None of the witness statements produced in **any** form, whether in the Audio Exhibit or reproduced in police documents reflect that any witness at the scene reported that an injured person was placed inside a vehicle.  (Audio Exhibit, Ex. U to 4/8/16 Thompson Decl.; Hutchins Report, Ex. G to Wisham Decl., p. 3; Officer Chery Report, Ex. H to Wisham Decl.; Gregorio Report, Ex I to Wisham Decl.; Gason Report, Ex. J to Wisham Decl.).

Response 63 - 4:          None of the statements by police, dispatchers, or other law enforcement recorded in documents or radio transmissions offered into evidence by the defendants reflect that the police believed anyone had been shot until after the police interviewed Julian Rene after entering the plaintiffs' apartment. (Audio Exhibit, Ex. U to 4/8/16 Thompson Decl.; Hutchins Report, Ex. G to Wisham Decl., p. 3; Officer Chery Report, Ex. H to Wisham Decl.; Gregorio Report, Ex I to Wisham Decl.; Gason Report, Ex. J to Wisham Decl.).

Response 63 - 5:          The report of Det. Hutchins states, to the contrary, that during the investigation at the plaintiffs' apartment the

police "learned" that there was a shooting victim. (Ex. G to Wisham Decl., p. 3).

Response 63 - 6: Regardless of whether an injured person was known to have been in the vehicle, before he entered the plaintiffs home Briley did not have "any information [] that anyone had been shot that was inside the residence [of the plaintiffs]". (Briley Tr., Ex. K to 4/8/16 Thompson Decl., 82:8-22).

64. Briley responded by canvassing the area searching for the moving vehicle that matched the description dispatched by the radio transmission. See Deposition of Timothy Briley annexed to Wisham Decl. as Exhibit No."5", at 10:23-25, 11:1-2.

Response 64 - 1: Undisputed that Briley "canvassed" the area, meaning "driving around" looking for a vehicle that matched the description. Disputed that Briley testified to receiving a radio transmission with the description of the vehicle – he did not recall if he did or did not. (Briley Tr., Ex. K to 4/8/16 Thompson Decl., 10:3-7).

65. When officer Briley arrived at 328 South 2nd Ave, he was met by several other police officers from the City of Mount Vernon Police Department who were inside the apartment occupied by the Plaintiffs. See Briley Deposition annexed as Exhibit No."5", at 11:11-25.

Response 65 - 1: Disputed as unsupported. The cited testimony does not expressly state that the officers were inside the apartment when Briley arrived. Briley testified that he was uncertain whether the building at 328 South Second Avenue was the focus of the investigation, or an apartment within it. (Briley Tr., Ex. K to 4/8/16 Thompson Decl., 15:14-25).

Response 65 - 2: Briley met Sgt. Sexton at the top of the stairs outside the plaintiffs' apartment. (Briley Tr. Ex. K to 4/8/16 Thompson Decl., 17:6 – 18:2). At that time, Briley testified that the occupants of the apartment at the top of the stairs [which would be the plaintiffs' apartment] were "standing next to one another at the

top of the stairway" in front of the door to the apartment. . (Briley Tr., Ex. K to 4/8/16 Thompson Decl., 21:6-17).

66.     Briley was inside 328 South 2nd Ave for approximately thirty to forty five minutes. See Briley Deposition annexed to Wisham Decl. as Exhibit No."5, at 25:8-10.

> Response 66 - 1:         Undisputed that Briley testified to this effect.

67.     Officer Briley was ordered by his immediate supervisor Sgt. Steven Sexton to remain in the occupant's apartment until he was no longer needed. See Deposition of Briley annexed as Exhibit No."5", at 25:16-25, 26:1-5.

> Response 67 - 1:         Undisputed.

68.     Officer Briley observed Prince Scott's mother laughing back and forth with Sgt. Sexton during the time Briley was inside the apartment occupied by the Plaintiffs. See Deposition of Briley annexed as Exhibit "5", at 46:1-15.(emphasis added [sic].

> Response 68 - 1:         Disputed.

> Response 68 - 2:         Even if true, Briley's testimony makes clear that the police knew the occupants of the apartment did not want them to enter or remain.  For example, Defendant Briley testified that the occupants of the apartment were "cursing" at the police, "using foul language" at them, and "calling [them] names."  (Briley Tr., Ex. K to 4/8/16 Thompson Decl.,. 19:17-25).   Defendant Briley testified that Vaughn Scott, Prince Scott's mother (and Brenda Scott's daughter, was "initially in the beginning very belligerent, hostile" to Defendant Sexton. (Briley Tr. 76:6-10). (See also plaintiff's 4/8/16 56.1 Statement ¶¶ 129 – 149).

> Response 68 - 3:         Vaughn Scott told the police not to enter. (Vaughn Tr. 7:6 – 8:6).

69.     No physical force was used during the course of the search of the apartment occupied by the Plaintiffs on March 20, 2013.  See Briley Deposition annexed as Exhibit No."5", at 46:17-25, 47:1.

> Response 69 - 1:         Disputed as unsupported.  Briley's testimony was expressly limited to what he saw.

Response 69 - 2:     Disputed as contradicted by other evidence.
Officer Sexton pushed the door of the apartment in against Brenda
Scott's foot.  (Brenda Tr., Ex. M to 4/8/16 Thompson Decl., 5:17-24;
Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 12:18-25).

Response 69 - 3:     As another example, Defendant Antonini
placed Kraig Utley in handcuffs.  (Kraig Tr., Ex. S to 4/8/16
Thompson Decl., 14:15 – 16:10).  Two other officers assisted
Antonini.  (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 17:8 - 10).

Response 69 - 4:     Defendant Antonini bent Corey Marrow's
hand back and confiscated his cell phone, to prevent Mr. Marrow
from filming the police. (Corey Tr., Ex. O to 4/8/16 Thompson Decl.,
30:12-20).

Response 69 - 5:     Defendant Antonini threated to "choke out"
Kraig Utley.  (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 15:21 –
16:4).

70.     Officer Briley defined his knowledge of exigent circumstances as
"immediate flight or pursuit of an individual who committed a felony". See Deposition of
Officer Timothy Briley annexed to Wisham Decl. as Exhibit"5", at 66:14-25.

Response 70 - 1:     Undisputed that Briley testified as stated.

71.     Plaintiff Kraig Utley alleged that the defendant officers were inside of his
apartment for approximately three (3) hours. See Deposition of Kraig Utley, annexed to
Wisham Decl. as Exhibit No"15", at 14:11-14.

Response 71 - 1:     Disputed.  In the cited testimony Kraig
states they were there "about three and a half hours."

Response 71 - 2:     A statement that the plaintiff "claims,"
"alleged," "stated," "testified," "admitted" or "revealed" something in
a deposition is not a material fact, even if the underlying subject
matter of the statement allegedly made would be material if stated in
factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist.
LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material;
facts about statements about facts are generally not.  *See id.*

72.     Utley was cursing the officers inside his apartment during the officers 'investigation telling Officer Antonini to ( " get the fuck out of here. This ant fucking right. You fucking harassing us"). See Deposition of Kraig Utley annexed to Wisham Decl. as Exhibit No. "15", at 15: 9-20.  [sic].

