UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

VAUGH SCOTT, NIGERIA SCOTT, PRINCE            Index No. 14-cv-4441(KMK)
SCOTT, ANDRE HARRIS, BRENDA SCOTT,
KRAIG UTLEY, COREY MARROW, A.S.,
A MINOR CHILD, K.M., A MINOR CHILD,            MEMORANDUM OF LAW
AND JULIAN RENE,                               IN OPPOSITION

                        *Plaintiffs,*

                against --

THE CITY OF MOUNT VERNON, a municipal
Entity, MT. VERNON POLICE OFFICER ALLEN,
MT. VERNON POLICE OFFICER CAMILO
ANTONINI, MT. VERNON POLICE OFFICER
TIMOTHY BRILEY, MT. VERNON POLICE
OFFICER DET. BRENT GAMBLE, MT. VERNON
POLICE OFFICER SGT. STEVEN SEXTON,
CITY OF MOUNT VERNON POLICE
DEPARTMENT, AND POLICE OFFICERS JOHN
DOES 1-10,

                        *Defendants*.
-------------------------------------------------------------------x

# Table of Contents

I.   Facts------------------------------------------------------------------------------- 1

II.  Argument----------------------------------------------------------------------- 6

   A.   Summary ..................................................................6

   B.   What The Defendants Are Claiming ................................................7

   C.   There Was an Actionable Seizure ....................................................7

   D.   There Was No Probable Cause For Entry, Arrest or Search ...................9

III. Exigent Circumstances ------------------------------------------------- 13

   A.   Exigent Circumstances for an Arrest or Search....................................14

   B.   Hot Pursuit ..............................................................................14

   C.   A Gun is Not an Exigency ..........................................................15

   D.   Aid of Victim ............................................................................15

IV. Consent Was Lacking -------------------------------------------------- 16

V.   The Defendants' Search Was Illegal ------------------------------------ 17

VI. Heck v. Humphrey ------------------------------------------------------- 18

   A.   Heck Does Not Bar All False Arrest Claims .......................................18

   B.   Defendants Fail to Properly Raise the Heck Issue................................19

   C.   The Seizure of Prince and Corey Was Not An Arrest for OGA .........................20

   D.   Even If Guilty, a Warrantless Arrest of Prince or Corey in Their Home Would Be Unlawful ..............................................................................21

VII.    Statute Of Limitations------------------------------------------------- 21

VIII.    Respondeat Superior----------------------------------------------- 22

IX. Assault and Battery; Excessive Force ------------------------------------ 23

X.   Monell & Training ------------------------------------------------------ 23

XI. Qualified Immunity --------------------------------------------------- 23

# **Table of Authorities**

## CASES

*Brownell v. LeClaire*, 96 A.D.3d 1336, (N.Y. App. Div. 3d Dep't 2012) ........................................22

*Cotter v. Summit Sec. Servs.*, 14 A.D.3d 475 (N.Y. App. Div. 2d Dep't 2005)........................23

*Covington v. City of New York*, 171 F.3d 117 (2d Cir. N.Y. 1999) ....................................19

*Cowan v. Breen*, 352 F.3d 756 (2d Cir. Conn. 2003)........................................................8

*Estate of Adkins v. County of Nassau*, 141 A.D.2d 603 (N.Y. App. Div. 2d Dep't 1988)........................22

*Fifield v. Barrancotta*, 353 Fed. Appx. 479 (2d Cir. N.Y. 2009)......................................19

*Florida v. Bostick*, 501 U.S. 429 (1991)........................................................................8

*Georgia v. Randolph*, 547 U.S. 103 (2006)....................................................................17

*Gold v Rockville Ctr. Police Dept.*, 71 A.D.3d 632 (N.Y. App. Div. 2d Dep't 2010).....................22

*Green v. City of Mt. Vernon*, 96 F. Supp. 3d 263 (S.D.N.Y. 2015) ......................................16

*Groh v. Ramirez*, 540 U.S. 551 (2004)..........................................................10, 14, 15, 24

*Harris v. Miller*, 818 F.3d 49 (2d Cir. N.Y. 2016) ........................................................24

*Harris v. O'Hare*, 770 F.3d 224 (2d Cir. Conn. 2014)......................................................9

*Heck v. Humphrey*, 512 U.S. 477 (1994) ..........................................2, 18, 19, 20

*Kirk v. Louisiana*, 536 U.S. 635 (2002) .................................................................9, 14

*Kyllo v. United States*, 533 U.S. 27 (2001) ..............................................................10

*Loria v. Gorman*, 306 F.3d 1271 (2d Cir. 2002) ................................................9, 10, 24

*Mincey v. Arizona*, 437 U.S. 385 (1978) ....................................................................15

*Minnesota v. Olson*, 495 U.S. 91 (1990) ....................................................................14

*Payton v. New York*, 445 U.S. 573 (1980).................................................................10

*People v. Paul*, 240 A.D.2d 168 (N.Y. App. Div. 1st Dep't 1997)......................................11

*Poventud v. City of New York*, 750 F.3d 121 (2d Cir. N.Y. 2014)......................................20

*Roaden v. Ky.*, 413 U.S. 496 (1973)..........................................................................14

*Salmon v. Blesser*, 802 F.3d 249 (2d Cir. N.Y. 2015)......................................................8

*Silverman v. United States*, 365 U.S. 505 (1961) ........................................................10

*Small v. Bud-Kworldwide, Inc.*, 895 F. Supp. 2d 438 (E.D.N.Y. 2012)................................20

*Smith v. Campbell*, 782 F.3d 93 (2d Cir. N.Y. 2015)......................................................19

*Tellier v. Fields*, 280 F.3d 69 (2d Cir. N.Y. 2000) ........................................................24

*Terry v. Ohio*, 392 U.S. 1 (1968).......................................................................8, 13

*Tierney v. Davidson*, 133 F.3d 189 (2d Cir. Vt. 1998)....................................................16

*United States v. Campbell*, 581 F.2d 22 (2d Cir. 1978) ................................................14

*United States v. Hassock*, 631 F.3d 79 (2d Cir. N.Y. 2011)........................................17, 18

