UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VAUGHN SCOTT; NIGERIA SCOTT;
PRINCE SCOTT; ANDRE HARRIS;
BRENDA SCOTT; KRAIG UTLEY;
COREY MARROW; A.S., a minor child;
K.M., a minor child; JULIAN RENE,

                                    Plaintiffs,

        v.

THE CITY OF MOUNT VERNON, a
municipal entity; POLICE OFFICER
ALLEN, Mt. Vernon; POLICE OFFICER
CAMILO ANTONINI, Mt. Vernon; POLICE
OFFICER TIMOTHY BRILEY, Mt. Vernon;
DET. BRENT GAMBLE, Mt. Vernon Police
officer; SGT. STEVEN SEXTON, Mt.
Vernon Police officer; CITY OF MT.
VERNON POLICE DEPARTMENT;
POLICE OFFICERS JOHN DOES, 1–10,

                                    Defendants.

---

No. 14-CV-4441 (KMK)

OPINION & ORDER

Appearances:

David A. Thompson, Esq.
Stecklow Cohen & Thompson
New York, NY
*Counsel for Plaintiffs*

Paul J. Sweeney, Esq.
Coughlin & Gerhart, LLP
Binghamton, NY
*Counsel for Defendants*

Tichina L. Johnson, Esq.
City of Mount Vernon, NY Department of Law
Mount Vernon, NY
*Counsel for Defendants*

Welton K. Wisham, Esq.
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Plaintiffs Vaughn Scott, Nigeria Scott, Prince Scott, Andre Harris, Brenda Scott, Kraig Utley, Corey Marrow, A.S. (a minor), K.M. (a minor), and Julian Rene (collectively, "Plaintiffs") filed this suit against Defendants the City of Mount Vernon, Mount Vernon Police Officer Allison Allen, Mount Vernon Police Officer Camilo Antonini, Mount Vernon Police Officer Timothy Briley, Mount Vernon Police Detective Brent Gamble, Mount Vernon Police Sergeant Steven Sexton, the City of Mount Vernon Police Department, and Police Officers John Does 1–10 (collectively, "Defendants"), pursuant to 42 U.S.C. § 1983 and state law, alleging violations of their First, Fourth, Fifth, and Fourteenth Amendment rights, as well as alleging claims for assault and battery, negligence, and respondeat superior. (*See* Compl. (Dkt. No. 1).) Before the Court are the Parties' Cross Motions for partial and full summary judgment. For the reasons to follow, the Motions are granted in part and denied in part.

## I. Background

### A. Factual Background

#### 1. Rule 56.1 Statements

Before discussing the factual background of these claims, some brief explanation about the documents the Court will consider on these Motions is necessary. On April 8, 2016, Defendants made their first attempt at filing for summary judgment. All but one of these documents, Defendants' declaration in support of their Motion, were rejected as improperly filed. (*See* Dkt. Nos. 23, 25–28.) On April 11, 2016, Defendants tried once again to file their Motion for summary judgment. This time, Defendants were able to file the motion itself, but the

other documents were rejected as improperly filed.  (*See* Dkt. Nos. 29, 31, 32.)  On April 14, 2016, Defendants filed what is listed on the docket as a "Rule 56.1 Statement," but what was, in reality, an oversized memorandum of law in support of their Motion.  (*See* Dkt. No. 33.)  Following some correspondence with the Court, detailed below, Defendants were granted additional time to file their Motion papers.  (*See* Dkt. No. 37.)  Finally, on May 12, 2016, Defendants submitted a memorandum of law in support of their Motion that conformed to the Court's individual rules.  (*See* Dkt. No. 40.)

Buried in the litany of misfiled documents, it turns out, is Defendants' actual Rule 56.1 Statement, which was never properly filed.  (*See* Dkt. No. 31.)  In fact, the document is improperly notated in the docket as a memorandum of law in support of Defendants' Motion.  It was only through careful parsing of the misfiled documents that the Court was able to determine that Defendants had even attempted to electronically file a Rule 56.1 Statement.  Defendants have thus never filed a Rule 56.1 Statement that conforms to the filing and docketing rules of the Court.

Nevertheless, Plaintiffs responded to Defendants' Rule 56.1 Statement.  (*See* Dkt. No. 46.)  While the Court appreciates Plaintiffs' diligence in determining that there was even a Rule 56.1 Statement to be responded to, the document filed by Plaintiffs is deficient in many respects. Instead of the "short and concise statements" contemplated by Local Rule 56.1, Plaintiffs have filed what look more like responses to interrogatories or document requests, levying general objections and numerous responses to each statement, many of which merely recite additional facts Plaintiffs find relevant to the Motion, or which add color and argument to the statements offered by Defendants.

"The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *see also Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) ("Local Rule 56.1 is designed to place the responsibility on the parties to clarify the elements of the substantive law which remain at issue because they turn on contested facts."). In this endeavor, the Parties have failed. Many of the statements in Defendants' Rule 56.1 Statement are supported by citations to evidence not appended to the single declaration of Defendants accepted for filing (though included in some of Defendants' rejected filings), and other statements appear to be supported by documents that do not even appear in the record. Plaintiffs' response, on the other hand, does little to "streamline" the voluminous record, and instead exacerbates the process by adding on gratuitous facts, and even case citations, resulting in a document nearly five times the size of Defendants' Rule 56.1 Statement.

Plaintiffs' Rule 56.1 Statement, by contrast, was properly filed, and follows the guidelines set forth by the Court's individual practices and the local rules. (*See* Dkt. No. 20.) And while Defendants have improperly responded in their reply brief, instead of in a separate Rule 56.1 response statement, (*see* Dkt. No. 45), the Court is able to at least discern which statements are undisputed and which statements may give rise to genuine disputes of material fact. For the purpose of setting forth the pertinent facts in this case, accordingly, the Court will cite only to Plaintiffs' Rule 56.1 Statement and Defendants' response thereto. That is not to say, however, that the Court will ignore the factual issues raised by Defendants, or that it has not read and considered the documents submitted by Defendants and cited in their briefs. Nor does this suggest that the Court has not reviewed Defendants' Rule 56.1 Statement and Plaintiffs'

response.  The Court does not presume that Plaintiffs' Rule 56.1 Statement represents the entire universe of facts in this case; as with every summary judgment motion, the Court must consider the entire record, and must deny summary judgment if, in the Court's judgment, there exist any genuine disputes of material fact.

### 2.  The Parties and the Apartment

Plaintiffs are members of a group of family and friends that were, allegedly, the target of constitutional violations in their home on March 20, 2013.  (*See* Compl. ¶ 1.)  Plaintiffs describe themselves by reference to their relationship to Plaintiff Vaughn Scott:

- Corey Marrow is Vaughn Scott's son, (*see* Decl. of David A. Thompson in Opp'n ("Thompson Opp'n Decl.") Ex. 1 ("Vaughn Tr."), at 33 (Dkt. No. 48); *see also* Pls.' Rule 56.1 Statement ("Pls.' 56.1") ¶ 9 (Dkt. No. 20));[1]

- Nigeria Scott is Vaughn Scott's daughter, (*see* Decl. of David Thompson i[n] Supp. of Pls.' Mot. for Summ. J. ("Thompson Decl.") Ex. P ("Nigeria Tr."), at 25; *see also* Pls.' 56.1 ¶ 10);

- Prince Scott is Vaughn Scott's son, (*see* Thompson Decl. Ex. N ("K.M. Tr."), at 9 (Dkt. No. 21); *see also* Pls.' 56.1 ¶ 11);

- Brenda Scott is Vaughn Scott's mother, (*see* Vaughn Tr. 16; *see also* Pls.' 56.1 ¶ 12);

- Andre Harris is Vaughn Scott's brother, (*see* Vaughn Tr. 16; *see also* Pls.' 56.1 ¶ 13);

- A.S. is Vaughn Scott's daughter, (*see* Vaughn Tr. 14–15; *see also* Pls.' 56.1 ¶ 14);

---

[1] Except where indicated, Defendants have not objected to Plaintiffs' Rule 56.1 Statement.  (*See* Defs.' Reply Mem. of Law in Further Supp. of Their Mot. for Summ. J. 1 (Dkt. No. 45).)

- K.M. is Vaughn Scott's son, (*see* K.M. Tr. 9; *see also* Pls.' 56.1 ¶ 15);

- Kraig Utley and Julian Rene are not related to the other Plaintiffs, but are treated like family and are regarded by Vaughn Scott as her godsons, (*see* Thompson Decl. Ex. D ("Vaughn Aff.") ¶ 43; *see also* Pls.' 56.1 ¶¶ 16–17).

On March 20, 2013, all Plaintiffs, except Utley and Rene, and Rene's mother lived at the apartment in which the facts giving rise to this case took place.  (*See* Pls.' 56.1 ¶ 27.)  That apartment (the "Apartment") is located at 328 South Second Avenue in Mount Vernon, New York.  (*See* Vaughn Aff. ¶ 2; *see also* Pls.' 56.1 ¶ 30.)  The Apartment is part of a three story detached house (the "House").  (*See* Vaughn Aff. ¶ 3; *see also* Pls.' 56.1 ¶ 31.)  While the precise dimensions of the Apartment and the House are not pertinent here, the Court notes that the House has a porch with a roof, (*see* Vaughn Aff. ¶ 8; *see also* Pls.' 56.1 ¶ 36), and a foyer leading to each of the three apartments in the House, (*see* Vaughn Aff. ¶¶ 15–20; *see also* Pls.' 56.1 ¶¶ 43–48).  The Apartment is located on the second floor, (*see* Vaughn Aff. ¶¶ 17–18; *see also* Pls.' 56.1 ¶¶ 45–46), and is separated from the rest of the House by a door with a doorknob, latch, and lock, (*see* Vaughn Aff. ¶ 21; *see also* Pls.' 56.1 ¶ 49).  In the Apartment, there is a living room, a kitchen, a bathroom, and several bedrooms.  (*See* Vaughn Aff. ¶¶ 23–40; *see also* Pls.' 56.1 ¶¶ 51–68.)

### 3.  The Shooting Near West Third Street

On March 20, 2013, at approximately 6:15 PM, two individuals called 911 to report shots fired near 70 West Third Street in Mount Vernon.  (*See* Thompson Decl. Ex. G ("Aegis Report"), at 4; *see also* Pls.' 56.1 ¶ 69.)  The first caller, who called in at 6:17 PM, reported that she heard two shots and noted that she saw a white minivan with three males in it going down South Ninth Avenue.  (*See* Aegis Report 4; *see also* Pls.' 56.1 ¶ 74.)  The second caller stated that he saw a

light-skinned black male wearing a red hoodie running near the site of the shooting.  (*See* Aegis Report 4.)  The police dispatcher who notified nearby officers of the shooting stated that witnesses had given "conflicting" information as to who may have been involved.  (*See* Thompson Decl. Ex. U ("Dispatch Recording"); *see also* Pls.' 56.1 ¶ 75.)  No witness, and no dispatcher or police officer, reported seeing anyone injured by the shots.  (*See* Dispatch Recording.)

Officers Michael Gregorio and Johanna Santos, neither of whom is named as a defendant in this action, responded together to the area of the shooting.  (*See* Thompson Decl. Ex. H ("Gregorio Report"); *see also* Pls.' 56.1 ¶ 81.)  Gregorio and Santos first set up a perimeter near South Eighth Avenue in an effort to find the black male wearing a red hoodie.  (*See* Gregorio Report; *see also* Pls.' 56.1 ¶ 82.)  When they were unable to locate that individual, Gregorio and Santos began to canvass the surrounding area for the white van described by one of the witnesses.  (*See* Gregorio Report; *see also* Pls.' 56.1 ¶¶ 83–84.)

At the time of the shooting, Utley and Rene were together on West Third Street.  (*See* Thompson Decl. Ex. R ("Rene Tr."), at 7–8; Thompson Decl. Ex. S ("Utley Tr."), at 25; *see also* Pls.' 56.1 ¶ 70.)  Upon hearing the shots, Utley and Rene started to flee; during their escape, Rene was grazed in the right buttocks by a bullet.  (*See* Thompson Decl. Ex. E; Utley Tr. 26–27; *see also* Pls.' 56.1 ¶¶ 71–72.)  As they ran, Utley and Rene happened to see Marrow driving his sister Nigeria's white minivan.  (*See* Utley Tr. 26; *see also* Pls.' 56.1 ¶ 72.)  They got in the minivan, and Marrow drove the group to the Apartment.  (*See* Utley Tr. 29; *see also* Pls.' 56.1 ¶ 73.)

### 4.  Arrival at the Property

Gregorio and Santos arrived at a location near the House at 6:37 PM, approximately 20 minutes after the initial 911 call, seeing that a white minivan matching the description offered by the witness was parked in a driveway by the House.  (*See* Aegis Report 1; *see also* Pls.' 56.1 ¶ 85.)  The Parties dispute, however, whether Gregorio and Santos reported that they found the white minivan parked at 328 South Second Avenue (where the House is located), or at 324 South Second Avenue.  (*See* Pls.' 56.1 ¶ 85; Defs.' Reply Mem. of Law in Further Supp. of Their Mot. for Summ. J. ("Defs.' Reply") ¶ 85 (Dkt. No. 45).)  The dispute arises from the fact that the audio file indicates that Gregorio reported over the dispatch that the white minivan was parked at 324 South Second Avenue, (*see* Dispatch Recording), whereas the report he filed indicates that the white minivan was parked at 328 South Second Avenue (the Home), (*see* Gregorio Report).  When Gregorio and Santos arrived, the minivan was "unoccupied."  (*See* Dispatch Recording; *see also* Pls.' 56.1 ¶ 89.)  Gregorio called the dispatcher to check the license plate of the minivan, (*see* Dispatch Recording; *see also* Pls.' 56.1 ¶ 86), and the dispatcher reported that the registration was valid, the minivan was registered to Nigeria Scott, and the address for Nigeria was a P.O. box, (*see* Dispatch Recording; *see also* Pls.' 56.1 ¶ 93).

Gregorio and Santos waited approximately five minutes for Sergeant Steven Sexton (a Defendant in this case) to arrive.  (*See* Aegis Report 2; Thompson Decl. Ex. J ("Sexton Tr."), at 16; *see also* Pls.' 56.1 ¶ 95.)  When Sexton arrived, he took command and remained in command for the remainder of the time period in question.  (*See* Sexton Tr. 20–21, 52; *see also* Pls.' 56.1 ¶¶ 96–97.)  Sexton was aware that shots had been fired in the area near West Third Street, (*see* Sexton Tr. 14), and knew that shell casings had been recovered from the area of the shooting, (*see id.* at 15).  Gregorio informed Sexton that he believed the white minivan parked in the

driveway at 328 (or 324) South Second Avenue was the same one reported on the dispatch, and noted that the windshield was broken (consistent with the description offered by one witness) and that the minivan's engine was still warm.  (*See id.* at 17).  At Sexton's command, he, Gregorio, and Santos entered the House, although they did not know which of the three apartments might contain a person associated with the white minivan or the shooting.  (*See* Sexton Tr. 17–18, 20; *see also* Pls.' 56.1 ¶¶ 102–04.)

### 5.  Entry to the Apartment

When officers first entered the House, the front door was closed.  (*See* Vaughn Aff. ¶ 46; *see also* Pls.' 56.1 ¶ 105.)  Upon entering the House, officers began knocking on every door, including the door to the Apartment.  (*See* Sexton Tr. 17, 19–20; Thompson Decl. Ex. M ("Brenda Tr."), at 9; Thompson Decl. Ex. O ("Marrow Tr."), at 10–11; *see also* Pls.' 56.1 ¶ 113.) When the officers arrived, the following people were present in the Apartment:

- Vaughn Scott,
- Prince Scott,
- Andre Harris,
- Brenda Scott,
- Kraig Utley,
- Corey Marrow,
- A.S.,
- K.M.,
- Julian Rene,
- Demetrius King,
- James Batson,

- Martha Rene, (*see* Vaughn Tr. 13–17; Marrow Tr. 7–8; *see also* Pls.' 56.1 ¶ 114).