> Response 72 - 1:          Undisputed that Kraig cursed.
>
> Response 72 - 2:          It is not unlawful to tell police to "get the fuck out of here" when they enter your home without a warrant.

73.     Kraig Utley stated in his deposition that Officer Antonini placed handcuffs on him for the safety of officer Antonini.  See Utley Deposition annexed hereto as Exhibit No."15",at 17:21-24.

> Response 73 - 1:          Disputed as incomplete and misleading.
>
> Response 73 - 2:          Kraig testified that Antonini "got in my face, he threatened he'll choke me out and I told him he's not going to do nothing.  That's when he put handcuffs on my and made me sit down on the couch with handcuffs behind my back."  (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 15:21 - 16:4).  In the passage cited by the defendants, Kraig testified that Antonini then said, "I'm putting the cuffs on you for my safety and your safety."  It was Antonini, not Kraig, that characterized Antonini's reasons for his actions.
>
> Response 73 - 3:          A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

74.     Utley testified that Julian Rene showed the officers the wounds Julian sustained when he was shot on March 20, 2013. See Utley Deposition annexed hereto as Exhibit No. "15", at 21: 12-19.

> Response 74 - 1:          Mischaracterizes the testimony.  Julian had a single injury, not multiple "wounds," and the cited testimony does not state otherwise.

75.     Julian Rene insisted that he was the victim of a shooting and voluntarily showed the police officers his butt cheeks. See Deposition of Kraig Utley, annexed to Wisham Decl. as Exhibit No. "15", at 21:20¬25. (I'll show you where I got shot" ) Deposition of Kraig Utley annexed as Exhibit No. "15", at 22:2¬22.

> Response 75 - 1:     Mischaracterizes the testimony, which speaks for itself. Kraig testified that the officers "were searching Julian and they was observing that he got grazed because he indicated that he got shot and they wanted to know where he got show at and so he showed them where he got shot at." (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 21:11-16). The cited testimony does not state that Julian's action was "voluntary" rather than performed in submission to police authority.

76.     Utley observed Julian Rene get up from sitting on the couch, and proceeded to pull down his pants to show the officers where he had been shot on his butt cheek. Utley Deposition annexed hereto as Exhibit No."15", at 23:2-8.

> Response 76 - 1:     Undisputed that Kraig testified to this effect, in sum and substance.

> Response 76 - 2:     Undisputed that no physical force was used to force Julian to pull down his pants. Police asked to Julian to pull his pants down, and he did not believe that he had any choice but to comply: "I mean I felt like I had no choice; 15 cops there. You got to comply what they say." (Julian Tr., Ex. R to 4/8/16 Thompson Decl., 27:15 – 28:16).

77.     Utley confirmed the fact that Rene was "shot near the projects on 3rd Street". See Deposition of Kraig Utley annexed hereto as Exhibit No. "15", at 24:16-25, 25:2-4.

> Response 77 - 1:     Undisputed that Kraig testified, in sum and substance, that that Rene was shot near the projects on 3rd Street.

> Response 77 - 2:     Disputed in that the quotation is not a statement by Kraig *in haec verba*.

> Response 77 - 3:     Disputed in that Kraig did not "confirm" anything, because he stated that he "found out when [Julian] showed

the officer that he got shot." (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 23:18-24). Kraig testified that he did not witness Julian being hit or have direct knowledge of it, although it "had to" have occurred during the incident at West 3rd Street. (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 23:18 – 26:10).

Response 77 - 4: Kraig's testimony does not state that he "confirmed" any fact to the police at the time of the incident. (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 23:18 – 26:10).

78. Kraig Utley was with Julian Rene at the time Julian was shot. See Deposition of Utley annexed as Exhibit No."15", at 25:5-7.

Response 78 - 1: Undisputed.

79. Kraig Utley ,and Julian Rene, hopped into a white minivan driven by Corey Marrow after shots were fired at Utley, and Julian Rene, March 20, 2013. See Deposition transcript of Kraig Utley annexed hereto as Exhibit No. "15", at 27:2-7, 25: 14-16. [sic].

Response 79 - 1: Undisputed.

80. Utley, and Julian Rene met Corey Marrow on 9th and 3rd Street, while shots were still being fired. See Utley Deposition annexed to Wisham Decl. as Exhibit No. "15", at 27:11-22.

Response 80 - 1: Undisputed that Kraig testified as stated, in sum and substance. Neither Corey nor Julian testified that shots wer "still being fired" when they entered the van.

81. There were six, or seven gun shots that rang out near the area of 9th and 3rd Street, according to Kraig Utley. See Utley Deposition annexed as Exhibit No."15", at 27:23-25. [sic].

Response 81 - 1: Undisputed that Kraig testified that there were six or seven shots.

Response 81 - 2: A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist.

LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

82. Utley's testimony confirms earlier reports to the Mount Vernon Police Department that gun shots had been fired, and that three (3) males blacks were seen getting into a white minivan and leaving the scene of the crime. See Deposition of Kraig Utley annexed as Exhibit No. "15", at 28:7-10.

> Response 82 - 1: This is not a statement of fact, but rather a statement of opinion about the probative effect of Kraig's testimony.

> Response 82 - 2: Kraig's testimony does not "confirm" that "three (3) black males were seen getting into a white minivan." First, Kraig testified that two (2) black males (himself and Julian) got into the minivan. Second, Kraig did not testify about what 'was seen' by witnesses. Finally, Kraig testified: "Corey Marrow was not at the scene [where the shots had occurred.]" (Kraig Tr., Ex. S to 4/8/16 Thompson Decl., 27:8-13).

83. The three (3) black males drove to 328 South 2nd Ave.,shortly after the shooting. See Utley Deposition annexed as Exhibit No."15",at 29:4-6. [sic]

> Response 83 - 1: The plaintiffs object to the reference to Kraig, Rene, and Corey as the "three (3) black males." It's unnecessary. It does not have a basis in the evidence. "Black males" is a term that was used to refer to various people witnesses saw, thought they saw, or claimed to have seen, in the area where the shots were fired. Some of these witnessed "black males" may correspond to real people, some may be composites or multiplications of real people, and some may be imagined. Callers, officers and dispatch reports variously identified a "light skinned male black with a red hoodie [who] ran into … the building opposite 70 West Third Street," a "black male" wearing a sweatshirt, "approximately six males" who entered a white minivan with a broken window on Ninth Avenue, three males entering a similar vehicle, and two males with "black shirts, black jeans" who ran away from Ninth Avenue towards Seventh Avenue. (Ex. U to 4/8/16 Thompson Decl., 01:00 – 13:20).

Response 83 - 2: Corey Marrow was the person who drove the van. He never got out of the van. He is not any one of the "males" or "black males" referenced by various conflicting reports, because it is undisputed that no witness saw the driver of the white vehicle. None of the witness reports stated that there were a total of three males, including the driver, in the white vehicle.