*United States v. Johnson*, 22 F.3d 674 (6th Cir. 1994) ................................................15

*United States v. Santana*, 427 U.S. 38 (1976) ............................................................15

*United States v. Sikut*, 488 F. Supp. 2d 291 (W.D.N.Y. 2007) ........................................16

*United States v. Simmons*, 661 F.3d 151 (2d Cir. N.Y. 2011)............................................15

*United States v. Vargas*, 376 F.3d 112 (2d Cir. 2004) ..................................................18

*Victory v. Pataki*, 814 F.3d 47 (2d Cir. N.Y. 2016) ......................................................23

*Welsh v. Wisconsin*, 466 U.S. 740 (1984) ..................................................................14

## STATUTES

C.P.L.R. § 215...............................................................................................22

C.P.L.R. § 217-a............................................................................................22

General Municipal Law § 50-i............................................................................22

General Municipal Law § 50-j............................................................................22

Penal Law § 120.00........................................................................................13

# I. Facts[1]

An unknown individual or individuals fired several shots in the vicinity of 70 West Third Street, near South Seventh Avenue. (Pl. 56.1 ¶ 69). The first call to the police relating to the incident was at 16:17 PM. (Pl. 56.1 ¶ 74). Police dispatchers received multiple calls from the public. (Def. 56.1 ¶ 17). The dispatcher reported over police radio that witnesses were "conflicting" as to who might have been involved. (Pl. 56.1 ¶ 74). Callers, officers and dispatch reports variously identified a "light skinned male black with a red hoodie [who] ran into … the building opposite 70 West Third Street;" "six males" who entered a white minivan with a broken window on Ninth Avenue; three males entering a similar vehicle; and two men with "black shirts, black jeans" who ran away from Ninth Avenue towards Seventh Avenue. (Pl. 56.1 ¶ 75). In addition, callers were "giving … different locations" of where the shots were fired. (Pl. 56.1 ¶ 76). One witness said two males that "were shooting" ran through the projects going back towards seventh avenue. (Def. Resp. 56.1 ¶ 77). At some point, "shell casings had been recovered at the location of the shooting." (Def. 56.1 ¶ 18). No-one reported seeing anyone injured. (Pl. 56.1 ¶ 78).

Police "set up a perimeter" at South 8th Avenue, to canvas for "a male black wearing a red sweatshirt." (Pl. 56.1 ¶ 82). That individual was not found. (Pl. 56.1 ¶ 83). Officers Michael Gregorio and Johanna Santos then "went on a canvas for the white van." (Pl. 56.1 ¶ 84). Twenty minutes later, the white minivan with a broken window was found, empty, in a driveway between the detached houses standing at 324 and 328

---

[1]    The plaintiffs' use of a statement from the defendants' 56.1 does not mean the plaintiffs accept the statement; each use should be considered to be taking the fact on an *arguendo* basis. The plaintiffs indicate their acceptance or dispute of facts in the responsive 56.1 statement.

South Second Avenue.  (Def. 56.1 ¶ 13; Pl. 56.1 85, 87, 89).  "Officer Gregorio reported that the minivan was "parked in the driveway of … 324 South Second Avenue."  (Pl. 56.1 ¶ 87). [2]  Supposedly, "the vehicle was still warm."  (Def. 56.1 ¶ 18).

The dispatcher reported that the registration was valid, and the car belonged to Nigeria Scott. The dispatcher reported that the address for Nigeria Scott was a PO box.  (Pl. 56.1 ¶ 93).  Sergeant Sexton arrived about five minutes after Gregorio's call, or about 27 minutes after the initial reports of shots fired.  (Pl. 56.1 ¶ 85, 94, 96).  When Sexton arrived, he took command at the scene, and remained in command until police left hours later.  (Pl. 56.1 ¶¶ 96-97, 190).   Sargent Sexton considered the individuals reported entering the van to be "suspects" in the shooting.  (Def. 56.1 ¶ 15).

Presumably, police canvassed 324 South Second, where they believed the van was parked.  The police turned their attention to 328 South Second, a three-family home. The front door of 328 South Second Avenue was closed when the police arrived.  (Pl. 56.1 ¶ 105).  It is not known how the police entered the front door.  It was normally locked, and visitors would ring a doorbell to enter.  (Pl. 56.1 ¶ 52; 108-111).  Neither the plaintiffs nor anyone else in the building gave the police permission to enter the front door.  (Pl. 56.1 ¶¶ 106-107).  The police did not know which apartment within 328 South Second Avenue might contain any person associated with the white minivan.  (Pl. 56.1 ¶ 102).  Sexton "knocked on every door" inside 328 South Second Avenue before knocking on the plaintiffs' door.  (Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 17:17-23).

---

[2]     Written reports produced after the fact give the address where the van was parked as 328 South Second Avenue (Def. Reply 56.1 ¶ 94), but the relevant question is where the police thought it was parked prior to entry, not where they knew it was parked when writing an after the fact report.  Sgt. Sexton identified Gregorio's voice on Gregorio's recorded call to the dispatcher.  (Pl. 56.1 ¶ 87 and cited evidence).

Sgt. Sexton knocked on the door of the plaintiffs' apartment on the second floor of 328 South Second Avenue.[3] Brenda Scott, whom Sexton did not know, answered the door. (Pl. 56.1 ¶¶ 115-116). The police claim Brenda told them they could enter. Brenda disputes that. (Pl. 56.1 1212-124). It is undisputed that Vaughn Scott told the police not to enter. (PL. 56.1 ¶ 123). Prince Scott, who was known to Sgt. Sexton as a member of the family and a resident of the apartment, told the police to leave. (Pl. 56.1 ¶ 128, 131-132; Def. 56.1 ¶ 25).

There is ample undisputed testimony that multiple residents of the apartment told the police they could not enter and should leave. Indeed, Defendant Sexton testified that "all" the occupants of the apartment were "getting loud as far as – you know, 'Get out. Get out of here." (Pl. 56.1 ¶ 142). The defendant police officers knew that the occupants of the apartment did not want them inside the apartment, and did not give permission for the police to enter or remain. (Pl. 56.1 ¶¶ 146-147). Once they entered, the defendant police officers knew that the occupants of the apartment wanted them to leave. (Pl. 56.1 148).