Brenda Scott answered the door.  (*See* Sexton Tr. 21; Brenda Tr. 9; K.M. Tr. 11; Marrow Tr. 9–10; *see also* Pls.' 56.1 ¶ 115.)  Sexton testified that he told Brenda that he was looking for the registered owner of the white minivan, that is, Nigeria Scott, (*see* Sexton Tr. 21–22; *see also* Pls.' 56.1 ¶ 117), although he testified also that he did not know at the time whether the registered owner was driving the minivan when it had been seen near the shooting, (*see* Sexton Tr. 22–23; *see also* Pls.' 56.1 ¶ 118).  Sexton told Brenda that he and the other officers wanted to enter the Apartment.  (*See* Sexton Tr. 25; Brenda Tr. 9; *see also* Pls.' 56.1 ¶ 119.)  The Parties dispute what happened next.  Brenda testified that she told Sexton to wait while she asked her daughter, Vaughn, whether it was okay for police to enter.  (*See* Brenda Tr. 9; *see also* Pls.' 56.1 ¶ 122.)  Brenda and K.M. both testified that Brenda told Sexton not to come in.  (*See* Brenda Tr. 9; K.M. Tr. 11–12; *see also* Pls.' 56.1 ¶ 124.)  Defendants disagree, however: Sexton testified that Brenda was cooperative and gave him consent to enter the apartment.  (*See* Sexton Tr. 24–25.)  There is no dispute, however, that Sexton did not have a warrant to enter, that Brenda asked him whether he had a warrant, and that Sexton responded that he did not need one.  (*See* Sexton Tr. 82; Brenda Tr. 9; *see also* Pls.' 56.1 ¶¶ 125–27.)

In any event, Sexton and the other officers made their way into the Apartment.  Plaintiffs contend that Sexton pushed the door open and struck Brenda's foot with the door, (*see* Brenda Tr. 10–12; *see also* Pls.' 56.1 ¶¶ 149–50), though Defendant Officer Timothy Briley testified that there was no force used "within [his] sight," (*see* Thompson Decl. Ex. K ("Briley Tr."), at 46).  The Court notes, however, that Briley did not arrive at the scene until after Sexton and the other officers had entered the Apartment, (*see* Briley Tr. 11, 17–18), so the Court cannot discern how Briley's testimony on this point is helpful.  Upon entry, Prince told Sexton and the officers to

10

leave, telling them to "[g]et out of here" and to "get off his property." (*See* Sexton Tr. 25, 27; *see also* Pls.' 56.1 ¶¶ 128–30.) Sexton testified that Prince began yelling at him and threatening him, (*see* Sexton Tr. 25–26), although he admitted that he felt threatened only because Prince was "really passionate and animated" and made "a lot of physical movements," (*see id.* at 27). All of the occupants of the Apartment told Sexton and the other police officers to leave. (*See* Sexton Tr. 41; *see also* Pls.' 56.1 ¶ 141.) Indeed, it is undisputed that Defendants knew that the occupants of the Apartment did not want them inside the Apartment, and did not give them permission to remain in the Apartment once they entered. (*See* Sexton Tr. 25, 27, 41, 54; Briley Tr. 19–20, 23–24; *see also* Pls.' 56.1 ¶¶ 146–47.)

Sexton testified that he recognized Marrow, stating that he had had "numerous interactions him" and that the "whole crew [was] actually one of the local gangs who [were] responsible for a lot of violence in the community." (Sexton Tr. 29.) Sexton also stated that he recognized Prince, Rene, Utley, and Demetrius King as members of the same gang Marrow belonged to. (*See* Sexton Tr. 30–31.)

Shortly after Defendants entered the Apartment, Prince called the Mount Vernon Police Station and told them that plainclothes officers were forcing their way into the Apartment. (*See* Thompson Decl. Ex. Q ("Prince Tr."), at 25–26; *see also* Pls.' 56.1 ¶ 152.) Although uniformed officers responded to the call, these officers spoke to Sexton and Officer Antonini (who by that point had arrived at the scene) and thereafter did nothing to stop the other officers from occupying the Apartment. (*See* Prince Tr. 26–27; *see also* Pls.' 56.1 ¶¶ 153–54.)

6.  Occupation and Search of the Apartment

Once the officers entered the Apartment, all of the occupants were told they were not free to leave. (*See* Briley Tr. 47; Marrow Tr. 5–7; Thompson Decl. Ex. T ("A.S. Tr."), at 12–13;

Vaughn Tr. 7–8; *see also* Pls.' 56.1 ¶¶ 155–56.)  The police officers conducted a search for weapons and victims of the shooting.  (*See* Sexton Tr. 46–48.)  The Parties dispute how extensive the search was, with Plaintiffs alleging that the officers searched the entire Apartment, broke the bathroom door, and took everything out of the medicine cabinet and put it in the sink. (*See* Brenda Tr. 13–14; K.M. Tr. 14–15; Marrow Tr. 6; Prince Tr. 29; Utley Tr. 19; A.S. Tr. 14–15; *see also* Pls.' 56.1 ¶¶ 157–60; Defs.' Reply ¶¶ 157–59.)  Defendants admit that they removed the contents of the medicine cabinet and placed them in the sink, but dispute that they searched the entire Apartment or broke any fixtures during their limited search.  (*See* Sexton Tr. 53; *see also* Defs.' Reply ¶¶ 157–59.)  The Parties agree, however, that the officers searched Marrow, Prince, Rene, and Utley, (*see* K.M. Tr. 15; Marrow Tr. 15–17; *see also* Pls.' 56.1 ¶¶ 161–62), that they searched the back bedroom, (*see* Sexton Tr. 46–47; *see also* Pls.' 56.1 ¶ 164), and that they found no weapons or contraband, (*see* Marrow Tr. 17–18; *see also* Pls.' 56.1 ¶ 166).  While searching the Apartment, Sexton discovered some individuals in the back bedroom and ordered them into the living room with the others.  (*See* Sexton Tr. 46–49.)

During the search and occupation of the Apartment, Sexton required all occupants of the Apartment to come into the living room—none of the occupants was free to leave the living room or move around the apartment.  (*See* Sexton Tr. 48–49; K.M. Tr. 14; Marrow Tr. 6; Vaughn Tr. 7–8; *see also* Pls.' 56.1 ¶ 168.)  The occupants were required to ask permission to use the bathroom and had to be accompanied by an officer when doing so.  (*See* Marrow Tr. 18; Vaughn Tr. 28; *see also* Pls.' 56.1 ¶ 169.)  Brenda, who at the time the officers entered was cooking dinner, was not allowed to finish cooking.  (*See* A.S. Tr. 9, 14; *see also* Pls.' 56.1 ¶ 170.)  The officers turned off the television and informed the occupants that if they talked, they would be arrested.  (*See* A.S. Tr. 13–14; *see also* Pls.' 56.1 ¶¶ 171–72.)

12

The officers remained inside the Apartment for several hours.  (*See* Aegis Report 2–3; Brenda Tr. 20–21; K.M. Tr. 13; Marrow Tr. 6–7; *see also* Pls.' 56.1 ¶ 173.)  It was not until 8:30 PM, approximately two hours after the officers arrived, that the officers learned the Rene had been grazed by a bullet.  (*See* Aegis Report 4; *see also* Pls.' 56.1 ¶ 174.)  This was the first time Sexton learned that any of the occupants had been in the area of the shooting.  (*See* Sexton Tr. 34–35; *see also* Pls.' 56.1 ¶ 177.)  Rene informed Sexton that someone had opened fire and that a bullet had grazed him.  (*See* Sexton Tr. 35; *see also* Pls.' 56.1 ¶ 178.)  The officers ordered Rene to pull his pants down to show his injury, (*see* Rene Tr. 27–29; *see also* Pls.' 56.1 ¶ 223), and Rene did so because he did not believe he had a choice, (*see* Rene Tr. 28; *see also* Pls.' 56.1 ¶ 224).  Sexton did not look closely at the injury, and Rene told the officers that he did not need medical assistance.  (*See* Sexton Tr. 35, 85; *see also* Pls.' 56.1 ¶¶ 179–80.)

Sometime during their occupation of the Apartment, the officers compelled Vaughn to leave the Apartment and stand on the porch.  (*See* Vaughn Tr. 7–8, 17; *see also* Pls.' 56.1 ¶ 208.)  Vaughn was required to stand on the porch for approximately two hours and was not allowed to leave the porch.  (*See* Vaughn Aff. ¶¶ 54–55; *see also* Pls.' 56.1 ¶¶ 209–10.)  Two officers, one of whom was Defendant Brent Gamble, guarded Vaughn and prevented her from leaving the porch.  (*See* Vaughn Aff. ¶ 56; *see also* Pls.' 56.1 ¶ 212.)  After approximately two hours, the officers took Vaughn back inside and made her sit on the couch for another two to three hours. (*See* Vaughn Aff. ¶ 59; *see also* Pls.' 56.1 ¶¶ 214–15.)

When the occupation of the Apartment began, Nigeria, the registered owner of the minivan and a resident of the Apartment, was not at home.  (*See* Nigeria Tr. 16–19; *see also* Pls.' 56.1 ¶ 201.)  When Nigeria arrived, officers prevented her from entering the House and made her stand on the porch for a period of time.  (*See* Nigeria Tr. 17–18; *see also* Pls.' 56.1 ¶¶ 202–03.)

At some point, Nigeria was asked to sign a form consenting to the search of her vehicle. (*See* Nigeria Tr. 7; Decl. of Welton K. Wisham ("Wisham Decl.") Ex. C (Dkt. No. 24); *see also* Pls.' 56.1 ¶ 197.) Nigeria did so under duress, believing the officers would remain at the Apartment indefinitely and would confiscate her vehicle, and indeed, officers told Nigeria that the vehicle would be confiscated if she did not sign the consent form. (*See* Nigeria Tr. 28–29; *see also* Pls.' 56.1 ¶¶ 196–98.) The Parties dispute whether the vehicle was ever actually searched, with Plaintiffs, somewhat counterintuitively, asserting that the minivan was never searched, (*see* Pls.' 56.1 ¶ 199; *see also* Sexton Tr. 85), and Defendants contending that a search was conducted, (*see* Defs.' Reply ¶ 199; *see also* Thompson Decl. Ex. E). Eventually, the officers told Nigeria to get off the porch and leave the property. (*See* Nigeria Tr. 17–18; *see also* Pls.' 56.1 ¶ 204.) Nigeria complied and waited on the sidewalk for some period of time. (*See* Nigeria Tr. 18–19; *see also* Pls.' 56.1 ¶¶ 205–06.)

Though the record is unclear on the number of officers who occupied the Apartment, the order in which they came, and the duration for which each officer remained, it is undisputed that Defendant Officer Camilo Antonini arrived at the Apartment shortly after Sexton. (*See* Prince Tr. 28; Utley Tr. 11–13; *see also* Pls.' 56.1 ¶ 151.) Antonini testified that he stayed at the Apartment for only about 10 minutes and did not interact directly with any of Plaintiffs, (*see* Thompson Decl. Ex. L ("Antonini Tr."), at 22–24), although Marrow testified that Antonini bent Marrow's hand back and confiscated his cell phone in order to prevent Marrow from filming the officers, (*see* Marrow Tr. 30), and Defendants have not disputed this fact, (*see* Pls.' 56.1 ¶ 218; Defs.' Reply). Utley also claimed that he told Antonini he had no right to be inside the Apartment without a warrant and that he should get out, (*see* Utley Tr. 14–18), which Antonini responded to by threatening to "choke" Utley, (*see id.* at 15–16). Utley responded that he did not

think Antonini was going to do that, and Antonini thereafter handcuffed Utley.  (*See id.*)

Defendants, again, do not dispute these facts.  (*See* Pls.' 56.1 ¶¶ 227–33; Defs.' Reply.)

Defendant Officer Allison Allen was also, at one point, at the Apartment.  Allen

responded to a radio transmission calling for assistance at the Apartment and arrived at the

Apartment sometime after 6:00 PM.  (*See* Dep. of Officer Allison Allen ("Allen Tr.") 10–11.)[2]

Officers were on the scene when Allen arrived and some had already entered the Apartment.

(*See id.* at 11–12.)  When she stepped inside the Apartment, Allen observed Prince and Marrow

cursing at the various officers in the Apartment.  (*See id.* at 15–16.)  Allen remained in the

Apartment for only about 10 minutes, (*see id.* at 16), and while there, she did not observe any

physical contact between any of the officers and the occupants, (*see id.* at 21).[3]

Defendant Officer Timothy Briley also responded to the scene.  Briley testified that when

he was called to the scene, dispatch informed him that an injured party had been placed inside

the white minivan before it left the scene of the shooting, (*see* Briley Tr. 9), although Plaintiffs

point out that this contention is belied by both the audio recordings and the police reports

produced in this litigation, (*see* Aegis Report; Gregorio Report; Dispatch Recording).  Officers

were already at the Apartment when Briley arrived, (*see* Briley Tr. 11), and he remained at the

Apartment for approximately 30 to 40 minutes, (*see id.* at 25).  Briley testified that while at the

Apartment, he saw Sexton and Brenda laughing with one another, (*see id.* at 46), and testified

also that he did not witness any use of force while he was at the Apartment, (*see id.* at 46–47).

---

[2] The excerpts from the deposition of Allen are attached to one of the many declarations incorrectly filed by Defendants' counsel.  (*See* Dkt. No. 26.)

[3] Although Plaintiffs have disputed Defendants' contention that Allen did not have any physical contact with any of the occupants, they do not point to any evidence that Allen did, in fact, come into physical contact with any of the occupants.

7.  Departure and Aftermath

Although the officers did not find anything during their initial sweep of the Apartment,
they remained inside the Apartment because they were waiting to see if they could obtain a
search warrant.  (*See* Sexton Tr. 35, 48–49; *see also* Pls.' 56.1 ¶ 181.)  Sexton specifically
wanted to search for a firearm, and he testified that his reason for believing a firearm might have
been in the Apartment was that the occupants of the Apartment were "known for weapons
possession . . . or violent acts."  (Sexton Tr. 36; *see also* Pls.' 56.1 ¶ 183.)  Ultimately, however,
Sexton was told that the district attorney would not try to obtain a search warrant because there
was no probable cause.  (*See* Sexton Tr. 52; *see also* Pls.' 56.1 ¶ 187.)  Soon after, the officers
left the Apartment, vacating completely by around 10:30 PM, (*see* Vaughn Aff. ¶ 61; *see also*
Pls.' 56.1 ¶ 188), though some officers remained on the porch of the House until approximately
11:57 PM, (*see* Vaughn Aff. ¶ 62; Aegis Report 1; *see also* Pls.' 56.1 ¶ 189).  Nobody was
formally arrested on March 20, 2013.  (*See* Sexton Tr. 52.)

Two days later, on March 22, 2013, Prince and Marrow were arrested for "obstructing
governmental administration."  (*See* Marrow Tr. 39; Wisham Decl. Ex. Q.)  On April 8, 2015,
the charge against Prince was reduced to one for disorderly conduct in exchange for pleading
guilty.  (*See* Defs.' Ex. R.)[4]  Marrow pled guilty to two apparently unrelated drug charges and
the obstruction of governmental administration was dropped in exchange for that plea.  (*See id.*)

B.  Procedural History

Plaintiffs filed their Complaint on June 19, 2014.  (*See* Dkt. No. 1.)  Defendants answered
on November 17, 2014.  (*See* Dkt. No. 3.)  A case management order was entered shortly

_____

[4] Though Defendants have provided the Court with a hard copy version of Exhibit R,
which is a Certificate of Disposition, Defendants have not filed this document on the docket.

thereafter, (*see* Dkt. No. 5), and the discovery deadlines were twice extended, (*see* Dkt. Nos. 8, 12).  The Court then set a briefing schedule for the Parties' Cross Motions for summary judgment.  (*See* Dkt. No. 18.)  Plaintiffs filed their Motion on April 8, 2016.  (*See* Dkt. Nos. 19–22.)  As discussed in more detail below, Defendants required an extension, and eventually completed their filing (somewhat) successfully on May 12, 2016.  (*See* Dkt. No. 40.)  The Motions were fully briefed on June 10, 2016.  On March 15, 2017, the Court requested supplemental letter briefing regarding whether Plaintiffs' state law claims were timely filed.  (*See* Dkt. No. 51.)  The Parties submitted their supplemental briefing on March 20, 2017.  (*See* Dkt. Nos. 52–53.)