Response 83 - 3: In addition, callers were "giving … different locations" of where the shots were fired. (Pl. Ex. 14,

84. None of the occupants of 328 South 2nd Ave, were arrested by the Mount Vernon police department on March 20, 2013. See Deposition of Kraig Utley annexed to Wisham Decl. as Exhibit No. "15", at 30:2-4.

Response 84 - 1: Defendants object that this statement repeats a substantially identical fact stated above. See Paragraph 42.

Response 84 - 2: Undisputed that none of the occupants were arrested in the sense of making an arrest for the purpose of taking a suspect of a crime into custody.

Response 84 - 3: Each of the occupants of the home were seized in a Fourth Amendment sense. They were held captive in the home for approximately four hours. During that time they were not free to leave. (Briley Tr., Ex. K to 4/8/16 Thompson Decl., 47:3- 10; Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 41:5-8; Brenda Tr., Ex. M to 4/8/16 Thompson Decl., 15:11-16; Vaughn Tr. 7:6 – 8:6, Ex. 1 to 6/6/16 Thompson Decl.; A.S. Tr., Ex. Tto 4/8/16 Thompson Decl., 12:20 – 13:6).

Response 84 - 4: During their captivity, the plaintiffs were not permitted to engage in any activity without police permission. (A.S. Tr., Ex. T to 4/8/16 Thompson Decl., 14:16-23; Julian Rene Tr., Ex. R to 4/8/16 Thompson Decl., 26:15-25).

Response 84 - 5:         For example, the grandmother, Brenda

Scott, asked if she could finish cooking dinner and was told she could

not.  (A.S. Tr., Ex. T to 4/8/16 Thompson Decl.,  14:16-23).

Response 84 - 6:         Occupants were not allowed to get water or

food while the police were there.  (Julian Rene Tr., Ex. R to 4/8/16

Thompson Decl., 26:15-25).

Response 84 - 7:

85.     Kraig Utley had been arrested five (5) or ten (10) times prior to the March
20, 2013 incident, including resisting arrest. See Utley Deposition annexed as Exhibit
No."15", at 31:-25, 32:2-25, 33:2-7, 40:2-8.

Response 85 - 1:         This statement is not a material statement.

86.     Utley was not physically injured by any of the police officers during the
time of the incident cited herein on March 20, 2013. See Deposition of Kraig Utley
annexed as Exhibit No. "15", 48:19-25.

Response 86 - 1:         Undisputed.

87.     Utley did not seek any treatment for his alleged mental stress as a result of
his detainment by the police on March 20, 2013.  See Utley Deposition annexed as
Exhibit No. "15", at 49:8-10.

Response 87 - 1:         Undisputed.

88.     . Utley is seeking compensation form the City of Mount Vernon as a result
of the emergency which existed which led the police to enter the premises at 328 South
2nd Ave. Utley claims that "I don't trust the police". See Utley Deposition annexed to
Wisham Decl. as Exhibit No. "15", at 50:2  [sic].

Response 88 - 1:         Disputed as utterly unsupported by the cited

testimony, which is a single line.

Response 88 - 2:         Kraig did not testify that an emergency

existed.  He did not testify that an emergency led the police to enter

the premises at 328 South Second Avenue.

Response 88 - 3:         A statement that the plaintiff "claims,"

"alleged," "stated," "testified," "admitted" or "revealed" something in

a deposition is not a material fact, even if the underlying subject

matter of the statement allegedly made would be material if stated in

factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

Response 88 - 4:        Undisputed that Kraig stated that he doesn't trust the police.

89.     Brenda Scott gave testimony that the police insulted her on March 20, 2013, and that the police slammed the door on her foot. See Deposition of Brenda Scott annexed to Wisham Decl. hereto as Exhibit No."13", at 5:17-25, 6:2.

Response 89 - 1:        It is true that the police insulted Brenda on March 20, 2013, and that the police slammed the door on her foot.

Response 89 - 2:        A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

90.     Brenda Scott also gave testimony that the police knocked on her door before entering the premises. See Deposition of Brenda Scott annexed to the Wisham Decl. as Exhibit" No. "13", at 9:6-9.

Response 90 - 1:        The statement mischaracterizes the testimony.  Brenda testified that the knocked before forcing their way into the apartment.  The police were already inside a private premises when the stood on the landing at the door to her apartment.

Response 90 - 2:        A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

91.     The police who first appeared at the occupant's residence on March 20, 2013, informed Brenda Scott that they were there to investigate a shooting. See Deposition of Brenda Scott annexed to Wisham Decl. as Exhibit No."13", at 12:13-21.

> Response 91 - 1:        The cited testimony stated that police told Brenda this at some point, not necessarily when the police "first appeared."

92.     Brenda Scott stated during her testimony that she was not physically injured by the police during the March 20, 2013, incident. See Deposition of Brenda Scott annexed to Wisham Decl. as Exhibit No." 13", at 15:13-16.

> Response 92 - 1:        Mischaracterizes the testimony.  In the cited passage, Brenda is being asked to testify about what she observed after she saw the police officers searching certain areas of her home. Testifying about this period of time, Brenda stated "They didn't touch me."  (Breanda Tr., Ex. M to 4/8/16 Thompson Decl. 15:3-16).

> Response 92 - 2:        A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

93.     Brenda Scott revealed the fact that she had been seeing a psychiatrist for a couple of years based on her fear of walking down the streets and that she did not sustained any other form of injuries. See Deposition of Brenda Scott annexed to Wisham Decl. as Exhibit No."13", at 24: 4-18, 29: 17-24.  [sic].

> Response 93 - 1:        A statement that the plaintiff "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

Response 93 - 2: Mischaracterizes the testimony. Brenda was asked if she suffered additional "emotional injuries." She confirmed that the question referred to emotional injuries only, and responded "No." She did not testify about physical injuries or other harms in the cited passage. She did not say "she did not sustained any other form of injuries." [sic].

94.     Andree Harris was informed by the Mount Vernon Police Department that they were conducting an investigation of a prior shooting in which a white minivan was identified as being at the scene of the shooting. See Deposition of Andree Harris annexed to Wisham Decl. as Exhibit No." 12,"at 11: 15-25, 12:2-7.

Response 94 - 1: Disputed as unsupported by the passage cited. Andre did not testify that he was told that the vehicle was a minivan. He did not testify that he was told that the vehicle was "at the scene of the shooting." Rather, he testified that he was told is was, in some way, "involved."

95.     Andree Harris admitted that the white van was owned by his sister Nigeria Scott which was parked in the driveway at 328 South 2nd Ave. on March 20, 2013. See Deposition of Andree Harris annexed to Wisham Decl. as Exhibit No."12" at 12:8-23. [sic]

Response 95 - 1: A statement that the plaintiff "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

Response 95 - 2: This statement is not a complete sentence. It lacks a verb and a predicate. The plaintiff cannot respond because its meaning is unclear.

96.     Andree Harris claims his rights were violated because the police told him to empty his pockets. Mr. Harris also claims that the police pushed him in manner of which Mr. Harris did not explain. See Deposition of Andree Harris annexed to Wisham

Decl. as Exhibit"12," ,at 20: 22-25, 21:2,. Mr. Harris suffered no other injuries.  Exhibit No."12", at 21:3-5.