Sexton entered, followed by Detective Antonini. (Pl. 56.1 ¶ 151) Sexton, in pushing the door open to enter, struck Brenda Scott's foot with the door. (Pl. 56.1 ¶ 150). Defendant Briley entered the apartment as well. (Pl. 56.1 133-140). Up to a dozen officers entered the apartment.

Once the police entered the apartment, all occupants of the apartment were seized. (Pl. 56.1 155). It is undisputed that the occupants of the apartment were not free to leave. (Pl. 56.1 ¶ 156). Defendant Sexton made all occupants of the apartment come into the

---

[3]    When Sexton uses the word "gang," he does not mean a criminal enterprise. He means: "A group of people working together for a negative impact on society." He explained that his use of the word "covers criminal and noncriminal" activities. (Sexton Tr., Ex. J to 4/816 Thompson Decl., 31:18-25).

living room and wait there. The occupants were not free to leave the living room or move around the apartment. (Pl. 56.1 ¶ 168). The occupants were required to ask permission to use the bathroom, and were accompanied by an officer when doing so. (Pl. 56.1 ¶ 169). The police told the occupants of the apartment that if they talked they would be arrested. (Pl. 65.1 ¶ 172).

Once inside the apartment, the police searched the house. (Pl. 56.1 ¶ 157-160, 163). The police looked in the entire apartment, including the bathroom, bedrooms, and closets. (Pl. 56.1 ¶ 158). The police took everything out of the medicine cabinet and put it in the sink. (Pl. 56.1 ¶ 160). According to the defendants, "Sexton conducted a limited search for weapons." (Def. 56.1 ¶ 33). In deposition, Sexton claimed they were searching for "any victims." (Pl. 56.1 ¶ 165). It is undisputed that Defendant Sexton had no specific information suggesting that victims of the shooting were to be found inside the apartment. (Pl. 56.1 ¶ 167). In their search, the police found no weapons or contraband. (Pl. 56.1 ¶ 166).

The police stayed in the apartment for about four hours. (Pl. 56.1 ¶¶ 85, 94-95, 173, 188).

The police searched Corey Marrow, Julian Rene, Prince Scott, Kraig Utley, And Andre Harris. (Pl. 561. ¶¶ 219, 222, 225, 226, 234). Defendant Antonini bent Corey Marrow's hand back and confiscated his cell phone, to prevent Mr. Marrow from filming the police. (Pl. 56.1 ¶ 218). After threatening to "choke out" Kraig Utley, Antonini and handcuffed Kraig, and he remained in handcuffs for approximately three hours and fifteen minutes. (Pl. 56.1 ¶ 233). At approximately 8:30 PM, police learned that Julian Rene had been grazed by a bullet in the shooting incident. (Pl. 56.1 ¶ 174-176). This

was the first time that Sgt. Sexton learned that anyone in the apartment has been in the area of the reported shooting. (Pl. 56.1 ¶ 177). Julian Rene told Defendant Sexton that someone unknown to him had "opened fire" and a bullet grazed him. (Pl. 56.1 ¶ 178). Sgt. Sexton knew that the injury was minor – the bullet has just "grazed" Julian's buttock. (Pl. 56.1 ¶¶ 176-179). Although the police called an ambulance, Julian refused police assistance and medical treatment. (Pl. 56.1 ¶ 179; Def. 56.1 ¶ 154). The ambulance went away, and the police continued to hold Julian captive, giving no further thought to his injury.

Despite knowing that the apartment contained no perpetrator, and only a victim who neither needed nor wanted assistance, the police remained inside the apartment waiting to see if they could obtain a warrant to search the apartment. (56.1 ¶ 181). Sexton wanted to search for a firearm. (Pl. 56.1 ¶ 182). At this point, Defendant Sexton's reason for believing that a firearm might be present in the apartment was that "the group of individuals … [were] known for weapons possession … or violent acts." (Pl. 56.1 ¶ 183). No concrete evidence to support these allegations has been provided. At the time, Sexton did not know whether any of the individuals present in the apartment had ever been either arrested for or convicted of a shooting offense. (Pl. 56.1 ¶ 185). Defendant Sexton did not know what the charges were for which any person present in the apartment had ever previously been arrested. (Pl. 561. ¶ 186).

Vaughn Scott, who was originally inside the apartment, was forced to leave her apartment and stand outside on the porch. (Pl. 56.1 ¶ 205). No reason for this has been given. She was guarded by two officers, one of whom was Officer Gamble. She was told she could not leave the porch, or go back inside. (Pl. 56.1 ¶¶ 210-212). During the

police occupation, Vaughn was kept captive on the porch for about two hours. The rest of the time, she was kept captive in the apartment. (Pl. 56.1 ¶¶ 207-215).

Nigeria Scott was held captive outside the house on the sidewalk. She arrived to sign a "consent" form allowing police to search the van, which was hers. (Pl. 56.1 ¶¶ 193-198). Police told Nigeria Scott that if she did not sign the consent, the vehicle would be confiscated, and Nigeria feared the police would never leave unless she signed. (Pl. 56.1 ¶¶ 195-198). Nigeria She was made to stand for a period of time on the porch of 328 South Second Avenue. (Pl. 56.1 ¶ 203). Police then told her to get off the porch and leave her own property, and she had to wait on the sidewalk while sidewalk for hours while the police occupied her apartment. (Pl. 56.1 ¶ 206).

From the police perspective, "None of the occupants at 328 South 2nd Ave. were arrested on March 20, 2013." (Def. 56.1 ¶ 42). They were seized, without process, and held for hours, for some other purpose.

## II. Argument

Without a warrant, the police held an entire family hostage for more than four hours. No one had committed a crime, no arrests were made, and no weapons or contraband were found. Anyone who believes in Constitutional democracy should be horrified. If the Fourth Amendment has any meaning, this Court's judgment must be for the plaintiffs.