Before turning to the merits, some discussion of the conduct of Defendants' counsel is in order.  Reprimand for failure to follow the individual filing and procedural rules of this Court and of the Southern District of New York is ordinarily confined to footnotes, but counsel for Defendants is in need of special attention.  Some of the missteps of counsel have already been detailed above, namely, his numerous failed attempts to file the motion papers on time.  The deficiencies of Defendants' counsel's filings included splitting up exhibits to a declaration among several entries, (*see* Dkt. Nos. 24–26), selecting the wrong event or document name for an entry, (*see* Dkt. Nos. 23, 28–29, 31, 33), and failing to file at all some documents cited by Defendants in support of their Motion, *see supra* note 4.  When Defendants finally did sort out their ECF filing, they submitted an oversized brief in violation of the Court's individual practices, (*see* Dkt. No. 33), and Plaintiffs moved to strike the papers of Defendants as violating the Court's individual rules and for untimeliness, (*see* Dkt. No. 34).  Defendants' counsel, Mr. Wisham, apologized for the mistake, stating that "[t]o be quite honest with [the Court], [he] was unaware of the page limitation," (Letter from Welton K. Wisham, Esq., to Court (May 2, 2016)

(Dkt. No. 35)), and sought leave to file an amended brief, (*see id.*).  The Court granted the request, although it noted that the individual practices are clear on the page limits and that the scheduling order specifically reminded counsel that there were strict page limits.  (*See* Dkt. No. 37.)  Plaintiffs shortly thereafter sought an extension to allow them time to respond to Defendants' new brief, as under the original scheduling order, Plaintiffs' opposition brief was due the same day as Defendants' amended brief.  (*See* Dkt. No. 38.)  The exact language of the request was as follows: "Accordingly, the plaintiffs respectfully request that the Court grant the plaintiffs until May 30, 2016 to respond to the defendants' motion once it is finally fully submitted."  (*See* Letter from David Thompson, Esq., to Court (Dkt. No. 38).)  The Court granted the extension.  (*See* Dkt. No. 39.)

A few days later, Defendants finally filed their amended brief, now in compliance with the Court's rules, but more problems arose.  Defendants did not file an opposition to Plaintiffs' original Motion and accompanying papers (which had been timely filed).  Plaintiffs pointed this out in a letter to the Court, asking that the Court deem Defendants' filings complete and bar any further submissions by Defendants.  (*See* Dkt. No. 41.)  Defendants' counsel's response, styled as an "Opposition to Plaintiff's [sic] request denying Defendants' Right to File Reply Opposition to Plaintiff's [sic] Partial Summary Judgment," was nothing short of incredible.  (*See* Letter from Welton K. Wisham, Esq., to Court (May 23, 2016) ("Wisham Letter") (Dkt. No. 43).)  Defendants' counsel, ostensibly quoting from the Court's endorsement on Plaintiffs' letter granting them additional time to respond to Defendants' belated brief, insisted that "reply motion for Summary Judgment '**Responses** were due by May 30, 2016.  The order is clear that responses are due on May 30, 2016, as opposed to May 13, 2016, thus extending the time for both parties, including the defendants, to file responses by May 30, 2016."  (*See id.* at 1.)

Defendants' counsel again referenced in the letter the use of the word "responses," and claimed

that he relied "in good faith" on the plain meaning of the word "responses."  But if Defendants'

counsel was quoting from an order of the Court extending the time for "responses," the Court

cannot find such an order in the record.  The memo endorsement allowing Plaintiffs additional

time to respond to Defendants' Motion said simply, "Granted."  (*See* Dkt. No. 39.)  And the

language in Plaintiffs' letter seeking the extension made clear that the only extension being

sought was with respect to Plaintiffs' response, owing to the fact that Defendants had not filed

timely motion papers.

> Defendants' counsel went on to say:

> > It appears clear to this office that the order extending time for responding to
> > motions for summary judgment was extended from the original date to response
> > [sic] by May 13, 2016.  To view the Court order as requested by the Plaintiff would
> > have made Defendant's [sic] motion for summary judgment and Defendant's [sic]
> > response to Plaintiff's [sic] partial motion for summary judgment due on May 13,
> > 2016.  Surely this was not the intent of this honorable Court.

(Wisham Letter 1.)  The Court does not understand why Defendants' counsel thought it

objectionable for the Court to require him to file his (past-due) motion papers and respond to

Plaintiffs' Motion on the same day.  Defendants' counsel, by failing to timely file his own

motion papers, was not entitled to additional time to respond to Plaintiffs' Motion.

> Nevertheless, the Court granted Defendants' counsel's request for additional time, and

Defendants were given an additional 14 days to respond to Plaintiffs' Motion.  (*See* Dkt. No. 44.)

This instruction, however, once again proved difficult for Defendants' counsel.  When the

response was filed, it was titled and docketed as a "Reply Memorandum of Law in Further

Support" of Defendants' Motion, instead of the opposition to Plaintiffs' Motion that should have

been filed.  (*See* Dkt. No. 45.)  Moreover, instead of setting forth, in a separate document,

Defendants' response to Plaintiffs' Rule 56.1 Statement, Defendants included those responses as part of their brief.

It is the duty of the Court to decide these Motions on the facts and the law, and that is what the Court will do.  But counsel have an obligation to follow the rules of the Court and to meet deadlines.  Here, the conduct of Defendants' counsel resulted in Defendants receiving an extra 24 days to respond to Plaintiffs' Motion beyond the time permitted in the scheduling order and beyond the time given to Plaintiffs.  And counsel's disjointed, improperly labeled, and incomplete filings have largely served to make these already complex Motions even more complex.  Defendants' counsel is reminded that all litigants, even those proceeding pro se, are expected to file timely and complete submissions that comply with the rules of the Court, and Counsel's professed ignorance of the rules is no excuse, and perhaps makes his transgressions even more unsettling.

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute

exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also*

*Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at

*2 (S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof at trial would fall on

the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go

to the trier of fact on an essential element of the nonmovant's claim," in which case "the

nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue

of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v.*

*PricewaterhouseCoopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal

quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . . , [a

nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were

correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for

trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot

rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*,

No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks

omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion

for summary judgment is properly supported by documents or other evidentiary materials, the

party opposing summary judgment may not merely rest on the allegations or denials of his

pleading . . . .")).

     "On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental*

*Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At summary

judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried."  *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims."  *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### B.  Analysis

Plaintiffs have raised a number of claims, some which are brought pursuant to 42 U.S.C. § 1983 and arise under the Constitution, and some of which are based on New York state law. Defendants have moved for summary judgment on all claims, and Plaintiffs have moved only for partial summary judgment with respect to Counts I (Fourth Amendment illegal search and seizure), II (Fourth Amendment false arrest), III (Fourth Amendment failure to intervene), IV (state law false arrest), and VIII (respondeat superior).  (*See* Mem. of Law in Supp. ("Pls.' Mem.") 1 (Dkt. No. 22).)  The Court will thus examine each claim in turn.

#### 1.  Fourth Amendment Warrantless Search and Seizure

Plaintiffs' claims stem largely from the Fourth Amendment, and the most fundamental claim here is that Defendants' unlawfully entered the Apartment without a warrant and subsequently "seized" the occupants of the Apartment.  As there is no dispute that the occupants were expressly told they could not leave, (*see* Sexton Tr. 48–49; K.M. Tr. 14; Marrow Tr. 6; Vaughn Tr. 7–8), and were thus "seized" within the meaning of the Fourth Amendment, *see Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 763 (2d Cir. 2003) ("[A] Fourth Amendment seizure occurs 'when there is a governmental termination of freedom of movement through means intentionally applied.'" (emphasis and some internal quotation marks omitted)

(quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998))); *see also Michigan v. Summers*, 452 U.S. 692, 696 (1981) (holding that there was a seizure where "the record demonstrate[d] that [the] respondent was not free to leave the premises while the officers were searching his home"); (*see also* Pls.' 56.1 ¶ 155), the only dispute here is whether the entry into the Apartment and the officers' occupation and seizure pursuant to that entry was in violation of the Fourth Amendment.

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted). Nevertheless, as "the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). One such exception is where "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)). A second exception is the emergency aid exception, which allows law enforcement officers to "enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (internal quotations marks omitted). Finally, a warrantless search may be justified on the ground of consent, as "it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991). Because Defendants invoke all three of these exceptions, the Court will address each in turn.

### a.  Exigent Circumstances

When police officers seek to justify a warrantless search on the basis of exigent circumstances, they need "probable cause plus exigent circumstances in order to make a lawful entry into a home." *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002).  In such situations, "the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984).  The Court will address first whether there was probable cause to enter and search the home, and second whether exigent circumstances existed to justify the warrantless search and seizure.

### i.  Probable Cause

Probable cause to enter a home exists when there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232.  "While probable cause requires more than a 'mere suspicion,' of wrongdoing, its focus is on 'probabilities,' not 'hard certainties.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (citation and internal quotation marks omitted).  Thus, in assessing probable cause, the Court "must look to the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (internal quotation marks omitted).  "Probable cause must 'exist *as of the time of the search*.'" *United States v. Keith*, 183 F. Supp. 3d 427, 432 (S.D.N.Y. 2016) (quoting *United States v. Raymonda*, 780 F.3d 105, 114 (2d Cir. 2015)).  "It has long been recognized that, where there is no dispute as to what facts were relied on to

demonstrate probable cause, the existence of probable cause is a question of law for the court."

*Walczyk*, 496 F.3d at 157.

Defendants offer a host of reasons why exigent circumstances existed at the time of the warrantless entry, but with respect to probable cause, they offer only that "[t]he search was made based on the officer's [sic] reasonable belief that suspects were inside the premises."  (*See* Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. ("Defs.' Mem.") 13 (Dkt. No. 40).)  This conclusory statement is unsupported by the record.

The facts relevant to probable cause are largely undisputed: shots were fired near 70 West Third Street, some witnesses saw three individuals enter a white minivan and depart the scene, a minivan matching the description offered by the witnesses and bearing a broken windshield similar to the one described by the witnesses was located near the House, the engine of the minivan was still warm, and the officers believed that the owner of the minivan resided in the Apartment.  These facts would certainly give any reasonable officer incentive and cause to investigate the involvement, if any, of the individuals in the minivan with the shooting.  But that is a distant cry from establishing that officers had probable cause to believe that *anyone in the Apartment* committed a crime, or that there was evidence of a crime in the Apartment.  As far as the officers knew, the individuals entering the minivan were merely witnesses or victims fleeing the scene of a dangerous shooting.

The only evidence that any of the occupants may have been involved in the shooting was the eyewitness statements that two (or three) black males near the scene of the shooting entered a white minivan.  Defendants make much of the fact that the white minivan had distinctive damage to the rear windshield and that the engine of the vehicle was still warm.  (*See* Defs.' Mem. 10 (citing Sexton Tr. 15–17).)  But while this was perhaps strong evidence that the minivan parked

at the House (or at an adjacent driveway)[5] was the same one seen near the area of the shooting, there was no evidence that the individuals who fled the scene were actually involved in the shooting, or in what residence they lived or were staying.  None of the callers to 911 reported seeing the individuals who entered the minivan carrying a weapon, and the only caller who suggested that he might have actually seen the shooting (although the record is far from clear that he did see any actual gunfire) referenced two black males, but made no mention of them entering the white minivan.  (*See* Dispatch Recording.)  Defendants have cited no case law, and the Court is aware of none, suggesting that the mere fact that individuals are spotted in the same general area as a shooting (at which other individuals were also seen) gives police officers probable cause to search the home of those individuals.  It is no surprise, then, that the district attorney ultimately elected not to seek a warrant on the ground that no probable cause existed.  (*See* Sexton Tr. 52.)

As Plaintiffs concede, (*see* Mem. of Law in Opp'n ("Pls.' Opp'n") 11 (Dkt. No. 47)), officers might have had reasonable suspicion to stop the white minivan and ask questions of the occupants, but that does not lead to the conclusion that probable cause to search the Apartment existed.  Moreover, while officers became aware (after speaking with Brenda) that the registered owner of the minivan, Nigeria, resided in the Apartment, they did not have any additional information suggesting that the individuals who climbed into the minivan at the scene of the shooting were in the Apartment at that moment, or even lived at the Apartment.  (*See* Sexton Tr. 22–23.)

---

[5] As discussed above, Plaintiffs contend, consistent with the dispatch recording in evidence, that Gregorio reported finding the minivan parked at 324 South Second Avenue, (*see* Dispatch Recording), while Defendants contend, consistent with Gregorio's police report, that the minivan was parked at 328 South Second Avenue (the Home), (*see* Gregorio Report).  This dispute is immaterial for the purpose of deciding the pending Motions.

There are no "rigid rules, bright-line tests, [or] mechanical inquiries" to determine whether probable cause exists to search a home.  *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013).  But "probable cause requires more than a 'mere suspicion' of wrongdoing."  *United States v. Kone*, 591 F. Supp. 2d 593, 605 (S.D.N.Y. 2008) (quoting *Gates*, 462 U.S. at 231).  The mere fact that individuals were seen entering a minivan and leaving the area where a shooting just occurred does not, without more, give rise to probable cause to enter and search the Apartment on a hunch those individuals might be living there.

### ii.  Exigent Circumstances

Assuming, however, that Defendants could establish probable cause to search the Apartment, there remains the question of whether exigent circumstances existed to justify the warrantless intrusion.

"The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an urgent need to render aid or take action."  *Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002) (alteration and internal quotation marks omitted).  The Supreme Court has identified a number of situations where exigent circumstances justify warrantless entry into a home, including where officers are engaged in "hot pursuit" of a fleeing suspect or where officers need to prevent the imminent destruction of evidence.  *See Missouri v. McNeely*, 133 S. Ct. 1552, 1558–59 (2013).  For its part, the Second Circuit has offered six factors to consider when assessing whether exigent circumstances existed at the time of a warrantless search:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

27

*United States v. MacDonald*, 916 F.2d 766, 769–70 (2d Cir. 1990) (alteration and internal

quotation marks omitted) (citing, inter alia, *Dorman v. United States*, 435 F.2d 385 (D.C. Cir.

1970)).  These factors "are intended not as an exhaustive canon, but as an illustrative sampling of

the kinds of facts to be taken into account."  *Id.* at 770.

      Defendants argue that exigent circumstances were present for a number of reasons, none

of which finds support in the record.  First, Defendants argue that the "hot pursuit" doctrine

justified their entry into the Apartment.  (*See* Defs.' Mem. 13.)  The hot pursuit doctrine was first

enunciated by the Supreme Court in *Warden v. Hayden*, 387 U.S. 294 (1967), wherein the Court

held that a warrantless entry into a home was justified where police officers were informed that a

suspect in an armed robbery had entered the home just five minutes before they arrived.  *See id.*

at 298.  The rationale of this rule was expounded on in *United States v. Santana*, 427 U.S. 38

(1976), wherein the Court held that "a suspect may not defeat an arrest which has been set in

motion in a public place . . . by the expedient of escaping to a private place."  *Id.* at 43.  As

Plaintiffs point out, (*see* Pls.' Opp'n 15), there was no pursuit and no attempt to effect an arrest

in a public place.  Officers were canvassing the area in search of a minivan that had been spotted

near the scene of the crime; they were not in "pursuit" of any particular suspect.  While officers

reasonably wanted to locate the occupants of the minivan with some expediency, that does not

transform an investigative sweep of a neighborhood into a "hot pursuit" of a known suspect.

Indeed, in both *Warden* and *Santana*, police officers were not merely searching for possible

suspects, but were in actual pursuit of known criminals who had retreated to the safety of a home

to escape arrest.  *See Santana*, 427 U.S. at 39–41; *Warden*, 387 U.S. at 298.  The circumstances

here are a far cry from those that justify invocation of the hot pursuit doctrine, particularly in

light of the fact that Plaintiffs were detained in the privacy of the Apartment.  *See Molina v. City*

*of Elmira*, No. 12-CV-6310, 2015 WL 1643280, at *10 (W.D.N.Y. Apr. 13, 2015) (denying

summary judgment to the defendants where the plaintiff alleged that the arrestee "was within the

home when the arrest began"); *Breitbard v. Mitchell*, 390 F. Supp. 2d 237, 248 (E.D.N.Y. 2005)

("The Second Circuit has generally found *Santana*'s reasoning inapplicable when the arrestee

attempts to stay within his or her home." (citing *Loria v. Gorman*, 306 F.3d 1271, 1286 (2d Cir.

2002); *United States v. Reed*, 572 F.2d 412, 423 (2d Cir. 1978)).

Next, Defendants contend that exigent circumstances existed "based on law

enforcement's needs to prevent the imminent destruction of evidence."  (Defs.' Mem. 14.)