Response 96 - 1:  A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

Response 96 - 2:  The statement is not supported by the testimony.  Part of the exhibit supporting the testimony is missing.

Response 96 - 3:  Andre testified that he was unlawfully held captive for approximately four hours, without a warrant, and treated like a criminal.  (Andre Tr., Ex. 2 to 6/7/16 Thompson Decl., 5:21-16; 8:13-18; 10:13 – 11:2).

Response 96 - 4:  Andre was subjected to a pat-down search in his own home, including a pat-down of his "private area."  (Andre Tr., Ex. 2 to 6/7/16 Thompson Decl., 24:22 – 25:5).

Response 96 - 5:  To the extent that Mr. Harris did not "explain" the manner in which he was pushed, the defendants have not shown that he was asked to explain.  A witness is not obliged to give a speech, only to answer questions posed.

97.  Prince Scott admitted that he recognized one of the police officers that entered his home March 20,2013, as Officer Sargent Sexton. See Deposition of Prince Scott annexed hereto Wisham Decl. as Exhibit No. 10, at 8:7-24.

Response 97 - 1:  A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist.

LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

Response 97 - 2:            The statement mischaracterizes the testimony.  In the cited passage, Prince testified that he saw, and recognized two officers: Sexton and Antonini.

98.    Prince Scott stated that he was previously arrested by Sgt. Sexton before the March 20, 2013, incident for domestic violence. See Deposition of Andree Harris annexed to Wisham Decl. as Exhibit No. 10, at 9:7-24.

Response 98 - 1:            Disputed as unsupported by the cited passage.  The statement cites to Andre Harris' deposition. Prince Scott did not testify during the deposition of Andre Harris.

99.    Prince Scott also admitted during his testimony that he recognized officer Antonini before officer Antonini entered his apartment on March 20, 2013. See Deposition of Prince Scott annexed to Wisham Decl. as Exhibit No. 10, at 12:8-11.

Response 99 - 1:            A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

Response 99 - 2:            Mischaracterizes the testimony, which states that Prince recognized Antonini when he entered the apartment, not before.

100.    Prince Scott was arrested by Officer Antonin on several prior occasions. See Deposition of Prince Scott annexed to Wisham Decl. as Exhibit No."10",at 12: 8-25.

Response 100 - 1:            Undisputed.

101.    Prince Scott was convicted of attempted assault, and possession of a controlled substance ,prior to the March 20, 2013, incident at 328 South 2nd Ave. See Deposition of Prince Scott annexed to Wisham Decl. as Exhibit No. 10, at 14:2-9.

Response 101 - 1:            Any prior criminal record is irrelevant.

102.    Corey Marrow, and Prince Scott are related as brothers. See Deposition of Prince Scott annexed to Wisham Decl. as Exhibit No. 10, at 18:16-17.

> Response 102 - 1:        Undisputed.

103.    Prince Scott resided at 328 South 2nd Ave, on March 20, 2013. See Deposition of Prince Scott annexed to Wisham Decl. as Exhibit No. 10, at 19:11-13.

> Response 103 - 1:        Undisputed.

104.    There were 4-5 males inside the white van driven by Corey Marrow on March 20, 2013. See Deposition of Prince Scott annexed to Wisham Decl. as Exhibit 10, at 21:2-6.

> Response 104 - 1:        Undisputed that the testimony cited supports the statement.  However, the plaintiffs note that the fact is inherently approximate, and other witnesses testimony, not cited, does not necessarily correspond precisely.

105.    Prince Scott testified that no one was handcuffed by the police during the March 20, 2013, incident. See Deposition of Prince Scott annexed to Wisham Decl. as Exhibit No. 10, at 31:5-8.

> Response 105 - 1:        A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not. *See id.*

> Response 105 - 2:        Mischaracterizes the testimony as a more definite statement than the transcript supports.  Prince was asked if he, Prince, was handcuffed, and responded: "Did they handcuff us, no."  In the context of the question, it is not a firm and absolute statement that no-one was handcuffed.

106.    Prince Scott stated that he was not physically injured by the police on March 20, 2013, during the incident during the time the police were inside his apartment on 328 South 2nd Ave. See Deposition of Prince Scott annexed as Exhibit No. 10, at 31:5-25.

Response 106 - 1:        A statement that the plaintiff "claims,"
"alleged," "stated," "testified," "admitted" or "revealed" something in
a deposition is not a material fact, even if the underlying subject
matter of the statement allegedly made would be material if stated in
factual form. *See Codrington v. City of New York*, 2015 U.S. Dist.
LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material;
facts about statements about facts are generally not. *See id.*

Response 106 - 2:        Mischaracterizes the testimony. In the cited
passage, Prince makes no statement about whether he was or was not
physically injured. No question posed in the cited passage related to
Prince's physical injuries or lack thereof.

107.    Prince Scott agreed with the Mount Vernon Aegis Report which reflects
the fact that Prince Scott was arrested on May 9, 2012, by officer Antonini ,and that
Officer Antonini arrested him on March 18, 2009, May 7,2011, and on July 27, 2008. See
Deposition of Prince Scott annexed to Wisham Decl. as Exhibit No. 10, at 33:9-25,
38:10-25, 39:2-22, 40:2-25. [sic].

Response 107 - 1:        A statement that the plaintiff "claims,"
"alleged," "stated," "testified," "admitted" or "revealed" something in
a deposition is not a material fact, even if the underlying subject
matter of the statement allegedly made would be material if stated in
factual form. *See Codrington v. City of New York*, 2015 U.S. Dist.
LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material;
facts about statements about facts are generally not. *See id.*

Response 107 - 2:        Mischaracterizes the testimony. In the cited
testimony, Prince did not "agree" with the Aegis report in its totality,
and expressed a lack of precise recollection as to details alleged in the
document, including dates, officers involved, and other matters.

108.    Prince Scott admitted that he had prior "run ins " with officer Antonini
and Officer Sexton. See Prince Scott Deposition annexed to Wisham Decl. as Exhibit
No.10, at 42: 17-22.

Response 108 - 1:        A statement that the plaintiff "claims,"
"alleged," "stated," "testified," "admitted" or "revealed" something in

a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

Response 108 - 2:    Officers Antonini and Briley frequently stopped Prince Scott and searched him without probable cause. The threatened him with "bogus" charges, and actually charged him with vague offenses like Disorderly Conduct and Obstructing Governmental Administration when their unlawful searches produced no results. (Prince Tr., Ex. Q to 4/8/16 Thompson Decl. 40:20 – 41:16).

109.    Prince Scott testified that Julian Rene told the officers who were inside his apartment on March 20,2013, that he was the one who had suffered a gunshot wound or was glazed on his buttocks. See Deposition of Prince Scott annexed to Wisham Decl. as Exhibit No. 10,at 46:16-25, 47:2-14. [sic].

Response 109 - 1:    A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

110.    According to Prince Scott, Julian Rene lifted his shirt up, and pulled his pants down to show the police officers his injuries from being shot. See Deposition of Prince Scott annexed to Wisham Decl. as Exhibit No. 10, at 48:2-16.