### A. Summary

Throughout this case, the defendants have been repeating over and over that "exigent circumstances" justified the entry of the police into the home, and their subsequent conduct. The reason for the entry was, they say, to look for a suspect, or a victim, or a gun. The search inside was a "protective sweep." They also claim (over her

denial) that Brenda Scott gave consent for their entry.  None of these arguments hold water, as will be fully explained below.

## B.  What The Defendants Are Claiming

When a dozen police officers enter a home and hold three generations of a family hostage, they need a compelling reason backed up by objective evidence.  Instead, the defendants have this:

> "[T]he officers entered plaintiff's residence without a warrant in furtherance of their criminal investigation."  (Docket No. 40 p. 12).  "Without a warrant to search or arrest but with substantial reason to believe that suspects of a recent shooting were inside the premises, the defendant officers entered the apartment and began to undertake a limited protective search for a weapon that the officers believed was involved in the prior shooting. The search was made based on the officer's reasonable belief that suspects were inside the premises, and that victims may have also been inside the apartment that required emergency treatment. The defendants had a reasonable belief that there was an imminent threat to the occupants which required immediate action."  (Docket No. 40 pp. 13-14).

Instead of one compelling reason, the defendants have a handful of half-baked reasons, none of which meet the clearly-established Constitutional standards.  Importantly, the defendants admit there was no probable cause to arrest.  Point 1(d) of their memorandum of law states:  "the search for weapons in the absence of probable cause to arrest was circumscribed by the exigencies…" (Def. Mem. of Law, p. 14).

## C.  There Was an Actionable Seizure

The defendants state that the plaintiffs were not arrested, as if that means that they have no cause of action.  It is certainly true that the plaintiffs were not **_formally_** arrested.  But it is not true that without a formal arrest, a person has no actionable claim under section 1983 for violation of constitutional rights.  A formal arrest is just one kind of Fourth Amendment seizure.

In <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), the Supreme Court ruled that a person is seized "when [an] officer, by means of physical force or show of authority, . . . in some way restrain[s] the liberty of a citizen." *Id.* at 19. *See also Cowan v. Breen*, 352 F.3d 756, 763-764 (2d Cir. Conn. 2003) ("[A] Fourth Amendment seizure occurs 'when there is a governmental termination of freedom of movement through means intentionally applied.'"). Often, whether or not a person has been seized is determined by asking whether the person was "free to leave." If not, then the person was seized. However, that is not the only test. "As the Supreme Court has recognized, the 'free to leave' test may not be the best measure of a seizure where a person has no desire to leave the location of a challenged police encounter." *Salmon v. Blesser*, 802 F.3d 249, 253 (2d Cir. N.Y. 2015) (citing *Florida v. Bostick*, 501 U.S. 429, 434-36 (1991)). In such circumstances, the Supreme Court "framed the seizure inquiry as 'whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *Salmon*, 802 F.3d at 253 (quoting *Bostick*, 501 U.S. at 436). Either test might apply in this case, where the plaintiffs were not free to leave their home, but also might not wish to leave their home to terminate a police encounter.

Any Fourth Amendment seizure that lacks justification can be the basis for a Constitutional tort under Section 1983. *See Salmon,* 802 F.3d at 254 (approving claim for unlawful Fourth Amendment seizure that was not an arrest).

In this case, each of the plaintiffs was seized. Except for Vaughn Scott, the plaintiffs in the apartment were forced to remain in the apartment. Indeed, they were not allowed to leave the living room. Vaughn Scott, whether held inside the apartment or on the porch, was not free to leave, nor "free to decline the officers' requests or otherwise

terminate the encounter."  Nigeria Scott, held on the sidewalk, similarly was not free to decline or terminate.

Each of the plaintiffs except Nigeria Scott was seized, at least initially, inside the home.  In that sacrosanct domain, all Fourth Amendment activity, be it a search or seizure, must be supported by probable cause.  "[P]olice officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home." *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002).  *Accord Harris v. O'Hare*, 770 F.3d 224, 231-232 (2d Cir. Conn. 2014).  Whether probable cause or reasonable suspicion were to be applied to Nigeria's seizure outside, the total absence of any facts connecting Nigeria – even speculatively – to a crime means that whichever standard were applied, lawful justification was lacking.

### D.  There Was No Probable Cause For Entry, Arrest or Search

The defendants admit there was no probable cause to arrest.  Point 1(d) of their memorandum of law states:  "the search for weapons in the absence of probable cause to arrest was circumscribed by the exigencies…" (Def. Mem. of Law, p. 14).  Even without that admission, the plaintiffs have shown there was no probable cause for entry, arrest, or search.

For police to enter a home without consent, there must first of all be probable cause (and secondly, either a warrant or exigent circumstances).  *See Kirk*, 536 U.S. at 638; *Loria v. Gorman*, 306 F.3d 1271, 1283 (2d Cir. 2002).  Based on witness reports about the shooting, there was no probable cause to believe any of the plaintiffs had committed a crime.  For similar reasons, there was no probable cause to believe a weapon was present inside the premises.

"Because the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion stands at the very core of the Fourth Amendment, our cases have firmly established the basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. Thus, absent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional **even when a felony has been committed** and there is probable cause to believe that incriminating evidence will be found within." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quotations omitted) (emphasis added).[4] "No reasonable officer could claim to be unaware of the basic rule." *Id.* at 564. *Accord Loria*, 306 F.3d at 1286 ("no reasonable officer" could believe that "taking two steps into the house . . . did **not** constitute a Fourth Amendment entry," requiring either a warrant or probable cause plus exigent circumstances) (emphasis added).

Witnesses to the shooting described multiple people running from the area. None of these people were described more precisely than "young black male," with the color of the clothing worn (black, red). The one witness that claimed to know who was shooting said the shooter ran through the projects towards South Seventh Avenue (that is, in the opposite direction from the white van on South Ninth Avenue). (Def. Resp. 56.1 ¶ 77).