Indeed, a warrantless search may be justified by the "need 'to prevent the imminent destruction

of evidence.'"  *Kentucky v. King*, 563 U.S. 452, 460 (2011) (quoting *Brigham City*, 547 U.S. at

403).  This exception may be invoked where "there is compelling need for official action and no

time to secure a warrant," *McNeely*, 133 S. Ct. at 1559 (internal quotation marks omitted), and in

determining whether the exigencies justified the search, the Court must "balance the privacy-

related and law enforcement-related concerns to determine if the intrusion was reasonable,"

*Illinois v. McArthur*, 531 U.S. 326, 331 (2001).

Aside from the unsupported assertion that "[t]he warrantless entry and search in the

instant case was reasonable and within the exceptions to warrant requirement [sic] of the Fourth

Amendment," (Defs.' Mem. 14), Defendants have offered no reason why it would have been

reasonable for officers to assume that destruction of evidence was imminent.  This issue is partly

tied to the question of probable cause, as no reasonable officer could have concluded that

destruction of evidence was imminent in the absence of probable cause to believe that there was

even evidence of a crime at the Apartment.  Moreover, the destruction of evidence exception

applies most naturally to those circumstances where narcotics or some other easily destructible

29

piece of evidence is at issue, in contrast to the firearms that officers perhaps hoped they would find here.  *See Rogers v. Apicella*, 606 F. Supp. 2d 272, 290 (D. Conn. 2009) ("[T]he evidence thought to be in Unit K-3—clothes, weapons and ammunition, and proof of [the suspect's] occupancy—are, unlike the marijuana at issue in *McArthur*, not as easily destroyed, putting at issue whether [the officer] reasonably could have feared evidence destruction . . . ."); *see also King*, 563 U.S. at 461 ("Destruction of evidence issues probably occur most frequently in drug cases because drugs may be easily destroyed by flushing them down a toilet or rinsing them down a drain.").  Without any argumentation from Defendants, or any testimony from the officers, the Court will not speculate on the destructibility of firearms; suffice to say, in the absence of a compelling reason otherwise, the Court is not inclined to conclude that the mere fact that officers suspect (reasonably or unreasonably) that firearms may be located within a home obviates the need for a search warrant.

To the extent they are relevant, the factors set forth in *MacDonald* do not support a finding of exigent circumstances.  First, the officers had no strong reason to believe that anyone in the Apartment would be charged with a serious crime, as they did not have evidence that any of the occupants of the white minivan were actually involved in the shooting.  For similar reasons, the officers had no reasonable belief that any of the occupants were armed, given that no witness described seeing the occupants of the minivan carrying a gun, and, in fact, no witness gave firm testimony that they even saw a firearm.  And there was, as set forth above, no probable cause to believe that any of the occupants committed a crime.  And while the officers were perhaps justified in believing that the occupants of the minivan were somewhere in the House, they did not know which apartment specifically, nor did they have reason to identify the occupants of the minivan as "suspects."  Furthermore, there was no reason for the officers to

30

believe that anyone in the Apartment would escape if not swiftly apprehended.  Finally, the circumstances of the entry were largely peaceful.  These factors weigh strongly against finding exigent circumstances, and confirm the Court's holding that no exigent circumstances existed at the time of the entry, search, and seizure.

Finally, although arguably not falling within the scope of exigent circumstances, Defendants argue that "where a responsibly prudent officer is warranted in the circumstance of a case to believe that his safety or that of others is endanger [sic], he may make a reasonable search for weapons of the person, . . . regardless of whether or not he has probable cause to arrest that individual for a crime."  (Defs.' Mem. 14–15 (citing *Terry v. Ohio*, 392 U.S. 1 (1968).)  Defendants' argument is as perplexing as it is wrong.

This case does not involve a *Terry* stop—this not a circumstance where a police officer "approach[ed] a person for purposes of investigating possibly criminal behavior even though there [was] no probable cause to make an arrest."  *Terry*, 392 U.S. at 22.  Plaintiffs have not argued that, once inside the Apartment, officers were not permitted to determine whether individuals known to have possessed weapons in the past were, at that moment, armed.  Instead, the question is whether officers had the authority to *enter* the Apartment in the first place and whether their search of the Apartment and seizure of the occupants were in violation of the Fourth Amendment.  Simply put, *Terry* does not apply here as the initial search was of a residence, and *Terry* does not answer the question of whether that search was lawful from its inception.

To the extent Defendants mean to argue that their sweep of the Apartment was justified pursuant to *Maryland v. Buie*, 494 U.S. 325 (1990), that case is inapposite.  There, the Supreme Court held that "as an incident to [an] arrest," officers may, "as a precautionary matter and

without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334.  While the Second Circuit has not restricted protective sweeps to only those situations in which an arrest has been effected, *see United States v. Miller*, 430 F.3d 93, 98 (2d Cir. 2005), it has held that "[w]here no other purpose is being pursued, a sweep is no different from any other search and, therefore, requires a warrant, exigency, or authorized consent," *United States v. Hassock*, 631 F.3d 79, 88 (2d Cir. 2011).  Thus, as there was no warrant, no exigent circumstances, and no valid consent to search the Apartment (*see infra*), the protective sweep doctrine is inapplicable in this circumstance.  Because the initial entry into the Apartment was unlawful, any subsequent protective sweep or search conducted pursuant to that entry cannot be justified on the doctrine set forth in *Buie* and *Hassock*.  And, in any event, even if Defendants were correct that they were entitled to conduct a sweep of the Apartment pursuant to either *Terry* or *Buie*, that does not explain the officers' continued presence in the Apartment for approximately four hours or the seizure after initial entry into and sweep of the Apartment.

Moreover, while it is true that a "warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted," *Summers*, 452 U.S. at 705, and that therefore, "[a]bsent special circumstances, the police . . . have the authority to detain occupants of premises while an authorized search is in progress, regardless of individualized suspicion," *Rivera v. United States*, 928 F.2d 592, 606 (2d Cir. 1991), those principles are inapplicable here because the officers had no authority to conduct the underlying search, *see Calderon v. City of New York*, 138 F. Supp. 3d 593, 610 (S.D.N.Y. 2015) ("[T]he principle that officers may detain the occupants of the premises while a proper search is conducted does not avail [the] defendants, because [the

plaintiff] has adequately pled that the search was unlawful, and detention during the execution of an unlawfully obtained search warrant is actionable under § 1983." (citation and internal quotation marks omitted)), *partial reconsideration granted on other grounds*, 2015 WL 6143711 (S.D.N.Y. Oct. 19, 2015); *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 294 (S.D.N.Y. 2015) (holding that once "the search was no longer constitutional," "the continued confinement of [the plaintiff] during that unconstitutional search was no longer constitutional, nor could a reasonable officer think otherwise").  And, in any event, the facts do not show that the officers detained the occupants of the Apartment while a "proper search" was conducted, but instead that the occupants were detained for several hours while officers waited to hear whether the district attorney would even attempt to procure a search warrant.  *See Muehler v. Mena*, 544 U.S. 93, 101 (2005) (holding, in the context of a detention effected during a search, that "a lawful seizure can become unlawful if it is prolonged beyond the time reasonably required to complete that mission" (internal quotation marks omitted)); *see also Hines v. City of Albany*, No. 06-CV-1517, 2011 WL 2620381, at *11 (N.D.N.Y. July 1, 2011) (denying summary judgment to the defendants where the plaintiffs had alleged that they "were being detained pending the *application for*, as well as the execution of, a search warrant," and noting additional factual issues about the length of the detention that required a factfinder), *aff'd*, 520 F. App'x 5 (2d Cir. 2013).  Defendants' contention, again, represents a departure from existing law.  Accordingly, in the absence of both probable cause and exigent circumstances, the officers' warrantless entry into the Apartment cannot be justified by the exception carved out for exigent circumstances.

### b.  Emergency Aid

Defendants additionally contend that the warrantless entry and seizure were justified because the officers "were faced with an emergency situation," ostensibly related to the need to

33

provide emergency aid.  (*See* Defs.' Mem. 13.)  A warrantless search may be justified by the emergency aid doctrine, which holds that "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Brigham City*, 547 U.S. at 403 (internal quotation marks omitted).  "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."  *Id.*[6]

At the time the officers entered the Apartment, they had no knowledge that anyone had been shot, much less that anyone in the Apartment had been shot.  (*See* Dispatch Recording; *see also* Pls.' 56.1 ¶ 78.)  There is no evidence that when the officers arrived at the House, they detected any signs of injury—blood, bullet holes, casings, etc.  And while Defendants contend, in their Rule 56.1 response, that the officers "had reasonable belief that there might have been a victim at [the House] where . . . [D]efendants found the minivan with its engine still warm, based on the fact that the police recovered three 9 mm shell casings as the scene of the shooting and the undisputed fact that several shots had been fired," (Defs.' Reply ¶ 79), the mere fact that the occupants of the Apartment were near the scene of a shooting is hardly sufficient to give rise to a reasonable belief that there was a victim in the Apartment, *see United States v. Calhoun*, No. 16-

---

[6] While the emergency aid exception is sometimes discussed in tandem with the exigent circumstances exception to the warrant requirement, it differs in the sense that officers need not also have probable cause that a crime was committed in order to invoke the emergency aid exception.  *See United States v. Calhoun*, No. 16-CR-92, 2017 WL 1078634, at *5 n.11 (D. Conn. Mar. 21, 2017) ("[T]he emergency cause doctrine differs somewhat from other exigent circumstances analyses because it does not necessarily involve a suspicion of wrongdoing at the moment that the police take action, and accordingly, does not depend upon probable cause or the availability of a warrant."); *United States v. Williams*, No. 12-CR-6152G, 2015 WL 429087, at *9 (W.D.N.Y. Feb. 2, 2015) ("[P]robable cause in the emergency aid context is not reason to believe a crime is occurring or has been committed, but reason to believe that someone is in need of aid and there is a compelling need to act." (internal quotation marks omitted)), *adopted by* 2015 WL 3454430 (W.D.N.Y. May 29, 2015).

CR-92, 2017 WL 1078634, at *6 (D. Conn. Mar. 21, 2017) (finding no threat of violence or emergency where "all of the available evidence suggested that [the defendant] fired shots at a *different* location and then fled to his residence"); *United States v. Paige*, 493 F. Supp. 2d 641, 647 (W.D.N.Y. 2007) ("[T]he evidence available to the police prior to their entry establishing the victim was stabbed, during the altercation, which started in front of [the] [d]efendant's apartment, the fact that no one saw any potential victim enter the apartment, the absence of blood stains on the street or sidewalk . . . , and the continuation of the search inside the apartment after the officers ascertained no victim was present in the apartment, support the conclusion that exigent circumstances to aid a victim were not present . . . ."). The Second Circuit has made clear that "groundless, retrospective speculation" about the presence of injured third parties does not give rise to the emergency aid exception. *United States v. Simmons*, 661 F.3d 151, 159 (2d Cir. 2011). As Defendants have offered nothing more than speculation to support their invocation of the emergency aid exception, the Court concludes that the exception is inapplicable here.

### c.  Consent

Finally, Defendants invoke the consent to enter allegedly given by Brenda. It is "well established that while a warrantless search of a home is generally unreasonable and therefore violates the Fourth Amendment, which proscribes 'unreasonable searches,' an individual may consent to a search, thereby rendering it reasonable." *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995). "For a consent to a search to be valid, the totality of the circumstances must indicate that it was voluntarily given." *United States v. Davis*, 967 F.2d 84, 86 (2d Cir. 1992). It is the burden of the government to prove "that the consent was, in fact, freely and voluntarily

given." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) (internal quotation marks omitted).

The Supreme Court has held that in cases where more than one tenant is present at the time consent to enter a home is sought, consent by one tenant that is disputed by another present tenant "gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." *Georgia v. Randolph*, 547 U.S. 103, 114 (2006); *see also Johnson v. City of New York*, No. 05-CV-7519, 2011 WL 2693234, at *2 (S.D.N.Y. June 30, 2011) ("Where one co-tenant gives consent for the police to enter, but another present tenant objects, the police may not enter to search.").  The Court clarified, however, that "a physically present co-occupant's stated refusal to permit entry . . . render[s] the warrantless search unreasonable and invalid *as to him*."  *Randolph*, 547 U.S. at 106 (emphasis added).

Here, there is no dispute that the occupants, outside of Brenda, were vociferous in their objection to the officers' entry.  (*See* Sexton Tr. 25, 27, 41, 54; Briley Tr. 19–20, 23.)  That fact, however, does not end the inquiry.  For one, Utley and Rene, although present in the Apartment at the time of the search, were not residents.  (*See* Pls.' 56.1 ¶ 27.)  And Sexton testified that at the time of the entry into the Apartment, he did not understand Marrow to be a resident of the Apartment, (*see* Sexton Tr. 27–28), and the record is silent on whether Sexton or the other officers knew which of the other occupants were residents of the Apartment.  The ability of a guest or visitor to challenge the constitutionality of a search of a home depends on the specific circumstances, *see Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990) (holding that an overnight guest enjoys an expectation of privacy sufficient in a home); *see also United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997) ("[A]ny guest, in appropriate circumstances, may have a legitimate expectation of privacy when he is there 'with the permission of his host, who is willing to share

36

his house and his privacy with his guest.'" (quoting *Olson*, 495 U.S. at 99)), and, accordingly, a

visitor "who is merely present [at the scene of a search] with the consent of the householder" is

not entitled to challenge a warrantless entry into a home, *see Minnesota v. Carter*, 525 U.S. 83,

90 (1998).  The officers may have thus reasonably believed that only Brenda had a reasonable

expectation of privacy in the home, and that the other occupants could claim no such interest and

therefore could not object to the officers' entry into the home.

Even if the officers could have discerned whether the other occupants had a reasonable

expectation of privacy in the home, the evidence construed in the light most favorable to

Defendants shows that Brenda, who answered the door, consented to the entry of the officers.

Plaintiffs argue that, in light of *Rudolph*, consent to enter a home must be unanimous, (*see* Pls.'

Mem. 10–11), but this contention overstates the law.  The Second Circuit has not had an

occasion to consider the effect of *Randolph* on the rights of the consenting tenant, but on its plain

terms, the holding in *Randolph* applies only to the objecting tenant, that is, a tenant's objection to

her co-tenant's consent serves to negate the consent only as to the first tenant, and not as to the

co-tenant (who has consented to the search).  *See Randolph*, 547 U.S. at 120 ("We therefore hold

that a warrantless search of a shared dwelling for evidence over the express refusal of consent by

a physically present resident cannot be justified as reasonable *as to him* on the basis of consent

given to the police by another resident." (emphasis added)).  This interpretation accords with the

Court's reasoning in *Randolph*.  There, the Court recognized the "consenting tenant's interest as

a citizen in bringing criminal activity to light," *id.* at 115–16, and the "co-tenant's legitimate self-

interest in siding with the police to deflect suspicion raised by sharing quarters with a criminal,"

*id.* at 116, but nonetheless held that "the cooperative occupant's invitation adds nothing to the

government's side to counter the force of an objecting individual's claim to security against the

government's intrusion into his dwelling place," *id.* at 115.  The Supreme Court's focus was thus on the reasonableness of the intrusion into an individual's private area, a focus that resonates with the Supreme Court's oft-repeated maxim that "the Fourth Amendment protects people, not places."  *Katz v. United States*, 389 U.S. 347, 351 (1967).  The intrusion into the home, accordingly, is offensive to the Fourth Amendment because it impinges on an individual's expectation of privacy.  The concern generated by that intrusion is accommodated when the individual whose interests are at stake consents to the entry, regardless of whether other co-tenants object to the entry and therefore remain protected by the Fourth Amendment.  Accordingly, *Randolph* is best read as applying only to those tenants who object to the entry, and therefore leaves intact the well-settled proposition that an individual who voluntarily consents to entry by officers forfeits his or her Fourth Amendment rights with respect to that entry.

Here, the Parties dispute whether Brenda ever consented to the officers' entry into the Apartment.  (*Compare* Brenda Tr. 9–10, *and* K.M. Tr. 11–12, *with* Sexton Tr.  24–25.)  Moreover, it is unclear whether Brenda revoked her consent after the officers entered the Apartment, (*see* Sexton Tr. 41 (testifying that the occupants "were all getting loud as far as—you know, 'Get out.  Get out of here.'")), raising questions as to whether Brenda may prevail on her Fourth Amendment claim at summary judgment.  Thus, in light of the fact that it is unclear whether officers could have known which of the occupants were entitled to object to the officers' entry, and because there are disputed issues of material fact with respect to whether any of the occupants consent to the officers' entry, the Court cannot grant summary judgment to either Party solely on these grounds.