Response 110 - 1:    A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist.

LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material;

facts about statements about facts are generally not.  *See id.*

111.    Nigeria Scott voluntarily gave police the authority to search her white minivan by signing a "Voluntary Wavier to Search and Seize" on March 20, 2013. See Deposition of Nigeria Scott annexed to Wisham Decl. as Exhibit "C".

Response 111 - 1:          Disputed.

Response 111 - 2:          Nigeria signed the form under duress,

believing that she had no choice.  (Nigeria Tr., Ex. P to 4/8/16

Thompson Decl., 28:7 – 29:5).  Nigeria was told by the officers, "if I

wanted the vehicle then I would have to let them search it."  In

addition, at the time Nigeria signed the form, her apartment was

occupied by police, she was not allowed in, her family were not

allowed out, and Nigeria was not even permitted to remain on her

own porch.  She was subordinated to the will and control of the police

and could not choose freely.

112.    Nigeria Scott admitted that the white minivan was parked in her driveway at 328 South 2Ave. on March 20, 2013. See Deposition of Nigeria Scott annexed to Wisham Decl. as Exhibit No. 9, at 8:5¬25,9:4-23,, 10:4-25, 11:2-25, 12:2-7.

Response 112 - 1:          The material fact for this case is not where

Nigeria says the van was parked, but where the police thought the van

was parked.  The evidence is undisputed that when the police

encountered the van, they believed it was parked at 324 South Second

Avenue.

Response 112 - 2:          However, it is also undisputed that, at the

time he located the vehicle, Officer Gregorio believed that the

driveway it was parked in belonged to 324 South Second Avenue.

(Ex U to 4/8/16 Thompson Decl., 13:38 – 14:08, 16:08 – 16:10;

Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 80:3 – 81:3).  Probable

cause is based on facts known to the officers at the time probable

cause is determined.  *See Stansbury v. Wertman*, 721 F.3d 84, 89 (2d

Cir. 2013) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir.

N.Y. 2006)). *Accord Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. N.Y. 2002); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996).

Response 112 - 3:     The defendants have offered the Aegis Public Safety System Incident Report (Ex. B to the Wisham Declaration) as establishing the location and time of the dispatch of officers.  This report shows that Sgt. Sexton was dispatched to **324** South Second Avenue, not 328 South Second Avenue.  (Ex. B to the Wisham Declaration, p. 2 ("At Scene 2 … 18:43:07 …. Sexton, Steven … Sec. Loc.: 324 S 2nd Av")).

Response 112 - 4:     A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

113.     Nigeria Scott admitted that the photographs annexed as Exhibit "D", are those which depict her white minivan with the shatter rear windshield.  Exhibit No. 9, at 13:4-25, 14:2-10.

Response 113 - 1:     A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

Response 113 - 2:     The images were not part of the defendants' submission, and so the plaintiffs cannot take a position on the truth or falsehood of this statement.

114.    Nigeria Scott testified that she was not detained inside the premises on March 20, 2013. See Deposition of Nigeria Scott annexed hereto as Exhibit No. "9", at 16:8-12.

> Response 114 - 1:    Nigeria was not allowed to enter her home. She was not allowed to remain on her property.  She was forced to stand on the sidewalk several doors down from her home.  (Nigeria tr., Ex. P to 4/8/16 Thompson Decl., 17:10 – 19:23).

> Response 114 - 2:    A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not. *See id.*

115.    Nigeria left the porch area at the time of the search and went " a couple of houses down". Deposition of Nigeria Scott annexed as Exhibit No. 9, at 18:12-23.

> Response 115 - 1:    Disputed as misleading by omission. Nigeria left the porch area against her will because she was ordered to by the police.  (Nigeria Tr., Ex. P to 4/8/16 Thompson Decl., 17:10 – 19:23).  She did not willingly leave her own property.

> Response 115 - 2:    Nigeria was not allowed to enter her home. She was not allowed to remain on her property.  She was forced to stand on the sidewalk several doors down from her home.  (Nigeria tr., Ex. P to 4/8/16 Thompson Decl., 17:10 – 19:23; Briley Tr., Ex. K to 4/8/16 Thompson Decl., 47:3- 10; Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 41:5-8; Brenda Tr., Ex. M to 4/8/16 Thompson Decl., 15:11-16; Vaughn Tr. 7:6 – 8:6, Ex. 1 to 6/6/16 Thompson Decl.; A.S. Tr., Ex. T to 4/8/16 Thompson Decl.,  12:20 – 13:6).

116. Nigeria Scott admitted that she was not injured as a result of the officers not allowing her to enter the premises during the time of the police investigation. See Deposition of Nigeria Scott annexed as Exhibit No. 9, at 20:21-25, 21:2-17.

> Response 116 - 1:          Mischaracterizes the testimony.  In the cited testimony, Nigeria stated that she was injured, and used that word. That is to say, this statement of fact is the opposite of true.  Nigeria's testimony was that her injuries consisted of discomfort, humiliation, and violation of her rights.  Nigeria did not testify to any physical injury.  (Nigeria Tr., Ex. P to 4/8/16 Thompson Decl., 20;10 – 21:21).

> Response 116 - 2:          A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

117. Nigeria Scott testified that she asked her mother, Vaughn Scott, if she could tell her what happen and why the police wouldn't allow her to enter the premises. Deposition of Nigeria Scott annexed to Wisham Decl. as Exhibit No 9, at 25:8-25.  [sic]

> Response 117 - 1:          A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

> Response 117 - 2:          This is not a material fact.  This statement could be as true as young love and it would make no difference whatsoever to the outcome of this motion.

118. According to Nigeria Scott, Vaughn Scott did not mention anything at the time to Nigeria Scott indicating to her that the police had forced their way inside the

plaintiff's residence. See Deposition of Nigeria Scott annexed as Exhibit No. 9, at 25:25, 26:2-11.

> Response 118 - 1: This is a false characterization of the testimony. Nigeria testified to a conversation with her mother about **why** the police were there and prevented Nigeria from entering her own home. Nigeria did not testify that the conversation related to the manner in which the police entered. The fact that this "why" conversation did not touch on "how" is utterly unremarkable.

> Response 118 - 2: A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

> Response 118 - 3: A statement that a plaintiff did not testify that another plaintiff made a statement about a fact is simple nonsense, not a Rule 56.1 statement of fact.

119.    Nigeria Scott was told "different stories" as to why the police were in her apartment on the evening of March 20, 2013. Exhibit No. 9, at 26:2-11. (emphasis added)

> Response 119 - 1: This is not a material statement of fact.

> Response 119 - 2: The police lacked a valid reason to hold this family hostage. Within this 56.1 statement, the defendants have told "different stories" as to why their actions might be justified. A passive-voice statement that unnamed people told different un-described stories to explain the defendants' disgraceful behavior is irrelevance distilled to its purest form.