On these facts, there was no probable cause to arrest the young black men seen getting in the van. Consider an illustrative New York State criminal case: "**Seconds** after hearing numerous gunshots, the officers observed defendant and his codefendant, the **only** persons present, running from the location of the shots, while the codefendant was carrying an object under his coat, and, upon seeing the officers, they suddenly veered

---

[4]     (citing *Kyllo v. United States*, 533 U.S. 27, 31 (2001); *Silverman v. United States*, 365 U.S. 505, 511 (1961); *Payton v. New York*, 445 U.S. 573, 586 (1980)).

further into a park." *People v. Paul*, 240 A.D.2d 168 (N.Y. App. Div. 1st Dep't 1997)

On these facts, the First Department found, there was "**reasonable suspicion** to detain." "In the ensuing frisk, the officers recovered a ski mask and a rubber glove from the codefendant, and discovered that both men were wearing two sets of clothing on a warm night." *Id.* The police held the two individuals for a "brief investigatory detention [which] was limited and necessary to enable the police to quickly confirm or dispel their suspicions." *Id.* "**Three minutes later, the police discovered a pistol, warm from recent firing**, which had been abandoned a short distance away. **This** raised the level of suspicion to probable cause for arrest." *Id.* (emphasis added throughout).

If the police had stopped the white van **as it drove away** from the scene of the shooting, they would **not** have had probable cause to make an arrest. There was more than one young black man in the car. There was no gun. One witness said the shooter ran in the opposite direction. (Def. Resp. 56.1 ¶ 77). No witness said the shooter got in the white van. At the scene, the police would have had reasonable suspicion to stop and enquire, but not probable cause for arrest. Twenty minutes later, when the police found the white van empty, far from the scene, there was no way police would be able to connect any particular "young black man" they might encounter with the "young black men" seen getting into the van 20 minutes before. Had the plaintiffs been standing in the yard of 328 South Second when the police arrived, there would not have been probable cause to arrest them.

The police initially thought the van was parked at 324 South Second. (Pl. 56.1 85, 94). Without knowledge of a connection between the white van and any particular apartment in 328 South Second, as they stood outside they had no cause to believe that

anyone connected to the van was inside the plaintiffs' apartment on the second floor. Whatever strands connected the white van to the earlier incident terminated there.

The police began canvassing door to door. Somehow they got past the locked front door to 328 South Second Avenue, and Sexton "knocked on every door" inside before knocking on the plaintiffs' door. (Sexton Tr., Ex. J to 4/8/16 Thompson Decl., 17:17-23). He knocked, and Brenda Scott opened the door.

Non-party Officer Gregorio wrote in his report that – once the door of the plaintiffs' apartment was opened – he could see Prince and Corey "sweating profusely and breathing rapidly." (Def. Resp. 56.1 ¶ 101). The implication of this allegation is supposed to be that the young men had been running, providing reason to believe that these were the same young men who ran to the white van. However, it is undisputed that this encounter occurred at least 27 minutes after the shooting. (Pl. 56.1 ¶ 85, 94, 96). Even a middle aged man such as I am will return to normal breathing after a run in less than ten minutes. No reasonable officer would believe that athletic young men would still be breathless half an hour after a short sprint of approximately two blocks.[5] The sweating/breathing allegation is self-evidently pure invention on the part of the officer, but even if not, a reasonable officer would know that a young man's heavy breathing at 6:45 or 7:00 PM would have no connection to a short burst of activity at 6:15 PM.[6]

At some point after Brenda opened the door, the officers learned that the registered owner of the van, Nigeria Scott, lived there. The police still had no way to

---

[5]    The shooting was reported as occurring somewhere in the vicinity of Seventh Avenue and West Third when the shooting occurred. (Pl. 56.1 ¶ 69). The white van was reported being seen on Ninth Avenue. (Pl. 56.1 ¶ 76). Police knew that whoever got in the van had run no more than about two blocks.

[6]    When one recalls that Corey **drove** the van – a sedentary activity – the suspicion that this neat allegation was invented becomes certainty. Police have learned to invent facts like this, which are usually unverifiable after the fact, relying on the fact that courts very rarely call them out on testimony that it too well-tailored to be true. And so perjury has become a fundamental tool of modern policing, as much so as are the nightstick and the gun.

connect any of the several young black men in the apartment with the ones seen entering the van. The police would have no way of obtaining this information, unless one of the occupants of the apartment told them. It is undisputed that the police did not learn that anyone in the apartment had been near the scene of the shooting until Julian Rene told them, after the police had been there for about two hours. (Pl. 56.1 ¶ 14).

All this adds up to an obvious and total lack of probable cause to arrest anyone in the apartment for any crime related to the shooting. The defendants suggest in conclusory terms that probable cause existed for arrest on the charge of "assault with a deadly weapon." (Def. Resp. 56.1 ¶ 5).[7] But the defendants have said nothing about **whom** they had probable cause to arrest. Probable cause doesn't hang in the air like smoke, it exists only in reference to a particular person, when the police have objective information showing that the particular person probably committed a particular crime.

For the same reason there was no probable cause to believe anyone in the apartment was the shooter, there was no reason to believe anyone in the apartment had a gun. There was no basis for entry for the purpose of searching for a weapon.

## III. Exigent Circumstances

The phrase "exigent circumstances" is not a magic wand. It takes more than catchphrases to justify any intrusion under the Fourth Amendment: "In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. The facts must establish that there was an

---

[7] For all degrees of assault, incidentally, require some form of injury to the victim as an element of the crime. See Penal Law § 120.00 (assault in the third degree). When the police entered the plaintiffs' apartment, there was no known victim.

"emergency or dangerous situation, described in our cases as 'exigent circumstances,' that would justify a warrantless entry into a home for the purpose of either arrest or search." *Minnesota v. Olson*, 495 U.S. 91, 100 (1990). In their brief, the defendants quote an earlier Supreme Court opinion, describing exigent circumstances as those in which "police action must literally be 'now or never' to preserve evidence of the crime, it is reasonable to permit action, without prior evaluation." *Roaden v. Ky.*, 413 U.S. 496, 505 (1973). The "now or never" element of urgency is completely lacking in this case.

## A. Exigent Circumstances for an Arrest or Search

For an arrest or search in the home, probable cause is required. Exigent circumstances can substitute for a warrant, but cannot do away with the necessity for probable cause. *See Kirk*, 536 U.S. at 638 ("police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home."). Uttering the phrase "exigent circumstances" does not change the fact that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004).