These factual disputes do not, however, frustrate Plaintiffs' Motion.  The Supreme Court has instructed that "[t]he standard for measuring the scope of a suspect's consent under the

38

Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251.  "An analysis of objective reasonableness is governed by the 'totality of the circumstances' standard.  If a court finds that, under the totality of the circumstances, it was objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to conduct the search that was undertaken, there is no Fourth Amendment violation." *Handy v. City of New Rochelle*, 198 F. Supp. 3d 298, 309 (S.D.N.Y. 2016) (some internal quotation marks omitted); *see also Garcia*, 56 F.3d at 423 ("[T]he ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." (internal quotation marks omitted)).

Here, Sexton testified that he "asked [Brenda] if [the officers] could come in, and she agreed."  (Sexton Tr. 25.)  Taking this statement as true, the Court cannot conclude that the "typical reasonable person" could have understood that Brenda's consent to the officers entering the entryway of the Apartment included consent to search other areas of the Apartment, empty out the medicine cabinet, and remain in the Apartment, without allowing any of the occupants to leave or go to the bathroom unaccompanied, for approximately four hours.  *See United States v. Santos*, 303 F. Supp. 2d 333, 342–44 (S.D.N.Y. 2003) (holding that although the defendant gave consent for officers to enter his apartment, that consent did not give officers the right to enter or search the bedroom or living room); *United States v. Romy*, No. 96-CR-607, 1997 WL 1048901, at *7 (E.D.N.Y. Apr. 24, 1997) ("[The defendant] did not grant any explicit permission to the officers to search these areas, nor did he imply any such consent.  He stood directly between the officers and the rest of his apartment.  He did not invite them to sit down or to make themselves comfortable, and he made no statement or gesture that suggested to them that they could proceed

39

any further than the entryway."); *cf. United States v. Camilo*, 287 F. Supp. 2d 446, 452

(S.D.N.Y. 2003) (considering whether consent to enter the apartment extended to other areas of

the apartment).  Accordingly, although Brenda's Fourth Amendment rights may not have been

infringed when she allegedly gave consent for Sexton and the other officers to enter, they were

undoubtedly violated when the officers entered areas of the Apartment for which consent was not

given and when they remained indefinitely and seized the occupants of the Apartment.  *See*

*Romy*, 1997 WL 1048901, at *7 ("[I]t was not objectively reasonable for the officers to believe

that [the defendant] had authorized the exploratory invasion of his home.").

It follows, accordingly, that even if the officers believed that Brenda was authorized to

consent to the officers' entry on behalf of the occupants (because the other occupants had no

legitimate expectation of privacy in the premises), that would not justify the search or the

extended occupation of the home.  Nor would this belief insulate the officers from liability for

their seizure of the other occupants, as Brenda surely could not have consented to the seizure of

the other occupants on their behalf.  Summary judgment on the Fourth Amendment search and

seizure claims is therefore appropriate with respect to all Plaintiffs occupying the Apartment at

the time of the warrantless search and seizure.

With respect to Vaughn's detention by Gamble on the porch of the House for

approximately two hours, the analysis is no different.  Gamble was no more entitled to detain

Vaughn on the porch of the House than Sexton and the other officers were entitled to detain the

occupants of the Apartment for the duration of the occupation.  *See Calderon*, 138 F. Supp. 3d at

693.  Although different issues arise regarding Gamble's liability for failure to intercede his

claim for qualified immunity, for the purpose of establishing a Fourth Amendment violation, the

undisputed facts show that Gamble's detention of Vaughn on the porch of the House was

unauthorized and in violation of Vaughn's Fourth Amendment rights. And, in any event, Vaughn was detained for approximately two hours *within* the Apartment as well, and the analysis regarding the rights of the occupants of the Apartment is therefore applicable to Vaughn as well.

Before turning to the other claims, some additional analysis is required as to Nigeria Scott. Nigeria was not present in the Apartment when the officers entered and occupied it, and when she arrived at the House, she was made to stand on the porch of the House for some period of time. (*See* Nigeria Tr. 16–21.) With respect to the entry and sweep of the Apartment, Nigeria was a resident of the Apartment, (*see* Vaughn Aff. ¶ 34), and so her Fourth Amendment rights were implicated by the officers' entry into the Apartment. But Nigeria was not present in the Apartment to object or consent to the entry of the officers, and so different issues arise with respect to Nigeria. Specifically, the Court must inquire whether Brenda was entitled to consent to the search of the Apartment on Nigeria's behalf.

In the Second Circuit, "a third party's consent will validate a search of places or items in which another maintains a privacy interest if two conditions are satisfied: the third party had (1) access to the area searched, and (2) either (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access to the area." *United States v. Snype*, 441 F.3d 119, 136 (2d Cir. 2006) (alteration and internal quotation marks omitted). "The consent of one who possesses common authority over the premises is valid as against absent, nonconsenting persons with whom the authority is shared." *Mangino v. Incorporated Village of Patchogue*, 739 F. Supp. 2d 205, 243 (E.D.N.Y. 2010) (citing *United States v. Matlock*, 415 U.S. 164, 170 (1974)), *partial reconsideration granted*, 814 F. Supp. 2d 242 (E.D.N.Y. 2011). Even if a party lacks actual authority to consent, "he still may have apparent authority to consent to the search." *Moore v. Andreno*, 505 F.3d 203, 209 (2d Cir. 2007). The existence of apparent authority "must

be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (alteration and internal quotation marks omitted).

The Court is not prepared to decide whether Brenda had actual or apparent authority to consent to the officers' entry into the home on Nigeria's behalf, although there is a strong case that a reasonable officer could have believed her to have such authority.  Instead, Defendants' liability with respect to Nigeria may be decided simply on the basis that she was detained outside her home for some time.  As set forth above, "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 U.S. at 705 (1981) (footnote omitted).  But, as discussed, a "proper search" was never conducted here.  And while the Supreme Court in *Illinois v. McArthur*, 531 U.S. 326 (2001), held that police officers could reasonably restrict a suspect from entering his home while officers sought a warrant, the Court based that holding on the existence of exigent circumstances, namely, the very real possibility that the suspect, who knew the officers were seeking a warrant to search for drugs, would dispose of the drugs if allowed to enter the home. *See id.* at 330–33.  But here, there was no reason for officers to believe that the destruction of evidence was imminent, and certainly no reason to believe that Nigeria, who had not even been driving the minivan at the time of the shooting and was not at the Apartment when the officers arrived, intended to participate in that supposed destruction.  And, unlike in *McArthur*, the district attorney here ultimately did not even seek a warrant.

Moreover, as discussed above, no reasonable officer could have construed Brenda's consent to the officers' entry into the Apartment as granting them carte blanche to search and occupy the Apartment for four hours.  Thus, even if Brenda was authorized to consent on Nigeria's behalf, her consent extended only to the initial entry, and Nigeria's Fourth Amendment rights were thus violated when the officers searched other areas of the Apartment and remained in the Apartment.  *See Santos*, 303 F. Supp. 2d at 342–44 (holding that although the defendant gave consent for officers to enter his apartment, that consent did not give officers the right to enter or search the bedroom or living room).

As the seizure of Nigeria on the porch was not justified pursuant to any applicable exception to the warrant requirement, and the scope of Brenda's alleged consent did not extend to the search and occupation of the Apartment, summary judgment in favor of Nigeria is appropriate on this claim.

Accordingly, except for those Defendants to whom qualified immunity attaches, *see infra*, Plaintiffs are entitled to summary judgment on their claim under § 1983 for an illegal search and seizure in violation of the Fourth Amendment.  Damages will be determined at a later date.

### 2.  False Arrest

Plaintiffs have brought two types of false arrest claims, one under the Constitution and one under state law, (*see* Compl. ¶¶ 64–66, 74–80), and have moved for summary judgment under both.

#### a.  Merits of Claims

"A [§] 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007).  "The

common law tort of false arrest is a species of false imprisonment," and under New York law, the elements of a false imprisonment claim are: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (alteration and internal quotation marks omitted).

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether the action is brought under state law or under § 1983." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citation and internal quotation marks omitted).  "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (emphasis and internal quotation marks omitted).

False arrest claims under both § 1983 and New York law "may be complete without either a formal arrest or a detention until the subject is arraigned." *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991).  Thus, an arrest "may occur even if the formal words of arrest have not been spoken provided that the subject is restrained and his freedom of movement is restricted." *Id.* at 98.  While the Court has already concluded that an unlawful seizure took place, *see supra*, that does not necessarily answer the question of whether a false arrest also took place, as "[w]hether a seizure is an arrest or a [sic] merely an investigatory detention, depends on the reasonableness of the level of intrusion under the totality of the circumstances." *Id.*; *see also id.* at 97–98 ("[J]ust as not every encounter between a citizen and the police is a seizure, not every seizure is an arrest." (citation omitted)).  To determine whether an unlawful detention amounts to a false

44

arrest, "[e]ach case must be considered on its own merits, based on the information available to

the police throughout the interval of detention."  *Peterson v. County of Nassau*, 995 F. Supp.

305, 314 (E.D.N.Y. 1998).  In assessing whether a detention amounts to a false arrest (as

opposed to a mere investigative detention), courts generally consider

> the amount of force used by police, the need for such force, . . . the extent to which
> the individual's freedom of movement was restrained, and in particular such factors
> as the number of agents involved, whether the target of the stop was suspected of
> being armed, the duration of the stop, and the physical treatment of the suspect . . . .

*United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993) (citations omitted).

There is thus no bright-line rule for determining when an unlawful investigatory

detention transforms into a false arrest, but this case does not require any nuanced judgment to

that effect.  With respect to the factors set forth in *Perea*, the occupants' freedom of movement

was restrained to the Apartment (and the occupants could only move about the Apartment if

escorted by an officer), there were at least six officers present in the Apartment, (*see* Sexton Tr.

51), and the duration of the detention was significant—four hours, in the case of Plaintiffs who

were in the Apartment.  Indeed, a detention for such a significant period of time, where the

Parties agree that the occupants were not free to leave the premises and were in fact escorted to

the restroom by officers, unquestionably amounts to an arrest within the meaning of New York

law and § 1983.  *See Berk v. City of New York*, No. 13-CV-3917, 2015 WL 7162239, at *5

(S.D.N.Y. Nov. 9, 2015) ("[T]he allegation that [the officer] restrained [the plaintiff] while the

Adult Protective Services officials interviewed her mother appears to state a claim for false

arrest, as there is no indication that the restraint was privileged."); *Castro v. Narcisse*, No. 12-

CV-1535, 2015 WL 2342401, at *13 (D. Conn. May 14, 2015) ("The record also indicates that

either a member of [c]asino security or one of the [officers] was with [the plaintiff] the entire

time that she was detained, and that the total time of her detention, first in the [c]asino security

45

office and later in the state troopers' office, spanned at least two hours, and in any event far longer than what could reasonably be considered a brief investigatory stop."); *cf. Chance v. Cundy*, No. 03-CV-40, 2004 WL 2009282, at *4 (D. Conn. Sept. 7, 2004) (finding no false arrest where the detention "lasted only twenty minutes," and concluding that "this encounter was not so intrusive as to rise to the level of a formal arrest and, rather, was merely at most, an investigatory stop").  In such circumstances, there is little question that the detention in the Apartment amounted to an arrest.

The issue is different with respect to Nigeria.  At her deposition, when asked how long she was made to stand on the porch, Nigeria merely responded that she was there "[f]or awhile," but that she did not "recall the exact amount of time."  (*See* Nigeria Tr. 18–19.)  Outside of this brief exchange, the Court has not found, and Plaintiffs have not pointed to, any evidence showing the length or circumstances of Nigeria's detention on the porch.  (*See* Pls.' 56.1 ¶¶ 202–06.)  There is no information, for example, as to the number of agents involved in the seizure or the physical treatment of Nigeria.  Nor can the Court say there is a genuine dispute of material fact; the issue is not that the Parties disagree on the facts, but rather that there are no facts from which it could be inferred that the seizure of Nigeria was an arrest within the meaning of the Fourth Amendment.  Summary judgment in favor of Defendants is therefore warranted with respect to Nigeria's Fourth Amendment false arrest claim.  *See Prevost v. City of New York*, No. 13-CV-3760, 2015 WL 9460139, at *2 (S.D.N.Y. Dec. 22, 2015) (holding that there was "[n]o [e]vidence" to support the plaintiff's false arrest claim where "[d]iscovery did not bear out the allegations in [the] [p]laintiff's complaint"); *Warner v. Gyle*, No. 09-CV-199, 2010 WL 3925211, at *2 (D. Conn. Sept. 30, 2010) (granting summary judgment to the defendants because the plaintiff "present[ed] no evidence of an invalid arrest").

46

For the occupants of the Apartment, however, there is no dispute that these Plaintiffs have satisfied the first three elements of false arrest under New York law (and, consequently, § 1983), and the only remaining question is thus whether the confinement was privileged, that is, whether the arrests were supported by probable cause.  Although Defendants contend that the "confinement was based on probable cause which is [sic] defeats [P]laintiffs['] claim for false arrest," (Defs.' Mem. 20), Defendants offer no explanation for this assertion.  Even assuming Defendants had probable cause to enter the Apartment, the question of whether probable cause existed to arrest Plaintiffs is different, and turns on the question of whether "the officers ha[d] knowledge or reasonably trustworthy information of facts and circumstances that [were] sufficient to warrant a person of reasonable caution in the belief that the person to be arrested ha[d] committed or [was] committing a crime."  *Gonzalez*, 728 F.3d at 155 (emphasis and internal quotation marks omitted).  Outside of Prince and Marrow, who were subsequently arrested and charged with obstructing governmental administration, (*see* Wisham Decl. Ex. Q), Defendants have made no argument, or even allegation, that they had probable cause to believe that any of the other occupants of the Apartment had committed or were committing a crime.  Defendants appear to have misunderstood the probable cause standard for false arrest, and seem to suggest that probable cause to search the Apartment (which, in any event, was not present) suffices.  It does not, and Defendants therefore cannot raise the defense of probable cause against any of Plaintiffs except Prince and Marrow.

With respect to Prince and Marrow, however, additional issues arise.  Plaintiffs first argue, largely unprompted by Defendants, that *Heck v. Humphrey*, 512 U.S. 477 (1994), does not bar adjudication of the claims here, (*see* Pls.' Opp'n 18–21).  In *Heck*, the Supreme Court held that

in order to recover damages for allegedly unconstitutional conviction or imprisonment, . . . a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Id.* at 486–87.  Accordingly, "when a [plaintiff] seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence."  *Id.* at 487.  Determining whether a § 1983 claim for false arrest "would necessarily imply the invalidity of any conviction or sentence resulting from the criminal proceedings against [the plaintiff] is inherently a factual [inquiry]."  *Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir. 1999).  Although it is not "inevitable" that a false arrest claim will impugn a state conviction arising from the allegedly unlawful arrest, "in a case where the *only* evidence for conviction was obtained pursuant to an arrest, recovery in a civil case based on false arrest would necessarily impugn any conviction resulting from the use of that evidence."  *Id.* at 123.  By contrast, a false arrest claim may not be barred by *Heck* if there was "independent evidence upon which a conviction could be obtained that was not in any way tainted by the unlawful arrest."  *Id.*

Although, unlike Plaintiffs, the Court does not read Defendants' motion papers as raising this argument at all, *Heck* held that a § 1983 claim that necessarily impugns an otherwise valid state criminal conviction is not cognizable under § 1983, *Heck*, 512 U.S. at 483, and the Supreme Court reiterated that holding in *Edwards v. Balisok*, 520 U.S. 641 (1997), *see id.* at 643 ("[A] state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence . . . ." (internal quotation marks omitted)).  Thus, although the bar in *Heck* is not jurisdictional, and although Defendants have not raised the issue, the Court considers itself obliged to address

48

whether Prince's and Marrow's false arrest claims are cognizable under *Heck*. *See Tankleff v. County of Suffolk*, No. 09-CV-1207, 2010 WL 5341929, at *6 n.4 (E.D.N.Y. Dec. 21, 2010) ("Inexplicably, the parties altogether fail to discuss *Heck*. Nevertheless, the [c]ourt is required to conduct its own independent *Heck* inquiry so as to avoid the unintentional rendering of conflicting decisions."); *Jean-Laurent v. Hennessy*, No. 05-CV-1155, 2008 WL 3049875, at *7 n.11 (E.D.N.Y. Aug. 1, 2008) (dismissing a claim sua sponte as barred by *Heck*), *reconsideration denied*, 2008 WL 5274322 (E.D.N.Y. Dec. 18, 2008).