120.    Plaintiff Arabia Scott testified that she was not injured in any manner during the time the Mount Vernon Police officers entered her residence on March 2,

2013. See Deposition of Arabia Scott annexed to Wisham Decl. as Exhibit No. "8", at 18: 4-5, 18:10-15, 18: 18-21.

Response 120 - 1:         A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

Response 120 - 2:         The minor plaintiff was not physically injured. The minor testified that she was held captive in her apartment, and was ordered not to talk and not to watch TV. This statement of fact is therefore true only to the extent that the word "injured" means "physically injured," and not "harmed." (A.S. Tr., Ex. T to 4/8/16 Thompson Decl. 12:8 – 13:6).

Response 120 - 3:         Counsel for the defendants did not ask the minor plaintiff about how the experience affected her feelings, thoughts or emotions. The defendants cannot argue that her statement about "injury," necessarily precludes damages for emotional distress.

121.     Kevin Marrow testified that the police who were inside his apartment at 328 South 2nd Ave, on March 20,2013, did not damage any property during the search. See Deposition of Kevin Marrow annexed to Wisham Decl. as Exhibit No."7", at 20"17-25, 21: 2-25. Marrow further testified to the fact that the police did not break the door. See Wisham Decl. annexed hereto as Exhibit No. "7", at 21:8-9.

Response 121 - 1:         The officers broke the bathroom door, and emptied the contents of the medicine cabinet into the sink. (Arabia Tr., Ex. T to 4/8/16 Thompson Decl., 14:25 – 15:6). They left everything piled in the sink. *Id.*

Response 121 - 2:         A statement that the plaintiff "claims," "alleged," "stated," "testified," "admitted" or "revealed" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in

factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

122.    Kevin Marrow was not injured during his encounter with the police on March 20, 2013. Exhibit No."7", at 22:6-7.

Response 122 - 1:        Undisputed that Kevin was not physically injured.

123.    Julian Rene admitted that he had in fact been gazed by a bullet on March 30, 2013, near the projects between 9th and 7th Ave and that multiple shots were fired. See Deposition of Julian Rene annexed to Wisham Decl.as Exhibit No. 6, at 5:21-25, 6:2-15, 7:2-12, 7:9-14, 7:20-25, 8:2-10. [sic].

Response 123 - 1:        Plaintiffs object that this is duplicative of multiple previous statements. Plaintiffs move to strike.

Response 123 - 2:        Undisputed that Julian testified in, in sum and substance, as stated. However, what Julian "testified" or "admitted" in deposition is not a material fact. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015) (admissions in depositions cannot create probable cause if unknown by police at time of arrest).

124.    Julian Rene, and Kraig Utley, flagged down Corey Marrow wo was driving the white van. See Deposition of Julian Rene annexed hereto as Exhibit No. 6, at 8:15-19, 11:12-16. [sic].

Response 124 - 1:        Plaintiffs object that this is duplicative of multiple previous statements. Plaintiffs move to strike.

Response 124 - 2:        Undisputed.

125.    Julian testified that he saw a guy who was wearing a red hoddie. See Dep of Julian Rene annexed as Exhibit No. "6", at, 10:21-25,11:2-5. [sic].

Response 125 - 1:        Undisputed that Julian testified in, in sum and substance, as stated. However, what Julian "testified" or "admitted" in deposition is not a material fact. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb.

27, 2015) (admissions in depositions cannot create probable cause if unknown by police at time of arrest).

Response 125 - 2:

126.    Rene also testified that he and two of his friends were shot in August of 2012. See Deposition of Julian Rene annexed hereto as Exhibit No." 6", at 12:22-25, 13:2-9, 13:12-24.

Response 126 - 1:    What Julian "testified" or "admitted" in deposition is not a material fact. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015) (admissions in depositions cannot create probable cause if unknown by police at time of arrest).

Response 126 - 2:    Nothing about the alleged incident is material to any claim or defense, or to damages. The plaintiffs decline to respond and move to strike..

127.    Rene stated that he sustained a bullet wound August 2012, the bullet entered behind his right knee. (" It hit basically my cap and went through my leg, went in and out"). See Deposition of Julian Rene annexed to Wisham Decl. as Exhibit No. "6", at 14:7-21. [sic].

Response 127 - 1:    What Julian "stated" or "admitted" in deposition is not a material fact. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015) (admissions in depositions cannot create probable cause if unknown by police at time of arrest).

Response 127 - 2:    Nothing about the alleged incident is material to any claim or defense, or to damages. The plaintiffs decline to respond and move to strike..

128.    Rene admitted that he knew most of the police officers that entered his apartment on March 20, 2013. Exhibit No. " 6", at 16:19-25, 17:2-4.(emphasis added) [sic].

Response 128 - 1:    What Julian "testified" or "admitted" in deposition is not a material fact. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015)

(admissions in depositions cannot create probable cause if unknown by police at time of arrest).

Response 128 - 2:    Undisputed that Julian testified that he knew "most of" the officers.

Response 128 - 3:    Whether he knew of did not know the officers is immaterial to any claim, defense, or damages.

129.    Rene admitted that the photographs shown during his deposition were photos of him pulling down his ( boxer's) pants to show the officer his wound from being shot with a bullet on the evening of March 20, 2013. Exhibit No. 6, 32:21-25, 33:4-25, 34:2-21.  [sic].

Response 129 - 1:    What Julian "testified" or "admitted" in deposition is not a material fact.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015) (admissions in depositions cannot create probable cause if unknown by police at time of arrest).

Response 129 - 2:    The plaintiffs object that this statement is unsupported by the referenced "photographs shown during his deposition."  Because the exhibits are not included in the defendants' submission, the plaintiffs cannot take a position on the truth or falsehood of this alleged fact.

130.    Julian Rene testified that the police officers present on March 20, 2013, did not force him to pull down his pants. See Deposition of Julian Rene annexed to Wisham Decl. as Exhibit No. "6", at 34:24¬25, 35:3-6.(emphasis added)

Response 130 - 1:    What Julian "testified" or "admitted" in deposition is not a material fact.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015) (admissions in depositions cannot create probable cause if unknown by police at time of arrest).

Response 130 - 2:    Undisputed that no physical force was used to force Julian to pull down his pants.  Police asked to Julian to pull his pants down, and he did not believe that he had any choice but to

comply: "I mean I felt like I had no choice; 15 cops there.  You got to comply what they say."  (Julian Tr., Ex. R to 4/8/16 Thompson Decl., 27:15 – 28:16).

131.    Rene also admitted that he had a flesh wound and that he had been bleeding. See Deposition of Julian Rene annexed as Exhibit No." 6", at 35:9-21.

Response 131 - 1:    What Julian "testified" or "admitted" in deposition is not a material fact.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015) (admissions in depositions cannot create probable cause if unknown by police at time of arrest).

Response 131 - 2:    It is undisputed that Julian had a flesh wound, and at some point it bled.

132.    The police officers saw blood on Julian Rene's pants before Julian pulled down his pants. See Deposition of Julian Rene annexed hereto as Exhibit No. "6", at 38:22-25, 39:2-5. (emphasis added)

Response 132 - 1:    Disputed.  None of the defendants testified that they saw blood at any point in time.