For an arrest, exigent circumstances can justify warrantless entry into the home only to arrest for "major felonies," and only if there are "identifiable exigencies, **independent of the gravity of the offense**, exist[ing] at the time of arrest." *Welsh v. Wisconsin*, 466 U.S. 740, 752 (1984) (citing *United States v. Campbell*, 581 F.2d 22 (2d Cir. 1978) (emphasis added). "[N]o exigency is created simply because there is probable cause to believe that a serious crime has been committed. *Welsh*, 466 U.S. at 753 (1984).

## B. Hot Pursuit

One kind of exigent circumstance is "hot pursuit." Hot pursuit is the "immediate or continuous pursuit of the [individual] from the scene of a crime*." Welsh*, 466 U.S. at

753.  The rationale for the hot pursuit doctrine is that a suspect should not be able "to defeat an arrest which has been set in motion in a public place … by the expedient of escaping to a private place." *United States v. Santana*, 427 U.S. 38, 43 (1976).  In this case, there was no probable cause for an arrest.  There was no pursuit from the scene.  At least 27 minutes separated the shooting from the Sgt. Sexton's arrival at "324 South Second Avenue" in response to Officer Gregorio's call that the van was parked there. (Pl. 56.1 ¶¶ 85, 87, 94-95).  At this point, the police were "canvassing," and conducting an investigation.  (Pl. 56.1 82, 84).  Canvassing is not pursuit.  Investigation is not exigency.  Neither mechanical application of the hot pursuit doctrine, nor thoughtful consideration of the rationale, could lead a reasonable person to believe it was applicable in this case.

### C.  A Gun is Not an Exigency

Probable cause for belief of the presence of a firearm does not, on its own, create urgency. *See United States v. Simmons,* 661 F.3d 151, 157 (2d Cir. N.Y. 2011) ("Of course, absent such an urgency, the gun alone did not justify the officers' search of the bedroom."); *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994) ("The mere presence of firearms does not create exigent circumstances.").  *See also Groh*, 540 U.S. at 559 ("absent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within.")

### D.  Aid of Victim

Police may enter a home without a warrant when the "they reasonably believe that a person within is in need of immediate aid."  *Mincey v. Arizona*, 437 U.S. 385, 392 (1978).  This is an objective standard.  *See Tierney v. Davidson*, 133 F.3d 189, 196 (2d

Cir. Vt. 1998). When police enter to render emergency aid, "the officers' authority to remain on the premises without a warrant end[s} when they determine[] no one in the apartment require[s] assistance." *United States v. Sikut*, 488 F. Supp. 2d 291, 313 (W.D.N.Y. 2007). *Accord Green v. City of Mt. Vernon*, 96 F. Supp. 3d 263, 293 (S.D.N.Y. 2015) (Karas, J.). Where police fail to leave upon learning that their presence is not privileged, they become trespassers. *See id.*

At the time they entered 238 South Second, the police had no evidence that an injured person was inside. The possibility that there was any victim to the shooting, anywhere, was merely speculative.[8] The possibility that the victim was inside the second floor apartment of 328 South Second Avenue was even more speculative. When the police first entered, they saw nothing indicating anyone was injured – let alone seriously injured. Their authority to remain – if it ever existed – terminated. But they remained. The police were inside the apartment for almost two hours before they learned that Julian Rene had been injured. (Pl. 56.1 ¶¶ 175-179). They learned, at the same moment, that the injury was minor and did not require assistance. (Pl. 56.1 ¶¶ 175-179). The injury provided no basis to remain. However, the police remained inside the apartment waiting to see if they could obtain a search warrant, because Defendant Sexton wanted to search for a firearm. (Pl. 56.1 ¶¶ 181-182).

## IV.    Consent Was Lacking

---

[8]         The sole evidence that any police officer had knowledge that there was a victim of the shooting is deposition testimony given by Officer Briley. Briley testified that he heard over the police radio that a person had been shot and that the injured person had been "placed inside the vehicle and left the scene." (Pl. Responsive 56.1 ¶¶ 62-63). Briley testified that the radio transmission would normally be recorded. The defendants agreed on the record to produce the recording. *Id.* While the defendants produced recordings, no recorded message produced by the defendants matches Briley's testimony. *Id.* (No written record documents that such a call was made). Briley testified that the radio messages had been the **sole** source of his knowledge. *Id.* Thus, where the radio messages contradict his testimony, the testimony is discredited and should be excluded from consideration. It is likely that Briley misremembered based on what he learned after entry into the home; but it is police knowledge before entry that is legally significant.

The defendants have not disputed that consent to enter must be unanimous among those present authorized to give or withhold consent. *Georgia v. Randolph*, 547 U.S. 103, 114-115 (2006). It is the duty of the officers relying on consent to "ascertain[] the … authority to consent." *United States v. Hassock*, 631 F.3d 79, 88-89 (2d Cir. N.Y. 2011). It is undisputed that several occupants of the apartment told the police they did not have consent to enter.[9]

## V. The Defendants' Search Was Illegal

The defendants do not dispute that they searched the home, but they call the search a "limited search for weapons," which in their memorandum they call a "limited protective search for a weapon" (Def. Memo. p. 13; Def. 56.1 ¶ 33). The defendants contend that the search was justified under the doctrine that allows police (lawfully) present in a home to do a "protective sweep," under certain circumstances. Inside a home, however, a "protective sweep" is a limited search for **people** – there is no such thing as a "protective sweep" to search for weapons.

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). "The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the

---

[9] It is undisputed that Sexton knew Prince Scott was a resident, and therefore someone authorized to withhold consent. (Pl. 56.1 116, 128-131). It's undisputed that Prince told the Sexton and the police to leave. (Pl. 56.1 116, 129-132). Vaughn Scott told the police they could not come in. (Pl. 56.1 ¶ 123). Police testimony colorfully portrays a consistent, loud curse-laden chorus of apartment residents telling the police they were not welcome. (Pl. 56.1 ¶¶ 122-148). Indeed, it is undisputed that: "The defendant police officers knew that the occupants of the apartment did not want them inside the apartment, and did not give permission for the police to enter." (Pl. 56.1 ¶ 146). While there is dispute concerning whether Brenda consented to entry, there is no dispute that consent was **not unanimous**. The plaintiffs prevail on this issue as a matter of law.

searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *United States v. Hassock*, 631 F.3d 79, 85 (2d Cir. N.Y. 2011) (quoting *Buie*, 494 U.S. at 325).