There is no *Heck* issue with respect to Marrow. Although Marrow pled guilty to two apparently unrelated counts for criminal possession of narcotics, Marrow was not convicted of obstructing governmental administration, (*see* Wisham Decl. Ex. R), and thus there is no conviction for which it could be said that a judgment in his favor on the false arrest claim would impugn.

For Prince, however, the question is closer, but ultimately, *Heck* bars Prince's false arrest claim. "[W]hen an arrest forms the basis of the official function interfered with in a charge of obstructing governmental administration, the arrest must be authorized in order to convict a defendant of the charge." *People v. Cacsere*, 712 N.Y.S.2d 298, 300 (App. Div. 2000); *see also Breitkopf v. Gentile*, 41 F. Supp. 3d 220, 265 (E.D.N.Y. 2014) ("To be guilty [of obstructing governmental administration], the defendant must intend to prevent the public servant from lawfully engaging in a specific official function."). Accordingly, "a defendant may use an unauthorized arrest as a defense to the charge and it is the duty of the trier of fact to determine if the arrest was, in fact, authorized." *Cacsere*, 712 N.Y.S.2d at 300. A judgment in favor of Prince on his false arrest claim would undermine his state court conviction because the

unlawfulness of the arrest could have been raised as a complete defense to the obstructing

governmental administration charge—this is the precise type of claim that *Heck* precludes:

> An example of . . . a § 1983 action that does not seek damages directly
> attributable to conviction or confinement but whose successful prosecution would
> necessarily imply that the plaintiff's criminal conviction was wrongful—would be
> the following: A state defendant is convicted of and sentenced for the crime of
> resisting arrest, defined as intentionally preventing a peace officer from effecting a
> *lawful* arrest.  He then brings a § 1983 action against the arresting officer, seeking
> damages for violation of his Fourth Amendment right to be free from unreasonable
> seizures.  In order to prevail in this § 1983 action, he would have to negate an
> element of the offense of which he has been convicted.

*Heck*, 512 U.S. at 486 n.6 (citation omitted).  Prince's § 1983 claim for false arrest is thus barred

by *Heck*, and summary judgment in favor of Defendants is appropriate.

The Court must consider also, however, whether the charge for obstructing governmental

administration gives rise to an inference of probable cause for the arrest of Marrow on March 20.

Marrow, unlike Prince, did not plead guilty to obstructing governmental administration, (*see*

Wisham Decl. Ex. R), and Defendants cannot therefore rely on any subsequent conviction (or, as

far is the Court is aware, indictment) to prove probable cause.[7]  The only evidence, in fact, that

Marrow engaged in any kind of misconduct is Allen's testimony that Marrow and Prince were

cursing at the officers, (*see* Allen Tr. 15–16), and Sexton's testimony that Marrow took out his

phone to record the encounter and that he and others were making "[c]onstant arm motions with

balled fists," and were "moving in place while yelling," (*see* Sexton Tr. 42–44).  Sexton testified

that he did not believe that Prince, who was engaged in similar conduct, was doing anything

illegal.  (*See id.* at 28.)  The law under which Marrow was charged, obstructing governmental

administration in the second degree, provides that:

---

[7] The Court does not read Plaintiffs' Complaint or subsequent papers as alleging that
Marrow's formal arrest on March 22, 2013, violated his constitutional rights.

> [a] person is guilty of obstructing governmental administration when he
> intentionally obstructs, impairs or perverts the administration of law or other
> governmental function or prevents or attempts to prevent a public servant from
> performing an official function, by means of intimidation, physical force or
> interference, or by means of any independently unlawful act, or by means of
> interfering, whether or not physical force is involved, with radio, telephone,
> television or other telecommunications systems owned or operated by the state, or
> a county, city, town, village, fire district or emergency medical service or by means
> of releasing a dangerous animal under circumstances evincing the actor's intent that
> the animal obstruct governmental administration.

N.Y. Penal Law § 195.05.  Suffice to say, this statute does not criminalize foul language or

spontaneous cinematography, *see Uzoukwu v. City of New York*, 805 F.3d 409, 414 (2d Cir.

2015) (noting that obstructing governmental administration requires intimidation, physical force

or interference, or any independently unlawful act), but even if it did, as set forth above, "a

defendant may use an unauthorized arrest as a defense to the charge" of obstructing

governmental administration, *Cacsere*, 712 N.Y.S.2d at 300.  The charge against Marrow was

premised on his conduct during an illegal search and seizure, and therefore there could not have

been probable cause to arrest Marrow for interfering with a lawful official activity.  *See Dancy v.

McGinley*, 843 F.3d 93, 112 (2d Cir. 2016) (finding no probable cause to arrest an individual on

the reasoning that "[the arrestee's] actions could not have constituted obstruction of

governmental administration because [the officer's] *Terry* stop and frisk were unauthorized");

*see also People v. Lupinacci*, 595 N.Y.S.2d 76, 77 (App. Div. 1993) ("[A] defendant may not be

convicted of obstructing governmental administration or interfering with an officer in the

performance of an official function unless it is established that the police were engaged in

authorized conduct.").  Accordingly, there was no probable cause to effect the arrest of Marrow,

and summary judgment in favor of Marrow is appropriate with respect to his false arrest claim.

b.  Procedural State Law Issues

In support of their Motion for summary judgment, Defendants additionally raise a statute

of limitations argument regarding Plaintiffs' state law claims for false arrest and assault and

battery, (*see* Defs.' Mem. 20–21), though they do not press this argument in their subsequent

brief.

According to Defendants, false arrest and assault and battery claims have a one year

statute of limitations under state law, (*see* Defs.' Mem. 20 (citing N.Y. C.P.L.R. § 215(3)), and

because the claims accrued on March 20, 2013 and the Action was not commenced until June 19,

2014, the false arrest and assault and battery claims under state law is time barred.  As Plaintiffs

point out, this calculation is incorrect.  While CPLR § 215(3) provides the general statute of

limitations for a false imprisonment claim, the functional equivalent of a false arrest claim in

New York, and for an assault and battery claim, New York General Municipal Law § 50-i

expressly displaces general statutes of limitations and allows for a statute of limitations of one

year and ninety days for claims against a municipality and its employees.  *See* N.Y. Gen. Mun.

Law § 50-i(1).  Courts in New York have recognized that § 50-i "takes precedence over the one-

year period of limitations provided for in CPLR [§] 215."  *Estate of Adkins v. County of Nassau*,

529 N.Y.S.2d 524, 525 (App. Div. 1988); *see also Ruggiero v. Phillips*, 739 N.Y.S.2d 797, 799

(App. Div. 2002) ("[W]ith respect to an action against a municipality, [§ 50-i(1)(c)] 'takes

precedence over the one-year period of limitations provided for in CPLR [§] 215.'" (quoting

*Estate of Adkins*, 529 N.Y.S.2d at 525)).

However, although the one year and ninety days limitations period applies to Plaintiffs'

false arrest and assault and battery claims, the claims are still untimely.  The claims accrued on

March 20, 2013, and the Complaint was not filed until June 19, 2014, one year and ninety-*one*

52

days later.  On March 15, 2017, the Court ordered additional briefing from the Parties regarding whether, assuming the statute of limitations set forth in § 50-i applied to Plaintiffs' state law false arrest and assault and battery claims, the Complaint was timely filed.  (*See* Dkt. No. 51.)  In their response, Defendants point out that the Complaint was filed one day late, and argue that there is no basis to toll the statute of limitations.  (*See* Letter from Paul J. Sweeney, Esq., to Court (Mar. 20, 2017) ("Sweeney Letter") (Dkt. No. 52).)  Plaintiffs did not respond to the question posed in the Court's order, and instead argue that because Defendants did not assert the affirmative defense of statute of limitations in their Answer, the defense was waived and the Court cannot raise it sua sponte.  (*See* Letter from David A. Thompson, Esq., to Court (Mar. 20, 2017) ("Thompson Letter") (Dkt. No. 53).)

Before addressing whether the Court will dismiss the state law claims as untimely, the Court must address Plaintiffs' arguments regarding waiver.  First, Plaintiffs have apparently confused waiver of affirmative defenses with the general preference against a court raising affirmative defenses sua sponte.  As Plaintiffs point out, the Second Circuit has expressed its disapproval of courts raising affirmative defenses, like statute of limitations, sua sponte, that is, without prompting from the parties, *see Davis v. Bryan*, 810 F.2d 42, 44 (2d Cir. 1987) ("If a defendant fails to assert the statute of limitations defense, the district court ordinarily should not raise it sua sponte." (italics omitted)), although that rule is subject to some exceptions, *see Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011) ("[D]istrict courts may dismiss an action sua sponte on limitations grounds in certain circumstances where the facts supporting the statute of limitations defense are set forth in the papers [the] plaintiff himself submitted." (italics and internal quotation marks omitted)).  But the Court did not raise the statute of limitations issue sua sponte—it was raised by Defendants in

their summary judgment papers, (*see* Defs.' Mem. 20–21), and Plaintiffs responded to the

argument in their opposition papers, (*see* Pls.' Opp'n 21–22).  Defendants contended, incorrectly

(as set forth above), that the Complaint was late by 91 days, but Plaintiffs' response that they had

an additional 90 days in which to file the Complaint raises the question of what excuse could be

offered for the remaining day.

The Court has neither the interest in nor the time to consider issues not raised by the

Parties, but the Court is perplexed as to how it could have possibly resolved the statute of

limitations argument raised by Defendants without determining whether Plaintiffs' Complaint

was filed within the time period set forth, correctly, by Plaintiffs.  Defendants' statute of

limitations argument does not fail simply because they applied the incorrect limitations period—

if it fails, it must be because the limitations period that does apply would render the Complaint

timely.  As the letters from the Parties demonstrate, that is not the case.

Plaintiffs are correct, however, that Defendants did not assert this defense in their

Answer, and that such a failure ordinarily results in waiver.  (*See* Thompson Letter 1–2.)  *See*

*also Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 751–52 (2d Cir. 1992)

("A claim that a statute of limitations bars a suit is an affirmative defense, and, as such, it is

waived if not raised in the answer to the complaint.").  Defendants, acknowledging this defect,

have requested leave to amend their Answer to assert the statute of limitations defense.  (*See*

Sweeney Letter 3.)  As an initial matter, this is the first time Plaintiffs have raised the argument

that the statute of limitations defense was waived.  In the moving papers, although Defendants

argued that Plaintiffs' state law claims were barred by the statute of limitations, Plaintiffs made

no suggestion in their opposition papers that Defendants' argument was waived or otherwise

improper.  (*See* Pls.' Opp'n 21–22.)  It was only when the Court sought clarification that

54

Plaintiffs, perhaps realizing that the argument was not without merit, argued that the defense had been waived.  The Court is thus not convinced it even need consider Plaintiffs' new argument, raised for the first time in its letter briefing, that the statute of limitations defense has been waived.

In any event, however, the law in the Second Circuit is clear that when a defendant raises an affirmative defense, like the statute of limitations, in its summary judgment motion papers that was not asserted in the pleadings, courts may nonetheless consider the argument so long as the plaintiff had an opportunity to respond.  *See Astor Holdings, Inc. v. Roski*, 325 F. Supp. 2d 251, 260 (S.D.N.Y. 2003) ("[T]he Second Circuit has held that a district court may consider the merits of an affirmative defenses—even one explicitly listed as such in Fed. R. Civ. P. 8(c)— raised for the first time at the summary judgment stage, so long as the plaintiff has had an opportunity to respond." (citing *Curry v. City of Syracuse*, 316 F.3d 324, 330–31 (2d Cir. 2003))).  Under this same reasoning, the Second Circuit has endorsed a procedure whereby a defendant's belated invocation of an affirmative defense may be construed as an application to amend the answer.  *See also Block v. First Blood Assocs.*, 988 F.2d 344, 350–51 (2d Cir. 1993) (noting that the district judge had "construed [the defendants'] summary judgment motion also as a motion to amend" and holding that in the absence of prejudice or bad faith, the district court's granting of that application was not an abuse of discretion).  Accordingly, "absent prejudice to the plaintiff, a defendant may raise an affirmative defense in a motion for summary judgment for the first time."  *Schwind v. EW & Assocs., Inc.*, 357 F. Supp. 2d 691, 698 (S.D.N.Y. 2005) (internal quotation marks omitted); *Economou v. Caldera*, No. 99-CV-12117, 2000 WL 1844773, at *15 (S.D.N.Y. Dec. 18, 2000) (allowing the defendant to assert an otherwise waived affirmative defense in its answer where the court found "no evidence of bad faith on the part of

defense counsel," the plaintiff had "not identified, nor [could] the [c]ourt surmise, what additional discovery would be needed," and the plaintiff "not only had knowledge of the facts upon which the defense [was] based, but also, due to the defense's various communications, notice of the possibility—indeed probability—that the [defendant] would assert the defense"); *Steinberg v. Columbia Pictures Indus., Inc.*, 663 F. Supp. 706, 715 (S.D.N.Y. 1987) ("Although Fed. R. Civ. P. 8(c) generally requires affirmative defenses to be pleaded, courts have been more lenient in the context of motions for summary judgment.  Absent prejudice to the plaintiff, a defendant may raise an affirmative defense in a motion for summary judgment for the first time." (alteration and internal quotation marks omitted)).

Plaintiffs have not identified, nor even sought to identify, any prejudice, bad faith, additional discovery issues, or undue delay attributable to Defendants' failure to raise the statute of limitations defense in their Answer.  In fact, beyond asserting the general principle that failure to raise an affirmative defense in an answer waives that defense, Plaintiffs have not offered any analysis of the case law described above governing this precise situation.  And there is no dispute that Plaintiffs have had an opportunity to respond to Defendants' argument (twice), although they did not avail themselves of the second opportunity.  Accordingly, while Defendants should have asserted the defense in their Answer (a misstep that is perhaps consistent with the other difficulties faced by Defendants' counsel in this litigation), they have now sought leave to amend their Answer to include the defense, and the case law in the Second Circuit is clear that because Plaintiffs have not suggested, nor has the Court found, any prejudice or bad faith, Defendants' Answer should be deemed amended to include a statute of limitations defense, and the arguments raised thereunder should be considered.

56

Turning, finally, to the merits of Defendants' argument, Plaintiffs have made no attempt to argue that their untimeliness should be excused on the grounds of tolling or any other doctrine. Federal courts applying New York law have not hesitated to dismiss claims that were filed just one day late.  *See, e.g.*, *La Russo v. St. George's Univ. Sch. of Med.*, 936 F. Supp. 2d 288, 297–98 (S.D.N.Y. 2013) (dismissing claim because "the two and one-half year limitations period expired on November 14, 2011, one day before the summons was filed," and no tolling doctrine applied), *aff'd*, 747 F.3d 90 (2d Cir. 2014); *Williams v. Trailwood Transp., Ltd.*, No. 09-CV-1005, 2010 WL 3386901, at *3 (W.D.N.Y. Aug. 25, 2010) (dismissing claim where "the documents were date-stamped and filed on June 19, 2009, one day after the statute of limitations expired for [the] plaintiff's claim"); *see also Kidney v. Webster*, No. 16-CV-831, 2017 WL 758508, at *9 (N.D.N.Y. Feb. 27, 2017) ("[W]hile it does seem harsh to deem an action time barred when the plaintiff missed the deadline by a little over a week, there is no exception to statutes of limitations for actions that are filed a few days late, and New York courts regularly use statutes of limitations to bar actions that are filed only one day late." (citing *Torres v. Greyhound Bus Lines Inc.*, 852 N.Y.S.2d 521, 522 (App. Div. 2008); *Spirig v. Evans*, 809 N.Y.S.2d 212, 213 (App. Div. 2006)).  In the absence of any argument by Plaintiffs as to why their tardiness should be excused, dismissal of Plaintiffs' state law claims for false arrest and assault and battery is warranted.