Response 132 - 2:    In the cited testimony, Julian is "guessing" at what was or might have been in the minds of the officers when they asked him to pull down his pants.  (Julian Tr., Ex. R to 4/8/16 Thompson Decl., 38:15 – 39:5) ("I guess they seen like blood").

Response 132 - 3:    The police did not learn that Julian had been shot until they were already inside the apartment for a significant period of time.  (Julian Tr., Ex. R to 4/8/16 Thompson Decl., 26:2 – 28:20).

Response 132 - 4:    Brenda Scott testified that she did not see blood on Julian.  (Brenda Tr. 17:11-22).

133.    Julian Rene was not physically injured by the police on March 20, 2013. See Deposition of Julian Rene annexed hereto as Exhibit No." 6", at 40:9-12.  [sic].

Response 133 - 1:    Undisputed.

134.    Vaughn Scott alleged that officers removed her from her residence, and made her stand on the porch.  See Deposition of Vaughn Scott annexed  to Wisham Decl. as Exhibit No."11", at 8:10-25.  [sic].

Response 134 - 1:         This is not a statement of material fact.  The fact that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  See *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

Response 134 - 2:         It is true that Vaughn testified to this general effect, but not in the cited passage.  Vaughn testified:

They pushed their way into my home, they took me outside after I told them do not enter my home.  They said they had a search warrant.  They took me outside, made me stand on the porch.  They would not allow me to go back into my home, they would not allow me to get a jacket and they would not allow me to leave my residence even to walk off my porch.  They would not allow me to.  (Vaughn Tr., Ex. 1 to 6/7/16 Thompson Decl., 7:22 – 8:6).

Response 134 - 3:         It is true that officers removed her from her residence, and made her stand on the porch.

135.    Vaughn Scott further claims that the police did not allow her to leave the porch area. Ms. Scott claims that she takes morphine because of the pain she felt as she stood on the porch without a jacket in pajamas, and a T-shirt. See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11", at 8:10-25.

Response 135 - 1:         This is not a statement of material fact.  The fact that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  See *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

Response 135 - 2:    The statement mischaracterizes the testimony.  Vaughn testified that she began taking morphine after back surgery in 2010, and she continues to take morphine for arthritis.  Vaughn testified: 'I have a physical illness where I'm not supposed to be in the cold."  She testified that, on that occasion, "by them making me stand outside [in a t-shirt and a pair of pajama pants] it made the pain worse."  Vaughn Tr., Ex. 1 to 6/7/16 Thompson Decl., 8:10 – 9:1).  The testimony otherwise speaks for itself.

136.    Vaughn Scott changed her testimony soon after her statement in paragraph 135, and now claims that she was taking morphine because of the pain in her body that "I have. I have arthritis and by them making me stand outside ,it made the pain worse". See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11", at 8:21-25, 9:2.  [sic].

Response 136 - 1:    This is not a statement of material fact.  The fact that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  See *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

Response 136 - 2:    This is a mischaracterization of her testimony.  In approximately  20 lines of question and answer, Vaughn testified answered an extremely general question, "How were you injured?" followed by several more specific follow up questions. There was no "change in testimony." (Vaughn Tr., Ex. 1 to 6/7/16 Thompson Decl., 8:10 – 9:1).

137.    Vaughn Scott testified that she was taking morphine in 2012, prior to the March 20, 2013, incident, and that the morphine was prescribe for pain she was experiencing in her back due to surgery she had unrelated to the March 20, 2013, incident. See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11", at 9:3-10.  [sic].

Response 137 - 1:    This is not a statement of material fact.  The fact that Vaughn "alleged," "stated" or "testified" or "admitted"

something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. See *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

Response 137 - 2:    Mischaracterizes the testimony. Vaughn stated that she began taking morphine after surgery in 2010, not 2012.

138.    Vaughn Scott stated during her testimony that the police took her outsider her apartment and made her stand on the porch for 2 hours. See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11", at 7:22-25,8:8. [sic].

Response 138 - 1:    This is not a statement of material fact. The fact that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. See *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

Response 138 - 2:    It is true that Vaughn was forced to stand on her porch for two hours.

139.    Vaughn Scott further testified that the police asked her to be quiet and sit down. See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. 11, at 10:2-6.

Response 139 - 1:    This is not a statement of material fact. The fact that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. See *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

Response 139 - 2:    It is true that that the police asked her to be quiet and sit down.

140.    Vaughn Scott claims that she injured her back while she was working at the post office. She does not remember how she injured her back. See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11", at 11:5-18.

Response 140 - 1:    This is not a statement of material fact.  The fact that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

141.    Vaugh Scott admitted that her daughter's white van was parked in the driveway on March 20, 2013. See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11", at 14:7-11.  [sic].

Response 141 - 1:    This is not a statement of material fact.  The fact that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  See *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

Response 141 - 2:    In her testimony, Vaughn does not state which driveway the van was parked in.

Response 141 - 3:    The material fact for this case is not where Vaughn thought the van was parked, but where the police thought the van was parked.  The evidence is undisputed that when the police encountered the van, they believed it was parked at 324 South Second Avenue.

Response 141 - 4:    However, it is also undisputed that, at the time he located the vehicle, Officer Gregorio believed that the driveway it was parked in belonged to 324 South Second Avenue. (Ex U to 4/8/16 Thompson Decl., 13:38 – 14:08, 16:08 – 16:10;

Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 80:3 – 81:3).  Probable
cause is based on facts known to the officers at the time probable
cause is determined.  *See Stansbury v. Wertman*, 721 F.3d 84, 89 (2d
Cir. 2013) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir.
N.Y. 2006)). *Accord Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d
Cir. N.Y. 2002); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569
(2d Cir. 1996).

Response 141 - 5:        The defendants have offered the Aegis
Public Safety System Incident Report (Ex. B to the Wisham
Declaration) as establishing the location and time of the dispatch of
officers.  This report shows that Sgt. Sexton was dispatched to **324**
South Second Avenue, not 328 South Second Avenue.  (Ex. B to the
Wisham Declaration, p. 2 ("At Scene 2 … 18:43:07 …. Sexton,
Steven … Sec. Loc.: 324 S 2nd Av")).

Response 141 - 6:        Officer Gregorio told Sexton the
information concerning the location of the vehicle by radio
transmission.  (Sexton Tr., Ex. J to the 4/8/16 Thompson Decl. 12:18
– 13:4).  In the recording of Officer Gregorio's radio transmission, he
states that the vehicle is located at **324** South Second Avenue, not
328.  (Ex U to 4/8/16 Thompson Decl., 13:38 – 14:08; 16:08 – 16:10;
Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 80:3 – 81:3).
Consistently with this recording, the Aegis Public Safety System
Incident Report (Ex. B to the Wisham Declaration, p. 3) reflects
Officer Johanna Santos arriving at "Scene 2" approximately five
minutes before Sexton, and the location is identified as "**324** S 2nd
Av"  Officer Santos shared a car with Officer Gregorio.  (Sexton Tr.,
Ex. J to 4/8/16 Thompson Decl., 16:8-15).  Where the Aegis Public
Safety System Incident Report reflects Officer Santos arriving at "**324**
S 2nd Av.," it means that Officer Gregorio was at the same location.