To emphasize: unlike the doctrine applicable to vehicles, a protective sweep of a home is limited to a visual inspection for **concealed human beings**. "Where officers cannot supply specific and articulable facts warranting a reasonably prudent officer to believe that an individual posing a danger is lurking in an area to be swept, we have found lacking an essential element necessary to justify a search under the protective sweep doctrine as defined in <u>Buie</u>." *See Hassock*, 631 F.3d at 86 (citing *United States v. Vargas*, 376 F.3d 112, 117 (2d Cir. 2004)). By their own admission, the defendants' "protective sweep" was an unlawful search for weapons.

## VI. Heck v. Humphrey

The defendants argue that the claims of Prince Scott and Corey Marrow are barred under the doctrine of <u>Heck v. Humphrey</u>. Under the Supreme Court's ruling in Heck, a plaintiff seeking relief under § 1983 for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid . . . must prove" that the conviction has been reversed, expunged, declared invalid, or called into question by a writ of habeas corpus. *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). If a judgment in favor of the § 1983 plaintiff "would necessarily imply the invalidity of his conviction . . . the complaint must be dismissed." *Id.* at 487.

### A. Heck Does Not Bar All False Arrest Claims

It is not the case, however, that <u>Heck</u> precludes all false arrest claims where the plaintiff was convicted of the offense for which he was arrested. In some cases, "a

plaintiff can wage a successful wrongful arrest claim and still have a perfectly valid conviction." *Covington v. City of New York*, 171 F.3d 117, 123 (2d Cir. N.Y. 1999). *Accord Fifield v. Barrancotta,* 353 Fed. Appx. 479, 481 (2d Cir. N.Y. 2009) ("a finding that an arrest was made without probable cause … would not necessarily call into question the validity of a plaintiff's eventual conviction"). A false arrest claim may survive conviction, for example, "if there were independent evidence upon which a conviction could be obtained that was not in any way tainted by the unlawful arrest." *Covington*, 171 F.3d at 123. Because Heck is a kind of collateral estoppel, it acts as a bar only where the identical issues which provided cause for the arrest were litigated and decision in the criminal court judgment. *See Toliver v. City of New York*, 2012 U.S. Dist. LEXIS 187196, 21-22 (S.D.N.Y. Dec. 10, 2012).

There are many other kinds of claims that Heck does not apply to: "Not every § 1983 claim that arises out of a criminal case requires that the underlying criminal process reach a favorable termination. [M]any violations of constitutional rights, even during the criminal process, may be remedied without impugning the validity of a conviction." *Smith v. Campbell*, 782 F.3d 93, 101 (2d Cir. N.Y. 2015). The defendants have not shown that Heck applies to a non-arrest Fourth Amendment seizure.

**B. Defendants Fail to Properly Raise the Heck Issue**

The defendants' Heck defense must be ultimately based on factual allegations. Such allegations must be set forth in a 56.1 statement to be placed properly before the Court. The sole basis for this defense is in the memorandum of law: there is nothing in the defendants' 56.1 The factual allegations in a memorandum of law[10] are not properly

---

[10]     On page 21 of the defendants memorandum of law, defendants state: "Corey Marrow and Prince Scott were lawfully arrest on March 25, 2013, and both were charged with one count of the Offense of

before the Court, and the plaintiffs are not required to respond to them.  The defendants' memo references an "Exhibit R" which supposedly shows that Prince and Corey pled guilty.  There is no Exhibit R on the docket.  The sole evidence presented is a misdemeanor information (Def. Ex. Q).

To prove <u>Heck</u> defense based on a plea, it is necessary to prove that the plaintiff, in his allocution, admitted to a charge or to facts that are inconsistent with the claim.  Thus, where multiple charges are dismissed on a plea, it matters what particular charge and facts the plaintiff pled to.  The allocution is always recorded on the record: Criminal Procedure Law section 340.20 provides that a plea "must be entered orally by the defendant in person."  Thus, to determine whether the plaintiff pled guilty to any particular charge, the Court must look at one thing and one thing only: what the defendant himself said orally on the record when the criminal proceedings at issue were terminated.  *See Poventud v. City of New York*, 750 F.3d 121, 137 (2d Cir. N.Y. 2014) (holding that plaintiff's allocution of guilt to a particular charge was **not** inconsistent with his claim of a <u>Brady</u> violation).[11]  See *also Small v. Bud-Kworldwide, Inc.*, 895 F. Supp. 2d 438 (E.D.N.Y. 2012) (comparing terms of plaintiff's allocution to the civil claims asserted, and finding no conflict and therefore no <u>Heck</u> bar).  The defendants have not met this burden.

**C.  The Seizure of Prince and Corey Was Not An Arrest for OGA**

---

Obstruction of Governmental Administration in the 2nd Degree in accordance with Penal Law Section 195.05 stemming from the March 23,2016, incident."  Police were in the plaintiffs' home on March 20th.

[11]      In <u>Poventud</u>, the Second Circuit examined whether any "element" of the plaintiff's § 1983 claim required the plaintiff to prove the negative of any fact stated by the plaintiff in his allocution.  "[I]f it did, his claim would be Heck-barred," but since there was no conflict between the civil claim and the allocated facts, "Heck's core concern of finality would not be undercut" by the plaintiff's success in his civil claim. *Id.* at 138.

The defendants state as an indisputable fact: "None of the occupants at 328 South 2n Ave. were arrested on March 20, 2013." (Def. 56.1 ¶ 42). This is certainly true, in that the plaintiffs were not taken into custody to be charged with any crime. They were held captive while police searched for weapons and tried to get a search warrant. The arrests of Prince and Corey for OGA occurred several days later. Since the plaintiffs' captivity on March 20, 2013 captivity had nothing to do with the plaintiffs' OGA charges, the plaintiffs can prevail on their Fourth Amendment seizure claim without "calling into question" any conviction for OGA.