Plaintiffs argue also, without any apparent support, that "[e]ven if claims against the individual officers were untimely, pursuant to the General Municipal Law, the City of Mount Vernon 'shall be liable for' the acts of any of its officers."  (Pls.' Opp'n 22 (quoting N.Y. Gen. Mun. Law § 50-j).)  The Court does not follow Plaintiffs' reasoning, as respondeat superior is a theory of liability, not a freestanding cause of action.  *See Pettengill v. Fireman's Fund Ins., Co.*,

No. 13-CV-154, 2013 WL 4054635, at *3 (D. Conn. Aug. 12, 2013) ("[R]espondeat superior is a theory of liability rather than an independent cause of action."); *Kogut v. County of Nassau*, Nos. 06-CV-6695, 06-CV-6720, 2009 WL 2413648, at *17 (E.D.N.Y. Aug. 3, 2009) ("[T]he theory of respondeat superior is not a stand-alone cause of action . . . .), *partial reconsideration granted*, 2009 WL 5033937 (E.D.N.Y. Dec. 11, 2009).  Thus, Plaintiffs' claims against the City of Mount Vernon are for false arrest and for assault and battery, and are subject to the same statute of limitations as their claims against the individual Defendants.  *See Messina v. Mazzeo*, 854 F. Supp. 116, 146 (E.D.N.Y. 1994) (applying the statute of limitations set forth in N.Y. Gen. Mun. Law § 50-i(1) to an assault and battery claim alleged against a municipality on the theory of respondeat superior).  Accordingly, to the extent Plaintiffs' state law claims against the individual Defendants are time barred, so are Plaintiffs' state law claims against the City of Mount Vernon.

Before moving on, the Court is obliged to address an issue raised in Defendants' letter to the Court, namely, whether Plaintiffs complied with N.Y. Gen. Mun. Law § 50-i.  As an initial matter, until the Court solicited additional briefing on an unrelated issue, Defendants had not raised the question of whether Plaintiffs complied with § 50-i.  (*See, e.g.*, Defs.' Mem.; Defs.' Reply.)  However, noncompliance with § 50-i divests a federal court of jurisdiction to entertain a state law claim.  *See Dillon v. Suffolk Cty. Dep't of Health Servs.*, 917 F. Supp. 2d 196, 216 (E.D.N.Y. 2013) ("Federal courts do not have jurisdiction to hear state law claims brought by plaintiffs who have failed to comply with the notice of claim requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim." (internal quotation marks omitted)); *Costabile v. County of Westchester*, 485 F. Supp. 2d 424, 431 (S.D.N.Y. 2007) ("[B]ecause [the] plaintiffs have not served a timely notice of claim . . . and we have no jurisdiction to grant [the]

plaintiffs' application for leave to serve a late notice of claim, [the] plaintiffs' state law claims against the [c]ounty are dismissed.").  The Court is therefore required to consider whether it has jurisdiction over these claims.

Section 50-i makes clear that it is not enough to file a timely notice of claim—the plaintiff must include "*as an allegation in the complaint or moving papers* that at least thirty days have elapsed since the service of such notice."  N.Y. Gen. Mun. Law 50-i(1) (emphasis added).  As far as the Court is able to discern, Plaintiffs have not pleaded compliance with the statute in either their Complaint or their moving papers.  That fact, however, is not fatal.  Although Plaintiffs have not complied with the technical requirements of the statute, there has been no suggestion by Defendants that Plaintiffs did not file a timely notice of claim.  In such situations, courts "have consistently held . . . that a technical pleading violation, such as for a plaintiff's failure to assert compliance with a notice of claim requirement in his or her complaint, does not require dismissal if the defendant would not be unfairly prejudiced by permitting the plaintiff to amend the complaint to allege compliance with the notice requirements."  *Whitfield v. City of Newburgh*, No. 08-CV-8516, 2015 WL 9275695, at *31 (S.D.N.Y. Dec. 17, 2015); *see also Christian v. Town of Riga*, 649 F. Supp. 2d 84, 92 n.7 (W.D.N.Y. 2009) ("[I]f [the] plaintiff did comply with the notice requirements but failed to plead such compliance in [the] [a]mended [c]omplaint, [the] plaintiff is not precluded from filing an amended complaint setting forth that he complied §§ 50-i and 50-e."), *reconsideration denied*, 2010 WL 4116785 (W.D.N.Y. Oct. 19, 2010).

The Court thus assumes, as it has no reason to believe otherwise, that Plaintiffs complied with the notice of claim requirements, and the only defect is Plaintiffs' failure to plead compliance in either the Complaint or their moving papers.  Were the Court to allow Plaintiff to

amend its Complaint to include these allegations and correct the technical defect, however, the result of the present Motions would not be different.  As set forth above, Plaintiffs' state law claims are barred by the statute of limitations, and even if the Court accepted Plaintiffs' argument that the statute of limitations claim was waived for failure to include it in the Answer, that argument would become moot, as if the Court granted Plaintiffs leave to amend to correct their deficient pleading, Defendants would be entitled to interpose a new answer setting forth the defense.  Accordingly, the Court assumes that Plaintiffs could correct the technical deficiencies in their pleadings, but concludes that such a correction would not cure the issues raised by Defendants with respect to the statute of limitations.

### 3.  Failure to Intercede

Plaintiffs next move for summary judgment on their claim for failure to intercede.  (*See* Pls.' Mem. 15–16.)  Defendants' only opposition to Plaintiffs' Motion on this point is that there was no duty to intervene because "Defendants did not violate the Plaintiff's [sic] Fourth Amendment right to be free from unreasonable search and seizure."  (Defs.' Mem. 20.)

"A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers."  *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988).  "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise."  *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994), *reh'g denied*, 27 F.3d 29 (2d Cir. 1994).

For the reasons set forth above, Defendants' argument that none of Plaintiffs' Fourth Amendment rights was violated is unavailing.  There are, nonetheless, other issues that must be

addressed related to this claim.  As an initial matter, liability may attach for failure to intercede

only if there was "a realistic opportunity to intervene to prevent the harm from occurring."  *Id.*

Here, however, Allen, Antonini, and Briley were all inferior officers to Sexton, who was in

command of the scene.  (*See* Sexton Tr. 20–21.)  There is thus a question of fact as to whether

Allen, Antonini, and Briley, who were all outranked by the commanding officer at the scene, had

a "realistic opportunity to intervene to prevent the harm from occurring," given that the facts do

not indicate whether they could have done anything to prevent Sexton from giving the orders he

gave and taking the actions he took.  *See Grant v. Wisener*, No. 11-CV-372, 2012 WL 1108538,

at *2 (E.D. Tex. Feb. 16, 2012) (Nor has [the plaintiff] shown that [the officer] had a reasonable

opportunity to prevent the search; as he concedes, the search was ordered by [another officer], a

lieutenant who outranked [the officer], and so [the officer] lacked authority to countermand his

superior officer's order."), *adopted by* 2012 WL 1108525 (E.D. Tex. Apr. 2, 2012); *Younger v.

City of New York*, 480 F. Supp. 2d 723, 732 (S.D.N.Y. 2007) (denying summary judgment and

holding that there was an issue of fact where there was "substantial uncertainty with respect to

whether [certain defendants] w[]ere in a position, during [the plaintiff's] arrest, to intervene and

attempt to stop any alleged use of excessive force").[8]

    With respect to Sexton, it is unclear how a failure to intercede claim could be brought

against him.  As the commanding officer, Sexton ordered the initial approach to the Apartment,

---

[8] The Court acknowledges that the Third Circuit has held that "[t]he duty to uphold the
law does not turn upon an officer's rank.  It is neither affected by, nor proportional to, a non-
intervening officer's relationship to an offending colleague."  *Smith v. Mensinger*, 293 F.3d 641,
651 (3d Cir. 2002).  While this holding has not been adopted by the Second Circuit, the Court
agrees that the existence of a duty to intervene does not turn solely on an officer's relationship to
an offending colleague, but holds that, nonetheless, the relationship can be relevant to whether
there existed a realistic opportunity to intervene.

(*see* Sexton Tr. 16–19), he sought (and allegedly obtained) consent from Brenda to enter the

Apartment, (*see id.* at 24–25), he was in command of the scene, (*see id.* at 20–21), and he

initiated the application for a search warrant, (*see id.* at 36–37).  Where an officer is directly

responsible for a violation of an individual's constitutional rights, the claim against the officer is

for the freestanding constitutional violation, not for failure to intercede.  *See Universal Calvary*

*Church v. City of New York*, Nos. 96-CV-4606, 99-CV-9228, 99-CV-9227, 99-CV-12193, 99-

CV-12182, 99-CV-12236, 99-CV-12247, 99-CV-9230, 2000 WL 1538019, at *9 (S.D.N.Y. Oct.

17, 2000) ("[The] [p]laintiff's evidence supports individual claims of excessive force, not a

failure to intervene or prevent a constitutional violation.").  Plaintiffs' claims against Sexton are

for the constitutional violations that he committed, not for his failure to intervene in preventing

those same constitutional violations.  Summary judgment is therefore granted to Defendants with

respect to the failure to intercede claim against Sexton.[9]

Finally, the failure to intercede claim against Gamble also poses a problem.  Unlike

Allen, Antonini, and Briley, the relationship between Gamble and Sexton is unclear, and it may

very well have been the case that Gamble had the authority to intervene and prevent or stop

Sexton and the other officers from violating Plaintiffs' constitutional rights.  *See Grant*, 2012

WL 1108538, at *2.  But as Defendants note, there is no evidence that Gamble was ever in the

Apartment.  (*See* Sexton Tr. 49.)  It is thus unclear whether Gamble ever had a realistic

opportunity to stop the unlawful search and seizures taking place in the Apartment.  And, like

Plaintiffs' claims against Sexton, Gamble may not be held liable for failing to intervene in his

---

[9] There is, perhaps, a question as to whether Sexton could have intervened to prevent Antonini from allegedly twisting Marrow's hand to confiscate the cell phone.  But as noted below, this conduct has not been alleged as the basis for a constitutional violation, and the Court therefore has no occasion to consider whether Sexton is independently liable for failing to prevent it.

own constitutional violation, i.e., preventing Vaughn from leaving the porch or reentering the Apartment.  Accordingly, there remain questions of fact with respect to Gamble's alleged failure to intercede, and summary judgment is therefore inappropriate on this claim.

Summary judgment is therefore denied on the failure to intercede claims with respect to Allen, Antonini, Briley, and Gamble, and is granted in favor of Defendants with respect to Sexton.

### 4.  Assault and Battery

Defendants, but not Plaintiffs, move for summary judgment on Plaintiffs' assault and battery claim on the grounds that the claim is time barred and there was no offensive contact. (*See* Defs.' Mem. 21.)  Plaintiffs argue that the claim is not time barred and that each of Plaintiffs have alleged facts giving rise to a claim for assault and battery.  (*See* Pls.' Opp'n 23.)

In order to establish a claim for assault and battery under New York law, "a plaintiff must prove that there was bodily contact, that the contact was offensive, i.e., wrongful under all of the circumstances, and intent to make the contact without the plaintiff's consent."  *Higgins v. Hamilton*, 794 N.Y.S.2d 421, 422 (App. Div. 2005).

The entirety of Plaintiffs' claim for assault and battery is set forth as follows:

81.    Plaintiff Julian Rene re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

82.    The Individual Defendants unlawfully forced the plaintiff Julian Rene to remove his clothing, and/or forcibly removed his clothing in the presence of his family, including female adults and one female child.

83.    This constitutes an assault and/or battery.

84.    As a result of Defendants' impermissible conduct, Plaintiffs were injured and harmed.  Accordingly, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

(Compl. ¶¶ 81–84.)  While Plaintiffs rightly point out that the evidence in the record shows that some of Plaintiffs have alleged offensive bodily contact, the basis of Plaintiffs' claim for assault and battery in the Complaint, which remains unamended, is the officers' forcible removal of Rene's pants.  But the undisputed facts at summary judgment show that while the officers may have made offensive contact with Rene and others during the occupation of the Apartment, the officers made no contact, offensive or otherwise, with Rene when they ordered him to pull his pants down.  (*See* Rene Tr. 28–29; *see also* Pls.' 56.1 ¶¶ 223–24.)  As that is the basis for Plaintiffs' assault and battery claim, and as parties may not amend their pleadings through briefing, *see CSX Transp., Inc. v. Emjay Envtl. Recycling, Ltd.*, No. 12-CV-1865, 2013 WL 1209116, at *2 (E.D.N.Y. Mar. 25, 2013) ("[A party] cannot use its opposition brief to amend its allegation."); *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005) ("It is long-standing precedent in [the Second Circuit] that parties cannot amend their pleadings through issues raised solely in their briefs."), *aff'd*, 157 F. App'x 398 (2d Cir. 2005), the Court grants Defendants' Motion with respect to the assault and battery claim.

Additionally, as set forth above, Plaintiffs' state law claims for false arrest and assault and battery are untimely, and therefore even were there disputes of fact sufficient to go to a trier of fact on the assault and battery claims, Defendants would still be entitled to summary judgment.

### 5.  Respondeat Superior

Plaintiffs' last ground for summary judgment is its claim against Defendant the City of Mount Vernon under a theory of respondeat superior.  (*See* Pls.' Mem. 16.)  As discussed above, Plaintiffs' state law claims are untimely, and because Plaintiffs' claim under a theory of

64

respondeat superior are for false arrest and assault and battery, (*see* Compl. ¶¶ 95–100), those claims are similarly time barred.

### 6.  Qualified Immunity

Defendants raise the issue of qualified immunity, arguing that the individual Defendants are qualifiedly immune from suit.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).  "[Qualified] immunity protect[s] government's ability to perform its traditional functions . . . by helping to avoid unwarranted timidity in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits." *Filarsky v. Delia*, 566 U.S. 377, 389–90 (2012) (second alteration in original) (internal quotation marks omitted).  Qualified immunity shields a defendant from standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks omitted).  Summary judgment may be granted on the "basis of a qualified immunity defense premised on an assertion of objective reasonableness [if] the defendant show[s] that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *O'Bert ex rel. Estate of*

*O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (second alteration in original) (internal quotation marks omitted).

The Supreme Court has held that when evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable law enforcement officer in the defendant's position would have believed his or her conduct would violate the asserted constitutional right. *See Pearson*, 555 U.S. at 236 (overruling *Saucier v. Katz*, 533 U.S. 194 (2001), and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). The Supreme Court has further instructed that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right.  In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (second alteration in original) (citations and internal quotation marks omitted).  Furthermore, "the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Id.* at 2094 (citations and internal quotation marks omitted).  Otherwise stated, to determine whether a right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).

The Second Circuit has acknowledged that "particularly in a case where the factual record is not in serious dispute, it may be difficult to separate the immunity issue from the

merits." *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990).  For that reason, in such circumstances, it is preferable for the court "to decide the issue of qualified immunity as a matter of law, preferably on a pretrial motion for summary judgment when possible, or on a motion for a directed verdict." *Id.*

Defendants argue that "they are protected under the doctrine of qualified immunity which shields . . . Defendants from any liability because . . . Defendant's [sic] acted objectively reasonable when they entered . . . Plaintiff's [sic] residence without a warrant based on the fact that a shooting had occurred and that the occupants of . . . Plaintiff's [sic] residence were involved."  (Defs.' Mem.)  Plaintiffs respond that the mere fact that the officers believed that the occupants of the Apartment were involved in a shooting did not justify entrance into the Apartment.  (*See* Pls.' Opp'n 24.)

There is no serious question that the law regarding the presumptive unreasonability of warrantless intrusions on the home and the need for exigent circumstances or consent was well settled at the time of the events in question.  Defendants have not suggested anything to the contrary.  More difficult, however, is whether "every reasonable official" would have understood that, under the circumstances here, the intrusion into the Apartment and the seizure and detention of the occupants were in violation of the Constitution.

The Second Circuit has held that "[p]lausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (e.g. a warrant, probable cause, exigent circumstances)." *Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003) (italics omitted); *cf. Diamondstone v. Macaluso*, 148 F.3d 113, 126 (2d Cir. 1998) (denying qualified immunity to an

officer because "[u]nder the circumstances, a reasonable individual in [the defendant's] position would not be entitled to ignore the rulings of the traffic court, regardless of what his superior officers told him"). Accordingly, "police officers are shielded from liability if they reasonably rely on a superior officer's plausible orders, which viewed under all the circumstances, could lead an officer to conclude that probable cause [or exigent circumstances] exist[]." *Heicklen v. Toala*, No. 08-CV-2457, 2010 WL 565426, at *5 (S.D.N.Y. Feb. 18, 2010), *aff'd*, 409 F. App'x 457 (2d Cir. 2011); *see also DiStefano v. Sedita*, No. 11-CV-1125, 2014 WL 349251, at *11 (E.D.N.Y. Jan. 31, 2014) ("While reliance on a superior's orders does not entitle an officer to qualified immunity, it is taken into consideration when assessing whether it was objectively reasonable for an officer to believe that the conduct at issue was lawful."). For similar reasons, "[w]hen making a probable cause determination, police officers are entitled to rely on the allegations of fellow police officers." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks omitted).