142.     Plaintiffs lived on the 2nd floor of a three family house on 328 South 2Ave. on March 20, 2013. See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11",at 12:9-19. [sic].

Response 142 - 1:     Undisputed.

143.     Vaughn Scott testified that the police officers dragged her out of her house, and took her down the steps after the police officers busted the door. See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11", at 17:20-22.

Response 143 - 1:     This is not a statement of material fact. The fact that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

Response 143 - 2:     It is true that the police officers dragged her out of her house, and took her down the steps after the police officers busted the door.

144.     Vaughn Scott stated that the police officers pulled down Julian Rene' s pants. See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11", at 26:3-8.   [sic].

Response 144 - 1:     This is not a statement of material fact. The fact that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form. *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015). Facts are material; facts about statements about facts are generally not. *See id.*

145.     Vaughn Scott subsequently changed her testimony and testified that once the police officers came inside her apartment, they took her outside and held her on the porch for two (2) and a half hours. See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No." 11", at 38:17-25. Scott then states that the police took her back upstairs and held her in her living room for another three(3) hours. Exhibit No. 11, at 39:2-6.  [sic].

Response 145 - 1:    This is not a statement of material fact.  The fact that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

Response 145 - 2:    Where the  first line of this statement reads "subsequently changed her testimony," there is no basis to understand what prior testimony Vaughn supposedly changed her testimony from.

Response 145 - 3:    The defendants again mischaracterize the testimony.  Defense counsel proposed the leading question: "You recall that the police held you hostage for about three to five hours, correct?"  Vaughn responded: "Correct."  Vaughn's testimony states that within this period, she spent two to two and a half hours outside on the porch, and the remainder of the time as a hostage in the living room.  She does **not** testify that after being brought in from the porch she was held in the living room for three hours.  (Vaughn Tr., Ex. 1 to 6/7/16 Thompson Decl., 38:4 – 39:6).

Response 145 - 4:    It is true that police officers came inside Vaughn's apartment, took her outside and held her on the porch for a long time.

Response 145 - 5:    It is true that police took her back upstairs and held her in her living room a long time.

146.    This testimony is inconsistent with Vaughn Scott's earlier testimony that she was dragged out of her apartment by the police. See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11", at 17:20-22.

Response 146 - 1:     This is not a statement of material fact.  The defendants' (baseless) opinion as to whether later testimony conflicts with earlier testimony is not factual.

Response 146 - 2:     Statements that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

Response 146 - 3:     The only difference in the pieces of testimony as described is that in the earlier, Vaughn uses the word "dragged" to describe how she was taken out of her home.  (Vaughn Tr., Ex. 1 to 6/7/16 Thompson Decl., 17:20-22).  In the latter testimony she uses the more general word "took" to describe how she was taken out of her home.  (Vaughn Tr., Ex. 1 to 6/7/16 Thompson Decl., 38:17 – 39:6).  Defendants did not explore whether the word "dragged" was meant literally or figuratively, or whether the general word "took" was intended to invoke or exclude any more specific terms such as "dragged."   There is no conflict.

147.     Vaughn Scott stated that she is unable to read, cannot see, cannot cook, needs assistance in doing everything, including bathing herself, she cannot walk out the door by herself as a result of her encounter with the police on March 20, 2013. See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11", at 60:8-22.

Response 147 - 1:     Statements that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

148.     Ms. Vaughn Scott then testified that the Mount Vernon Police did not physically injure her.  See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11", at 60:23-25, 61:2-5.

>     Response 148 - 1:          Statements that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

149.     Vaughn Scott indicated in her testimony that she had brain surgery as a result of standing in the cold.  See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11", at 67:2-11.

>     Response 149 - 1:          Statements that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*  A statement that Vaughn "indicated" something in her testimony is scarcely even a statement about a statement.

150.     The Complaint that Vaughn Scott filed is void of any mention of her having brain surgery due to the police officers not permitting her inside her apartment and causing her to stand in the cold due to the ongoing police investigation on March 20, 2013. See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11":, at 73:2-10. 6:4-25, 77:2-25. See also Federal Complaint filed on June 19, 2014, annexed to Wisham Decl. as Exhibit No. "A".

>     Response 150 - 1:          What the complaint says is a matter of public record on the docket.

151.     Vaughn Scott admitted that she has no medical support linking her brain surgery, high blood pressure, strokes, seizures, or aneurisms due to the police activity on March 20, 2013. See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11", at 78:8-16.

Response 151 - 1:        Statements that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

152.    Vaughn Scott admitted that she has had arthritis since 2011, and 2011. See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11", at 64:19-25, 65:2-7.  [sic].

Response 152 - 1:        Statements that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

Response 152 - 2:        Defendants mischaracterize the testimony. The dates are wrong, and the question related to how long she had seen a doctor, not how long she had the condition.

153.    The seizures in which Vaughn Scott refers to in her testimony occurred during MS, Scott's operation when according to Vaughn Scott, the doctors decided they' were going to clip the aneurism in the 1st surgery".  See Deposition of Vaughn Scott annexed to Wisham Decl. as Exhibit No. "11",at 61:6-25. [sic].

Response 153 - 1:        Statements that Vaughn "alleged," "stated" or "testified" or "admitted" something in a deposition is not a material fact, even if the underlying subject matter of the statement allegedly made would be material if stated in factual form.  *See Codrington v. City of New York*, 2015 U.S. Dist. LEXIS 24905, 11-12 (E.D.N.Y. Feb. 27, 2015).  Facts are material; facts about statements about facts are generally not.  *See id.*

Response 153 - 2:    The statement mischaracterizes the testimony.  The cited passage contains no mention of clipping an artery, nor of doctors deciding what to do during a "1st surgery," nor of seizures.

154.    The police officers who entered plaintiff's apartment called an ambulance for medical treatment for Julian Rene who refuse to be taken to a hospital for the wounds he received in his buttock as a result of the shooting which had occurred several minutes before police arrived at 328 South 2nd Ave., on March 20, 2013. See Deposition Sgt. Steven Sexton, annexed to the Wisham Decl., as Exhibit No." 1", at 85:2¬17.  [sic]

Response 154 - 1:    Unsupported by the cited passage.

Response 154 - 2:    The cited passage does not describe the shooting at all, much less describe it as something "which had occurred several minutes before police arrived at 328 South 2nd Ave., on March 20, 2013."  The cited passage does not state that "police officers who entered plaintiff's apartment called an ambulance." Instead, Sexton stated that an ambulance "was called," and that he did not remember who called it.  The cited passage does not mention the location of the wound.

Response 154 - 3:    It is undisputed that Julian refused medical treatment.

DATED:    New York, New York
          June 8, 2016

                    Respectfully submitted,

                    _____//s//_____
                    DAVID A. THOMPSON [DT 3991]
                    STECKLOW & THOMPSON
                    ATTORNEYS FOR PLAINTIFF
                    217 Centre Street, 6th Floor
                    Phone:  (212) 566-8000
                    Fax:    (212) 202-4952
                    dave@sctlaw.nyc