### D. Even If Guilty, a Warrantless Arrest of Prince or Corey in Their Home Would Be Unlawful

Even if it were proven that Prince and Corey both pled guilty to OGA, this would not prevent the defendants from bringing these claims. "[C]ourts have permitted warrantless home arrests for **major felonies** if identifiable exigencies, independent of the gravity of the offense, existed at the time of the arrest." *Welsh v. Wisconsin*, 466 U.S. 740, 752 (1984) (emphasis added). OGA is a misdemeanor. There was neither a warrant nor exigent circumstances. Even if guilty of OGA, the defendants could not arrest Corey and Prince in their home without a warrant. Thus, even if the time that Prince and Corey were held captive on March 20th were deemed part of an arrest for OGA (contrary to defendants' statement that it was not), a verdict for the plaintiffs would not "invalidate" a conviction on the charge of OGA. It can be true both that Prince and Corey were 'guilty' of OGA, **and** that the seizure of Prince and Corey in their home was unlawful because a warrant and exigent circumstances were lacking.

## VII. Statute Of Limitations

Claims against municipalities and their employees are subject to a statute of limitations which is one year and ninety days, pursuant to General Municipal Law § 50-i. "Personal injury claims against a municipal defendant must be commenced within a year and 90 days from when they accrued." *Brownell v. LeClaire*, 96 A.D.3d 1336, 1337 (N.Y. App. Div. 3d Dep't 2012) (citing General Municipal Law § 50-i(1)). The statute expressly superseded contrary provisions elsewhere, stating that it "shall be applicable notwithstanding any inconsistent provisions of law, general, special or local." (General Municipal Law § 50-i (2)). The "one year and 90 days as provided in General Municipal Law § 50-I …. takes precedence over the one-year period of limitations provided for in CPLR 215." *Estate of Adkins v. County of Nassau*, 141 A.D.2d 603 (N.Y. App. Div. 2d Dep't 1988).

The year-and-ninety limitations period applies to false arrest claims against police officers. *See Gold v Rockville Ctr. Police Dept.*, 71 A.D.3d 632, 633 (N.Y. App. Div. 2d Dep't 2010). In <u>Gold,</u> the plaintiff filed his complaint one year, two months and several days after his arrest. The Appellate Division affirmed denial of a motion to dismiss the claims against the municipality and police detectives, noting that the claims were timely filed "within the one-year and 90-day statute of limitations period." *Id.* (citing Gen. Mun. Law § 50-i(1)(c)). If it were not this statute, then it would be C.P.L.R. § 217-a, which also provides for one year and ninety days.

Even if claims against the individual officers were untimely, pursuant to the General Municipal Law, the City of Mount Vernon "shall be liable for" the acts of any of its officers. *See* General Municipal Law § 50-j.

## VIII. Respondeat Superior

Pursuant to the General Municipal Law, the City of Mount Vernon "shall be liable for" the acts of any of its officers. *See* NY Gen Mun § 50-j. The proven conduct of the officers, both defendant and non-party, is plainly wrongful and caused compensable harm, as stated elsewhere herein.

## IX.    Assault and Battery; Excessive Force

To state a claim for assault, "there must be proof of physical conduct placing the plaintiff in imminent apprehension of harmful contact." *Cotter v. Summit Sec. Servs.*, 14 A.D.3d 475 (N.Y. App. Div. 2d Dep't 2005). Each of the plaintiffs, in particular Kraig Utley, Brenda Scott, Corey Marrow, and Julian Rene, have made this showing. "To recover damages for battery, a plaintiff must prove that there was bodily contact, made with intent, and offensive in nature." *Id.* Several plaintiffs have alleged offensive bodily contact: Kraig Utley, Brenda Scott, Corey Marrow, Andre Harris, Prince Scott, and Julian Rene (Pl. 56.1 ¶¶ 150, 218-219, 222-223, 225, 226-234). Under the circumstances of this case, all force was excessive.

## X. Monell & Training

The defendants state in a conclusory fashion in their memorandum of law that the plaintiffs have not shown evidence for certain claims. In summary judgment, "the burden [is] on the moving party to demonstrate the absence of any material fact genuinely in dispute." *Victory v. Pataki*, 814 F.3d 47, 58-59 (2d Cir. N.Y. 2016). A sentence in a memorandum of law does not meet that burden. To rule otherwise would be, in essence, to reverse the burden on the motion.

## XI.    Qualified Immunity

Qualified immunity is an affirmative defense that may be waived if … defendants fail[] to move for summary judgment on this defense, even if… the defendants asserted the defense in their answer." *Harris v. Miller*, 818 F.3d 49 (2d Cir. N.Y. 2016). Accordingly, the defendants must be deemed to have waived the defense except insofar as it is stated in this motion. The defendants bear the "burden of demonstrating the nonexistence of a clearly established right or that it was reasonable, as a matter of law, for defendants to take the actions that … they took." *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. N.Y. 2000). The defendants make no effort to show that the law was not clearly established. They have waived such arguments.[12] The defendants' conclusory argument relies on a single fact: "occupants of the Plaintiff's residence were involved" in a shooting. The defendants have waived any other factual basis for this defense. The lone fact cited does not support the defense: police learned that individuals inside the apartment were present at the shooting **after** they entered; and they simultaneously learned that the involvement was as a victim with a graze injury requiring no treatment. (Pl. 56.1 ¶¶ 177-181). In any case, mere "involvement" could never justify warrantless entry into a home: only probable cause to arrest for a major felony, plus a warrant or exigent circumstances could do so.

Dated: New York, N.Y.

June 10, 2016

_____//s//_____
David Thompson [dt3991]
Stecklow & Thompson
217 Centre Street, 6th Floor
New York, NY 10013

---

[12] Even if not waived, the argument could not succeed. See *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quotations and citations omitted).[12] "No reasonable officer could claim to be unaware of the basic rule." *Id.* at 564. *Accord Loria v. Gorman*, 306 F.3d 1271, 1286 (2d Cir. 2002).

Phone:  (212) 566-8000
Fax:       (212) 202-4952
Email: dave@sctlaw.nyc