Here, it is undisputed that Sexton was the officer in command at the scene. (*See* Sexton Tr. 20–21.) Briley testified that he was merely following orders when he responded to the scene, (*see* Briley Tr. 17–18, 25), and Antonini and Allen both indicated that they arrived at the Apartment and simply stood around for a short time before being instructed to leave, (*see* Antonini Tr. 23–24; Allen Tr. 15–17).[10] Antonini further testified that he knew nothing about the officers' presence in the Apartment except that they had requested assistance, (*see* Antonini Tr. 19), and that it was his belief that the officers' presence was justified by exigent circumstances, (*see id.* at 38–39). Briley also testified that he did not know why the officers

---

[10] It bears noting that Officers Gregorio and Santos, who were the first officers to arrive on the scene and who accompanied Sexton when he first entered the House and the Apartment, have not been named as Defendants in this case.

were in the Apartment, (*see* Briley Tr. 29), adding that he did not know whether the search and seizure was being conducted pursuant to a warrant, (*see id.* at 48).   And Allen indicated that she did not know what the purpose of the officers standing in the Apartment was, and could say only that the occupation was related to a shooting that took place earlier that evening.   (*See* Allen Tr. 12, 20.)   Plaintiffs have offered no evidence to contradict this testimony.

It cannot be said that Antonini and Allen, who had virtually no knowledge of the circumstances giving rise to the search of the Apartment and the seizure of the occupants and who were merely responding to a call for assistance at the scene, were acting unreasonably. Officers are "entitled to rely on the reasonable instructions of their superior in the chain of command, particularly where those instructions were not inconsistent with their personal knowledge and experience."   *Washington Square Post No. 1212 Am. Legion v. Maduro*, 907 F.2d 1288, 1293 (2d Cir. 1990).   No reasonable trier of fact could conclude that every reasonable official would know that Antonini's and Allen's decision to follow the orders of their superior and enter the Apartment (and remain there for some time), where other officers were already present, was a violation of Plaintiffs' Fourth Amendment rights.   And for Briley, the conclusion is similar, as he did not even know that the search was conducted without a warrant and specifically testified that he was given orders by Sexton upon arriving at the Apartment.   In such circumstances, these Defendants are entitled to qualified immunity with respect to the search of the Apartment and seizure of the occupants.   *See Brandon v. City of New York*, 705 F. Supp. 2d 261, 271 (S.D.N.Y. 2010) (granting qualified immunity where, based on the statements of a superior officer, the defendants "were under the impression that [the superior officer] stopped the car because he believed one of the individuals on the street was carrying a firearm" and the superior officer "yelled the code word for arrest"); *Heicklen*, 2010 WL 565426, at *6 ("Even if

the defendant [officer] did not actually have probable cause to arrest, given the plausible orders from [the] [l]ieutenant . . . and his own observation of all of the circumstances, [the] defendant [officer] reasonably could have concluded that probable cause existed.").

These same Defendants are also entitled to qualified immunity on the failure to intercede claim.  In order to obtain summary judgment on qualified immunity ground with respect to a claim for failure to intercede, "a defendant must show that the only result a fair jury could reach is that reasonably competent police officers, faced with the information available to the non-intervening officer at the time of the arrest, could disagree about the legality of the [action]." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997); *see also Holland v. City of New York*, 197 F. Supp. 3d 529, 549 (S.D.N.Y. 2016) ("[A]n officer is entitled to qualified immunity unless his failure to intercede was under 'circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate the plaintiff's rights.'" (alteration omitted) (quoting *Ricciuti*, 124 F.3d at 129)).  As set forth above, Antonini, Allen, and Briley, whose presence at the Apartment and involvement in the search and seizure were minimal, were entitled to reasonably rely on the commands of their superior officer.  The undisputed record reveals nothing that would alert a reasonable officer, arriving to the scene after the Apartment had already been entered and the occupants seized, that Sexton's commands were in clear violation of Plaintiffs' constitutional rights.  Accordingly, no reasonable jury could conclude that reasonable officers, standing in the shoes of Antonini, Allen, and Briley, could not disagree about the legality, or apparent legality, of Sexton's actions.  These officers are therefore entitled to qualified immunity with respect to the failure to intercede claim as well.

For Gamble, the inquiry is slightly more complex.  Gamble indicated at his deposition that he had no recollection of any of the events giving rise to this litigation.  (*See* Dep. of John

Gamble.)[11]   The only other information available with respect to Gamble is Sexton's testimony

that "Gamble eventually showed up," but that "he was not in the [A]partment," (Sexton Tr. 49),

and Vaughn's allegation that Gamble was one of the officers who prevented her from leaving the

front porch, (*see* Vaughn Aff. ¶ 56).   There is thus minimal information about what Gamble

actually knew when he arrived on the scene, or what actions he took.   However, like Antonini,

Allen, and Briley, Gamble arrived after the search and occupation was in progress.   There is no

indication that he had any command at the scene, and Sexton in fact testified that he was not in

the Apartment.   The facts thus show only that Gamble arrived at a scene where a search was

already in progress and that he held Vaughn on the porch of the House for some time while the

search and occupation was in progress.   There is no evidence that Gamble had any knowledge

about the circumstances of the search (i.e., the lack of consent, the lack of probable cause or

exigent circumstances) or that he had any independent reason to believe the search and seizure

were unauthorized.   In these circumstances, the Court is persuaded that reasonable officers,

standing in Gamble's shoes at the time of the search and seizure, could disagree as to whether

Gamble violated the rights of any of Plaintiffs.   For similar reasons to those set forth above,

Gamble is also entitled to qualified immunity on the failure to intercede claim.

      With respect to Sexton, however, the Court has little difficulty in concluding that

qualified immunity does not attach.   As the commanding officer at the scene, Sexton cannot

invoke the line of cases affording qualified immunity to those officers who merely respond to

orders from a superior officer.   Nor are there any facts suggesting that Sexton relied on the

representations of other officers in determining that entry into the Apartment, search of the

---

[11] The excerpts from the deposition of Gamble are attached to one of the many
declarations incorrectly filed by Defendants' counsel.   (*See* Dkt. No. 25.)

premises, and detention of the occupants was warranted under the circumstances.  The facts, instead, indicate that it was Sexton who made that judgment.

Nor is there any compelling argument that Sexton acted reasonably when he determined that exigent circumstances existed, or that the emergency aid exception applied, when he entered the Apartment.  As set forth above, there was no evidence that any of the occupants fired or possessed the weapon used in the shooting, that anyone in the Apartment or elsewhere had been injured during the shooting, that the destruction of evidence was imminent, or that the consent allegedly provided by Brenda included a consent to search the Apartment and seize the occupants.  It was not even until after almost two hours that Sexton learned that Rene had been shot.  (*See* Pls.' 56.1 ¶ 175.)  Police officers are, to be sure, sometimes required to make split-second judgments about the reasonableness of a warrantless entry, and the Court understands the difficulty an officer faces when confronted with, as Defendants call it, a "now or never" scenario.  (*See* Defs.' Mem. 9.)  But this was no such scenario—there was no hot pursuit, no imminent danger, and simply no reason to believe, beyond pure speculation, that evidence of a crime could be found in the Apartment.  Indeed, this was the conclusion of the district attorney, who was consulted, but refused to seek a search warrant.  Sexton may well have believed, based on his past experience with Plaintiffs, that some of them had a propensity for violence or criminal misconduct, but that does not justify his intrusion into their home in *this* circumstance.  Defendants' post hoc explanations for their conduct are insufficient to compel the conclusion that a reasonable officer would not have known that Sexton's conduct in directing a search of the Apartment and a seizure and arrest of the occupants was in violation of the occupants' Fourth Amendment rights, and the Court therefore concludes that Sexton is not entitled to qualified immunity.  *See Loria*, 306 F.3d at 1287 (affirming denial of summary judgment where "no

reasonable officer could have found that exigent circumstances were present at the time of the arrest.").

### 7.  Negligence and *Monell* Liability

Defendants move for summary judgment on Plaintiffs' claim against the City of Mount Vernon pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), on the ground that Plaintiffs have not adduced evidence that any of the alleged violations were committed pursuant to a municipal policy or were committed by a government official responsible for establishing municipal policies, (*see* Defs.' Mem. 23–24).  Defendants have also moved, for the same reasons, for summary judgment on Plaintiffs' two claims for negligence, each under both § 1983 and state law, against the City of Mount Vernon, Sexton, and Gamble relating to their alleged failure to supervise or train their employees and subordinates.  (*See id.* at 22–23.)

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right."  *Sykes v. Bank of Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013).  "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell*, 436 U.S. at 691.  Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).  A municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted).  Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of*

*Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."). "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'"  *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003).  Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]."  *Newton v. City of New York*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008); *see also City of Oklahoma v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

A plaintiff may satisfy the "policy or custom" requirement by showing one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon*, 705 F. Supp. 2d at 276–77 (citations omitted); *see also Roe*, 542 F.3d at 37 (describing the second category for establishing *Monell* liability); *Patterson v. County of Oneida*, 375 F.3d

74

206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability).  Moreover, a

plaintiff must also establish a causal link between the municipality's policy, custom, or practice

and the alleged constitutional injury.  *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal

'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement

that the particular policy be the 'moving force' behind a *constitutional* violation.  There must at

least be an affirmative link between[, for example,] the training inadequacies alleged, and the

particular constitutional violation at issue."); *Roe*, 542 F.3d at 37 (holding that "a plaintiff must

demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind

the alleged injury" (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404

(1997))).

For negligence claims under state law, "a cause of action sounding in negligence is

legally sustainable against a city when the injured party demonstrates that he was injured due to

the negligent training and supervision of a law enforcement officer."  *Barr v. Albany County*, 406

N.E.2d 481, 485 (N.Y. 1980).

Plaintiffs assert that summary judgment is not appropriate here because "the burden [is]

on the moving party to demonstrate the absence of any material fact genuinely in dispute."

*Victory v. Pataki*, 814 F.3d 47, 58–59 (2d Cir. 2016).  While this is true as a matter of law, it is

also true that "when the burden of proof at trial would fall on the nonmoving party, it ordinarily

is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential

element of the nonmovant's claim," in which case "the nonmoving party must come forward

with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid

summary judgment."  *CILP Assocs.*, 735 F.3d at 123 (2d Cir. 2013) (alteration and internal

quotation marks omitted).  In reviewing the deposition testimony, the exhibits, the Rule 56.1

statements, and the briefing, there is simply no evidence that any of the constitutional violations alleged or proven here were committed pursuant to a municipal policy or custom, or by a policymaker.  Plaintiffs have not "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial," *id.*, and the Court thus has no choice but to grant Defendants' Motion on these claims, *see Carnesi v. City of New York*, No. 98-CV-4899, 2001 WL 1098027, at *5 (S.D.N.Y. Sept. 10, 2001) ("Because [the] plaintiff has not submitted sufficient evidence to establish a municipal policy condoning abuse of the arrested, nor made a showing that the [c]ity's failure to train rises to the level of deliberate indifference, the § 1983 claim against the [c]ity is dismissed."); *Harmer v. City of Lockport*, No. 98-CV-10, 2000 WL 210201, at *4 (W.D.N.Y. Feb. 9, 2000) ("[B]ecause [the] plaintiff has made no attempt to demonstrate how such direct supervision could have altered the consequences of [the] defendants' actions or set forth any evidence that [the] defendants lacked training in proper law enforcement techniques, no question of fact exists as to whether any defendant should have supervised his subordinates in such manner so as to prevent the allegedly tortious acts." (alterations and internal quotation marks omitted)).  If Plaintiffs believed sufficient evidence existed to withstand summary judgment on these claims, it was their obligation to point to that evidence in response to Defendants' Motion; they have not, and summary judgment is therefore appropriate.

### 8.  Mount Vernon Police Department

Defendants argue that the claims against Mount Vernon Police Department must be dismissed because the police department is an agency of the City of Mount Vernon and is not a suable entity.  (*See* Defs.' Mem. 24.)  Defendants are correct.  *See Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 469 (S.D.N.Y. 2008) ("The claims against the [Mount Vernon Police] Department are dismissed because the Department, as an agency of a

municipality, is not a 'suable entity' under [§] 1983."); *Lewis v. City of Mount Vernon*, 984 F. Supp. 748, 756 n.2 (S.D.N.Y. 1997) ("[T]he Mount Vernon Police Department, as an agency of the municipality, is not a 'suable entity' under § 1983.").  Accordingly, all claims against the Mount Vernon Police Department are dismissed with prejudice.

### 9.  John Doe Defendants

Plaintiffs name in their Complaint 10 John Doe officers.  (*See* Compl.)  Plaintiffs have made no attempt to amend their Complaint to include the real identities of those individuals.  As discovery has now closed, the proper course is to dismiss the John Doe Defendants without prejudice.  *See Kaczmarek v. City of Schenectady*, No. 10-CV-1193, 2013 WL 5506276, at *2 (N.D.N.Y. Oct. 4, 2013) ("Because [the] plaintiffs have failed to timely identify and serve the John Doe defendants, [the] plaintiffs' claims against both John Doe defendants are dismissed."); *Sachs v. Cantwell*, No. 10-CV-1663, 2012 WL 3822220, at *10 (S.D.N.Y. Sept. 4, 2012) ("Where discovery has closed and the [p]laintiff has had ample time and opportunity to identify and serve John Doe [d]efendants, it is appropriate to dismiss those [d]efendants without prejudice." (internal quotation marks omitted)); *Watkins v. Doe*, No. 04-CV-138, 2006 WL 648022, at *3 (S.D.N.Y. Mar. 14, 2006) ("[D]espite having the full opportunity to conduct discovery, [the] plaintiff has not yet identified and served defendants Police Office [sic] John Doe # 2 or Police Office [sic] John Doe # 3 within 120 days of filing the complaint . . . . Therefore, the claims against the two John Doe defendants are dismissed without prejudice."). Accordingly, all claims against the John Doe Defendants are dismissed without prejudice.

As far as the Court is able to discern, Nigeria's claims for her detention on the porch have been raised only against the John Doe Defendants.  Accordingly, although Nigeria is still entitled to summary judgment against Sexton for his search and occupation of the Apartment in the

absence of exigent circumstances or valid consent, her claims arising out of her detention on the porch are effectively mooted by the removal of the John Doe Defendants.  Moreover, her false arrest and imprisonment claim could only have been raised against the John Doe Defendants, and therefore Nigeria's claims for false arrest and imprisonment must be dismissed.

### III.  Conclusion

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment is granted in part and denied in part, and Defendants' Motion for Summary Judgment is granted in part and denied in part.  Specifically:

-Summary judgment is granted in favor of Plaintiffs with respect to their Fourth Amendment claims pursuant to § 1983 against Sexton arising out of the unlawful search and seizure (Count I); and all Plaintiffs, except Nigeria and Prince, with respect to their false arrest claims pursuant to § 1983 against Sexton (Count II);

-Summary judgment is granted in favor of Defendants with respect to Plaintiffs' claims pursuant to § 1983 against all Defendants except Sexton arising out of the unlawful search and seizure (Count I); Plaintiffs' false arrest claims pursuant to § 1983 against all Defendants except Sexton (Count II); Nigeria's and Prince's false arrest claims pursuant to § 1983 against Sexton (Count II); Plaintiffs' failure to intervene claims (Count III); Plaintiffs' false imprisonment claims pursuant to state law (Count IV); Plaintiffs' assault and battery claims (Count V); Plaintiffs' negligence claims (Counts VI and VII); Plaintiffs' respondeat superior claims (Count VIII); and Plaintiffs' claims for liability pursuant to *Monell* (Count IX);

-All claims against the City of Mount Vernon Police Department are dismissed with prejudice;

-All claims against Police Officers John Does 1–10 are dismissed without prejudice.

The Court will hold a conference on April 18, 2017, at 10:30 AM to discuss the status of the

case. The Clerk of Court is respectfully requested to terminate the pending Motions. (Dkt. Nos.

19, 30.)

SO ORDERED.

DATED:        March 30, 2017
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

79